UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC.<br><br>Interpleader-Plaintiff,<br><br>v.<br><br>FIDELITY INFORMATION SERVICES, INC., f/k/a ALLTEL INFORMATION SERVICES, INC., and TOYOTA MOTOR CREDIT CORPORATION,<br><br>Interpleader-Defendants. | Civil Action<br>No. 05-10018-RGS<br><br>**Request for ex parte consideration** |

**Request for special action**

## MEMORANDUM IN SUPPORT OF
## EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Defendant, Toyota Financial Services ("TFS"), submits this memorandum in support of its Ex Parte Application for a Temporary Restraining Order (TRO) and Order to Show Cause (OSC) why a Preliminary Injunction should not issue requiring Iron Mountain Intellectual Property Management ("Iron Mountain") to release the OSCAR software to TFS.

**I.   INTRODUCTION**

Beginning in February 2000, Toyota Financial Services ("TFS", also known as Toyota Motor Credit Corporation or "TMCC") and Fidelity Information Services ("FIS", formerly ALLTEL Information Services or "ALLTEL") entered into a series of agreements[1]

---

[1] Services Agreement (2000AIS001) (*entered February 2000, amended March 2002*), Implementation Statement of Work (*entered February 2000, amended October 2001 and March 2002*), Master Software License Agreement (*entered August 2000, amended March 2002*), Product Schedule No. 1 (*entered August 2000, amended March 2002*), Source Code Escrow Agreement (*entered and amended August 2000*).

LA2:746161.1

("Agreements") under which FIS agreed to replace TFS' legacy credit and finance computer system with a new system that would completely automate the process by which TFS decisions (i.e., approves) and discounts (i.e., calculates rates, applies special programs, etc.) automotive credit applications and contracts. The parties referred to this new system as "OSCAR". Under the Agreements, FIS agreed to place interim versions of the computer software for OSCAR[2] into escrow in the event that FIS was unable or unwilling to complete the project.

In early 2003, after FIS had delivered approximately one third of the planned OSCAR functionality, the system began to exhibit severe performance issues including intermittent system outages. After a period of analysis, the parties, along with third party experts, determined that the system architecture would not support full deployment of the planned OSCAR functionality. TFS asked FIS to remedy this problem and FIS refused. Based on FIS' failure to remedy the problem, TFS terminated the Agreements and demanded release of the software from escrow. TFS, as the party currently supporting OSCAR, has an urgent need for the software so that TFS may respond to further system problems.

## II.   FACTS

### A.   The Parties

Toyota Financial Services (TFS) is a leading provider of automotive financial services, offering automobile financing to Toyota and non-Toyota customers in the U.S. Gallucci Decl. ¶ 16. TFS offers financing both over the internet and through approximately 1,900 authorized dealers nationwide. Gallucci Decl. ¶¶ 16-17. To provide this service, TFS relies heavily on computer systems to automate the decisioning and discounting functions associated with issuing financing. Gallucci Decl. ¶ 3, 19.

---

[2] The first set of agreements refers to the software of the OSCAR system as the "AP7000" source code, while the amendments refer to it as the "ALS-COM" source code. *See*, First Amendment to Product Schedule No. 1, ¶ 1 (Scarsi Decl, ex. 6). For simplicity's sake, herein the software is referred to as the "OSCAR software."

Fidelity Information Services (FIS), formerly ALLTEL INFORMATION SYSTEMS (ALLTELL), is a recent acquisition by Fidelity National Financial, Inc. Historically, ALLTEL developed software systems for small-scale lenders to manage loan transactions.

### B.   The OSCAR Project

In February 2000, TFS contracted with FIS to replace TFS' then existing computer system with a new system that would completely automate TFS' credit application processing. Gallucci Decl. ¶ 3. The parties dubbed the new system OSCAR. Gallucci Decl. ¶ 3.

The replacement program involved a study of TFS' legacy system to develop requirements for the new system, development of the software for the new system and implementation of the software at TFS' 30 Dealer Sales and Service Offices. Gallucci Decl. ¶ 5.

Due to FIS' inability to make progress on the project, the parties agreed in 2002 to restructure the project schedule so that FIS would deliver the software in three separate phased deliveries: the first delivery consisting of the decisioning functionality, the second consisting of the discounting functionality and the third delivery adding enhancements to both pieces. Gallucci Decl. ¶ 6.

TFS conditionally accepted the first phase delivery in March 2003 and commenced a pilot implementation. Gallucci Decl. ¶ 7. After several months of troubleshooting, TFS began deployment of OSCAR on May 19, 2003. Gallucci Decl. ¶ 8.

Almost immediately, TFS experienced debilitating performance issues (slow response times and system outages) with OSCAR. Gallucci Decl. ¶ 8. In June 2003, OSCAR went down for two hours. Gallucci Decl. ¶ 8. In August 2003, OSCAR went down twice for a total of 3 ½ hours. Gallucci Decl. ¶ 8. In September 2003, TFS halted further deployment of the system so that TFS and FIS could focus on fixes to the performance and stability issues. Gallucci Decl. ¶

9. This effort, however, was largely unsuccessful. In fact, OSCAR crashed in both October 2003 and November 2003. Gallucci Decl. ¶ 9.

In December 2003, after an apparent stabilization of the system, TFS restarted system deployment. Gallucci Decl. ¶ 10. Unfortunately, the stabilization was short lived. OSCAR crashed in March 2004, April 2004 and May 2004 forcing TFS to once again halt the OSCAR roll-out. Gallucci Decl. ¶ 10. FIS refused to accept responsibility for the instability of the system, forcing TFS to bring in Microsoft consultants to assess the problems with OSCAR. Gallucci Decl. ¶ 12-13. Upon conclusion of these studies, it became apparent to all involved that the architecture of the system developed by FIS would not support the functionality planned for the system. Gallucci Decl. ¶ 13.

Despite recognition of the architecture problem, FIS refused to take responsibility for re-architecting the system. Gallucci Decl. ¶ 14. As a result, TFS informed FIS that it considered FIS to be in material breach of the agreements[3] and terminated its contractual relationship with FIS by letter dated December 1, 2004. Scarsi Decl. ¶ 11, Ex. 8. Following termination, TFS notified Iron Mountain in writing that an Impact Event had occurred and demanded the release of the OSCAR software from escrow. Scarsi Decl. ¶ 12, Ex. 9. Although Iron Mountain originally concurred that TFS had the right to receive software, Iron Mountain received pressure from FIS not to make the release. Scarsi Decl. ¶ 13. Subsequently, Iron Mountain filed this interpleader action expressly seeking direction from this Court.

Upon TFS' termination of the Agreements, FIS ceased providing TFS with support of the OSCAR system. Scarsi Decl. ¶ 14. After TFS demanded release of the OSCAR software from escrow, FIS, presumably recognizing TFS' right to receive the software, changed its position and

---

[3] TFS has filed an arbitration demand with the American Arbitration Association in Los Angeles to adjudicate the breach of contract issue pursuant to Section 22 of the Master License Agreement (arbitration clause). Scarsi Decl. ¶ 15.

argued that it would provide support. FIS' in-house counsel Timothy Kyle, however, confirmed that FIS did not consider itself currently obligated to provide support during a telephone meeting on December 20, 2004. Scarsi Decl. ¶ 14. Obviously, this leaves TFS in the precarious position of not having any support for OSCAR and no software with which it can repair OSCAR in the event of a crash. Gallucci Decl. ¶ 15. With this lack of support, a crash of OSCAR will lead to devastating and irreparable harm to TFS, including: irreversible loss of confidence and good will among the DSSOs, dealers and Toyota customers, as well as the potential loss of millions of dollars. Gallucci Decl. ¶ 16-20.

    C.    **The Contracts**

As indicated above, a number of agreements govern the OSCAR project, including: a Master Services Agreement and amendment, a Master License Agreement and amendment (Scarsi Decl., Exs. 2-3), a Product Schedule and amendment (Scarsi Decl., Exs. 5-7), and an Escrow Agreement and amendment (Scarsi Decl., Exs. 3-4) (collectively, Agreements). At a high level, the Agreements require FIS to deposit the most current version of the OSCAR software into escrow and give TFS the right to terminate the Agreements and demand release of the software if FIS fails to remedy defects in the OSCAR system.

Specifically, TFS is entitled to a release of the software under any one of the following provisions, each of which is applicable to the situation at hand.

    1.    Pursuant to the First Amendment to Product Schedule No. 1 § 4.0(iii) (Scarsi Decl., Ex. 7), TFS is entitled to a release of the software upon FIS ceasing to supply support "for any reason other than [TFS's] breach."

2. Pursuant to the First Amendment to the Source Code Escrow Agreement ¶ 1 (Scarsi Decl., Ex. 5), TFS is entitled to a release of the software if FIS is unable or unwilling to remedy a defect in the software.[4]

3. Pursuant to the First Amendment to the Master Software License Agreement § 9.2 (Scarsi Decl., Ex. 2), TFS is entitled to terminate the agreement in the event of a material breach by FIS. With this amendment, such a termination constitutes an "Impact Event" as defined in the Source Code Escrow Agreement § 1.5. As an Impact Event, this entitles TFS to the prompt release of the source code under Source Code Escrow Agreement § 7.1.

### III. THE COURT SHOULD REQUIRE IRON MOUNTAIN TO IMMEDIATELY RELEASE THE OSCAR SOFTWARE TO TOYOTA

The First Circuit and its district courts weigh four factors to determine whether to issue a temporary restraining order or preliminary injunction: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996); *Largess v. Supreme Judicial Court for the State of Massachusetts*, 317 F.Supp.2d 77, 81 (D.Mass. 2004). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons*, 102 F.3d at 16 (1st Cir. 1996). Since TFS has a strong likelihood of prevailing on

---

[4] Note, the First Amendment to the Source Code Escrow Agreement (dated by FIS August 25, 2000 and by TFS August 29, 2000) refers to Section 7 of the original Product Schedule No. 1 (dated August, 25, 2000) and does not refer to Section 7 of the First Amendment to Product Schedule No. 1 (dated in March of 2002). Therefore, in the event that FIS is unable or unwilling to cure a defect in the OSCAR software, TFS is entitled to an immediate release of the software.

the merits and the other three factors clearly weigh in favor of TFS, this Court should enter a TRO requiring Iron Mountain to release the OSCAR software to TFS.

### A.   Likelihood of Success on the Merits

TFS can establish a likelihood of success on the merits through three different contractual provisions, any of which would suffice for this Court to find the release of the source code proper were it now ruling on the merits.[5] In addition, evaluation of the provisions together clearly establish that the parties intended at the time of contracting that the escrow agent would release the OSCAR software in situations such as the one at hand.

> 1.   <u>TFS is entitled to a release of the OSCAR software under Section 4.0 (iii) of the First Amendment to Product Schedule No. 1.</u>

Section 4.0 (iii) of the First Amendment to Product Schedule No. 1 states:

> Upon termination of the ES Services hereunder by [FIS] for any reason other than [TFS'] breach hereof, *TFS shall be entitled to access source code held in escrow* . . .. (emphasis added)

The plain language of this section establishes an absolute right for TFS to obtain the OSCAR software in a situation where FIS ceases supporting the OSCAR system and TFS is not in breach of the Agreements. Since FIS' own in-house counsel admitted that FIS had ceased providing support for the OSCAR system and, at the time, TFS was not in breach and FIS had not so claimed,[6] section 4.0 (iii) of the First Amendment to Product Schedule No. 1 unequivocally entitles TFS to a release of the software from escrow.

---

[5] As indicated above, pursuant to the Agreements, the merits of TFS' breach of contract claim will be decided by the American Arbitration Association in an action separate from this interpleader proceeding.

[6] At the time FIS ceased providing support, TFS had not breached its contractual obligations with FIS and FIS had not so claimed. Subsequently, FIS alleged that TFS will be in breach of the Agreements if TFS fails to pay FIS additional sums by January 15, 2004. TFS disputes this allegation.

> 2. <u>TFS is entitled to a release of the OSCAR software under Paragraph 1 of the First Amendment to the Source Code Escrow Agreement.</u>

Paragraph 1 of the First Amendment to the Source Code Escrow Agreement reads:

> Notwithstanding anything to the contrary in Section 1.5 of the Agreement, pursuant to Section 7.0 of Product Schedule [1] . . ., in the event that [FIS] is unable to resolve a Defect in accordance with the procedures thereunder, *such default shall be considered an "Impact Event" (as defined in the Agreement) and [TFS] shall be entitled to a release of the [OSCAR] source code.* (emphasis added)

As discussed above, FIS has acknowledged that the current architecture of the OSCAR system will not support deployment of the OSCAR functionality. FIS, however, has refused to remedy this defect. Per paragraph 1 of the First Amendment to the Source Code Escrow Agreement, this refusal constitutes an Impact Event, giving TFS the right to receive the OSCAR software from escrow. This right is especially clear when viewed together with Product Schedule No. 1 § 7.0, which states:

> If a Defect remains unresolved after thirty (30) days after the applicable Final Resolution Deadline, [TFS] shall be entitled to release of source code pursuant to the Escrow Agreement, and to all other remedies available at law or in equity.

The intent behind these provisions is to allow TFS to obtain the software from escrow in the event that it identifies a serious defect which FIS fails to resolve. Since TFS has identified a serious defect, inadequate system architecture, and FIS has unequivocally refused to resolve this defect, TFS, again, has the right to the receive the OSCAR software from escrow.

      3.      <u>TFS is entitled to a release of the OSCAR software under Section 9.2 of the Master Software License Agreement.</u>

The agreements establish that when defects exist in the OSCAR system, FIS must remedy those defects within the prescribed periods using the appropriate methods. *See,* Master Software License Agreement §§ 6, 7, as amended; Product Schedule No. 1 § 7.0, as amended; Attachment 2 to Product Schedule No. 1. In this case, although FIS acknowledges that the software is defective, FIS has refused to remedy the defect. FIS' refusal constitutes a material breach of the Agreements.

Section 9.2 of the Master Software License Agreement as amended states:

> In the event of [FIS'] material breach of this Agreement, [TFS] may terminate this Agreement, and, without limiting [TFS'] other rights or remedies, *such termination shall be considered an Impact Event as defined in the Source Code Escrow Agreement . . ..*

(emphasis added)

Therefore, under Master Software License Agreement, TFS' termination, in and of itself, is an Impact Event that entitles TFS, under the Escrow Agreement, to a release of the OSCAR software.

      4.      <u>Read Together, the Contract Provisions Clearly Establish TFS' Right to a Release of the OSCAR Software.</u>

While each of the above provisions alone provides TFS the right to recover the OSCAR software from escrow, taken together, the provisions provide even more support for TFS' likely success on the merits. These provisions exhibit a clear intent by the parties that the software

should be released upon a termination of the project or upon a material breach by FIS. The very purpose of having the OSCAR software in escrow is to provide TFS with a means to support OSCAR when FIS becomes unable or unwilling to do so. This is precisely the situation facing the parties today. Interpreting the contracts in such a way that TFS cannot immediately obtain the software in this circumstance leaves TFS vulnerable to catastrophic losses in the event of an OSCAR outage—the very danger that these provisions were drafted to prevent.

### B.  Potential for Irreparable Harm

The potential for irreparable harm in this case is clear. Simply stated, in the event that OSCAR crashes, TFS, without access to the OSCAR software, will be unable to repair OSCAR and TFS' business will come to a grinding halt. Not only will TFS potentially lose millions of dollars in lost revenue, TFS will irreversibly lose the good will it has earned with its DSSO customers and the American public. Toyota's customers rely on TFS to provide accurate and quick service in meeting their financing needs, and an extended outage would lead these consumers to lose confidence and patience in dealing with TFS to provide this service. This type of injury simply cannot be repaired through a later cash judgment from FIS. Indeed, this type of injury defies accurate quantification. *See, Ross-Simons*, 102 F.3d at 19.

Moreover, issuance of a temporary restraining order is appropriate because an OSCAR crash can occur before this Court can schedule a preliminary injunction hearing. As has been the case for the life of the OSCAR project, crashes are not uncommon and TFS will suffer irreparable harm were the system to crash before the Court could issue a preliminary injunction.

### C.   Balancing of the Harms

As stated above, TFS will face devastating harm in the event that OSCAR crashes while TFS does not have possession of the software enabling TFS to repair OSCAR. FIS and Iron Mountain, on the other hand, will suffer absolutely no harm if the Court orders a software release. In fact, the software is of no use to either Iron Mountain or FIS since the software is specifically designed for TFS. Apparently, FIS' only interest in blocking release of the software is a bad faith attempt to use possession of the software as a bargaining chip in settlement negotiations with TFS. The Court should not condone this conduct. Since TFS will suffer devastating harm if the software is not released and Iron Mountain and FIS will suffer no legitimate harm, the balance of harms clearly favors issuance of a TRO.

### D.   Public Interest

As stated above, if OSCAR crashes and TFS is unable to repair the system, consumers will be unable to secure loans through TFS and will therefore have fewer options in securing financing for their automobile purchases. Therefore the public interest favors the issuance of a TRO since it will help to ensure greater financing options for consumers.

## IV. CONCLUSION

For the above reasons and authorities, Toyota Financial Services respectfully asks the Court to enter a Temporary Restraining Order requiring Iron Mountain to release the OSCAR software to TFS.


Dated: January 6, 2005

Toyota Financial Services

By its attorneys,


s/David B. Chaffin
(BBO No. 549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

Of Counsel:
Mark C. Scarsi
Timothy M. Martin
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, California 90071-2899
(213) 430-7800