UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC. <br><br> Interpleader-Plaintiff, <br><br> v. <br><br> FIDELITY INFORMATION SERVICES, INC., f/k/a ALLTEL INFORMATION SERVICES, INC., and TOYOTA MOTOR CREDIT CORPORATION, <br><br> Interpleader-Defendants. | Civil Action No. 05-10018-RGS <br><br> **Request for ex parte consideration** |

**Request for special action**

### DECLARATION OF MARK C. SCARSI IN SUPPORT OF TOYOTA FINANCIAL SERVICES' APPLICATION FOR TEMPORARY RESTRAINING ORDER

I, Mark C. Scarsi, declare and state:

1.    I am an attorney admitted to practice law in the State of California.  I practice with the law firm of O'Melveny & Myers LLP, counsel of record for Defendant Toyota Financial Services ("TFS," formerly Toyota Motor Credit Corporation).  I make this Declaration in support of Defendant TFS's Application for Temporary Restraining Order.  I have personal knowledge of the facts stated herein and, if called as a witness, would competently testify thereto.

2.    Exhibit 1 to this declaration is a true and correct copy of the Master Software

License Agreement between TFS and Fidelity Information Services ("FIS"), signed August 25, 2000.

3.      Exhibit 2 to this declaration is a true and correct copy of the First Amendment to the Master Software License Agreement between TFS and FIS, signed March 4 and March 5, 2002.

4.      Exhibit 3 to this declaration is a true and correct copy of the Source Code Escrow Agreement between TFS, FIS, and Iron Mountain Intellectual Property Management ("Iron Mountain"), signed August 25, August 29, and September 6, 2000.

5.      Exhibit 4 to this declaration is a true and correct copy of the First Amendment to the Source Code Escrow Agreement between TFS, FIS and Iron Mountain, signed August 25, August 29, and September 6, 2000.

6.      Exhibit 5 to this declaration is a true and correct copy of the Product Schedule No. 1 between TFS and FIS, signed August 25, 2000.

7.      Exhibit 6 to this declaration is a true and correct copy of the First Amendment to the Product Schedule No. 1 between TFS and FIS, signed March 4 and March 5, 2002.

8.      Exhibit 7 to this declaration is a true and correct copy of the Attachment 2 to the

Product Schedule No. 1 between TFS and FIS, signed March 4, 2002.

9.      Exhibit 8 to this declaration is a true and correct copy of the letter from Shaun Coyne, Vice President and Chief Information Officer of TFS, to Frank Sanchez, President of FIS's Strategy and Product Development Division, dated December 1, 2004.

10.      Exhibit 9 to this declaration is a true and correct copy of the letter dated December 14, 2004, from Katherine Adkins of TFS to Paula Smith of Iron Mountain.

11.      On December 1, 2004, TFS provided FIS written notice of material breach of the License Agreement and informed FIS that it was terminating the License Agreement and asserting its rights to release of the Source Code from escrow. Ex. 8. At the same time, TFS rejected the Phase Two and Phase Three deliveries.

12.      On December 14, 2004, TFS made a written demand for release of the OSCAR software from Iron Mountain providing Iron Mountain with evidence of FIS' breach of the License Agreement. Ex. 9. TFS also provided Iron Mountain with a copy of a letter previously sent from TFS to FIS in which TFS both terminated the License Agreement for FIS' material breach (Ex. 8) and demanded the release of the Source Code from escrow under Section 9.2 of the License Agreement.

LA2:746442.1                                         3

13.     Iron Mountain originally concurred that the contracts provided for release of the software. Iron Mountain, however, decided to file this interpleader action after receiving pressure from FIS to refrain from releasing the software.

14.     During a telephone meeting on December 20, 2004 with TFS, FIS and Iron Mountain, FIS' in-house counsel Timothy Kyle confirmed that FIS did not consider itself currently obligated to provide support for the OSCAR system.

15.     TFS has filed an arbitration demand with the American Arbitration Association in Los Angeles to adjudicate the breach of contract issue pursuant to Section 22 of the Master License Agreement (arbitration clause).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 6th date of January 2005, at Los Angeles, California.

_____
Mark C. Scarsi

Exhibit 1

# MASTER SOFTWARE LICENSE AGREEMENT

## AGREEMENT NUMBER 2000AIS002

This Software License Agreement ("**Agreement**"), dated _____, 2000 (the "**Effective Date**"), is made and entered into by and between ALLTEL INFORMATION SERVICES, INC., an Arkansas corporation with its principal place of business at 4001 Rodney Parham Road, Little Rock, Arkansas 72212 ("**ALLTEL**"), and TOYOTA MOTOR CREDIT CORPORATION, a California corporation with its principal place of business at 19001 South Western Avenue, Torrance, California 90509-2991 ("**TMCC**") (collectively the "**Parties**"). For purposes of this Agreement, the term "Affiliate" shall mean any entity (a) which directly or indirectly (i) controls TMCC; (ii) is controlled by TMCC; (iii) is under common control with TMCC; or (iv) is under common ownership of Toyota Motor Corporation (Japan). For purposes of this Agreement, "control" shall mean the direct or beneficial ownership of a voting interest of at least fifty percent (50%). ALLTEL and TMCC acknowledge that they are parties to that certain Services Agreement Number 2000AIS001, dated as of February 7, 2000 (the "Services Agreement"), wherein services defined in a Statement of Work ("Statement of Work") thereto which pertain to or result in the development of "ALLTEL Software" (as defined therein) shall be licensed to TMCC under the terms of this Agreement.

1.    **Provision of Software.**  ALLTEL agrees to license and furnish to TMCC certain computer software programs (the "**Software**") as more particularly described in those certain Product Schedules ("**Product Schedule(s)**") executed between the Parties and attached to and made a part of this Agreement.  In the event of a conflict between the terms of a particular Product Schedule(s) and the terms of this Agreement, the terms of the Product Schedule(s) will prevail.

2.    **Delivery.**  For every applicable Product Schedule(s), ALLTEL shall deliver to TMCC each item of Software listed therein at the location(s) designated in the Product Schedule(s) ("**Installation Site**") on or before the date requested for delivery (the "**Delivery Date**"), or at such other time to which the Parties may agree.  TMCC may change the Installation Site with written notice to ALLTEL within a reasonable time after such change.  Upon such notice of change of Installation Site, TMCC will promptly cease use of the Software at the old Installation Site.  Furthermore, for backup purposes, TMCC may change the backup site at any time and, if it intends to do so, TMCC shall notify ALLTEL of the address of the site that will become the new backup site and shall stop using the Software and the Documentation at the "former" backup site as promptly as practicable.

3.    **Documentation.**  ALLTEL shall deliver to TMCC a complete set of: (i) operating instructions and/or manuals for each item of Software delivered; (ii) other related documentation, research and software tools generally made available by ALLTEL; and (iii) other related documentation research and software tools developed specifically to support any customized software, if applicable, specified in a Product Schedule(s) and/or a Statement of Work ("**Support Documentation**").  Collectively (i), (ii) and (iii) above shall be known as the "**Documentation**".  Subject to the disclosure restrictions set forth herein, TMCC may copy the Documentation at no additional fee or may request additional copies from ALLTEL, which ALLTEL shall provide at its then standard fees.

4.    **Software License and Use.**  For the Software set forth on the applicable Product Schedule(s), ALLTEL grants to TMCC, and TMCC accepts, a non-exclusive license to the

Software (the "**License**") for TMCC, its Affiliates and its Authorized Representatives (as defined in Section 5) to use the Software solely for TMCC's own internal businesses, and to reproduce the Software for archival and backup purposes, subject to the restrictions set forth in Section 5 hereof. Said License shall commence on the applicable Product Schedule(s) Effective Date and continue thereafter until termination of said License in accordance with its terms. It is the intention of the parties that (i) the Affiliates using the Software pursuant to this License shall be bound by the terms and conditions of this Agreement, (ii) all of the systems and services provided under this Agreement be made available to such Affiliates, and (iii) TMCC guarantees the performance of and the payment by (as applicable) each such Affiliate of any and all obligations and liabilities under this Agreement. ALLTEL will provideTMCC advance written notice of any separate agreement subjecting the Affiliate to the terms of this Agreement between any Affiliate and Alltel to which TMCC is not also a party. For production purposes, there shall be only one Installation Site, which shall be identified in the applicable Product Schedule. For regular offsite backup, temporary emergency relocation and the operation of Non-Production Copies (defined below), at no additional charge, TMCC, its Affiliates and its Authorized Representatives may use the Software and Documentation at any (unlimited number) of additional TMCC, Affiliates' or dealer locations. For purposes of this Agreement, "Non-Production Copies" are defined as copies of the Software used exclusively for purposes other than as used in a live production environment. TMCC, its Affiliates and its Authorized Representatives also may keep a copy of the Software and the Documentation at a backup site exclusively for backup and disaster recovery purposes. TMCC agrees that the Affiliates and the Authorized Representatives will not make copies, or similar versions of the Software or any part thereof without the prior written consent of ALLTEL, except as expressly provided otherwise herein. TMCC is not authorized to use or allow any other party to use the Software for service bureau purposes or to act as a processor for any third parties, except as may be mutually agreed to by ALLTEL and TMCC. TMCC can outsource the application maintenance processing and the data center operations of the object code version of the Software to a third party operator ("Operator") subject to the following conditions: (i) the Operator enters into an Operating Agreement with ALLTEL and TMCC, in substantially the form attached as Exhibit B to this Agreement (unless otherwise provided in the Product Schedule) ("Operating Agreement") and ALLTEL will not unreasonably withhold signing such Operating Agreement provided that it is substantially similar to the terms of the form attached as Exhibit B to this Agreement; and (ii) in addition to all other fees payable hereunder, for Software subject to a per account fee as provided in the applicable Product Schedule only, TMCC pays to ALLTEL a mutually agreed annual outsourcing fee ("Outsourcing Fee") not to exceed twenty-five percent (25%) of the then current per account charges applicable to the Software, which Outsourcing Fee is payable on the same terms as the per account charges in the applicable Product Schedule. TMCC agrees to be jointly and severally liable for the actions of the Operator. Notwithstanding anything to the contrary, this Agreement shall not be construed to preclude TMCC from using the License for the Software and Documentation for the purposes of processing information (a) for entities formed to acquire and securitize receivables owned by TMCC or its Affiliates and/or (b) for TMCC's administration of a third party's financial services portfolio. For purposes hereof, "administration" by TMCC means a combination of information technology services and administrative services for financial services portfolios.

5.    **Confidentiality and Safeguards.** TMCC acknowledges that the Software and Documentation constitute valuable assets and trade secrets of ALLTEL, that neither legal nor equitable title to the Software passes to TMCC under the terms of this Agreement, and that all information with respect to the Software is confidential. TMCC agrees to use its best efforts to prevent disclosure of any part of the Software or Documentation, and shall assure that it does

2

not, through its employees or representatives, "unlock", decompile, reverse-assemble or reverse-engineer the binary, object or executable code of the Software, sell, lease, assign, or otherwise transfer (except as provided for in Section 14 hereof), disclose, or make available, in whole or in part, the licensed Software or Documentation to any third party for any reason (except for employees of TMCC, its consultants, contractors and subcontractors, and the dealers with which TMCC transacts business (collectively, the "Authorized Representatives"), or as otherwise authorized under the Operating Agreement (if any), as necessary for the use of the Software and Documentation by TMCC, for auditing purposes by independent certified public accountants, or for complying with applicable governmental laws, regulations, or court orders). TMCC represents that prior to disclosure of any part of the Software or Documentation to its Authorized Representatives, (i) the Authorized Representatives (other than the dealers) are bound by confidentiality agreements between the employer of the Authorized Representatives and TMCC which terms and conditions are no less restrictive than as set forth herein; (ii) that TMCC shall be responsible and liable for the acts of its Authorized Representatives; (iii) that in no event shall the dealers be given access to Software source code or source code documentation; and (iv) that if TMCC knows or has reason to believe that any unauthorized access to the Software or Documentation has occurred, TMCC will promptly notify ALLTEL thereof and, if ALLTEL asks TMCC to do so, TMCC will assign to ALLTEL any and all rights, remedies and causes of action which TMCC may have with respect to any such unauthorized access. Except as otherwise approved by ALLTEL in writing (including in the event of outsourcing as provided in Section 4 above), in no event shall any competitor of ALLTEL be furnished with any information concerning the Software or Documentation. For purposes of this Agreement, a "competitor" is any person, firm or corporation engaged in the business of developing, marketing or licensing application software products, or engaged in the business of providing like technology services to financial services companies.

**5.1    Acknowledgement and Precautions.** The Parties acknowledge and agree that each will be provided certain information originated by or uniquely within the knowledge of the other Party (the "**Disclosing Party**") which is not generally available to the public and which the Disclosing Party considers confidential or proprietary (the "**Confidential Information**"). Each Party agrees to: (i) treat the Confidential Information in the same manner as it treats its own Confidential Information, which shall in no event be less than in a reasonable manner; (ii) take reasonable security precautions to safeguard the Confidential Information from theft or from access by unauthorized person(s); (iii) not use the Confidential Information in any way detrimental to the Disclosing Party; and (iv) not directly or indirectly disclose or divulge any Confidential Information to any third party without the prior written consent of the Disclosing Party.

**5.2    Exclusions.** The Party receiving the Confidential Information (the "**Receiving Party**") shall have no confidentiality obligation to the Disclosing Party with respect to information which: (i) is or becomes publicly known through no wrongful act, fault or negligence of the Receiving Party; (ii) was known, free of obligations of confidentiality, by the Receiving Party prior to disclosure by the Disclosing Party; (iii) was disclosed to the Receiving Party by a third party, other than an affiliate, subsidiary, parent or agent of the Disclosing Party, who was free of obligations of confidentiality, directly or indirectly, to the party providing said third party the information; (iv) is approved for release by prior written authorization of the Disclosing Party; (v) is publicly disclosed pursuant to a requirement or request of a governmental agency or disclosure is required by operation of law, provided, however, that the Receiving Party shall first have given written notice to the Disclosing Party so that the Disclosing Party may seek an appropriate protective

order; (vi) is furnished to a third party, other than to an affiliate, subsidiary, parent or agent of the Disclosing Party, by the Disclosing Party without a similar restriction on the third party's rights; or (vii) is independently developed by employees of the Receiving Party who did not have access to any or all of the Confidential Information. The Receiving Party shall have the burden of proof with respect to any of the above events on which the Receiving Party relies as relieving it of the restrictions hereunder on disclosure or use of Confidential Information.

**5.3    Limited Disclosure.**  This Agreement and each Product Schedule attached hereto contain Confidential Information that may be considered proprietary by one or both of the Parties.  Thus, the Parties agree to limit the distribution of said Agreement and Product Schedule(s) to those individuals with a need to know their contents. Neither Party may reproduce this Agreement or any Product Schedule, nor show copies to any third parties (exclusive of employees and Authorized Representatives of TMCC and its Affiliates,) except as otherwise provided herein without the prior written consent of the Disclosing Party, except as may be necessary by reason of legal, accounting, tax or regulatory requirements, in which event the Parties shall exercise reasonable diligence in limiting the number of such disclosures to the minimum necessary under the particular circumstances.

**5.4    Nondisclosure.**  The Receiving Party agrees and acknowledges that it shall have no proprietary interest in the Confidential Information of the Disclosing Party and will not disclose, communicate nor publish the nature or content of such information to any person or entity, nor use, except as authorized in writing by the Disclosing Party, any of the Confidential Information it produces, receives, acquires or obtains from the Disclosing Party, subject to the terms of this Section 5 hereof.  The Receiving Party shall take all necessary steps to insure that the Confidential Information is securely maintained.  The Receiving Party's obligations set forth herein shall survive the termination or expiration of this Agreement.

**5.5    Remedies.**  The Parties acknowledge and agree that any remedy at law for a breach or threatened breach of any of the provisions under this Section 5 would be inadequate and, in recognition of this fact, in the event of a breach or threatened breach by the Receiving Party of any of the provisions contained in this Section 5, the Disclosing Party, without posting any bond, shall be entitled to obtain provisional equitable relief in the form of a temporary restraining order and/or temporary injunction or any other provisional equitable remedy which may then be available, and the Receiving Party hereby agrees not to contest same.  Nothing herein contained shall be construed as prohibiting the Disclosing Party from pursuing any other remedies available to it from such breach or threatened breach.  Pursuit of any remedy at law or in equity shall not be deemed as an election of remedies.

6.    **Testing and Acceptance.**

**6.1    Acceptance Test Plan; Acceptance Criteria.**  The provisions for acceptance of the software by TMCC ("**Acceptance**"), will be in accordance with an acceptance test plan that is mutually agreed upon by the parties pursuant to the applicable product schedule ("**Acceptance Test**") and mutually agreed acceptance criteria as described in the applicable Product Schedule ("**Acceptance Criteria**").  At a minimum, the Acceptance Criteria shall include the following requirements:  (a) that the Software

4

perform in accordance with the specifications in the Documentation and any Applicable Specifications (defined in the Product Schedule), (b) that the Software perform according to mutually agreed performance criteria identified in the applicable Product Schedule, and (c) that the Software perform functionally in a live operating business unit of TMCC.

**6.2    Procedure.** If, during the Acceptance Test period for any Software designated in the applicable Product Schedule ("**Acceptance Test Period**") the Software as delivered does not perform to the applicable Documentation and Acceptance Criteria, which shall constitute a Defect within the meaning of that term as defined in Section 7.1 below, TMCC shall notify ALLTEL in writing in accordance with the procedures specified in the Acceptance Test Plan of any and all such Defects, and ALLTEL shall use all reasonable efforts to promptly correct any and all such Defects during the Acceptance Test Period.    To the greatest extent possible, the Acceptance Test will proceed concurrently with ALLTEL's efforts to correct any reported Defects. Following ALLTEL's delivery of corrected Software to TMCC and unless otherwise agreed to by the Parties in the Product Schedule, TMCC shall have an agreed upon time to install said corrected Software in its test environment and re-conduct the Acceptance Test procedures.  If, at the end of such mutually-agreed correction testing period, the Software does not conform to the Acceptance Criteria, at TMCC's election, TMCC (i) may reject the Software as provided for in Section 6.3 below, or (ii) report any Defects in the corrected Software, which will start the correction and re-testing process described above anew (and such re-correction and re-testing process shall be conducted in accordance with the timeframes agreed to by the parties).  In the event TMCC elects to report the Defects for correction by ALLTEL, the original Acceptance Test Period will be extended as necessary, by a reasonable amount of time, not to exceed the amount of time initially allotted for the Acceptance Test.

For purposes of this Agreement, the "**Acceptance Date**" of TMCC's Acceptance of the Software shall mean the earlier to occur of either:  (i) TMCC's commencement of use of the Software in a Production Environment (not to include any testing of the Software in a Production Environment that is a documented and agreed to be part of the Acceptance Test as per the applicable Product Schedule), or (ii) TMCC's provision to ALLTEL of written notice that it has accepted the Software.  If TMCC has not provided written notice of its Acceptance of the Software within the specified time frames set out in the Acceptance Test Plan, then ALLTEL will notify TMCC in writing that ALLTEL has not received such notice and TMCC shall respond to such notice within five (5) business days of its Acceptance or rejection of the Software.  If TMCC does not so respond, the Software will be deemed accepted as of the sixth (6th) day following ALLTEL's notice.

**6.3    Rejection.**  As provided in Section 6.2 above, if by the end of the Acceptance Test Period, the Software does not conform to the applicable Acceptance Criteria, TMCC may reject such Software by notifying ALLTEL in writing of said rejection. TMCC's rejection of such Software shall entitle TMCC to terminate the applicable Product Schedule. Upon such termination, ALLTEL shall promptly refund to TMCC all license fees paid to ALLTEL for such Software (as defined in the applicable Product Schedule), and any other sums to which TMCC is entitled upon such rejection pursuant to the Product Schedule.  TMCC shall then discontinue all use of the terminated Software and Documentation, and shall return to ALLTEL (or destroy) all copies thereof in TMCC's possession or control.

7.    **Software Enhancement and Support Services.**

**7.1**    ALLTEL will provide Software Enhancement and Support Services (**"ES Services"**) for the Software as set forth below (a) for no charge, during the Warranty Period for such Software (defined below), and (b) in accordance with the terms hereof, for the specified periods of time set forth in the applicable Product Schedule (the **"ES Period"**):    ALLTEL shall correct and repair any failure, malfunction, defect, or nonconformity (**"Defect"**) in the Software, if such Defect prevents the Software from operating and performing in accordance with the Acceptance Criteria.

**7.1.1**    In the event of a Defect in the Software during the Warranty Period and/or ES Period, ALLTEL shall correct and repair such Defect per the severity classifications and descriptions in the chart below. If ALLTEL cannot immediately resolve the Defect, then no later than the applicable Work-Around Delivery Date Deadline set forth in the chart below for such Defect, ALLTEL shall deliver a suitable work around. In all cases, resolution of the Defect shall be achieved no later than the applicable Final Resolution Deadline specified in the chart below (calculated from the date of the Acknowledgement (defined below)) or a Final Resolution Deadline which may be mutually agreed to by the parties. For purposes of this Agreement, a **"Work Around"** shall mean a temporary fix for the Defect, consisting of sufficient programming and operating instructions to implement the modification or addition to the Software which, when made or added to the Software, will bring the Software into material conformity with the Acceptance Criteria and/or a new procedure or routine that, when observed in the regular operation of the Software, avoids the practical adverse effect of such Defect.

**7.1.2**    TMCC agrees to provide in writing and in reasonable detail a description of each such Defect. Defects are described and categorized in the chart below. The five (5) severity classifications are ranked in order of the severity of their impact to the end user. Codes are assigned to problems strictly on the basis of their symptoms, and not according to frequency of occurrence, likelihood of being seen, or difficulty of reproducing. Per the chart below, an **"Acknowledgement"** is a verbal (evidenced by TMCC's written log) or written statement from ALLTEL to TMCC verifying that a problem has been identified by TMCC and reported to ALLTEL and that ALLTEL is in the process of solving the problem. In the event that ALLTEL determines that a problem reported by TMCC is not a Defect, TMCC shall pay ALLTEL for its services at ALLTEL's rates negotiated for TMCC then in effect (if any), and TMCC will reimburse ALLTEL for any and all reasonable travel and living expenses incurred by ALLTEL in rendering such services.

| Defect Severity Code | Type | Description | Acknowledgement | Effort | Work-Around Delivery | Final Resolution Deadline |
|---|---|---|---|---|---|---|
| 0 | Fatal Problem | Causes system to crash or halt | 2 hours | Immediate and Continuous | 24 Hours | Ten (10) Days |

| | | or destroys data | | | | |
|---|---|---|---|---|---|---|
| 1 | Major Problem | Renders major system function unusable | 4 hours | Immediate and Continuous | 24 Hours | Ten (10) Days |
| 2 | Minor Problem | Renders a minor system function unusable. | 24 hours | Immediate and Continuous | 48 Hours if work-around exists or mutually agreeable schedule if no work-around exists. | Thirty (30) Days |
| 3 | Nuisance Problem | Minor system nuisance which does not limit system functionality. | 24 hours | Reasonable Assistance | (see next column) | By issuance date of second Update issued after date of Acknowledge-ment |
| 4 | Document-ation Problem | Documentation correction/ addition required. | 24 hours | Reasonable Assistance | (see next column) | By issuance date of second Update issued after date of Acknowledge-ment |

7.1.3  Remedies.  See applicable Product Schedule.

7.1.4  ALLTEL agrees to provide to TMCC all revisions, modifications, corrections and enhancements generally released to customers for the Software listed in the applicable Product Schedule(s) (the "Updates"), which Updates shall become a part of the licensed Software for all purposes described herein. ALLTEL shall provide TMCC with all such Updates, together with the corresponding Documentation, as soon as they are made commercially available to other users and/or licensees of the Software.

7.1.5  ALLTEL shall provide reasonable remote technical assistance and consultation by telephone, facsimile, mail, email or web based support services to TMCC in accordance with the Product Schedule(s) provided that the Software being used by TMCC is within two (2) Updates or within Updates made available within two (2) years of the then-current Updates generally available, whichever is the greater period.

7.2    To the extent that TMCC modifies the Software, fails to install Updates to the extent required by Section 7.1.5 above, or interrupts ES Services, ALLTEL shall continue to perform the ES Services but shall be relieved of its responsibilities and liability for any Defect or improper operation of the affected Software.

7.3    Following the initial ES Period TMCC may purchase continuing ES Services at rates to be mutually agreed upon and amended in the applicable Product Schedule,

7

subject to a price increase cap as agreed to in the applicable Product Schedule. ALLTEL may provide TMCC with twelve (12) months written notice of its intention to discontinue such ES Services on any item of Software following the expiration of the ES Period.

8.    **Invoicing and Payment.**

    **8.1**    For the licensing of the Software pursuant to the terms and conditions of this Agreement, TMCC will pay to ALLTEL a license fee as set forth in the applicable Product Schedule(s) ("**Software License Fee**").

    **8.2**    **ES Services Fee.** For the ES Services described in Section 7, TMCC shall pay to ALLTEL the amounts reflected in the applicable Product Schedule(s) for the ES Services applicable to such Software ("**ES Fees**")..

    **8.3**    **Payment Terms.** Except as otherwise expressly stated in a Product Schedule, all sums due from TMCC to ALLTEL are payable thirty (30) calendar days after receipt of a correct invoice referencing a valid purchase order. For all payments not made within thirty (30) days after TMCC's receipt of ALLTEL's correct invoice, TMCC shall pay a late fee at the rate of one percent (1%) per month from the due date for payment until such payment is made. No failure by ALLTEL to request such payment shall be deemed a waiver by ALLTEL of TMCC's obligation to pay such amounts. A correct invoice is one in which (a) the invoice matches the products and/or services specified on the Purchase Order, and (b) the invoice references the valid Purchase Order number under which the products and/or services were purchased and/or performed.

9.    **Termination.**

    **9.1**    **Termination for Convenience.** At any time prior to the Acceptance Date for a particular item of Software, TMCC shall have the right to terminate any Product Schedule upon sixty (60) days advance written notice to ALLTEL. In the event of such a termination by TMCC, (i) ALLTEL shall retain any License Fees already paid to ALLTEL pertinent to the affected Software as of such termination date by TMCC, and (ii) such other termination for convenience fees as may be specified and mutually agreed between the Parties in the applicable Product Schedule.

    **9.2**    **Termination for Cause.** For material breach of this Agreement by either Party, the non-breaching Party may terminate this Agreement if cure is not effected within thirty (30) days of receipt of notice thereof. In the event of a threatened or actual breach by TMCC of Section 4, or by either Party of Section 5 of this Agreement, monetary damages alone shall not be an adequate remedy, and the non-breaching Party shall be entitled to injunctive, equitable, and other legal relief against such breach as may be awarded by a court of competent jurisdiction, plus reasonable expenses (including attorneys' fees). Except as specifically provided herein, no election of any remedy shall be construed as a waiver of or prohibition against any other remedy in the event of breach hereunder. In the event of TMCC's material breach of this Agreement, ALLTEL may terminate the licenses arising hereunder. Upon such termination, TMCC agrees to promptly cease using and return to ALLTEL (or destroy) all Software, Documentation, and copies thereof, accompanied by written certification by an officer of TMCC verifying the accomplishment of such return or destruction.

**9.3    Effect on Confidential Information.** Upon termination of this Agreement or any Product Schedule for any reason, the Parties each shall cease all use of the other Party's Confidential Information and return the same to such other Party accompanied by written certification by a corporate officer verifying all Confidential Information has been returned or destroyed.

## 10.    Warranties.

**10.1    Unencumbered Rights.** ALLTEL warrants to TMCC that (1) the Software and Documentation are free of all liens, claims and encumbrances; and (2) TMCC shall have the right of quiet enjoyment of the Software and Documentation. ALLTEL warrants that it has full title to and ownership of the Software licensed to TMCC under this Agreement, and that it has full power and authority to grant the licenses granted to TMCC by this Agreement. TMCC's use of the Software will in no way constitute an infringement or other violation of any copyright, trade secret, trademark, patent, or other proprietary right of any third party. There is currently no actual or threatened suit by any third party based on an alleged violation of its rights by ALLTEL. To the extent that, as identified on the applicable Product Schedule, any software programs, modifications, applications owned by third parties ("**Third Party Software**") are integrated into and function as a component of the Software, ALLTEL will warrant such Third Party Software as ALLTEL-owned Software as described herein. Notwithstanding, to the extent that Third Party Software is provided but not integrated as a component of the Software, the Product Schedule will so identify any such Third Party Software ("**Provided Third Party Software**"), and ALLTEL makes no warranty of any type with respect to any such Provided Third Party Software, but hereby assigns and transfers to TMCC, to the extent permitted by ALLTEL's agreement with any such third party, the benefit of any warranties relating to such Provided Third Party Software that may be provided by the vendor of such software. ALLTEL shall have only those maintenance and support obligations with respect to the Software owned by ALLTEL.

**10.2    Performance.** For six (6) months from the Acceptance Date as defined in relevant Product Schedule(s) or such longer period as may be specified by the Parties in the applicable Product Schedule ("**Warranty Period**"), x, ALLTEL warrants and represents that the Software and any Updates as delivered will perform in the manner and environment described in the applicable Acceptance Criteria in the applicable Product Schedule(s) (the "**Specifications**").

**10.3    Date Compliance.**

**10.3.1 Definitions.** "**Date Compliant**" shall mean that all dates, including, without limitation, the years 1900 - 1999, 2000 and thereafter, encountered and/or processed by the Software will be correctly recognized, calculated, compared, sorted, stored, displayed and/or otherwise processed on the hardware platform set forth in the applicable Product Schedule and with the software, files and interfaces with which said hardware platform is to be utilized.

**10.3.2 Representations.** ALLTEL represents and warrants at delivery of the Software and at delivery of each Update: (a) that such Software is Date Compliant, is designed to be used prior to, during, and after the calendar year 2000 AD, will operate

consistently, predictably and accurately, without interruption or manual intervention, and in accordance with all requirements of this Agreement, including without limitation all specifications and/or functionality and performance requirements, during each such time period, and the transitions between them, in relation to dates it encounters or processes; (b) that all date recognition and processing by such software will correctly recognize and process the date of February 29, and any related data, during Leap Years; and (c) that all date sorting by such software that includes a "year category" shall be done based on the Four Digit Year Format (or a two digit year format with windowing techniques which result will be in a Four Digit Year Format).

**10.4    No Viruses.** ALLTEL represents and warrants that at delivery the Software does not contain any computer virus and has undergone and passed generally accepted virus checking procedures for known software viruses.    ALLTEL further represents and warrants the Software does not contain any logic devices, other programs, or password-activated security devices that will cause the Software to cease functioning due to the elapse of time or for any other reason.

**10.5    Rights in Data** ALLTEL represents and warrants that all data created and/or processed by the Software shall be and remain the property of TMCC and ALLTEL shall not have any rights in or to the data of TMCC.

**10.6    Disclaimer.** EXCEPT AS PROVIDED HEREIN, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXPRESSLY DISCLAIMED.

**10.7    Hold Harmless.** The parties hereto shall each defend, indemnify and hold the other party, its parent, subsidiaries, affiliates, and their respective directors, officers, agents, representatives, contractors, employees, successors and assigns, harmless from and against any and all costs, expenses, damages, claims, suits, actions, liabilities, losses and judgments, including, without limitation, attorneys' fees and legal expenses, based upon personal injury and/or death, claims of infringement, property damage, and breaches of confidentiality arising out of the performance of the indemnifying party's obligations under this Agreement, or otherwise in connection with the acts or omissions of the indemnifying party, its employees, agents or contractors, including claims made by or on behalf of third parties for whom TMCC administers financial services portfolios, at no expense to the indemnified party, except to the extent those claims are caused by the negligence or willful misconduct of the indemnified party or its employees.    This obligation shall extend beyond the termination or expiration of this Agreement. The indemnified party shall fully cooperate with the indemnifying party in the defense and settlement of such action.    The indemnifying party shall have the sole right to conduct the defense of any such claim or action and all negotiations for its settlement or compromise, provided, however, that if any such compromise or settlement does not provide at least one of the remedies specified in Section 10.8 at no additional cost or obligation to the indemnifying party, no such action, claim, or liability shall be settled without the prior written consent of the indemnified party adversely affect the indemnified party's rights hereunder or impose any obligations upon the indemnified party in addition to those set forth herein.    The indemnified party agrees to give the indemnifying party prompt written notice of any written threat, warning or notice of any such claim or action.

**10.8    Remedies.**

**10.8.1** If, during the Warranty Period, the Software does not conform to the warranties made by ALLTEL in this Agreement and if ALLTEL is unable to correct all such errors or non-conformities by the Final Resolution Deadline specified in Section 7.1.1, then, following written notice from TMCC of such warranty defects, TMCC may elect to terminate the applicable Product Schedule as to such Software, and in such event, ALLTEL promptly shall refund to TMCC all license fees paid to ALLTEL for the affected Software. Upon TMCC's receipt of the License Fees from ALLTEL upon such breach of warranty, TMCC shall return or destroy all copies of the affected Software and Documentation, and at such time the applicable Product Schedule shall terminate as to the affected Software.

**10.8.2** If, at any time, in any suit relating to infringement of a party's intellectual property is so defended and is held to constitute an infringement or violation of any other party's intellectual property rights and is enjoined, or if in respect of any claim of infringement, the indemnifying party deems it advisable to do so, the indemnifying party shall, at its sole option, take one or more of the following actions to the extent relevant, at no additional cost or obligation to the indemnified party: (a) procure the right to continue the use of the same without material interruption for the indemnified party; (b) replace the same with non-infringing software that meets the specifications identified in the relevant Documentation pursuant to the applicable Product Schedule(s), or where TMCC is the indemnifying party with respect to a claim of infringement, TMCC may direct ALLTEL to immediately cease further use of materials which are allegedly infringing; and relieve ALLTEL of any affected obligation as it may relate to services being provided to TMCC under the applicable Product Schedule(s); (c) modify said software so as to be non-infringing, provided that the software as modified meets all of the specifications; or (d) take back the infringing software and credit the indemnified party with an amount equal to the license fee paid for that portion of the Software deemed to be infringing if the software is taken back within two (2) years of execution of the Agreement; and, thereafter, credit the indemnified party with an amount equal to the license fee paid for that portion of the Software deemed to be infringing less straight line depreciation for the amount of time in excess of two (2) years the software was used by the indemnified party over a three (3) year depreciation time schedule. The foregoing represents the sole and exclusive remedy with regard to any of the above infringements or alleged infringements

**11.    Limitation of Liability.**

**11.1    Erroneous Processing.** Except as specifically described in Section 7 and 10, ALLTEL has no obligation or liability, either express or implied, with respect to any erroneous processing attributable to any error in the Software.

**11.2** Except for liabilities, losses, damages and expenses related to: (i) death, personal injury or damage to property; or (ii) third party claims of infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, the liability of either Party to the other hereunder for any breach or any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement shall be limited to actual direct damages incurred by the other Party, and, except as to excepted claims, in no event shall either Party's aggregate liability

exceed the license fees actually paid to ALLTEL by TMCC hereunder. Neither party shall be liable for any special, indirect, incidental or consequential damages suffered by such party.

12.    **Taxes.** All charges and fees to be paid by TMCC under this Agreement are exclusive of any applicable withholding, sales, use, value added, excise, services or other tax which may be assessed on the provision of the services. In the event that a withholding, sales, use, value added, excise, services or other tax is assessed on the provision of any of the services provided to TMCC under this Agreement, TMCC will pay directly, reimburse or indemnify ALLTEL for such taxes, as well as any applicable interest, penalties and other ALLTEL fees and expenses. The parties will cooperate with each other in determining the extent to which any tax is due and owing under the circumstances, and shall provide and make available to each other any resale certificates, information regarding out-of-state or country use of materials, services or sale, and other exemption certificates or information reasonably requested by either party. ALLTEL shall be responsible to pay to the appropriate taxing authorities any taxes paid by TMCC to ALLTEL. ALLTEL shall assume full responsibility for payment of all federal, state, local taxes or contributions imposed or required under unemployment insurance, social security, workers compensation and income tax laws with respect to its personnel, and any taxes due based on ALLTEL's income. Notwithstanding the foregoing, TMCC shall not be required to pay or otherwise be liable or responsible for, and ALLTEL hereby indemnifies and holds TMCC harmless against, any penalty, additional tax, or interest that may be assessed or levied as a result of the failure of ALLTEL to file any return, form or information statement that may be required to be filed by any governmental agency but only in the event such penalties arise out of ALLTEL's failure to pay taxes already paid by TMCC to ALLTEL.

13.    **Excusable Delay.** If due performance of this Agreement by either Party is delayed (except for delay or failure of payment) in whole or in part from any cause beyond its reasonable control and without its fault or negligence, including but not limited to any act of God, strikes, riots, acts of war or revolution, epidemics, fires, communication line failures, power failures, earthquakes, floods, unusually severe weather conditions or other disasters, it shall give notice thereof to the other Party and shall be under no liability for any loss, damage, injury, or expense (whether direct or consequential) suffered by the other Party due to such delay of performance. The time for performance hereunder by the Party claiming force majeure shall be enlarged to the extent necessitated by such force majeure event.

14.    **Assignment.** Neither Party may assign this Agreement and all of its rights and obligations hereunder to a third party without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, TMCC may assign this Agreement to a parent, affiliate or subsidiary, provided that the scope and character of the license use remains unchanged and such parents, affiliates or subsidiaries agree in writing to be bound by the terms of this agreement.

15.    **Governing Law.** The laws of the State of New York shall be applicable to the interpretation of this Agreement without regard to conflicts of law principles thereof.

16.    **Advertising or Publicity.** Neither party shall use the name of the other in media advertising or publicity releases of any sort without securing the prior written consent of the other.

**17.    Employment.** During the term of this Agreement and for twelve (12) months after the termination hereof, neither party may solicit for employment, hire or otherwise retain any current employee of the other Party who performed services directly related to or in support of the objectives of this Agreement, without prior written approval of the other Party.

**18.    Entire Agreement.** This Agreement, together with all attachments and amendments, and the Services Agreement Number 2000AIS001, dated as of February 7, 2000 and the Statement of Work thereto, constitutes the entire Software license agreement between the Parties and supersedes all prior understandings, either written or oral between them, as to the subject matter hereof. Each provision of this Agreement is severable and shall be stricken in the event the provision is void, voidable, or unenforceable.

**19.    Liability Insurance Provisions.** ALLTEL shall obtain and/or maintain during the effectiveness of any and all Product Schedules under the terms and conditions of this Agreement:

(a)     commercial general liability insurance with minimum coverage of One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage,

(b)     employer's liability insurance in a minimum amount of One Million Dollars ($1,000,000), as well as worker's compensation insurance in an amount satisfying applicable laws,

(c)     automobile liability insurance with the following minimum limits: One Million Dollars ($1,000,000) bodily injury each person, One Million Dollars ($1,000,000) property damage each accident, and

(d)     electronic errors and omissions insurance in the amount of Three Million Dollars ($3,000,000).

ALLTEL shall name TMCC, its parent, subsidiaries and affiliated corporations as additional insureds on the general liability insurance required hereunder, which insurance policy shall cover risks of loss, damage or injury associated directly or indirectly with the performance of ALLTEL's obligations under this Agreement. ALLTEL shall provide TMCC with proof of the acquisition of all of the insurance coverages required hereunder in the form of one or more Certificates of Insurance within five (5) business days of the effective date of this Agreement and/or upon request.  The insurance policies must provide that TMCC shall receive at least thirty (30) days written notice prior to any change, cancellation or reduction of such coverages. TMCC reserves the right to review, and must be satisfied with, the types and level of coverage to be obtained and maintained hereunder. All insurance coverages required hereunder shall be procured from insurers with an A.M. Best's performance rating of at least A and with a financial size category of at least Class VII.

**20.    Agreement to Escrow for Software Source Code.** For any Software to which ALLTEL grants a license (in object code form only) to TMCC under this Agreement, ALLTEL will deposit with a third party escrow agent identified in the applicable Product Schedule ("**Escrow Agent**") the source code of such Software and related materials which exist and is available sufficient to enable a reasonably skilled programmer or analyst to maintain and enhance the Software, as more particularly described in the applicable Product Schedule ("**Escrow**

Deposit"). The Escrow Deposit for any particular (or all the) Software licensed hereunder will be made available to TMCC, pursuant to the terms of an escrow agreement to be entered into by and among ALLTEL, TMCC and the Escrow Agent, in substantially the form of Exhibit A hereto ("**Escrow Agreement**"), upon the occurrence of any of the following events: (1) ALLTEL becomes insolvent; (2) ALLTEL is sold to a third party that is a competitor of TMCC; or (3) ALLTEL terminates ES Services (except for TMCC's breach) during an ES Period or ceases to support the Software.

21. **Survival Upon Expiration or Termination.** The provisions of Sections 5 (Confidentiality and Safeguards), 9 (Termination), 10,4, 10.6, 10.7 (Warranties), 11 (Limitation of Liability), 12 (Taxes), and 15 (Governing Law), shall survive the expiration or termination of this Agreement, unless otherwise agreed to in writing by both parties.

22. **Dispute Resolution.**

22.1. Escalation. Except for claims for provisional equitable relief, if any party shall have any dispute with respect to the terms and conditions of this Agreement, or any subject matter referred to in or governed by this Agreement, that party shall provide written notification to the other party in the form of a claim identifying the issue and including a detailed reason for the claim is made shall respond in writing to the claim within ten (10) days from the date of receipt of the claim document. The party filing the claim shall have an additional five (5) days after the receipt of the response to either accept the resolution offered by the other party or request that the claim be escalated. If the above negotiation procedures do not lead to resolution of the underlying dispute or claim to the satisfaction of a party involved in such negotiations as set forth above, then either party may notify the other in writing that such party desires to elevate the dispute or claim for resolution to the next level of management responsible for the project which is the subject matter of this Agreement ("**Senior Manager**") of each Party ("**Second Level Escalation**"). Immediately upon issuance of a Second Level Escalation notice by a party, the dispute or claim shall be so elevated and the Senior Managers of each Party shall negotiate in good faith and undertake to resolve such dispute or claim, within five (5) days of the issuance of the Second Level Escalation notice. If the immediately preceding negotiation procedures do not lead to resolution of the underlying dispute or claim to the satisfaction of a party involved in such negotiations as set forth above, then either party may notify the other in writing that such party desires to elevate the dispute or claim again for resolution to the President of Financial Services (or similar title) of ALLTEL and the Senior Vice President and General Manager (or similar title) of TMCC for resolution. Upon receipt by the other party of such written notice, the dispute or claim shall be so elevated and the President of Financial Services of ALLTEL and the President and General Manager of TMCC shall negotiate in good faith and undertake to resolve such dispute or claim within three (3) days of the issuance of the notice of such escalation. The location, format, frequency, duration and conclusion of these elevated discussions shall be left to the discretion of the representatives involved. If the negotiations conducted pursuant to this Section 22.1 do not lead to resolution of the underlying dispute or claim to the satisfaction of a party involved in such negotiations, then either party may seek binding arbitration pursuant to Section 22.2 below. The adherence to or failure to follow these dispute resolution procedures shall not waive either party's rights or duties under this Agreement.

**22.2    Arbitration.** Upon a party's receipt of written notice from the other party calling for arbitration hereunder, except for claims for provisional equitable relief, the matter shall be submitted to binding arbitration. Such arbitration shall be conducted under the commercial rules of the American Arbitration Association by a single arbitrator appointed by the American Arbitration Association. Insofar as possible, such arbitrator shall be, at the time of his selection, a partner or manager of a national or regional accounting firm (including the information processing, management support, and merger and acquisitions operations or affiliates thereof) not regularly employed by either party, and such arbitrator shall be required to have substantial experience in the field of computer software technology and licensing. The decision of the arbitrator shall be final and binding on the parties, and may be entered and enforced in any court of competent jurisdiction by any such party. The prevailing party in the arbitration proceedings shall be awarded reasonable attorneys' fees, expert witness costs and expenses, and all other costs and expenses incurred directly or indirectly in connection with the proceedings, unless the arbitrator for good cause determines otherwise.

**23.    Export Controls.** TMCC acknowledges that the Software constitutes "technical data" for purposes of export control laws of the United States of America and relevant regulations issued by the U.S. Department of Commerce and Department of State. TMCC covenants to comply with such laws and regulations and any other applicable laws and regulations. Without limiting the generality of the foregoing, TMCC will not at any time export, re-export, divert or transfer, directly or indirectly any Software nor any copies or direct products of them (as defined in such regulations) to Cuba, Iran, Iraq, Libya, North Korea or any other country that is the subject of a U.S. embargo pursuant to any Executive Order or to any country for which an export license is required under regulations promulgated by the U.S. Department of Commerce, unless specifically authorized by ALLTEL and where required, the United States government.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Signing Date by their duly authorized representatives.

| ALLTEL INFORMATION SERVICES, INC. | TOYOTA MOTOR CREDIT CORPORATION |
|---|---|
| By: | By: |
| Name: STEVEN R. PIERCE | Name: GEORGE KRIST |
| Title: SVP / DIRECTOR | Title: Sr. Vice President & Gen. Mgr. TFS |
| Date: 8/25/00 | Date: 8/25/00 |

15

Exhibit 2

**FIRST AMENDMENT**
**TO**
**MASTER SOFTWARE LICENSE AGREEMENT**

This **FIRST AMENDMENT TO MASTER SOFTWARE LICENSE AGREEMENT** ("First Amendment") is made and entered into by and between **TOYOTA MOTOR CREDIT CORPORATION** ("TMCC") and **ALLTEL INFORMATION SERVICES, INC.** ("ALLTEL") effective as of the 1st day of March, 2002 ("First Amendment Effective Date"), and amends and supplements that certain Master Software License Agreement by and between TMCC and ALLTEL executed on August 25, 2000 (sometimes referred to herein as the "Agreement").

**WHEREAS,** TMCC and ALLTEL desire to make certain changes to the Master Software License Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.    Section 4 of the Master Software License Agreement shall be deleted in its entirety and replaced as follows:

"**4.0    Software License and Use.**  For the Software set forth on the applicable Product Schedule(s), ALLTEL grants to TMCC, and TMCC accepts, a non-exclusive license to the Software (including Phased Delivery Software as defined in Section 6.1 herein)  (the "**License**") for TMCC, its Affiliates and its Authorized Representatives (as defined in Section 5) to use the Software solely for TMCC's own internal businesses, and to reproduce the Software for archival and backup purposes, subject to the restrictions set forth in this Section 5 hereof.  Said License shall commence on the applicable Product Schedule(s) Effective Date and continue thereafter until termination of said License in accordance with its terms.

"**4.1    Affiliates Use.**  It is the intention of the parties that (i) the Affiliates using the Software pursuant to this License shall be bound by the terms and conditions of this Agreement, (ii) all of the systems and services provided under this Agreement be made available to such Affiliates, and (iii) TMCC guarantees the performance of and the payment by (as applicable) each such Affiliate of any and all obligations and liabilities under this Agreement.  ALLTEL will provide TMCC advance written notice of any separate agreement subjecting the Affiliate to the terms of this Agreement between any Affiliate and ALLTEL to which TMCC is not also a party.

"**4.2    Locations.**  For production purposes, there shall be only one Installation Site, which shall be identified in the applicable Product Schedule.  For regular offsite backup, temporary emergency relocation and the operation of Non-Production Copies (defined below), at no additional charge, TMCC, its Affiliates and its Authorized Representatives may use the Software and Documentation at any (unlimited number) of additional TMCC, Affiliates' or dealer locations.  For purposes of this Agreement, "Non-Production Copies" are defined as copies of the Software used exclusively for purposes other than as used in a live production environment.  TMCC, its Affiliates and its Authorized Representatives also may keep a copy of the Software and the Documentation at a backup site exclusively for backup and disaster recovery purposes.  TMCC agrees that the Affiliates and the Authorized Representatives will not make copies, or similar versions of the

1

Software or any part thereof without the prior written consent of ALLTEL, except as expressly provided otherwise herein.

**"4.3    Use Restrictions.**

"4.3.1  TMCC is not authorized to use or allow any other party to use the Software for service bureau purposes or to act as a processor for any third parties, except as may be mutually agreed to by ALLTEL and TMCC.

**"4.3.2  Outsourcing.**

"(a)  At any time after the Effective Date, TMCC may outsource the application maintenance processing and/or the data center operations of the object code version of Software to a third party operator ("Operator"), subject to the following conditions:  (i) the outsourcing is a part of the outsourcing by TMCC or its Affiliates of a material portion of its applications; (ii) Operator is a publicly traded company with a market capitalization of at least 1 billion dollars at some time within the three (3) months prior to the time TMCC elects to outsource or is controlled by such a company; (iii) the outsourcing operations are performed in the United States of America; and (iv) the Operator enters into an Operating Agreement with ALLTEL and TMCC, in substantially the form attached as Exhibit B to this Agreement (unless otherwise provided in the Product Schedule) ("Operating Agreement"); provided, however, that ALLTEL will not unreasonably withhold signing such Operating Agreement if it is substantially similar to the terms of the form attached as Exhibit B to this Agreement.  Any change to the market capitalization of Operator or its controlling entity following the date of the Operating Agreement shall not affect the continuing validity of the Operating Agreement for this purpose.

"(b)  If any time after the Effective Date, TMCC elects to outsource the application maintenance processing and/or the data center operations of Software under any circumstances other than those described in Section 4.3.2(a) above, TMCC may do so subject to the following conditions: (i) the Operator enters into an Operating Agreement as described in Section 4.3.2(a) above (and such condition is subject to the proviso in Section 4.3.2(a) above) and (ii) in addition to all other fees payable hereunder, TMCC pays to ALLTEL a mutually agreed annual outsourcing fee ("Outsourcing Fee") not to exceed twenty-five percent (25%) of the then current annual maintenance fees for the Software as provided in the applicable Product Schedule, which Outsourcing Fee is payable on the same terms as the maintenance fees in the applicable Product Schedule. TMCC agrees that at any time that TMCC considers outsourcing the services described in this Section 4.3.2(b) that TMCC will provide ALLTEL an opportunity to submit a proposal to perform such services. In the event that ALLTEL and TMCC enter into an agreement for ALLTEL to provide such services, TMCC shall not be required to pay an Outsourcing Fee as described herein.

"(c) Notwithstanding anything to the contrary, this Agreement shall not be construed to preclude TMCC from using the License for the Software and Documentation for the purposes of processing information for entities formed to acquire and securitize receivables owned by TMCC or its Affiliates, for Affiliates, or for affiliates of Southeast Toyota Distributors LLC or of Toyota Material Handling, U.S.A., Inc. and/or for TMCC's administration of such third parties' financial services portfolios. For purposes hereof, "administration" by TMCC means a combination of information technology services and administrative services for financial services portfolios."

2.    Section 6.1 of the Master Software License Agreement is hereby amended by adding the following new paragraphs:

"If the Software as agreed upon is scheduled to be delivered to TMCC in specific phases, or delivered in portions less than the totality of the Software ("Phased Delivery Software") such Phased Delivery Software shall be described (including the content and delivery date) in the particular Product Schedule or in the related Statement of Work ("Statement of Work") under that certain Services Agreement dated as of February 7, 2000 by and between ALLTEL and TMCC, as amended ("Services Agreement"), or in documents attached to or referred to in the Product Schedule or the related Statement of Work. References to "Software" in this Agreement shall include such Phased Delivery Software."

3.    Section 6.2 of the Master Software License Agreement is hereby amended by replacing the first paragraph in its entirety with the following new paragraphs:

"Each Product Schedule or the related Statement of Work shall provide for an acceptance test period (the "Acceptance Test Period") for the Software under the Product Schedule, and shall indicate which party is responsible for installation of Software and conduct of verification testing. The length of the Acceptance Test Period for any Software shall be set forth in the Product Schedule or the related Statement of Work, may vary from Software to Software, and may be extended in accordance with the Product Schedule or the applicable Statement of Work. The event or events that cause the Acceptance Test Period to commence shall be set forth in each Product Schedule or the applicable Statement of Work.

"Following installation of Software in TMCC's test environment and verification testing, TMCC will conduct the Acceptance Test. If Software as delivered does not perform according to the applicable Documentation and the Acceptance Criteria, such non-performance shall constitute a defect ("Defect"). In the case of Software which comprises multiple elements, the failure of any such element to perform according to the Acceptance Criteria applicable to such element shall constitute a Defect. TMCC shall notify ALLTEL in writing of any and all such known Defects promptly after they become known, but not later than TMCC's notification to ALLTEL of the completion of the Acceptance Test, which shall occur no later than the expiration of the Acceptance Test Period for that Software. TMCC shall give ALLTEL the notification of Defects not less frequently than once weekly, if any Defects become known during such week. The Acceptance Test Plan shall specify any requirements as to the form of the notification, but in the absence of any provisions to the contrary TMCC may give such notification in the form of adding a description of the Defect to an "issues log" to be maintained for this purpose.

3

"Promptly after receipt of notification of a Defect in Software, ALLTEL, at its own expense, shall commence the taking of reasonable efforts to correct the Defect so that the Software meets the applicable Documentation and Acceptance Criteria, and shall continue such efforts diligently until the Defect is corrected, or until the Software (including Phased Delivery Software) is accepted or rejected, whichever first occurs, except as the parties may otherwise agree. If the Defect identified by TMCC pertains to a particular element of Software, upon correction of that element of the Software ALLTEL may, but shall not be required to, deliver to TMCC the correction to the Defect (unless the identified Defect has caused a cessation of or delay in TMCC's conduct of the Acceptance Test, in which case ALLTEL will deliver the correction to the Defect promptly). Notwithstanding the foregoing, not later than thirty (30) days after TMCC notifies ALLTEL of the completion of the Acceptance Test or thirty (30) days after the expiration of the Acceptance Test Period, whichever first occurs, ALLTEL shall: (i) correct the Software (including a Phased Delivery Software) so that such Software or Phased Delivery Software performs according to the applicable Documentation and Acceptance Criteria; and (ii) if the respective Product Schedule provides for ALLTEL to install Software in the TMCC test environment and conduct validation testing, ALLTEL will reinstall the corrected Software in the TMCC test environment in its entirety and conduct validation testing. If the respective Product Schedule provides for TMCC to install Software in its test environment, the thirty-day period shall expire upon ALLTEL's delivery of the corrected Software to TMCC.

"ALLTEL's efforts to correct any such Defects shall, to the extent reasonably possible, not delay TMCC's conduct of the Acceptance Test of Software or elements of Software not materially affected by such reported Defects.

"Upon delivery and reinstallation in TMCC's test environment of corrected Software (including an entire Phased Delivery Software), TMCC shall have an additional Acceptance Test Period to re-conduct the Acceptance Test. The additional Acceptance Test Period for Software shall be of the same duration as the initial Acceptance Test Period for that Software. If the identified Defect or Defects have not been corrected or the Software otherwise does not perform according to the applicable Documentation and Acceptance Criteria, TMCC at TMCC's sole discretion: (i) may reject the Software as provided for in Section 6.3; or (ii) may propose to ALLTEL an agreement providing for the resolution of Defects in the Software upon mutually acceptable terms and conditions, and if such an agreement is entered into in writing, the Software shall be deemed neither to be accepted nor rejected when such agreement is entered into; or (iii) may propose to accept the Software with known Defects provided that ALLTEL agrees to fix the Defects at ALLTEL's expense within a specified period, and if such an agreement is entered into in writing, TMCC will accept the Software with such known Defects. If TMCC elects option (ii) or (iii) above, TMCC retains the right to reject the Software until the written agreement is entered into. In the case of option (ii), above, the agreement shall provide that upon resolution of Defects within a period specified in the agreement and upon satisfaction of any other conditions contained in the agreement, TMCC will accept the Software; and the agreement shall provide that TMCC may reject the Software if such conditions are not satisfied.

"TMCC shall notify ALLTEL of its election provided for in the prior paragraph at or prior to the expiration of the additional Acceptance Test Period for the re-delivered Software. TMCC may make such election prior to the expiration of the additional Acceptance Test Period for the re-delivered Software. The parties acknowledge and agree that in the case of Phased Delivery Software, (i) such additional Acceptance Test Period does not commence until the delivery of the corrected Phased Delivery Software in its entirety, and (ii) Phased Delivery Software will not be

4

considered to perform according to the applicable Documentation and Acceptance Criteria unless all elements of the Phased Delivery Software perform according to the applicable Documentation and Acceptance Criteria.

"ALLTEL agrees that TMCC's Acceptance of any Software prior to final Acceptance of all Software covered by a Product Schedule (including, without limitation, TMCC's Acceptance of Phased Delivery Software) shall not limit TMCC's right to reject the Software covered by a Product Schedule in its entirety if any of such Software does not meet the applicable Documentation and Acceptance Criteria. TMCC may place in use any Phased Delivery Software upon Acceptance."

4.      Section 6.3 of the Master Software License Agreement is hereby amended and restated in its entirety as follows:

"**6.3     Rejection.** As provided in Section 6.2 above, if TMCC notifies ALLTEL of any Defect in Software (including Phased Delivery Software) and ALLTEL either does not deliver corrected Software within the period specified in Section 6.2 or such redelivered Software does not perform according to the Documentation and the Acceptance Criteria, TMCC may reject such Software or Phased Delivery Software by notifying ALLTEL in writing of said rejection. TMCC's rejection of Software shall entitle TMCC to terminate the applicable Product Schedule. Upon such termination, ALLTEL shall promptly refund to TMCC all license fees paid to ALLTEL for such Software (as defined in the applicable Product Schedule), and any other sums to which TMCC is entitled upon such rejection pursuant to the Product Schedule. TMCC shall then discontinue all use of the terminated Software and Documentation, and shall return to ALLTEL (or destroy) all copies thereof in TMCC's possession or control. Notwithstanding the foregoing, for a Product Schedule that provides for Phased Delivery Software, if TMCC rejects any Phased Delivery Software, TMCC may elect not to terminate the Product Schedule and not to discontinue use of any Phased Delivery Software TMCC had previously Accepted ("In-Use Phased Software") and any related Documentation. In such event, (a) TMCC shall have no duty to return to ALLTEL (or destroy) any copies of the In-Use Phased Software or the related Documentation; (b) ALLTEL shall not be obligated to refund to TMCC license fees TMCC had paid to ALLTEL under such Product Schedule; (c) TMCC shall have no duty to pay any additional license fees to ALLTEL under such Product Schedule; (d) ALLTEL shall continue to provide ES Services for the In-Use Phased Software on the terms provided for in the Product Schedule; and (e) the ES Services Fee for the In-Use Phased Software shall be the ES Services Fee provided for under the Product Schedule applicable to the period immediately following TMCC's acceptance of the In-Use Phased Software."

5.      Section 7.1 of the Master Software License Agreement is hereby amended by replacing Section 7.1 in its entirety (but not subsections 7.1.1 through 7.1.5) with the following:

"ALLTEL will provide Software Enhancement and Support Services ("ES Services") for the Software as set forth below unless explicitly stated to the contrary in the applicable Product Schedule. Except as expressly provided otherwise in an applicable Product Schedule, the ES Services shall be provided at no charge during the Warranty Period, as defined in Section 10.2 below, for the Software, and, in accordance with the terms hereof, for the periods of time set forth in the applicable Product Schedule ("ES Period"). ALLTEL shall correct and repair any Defect in the Software if such Defect prevents the Software from operating and performing in accordance

with the Documentation and the Acceptance Criteria or in accordance with any service level commitments, if any, provided for in a Product Schedule."

6.      Section 7.1.1 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end of sub-section 7.1.1:

"Notwithstanding the foregoing, a temporary fix that includes any operating instructions, new procedure, or new routine that, when implemented, requires TMCC to incur additional expense including hiring additional personnel or buying additional equipment or software to implement such operating instructions, new procedure, or new routine shall not be considered a Work Around."

7.      Section 7.3 of the Master Software License Agreement is hereby amended by adding the following new sentence at the end this section:

"ALLTEL's discontinuance of such ES Services shall be considered an Impact Event as defined in the Source Code Escrow Agreement dated August 25, 2000."

8.      Section 9.2 of the Master Software License Agreement is hereby amended by adding the following new sentence at the end this section:

"In the event of ALLTEL's material breach of this Agreement, TMCC may terminate this Agreement and, without limiting TMCC's other rights or remedies, such termination shall be considered an Impact Event as defined in the Source Code Escrow Agreement dated August 25, 2000."

9.      Section 11.2 of the Master Software License Agreement is hereby amended and restated in its entirety as follows:

"11.2 Except for liabilities, losses, damages and expenses related to: (i) death, personal injury or damage to property; or (ii) third party claims of infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, the liability of either Party to the other hereunder for any breach or any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement or the Services Agreement shall be limited to actual direct damages incurred by the other Party, and, except as to excepted claims, in no event shall either Party's aggregate liability for any and all claims exceed the aggregate amount actually paid to ALLTEL by TMCC under this Agreement (including Product Schedules hereunder) and under the Services Agreement (including Statements of Work thereunder) whether such claim or claims are brought under this Agreement or the Services Agreement or both. Neither party shall be liable for any special, indirect, incidental or consequential damages suffered by such party."

10.     Section 13.0 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end this section:

"If it is foreseen that a force majeure event claimed by a party will cause a delay in performance to exceed six (6) months, then the party not making the claim shall have the option to terminate the applicable Product Schedule to the Agreement without the payment of any termination for convenience fees provided for in such Product Schedule or the related Statement of Work. Further, during a force majeure event, ALLTEL shall to the extent practicable maintain any ES Services

6

service level commitments set forth in a Product Schedule. Upon the conclusion of a force majeure event, the effectiveness and enforcement of such ES Services service level commitments shall be restored and ALLTEL shall perform its obligations in conformity therewith."

11.   Section 17.0 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end this section:

"Notwithstanding anything to the contrary herein, neither party shall not be bound to the restrictions contained herein this Section 17 in the event of (i) a party commencing any proceeding under Title 11 of the United States Code ("Bankruptcy Code") or any other federal or state bankruptcy, insolvency, receivership, or similar law, or if a party is made subject to such a proceeding involuntarily; (ii) the termination of substantially all of a party's ongoing business operations relating to the subject of the Agreement; (iii) any liquidation of a party or any sale, assignment, or foreclosure of or upon assets that are necessary for the performance by a party of its responsibilities under this Agreement, or (iv) ALLTEL discontinuing ES Services."

12.   Section 18.0 of the Master Software License Agreement shall be amended to add the following sentence at the end of such section:

"Appendices and exhibits to this Agreement or to any Product Schedule are incorporated into and made a part of this Agreement or such Product Schedule, respectively."

13.   Section 20.0 of the Master Software License Agreement is hereby amended by deleting the first sentence and replacing it as follows:

"For any Software or Phased Delivery Software to which ALLTEL grants a license (in object code form only) to TMCC under this Agreement, within thirty (30) days after such license is granted ALLTEL will deposit with a third party escrow agent identified in the applicable Product Schedule ("Escrow Agent") the source code of such Software and related materials which exist and is available sufficient to enable a reasonably skilled programmer or analyst to maintain and enhance the Software, as more particularly described in the applicable Product Schedule ("Escrow Deposit")."

14.   The parties will use their best efforts to amend the Source Code Escrow Agreement dated August 25, 2000 to modify the definition of "Impact Event" therein as provided in paragraphs 7 and 8 of this First Amendment.

15.   All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

16.   All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect. This First Amendment constitutes the entire agreement between TMCC and ALLTEL relating to the subject matter hereof.

17.   Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

18.   This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

7

19.    This First Amendment shall be governed by and shall be construed in accordance with the laws of State of California.

**IN WITNESS WHEREOF**, the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

| ALLTEL INFORMATION SERVICES, INC. | TOYOTA MOTOR CREDIT CORPORATION |
|---|---|
| By: | By: |
| Name: _CLIFF THOMPSO_ | Name: _Shaun Coyne_ |
| Title: _SVP AUTO FINANCE_ | Title: _Vice President & CIO_ |
| Date: _March 4, 2002_ | Date: _March 5, 2002_ |

Exhibit 3

## SOURCE CODE ESCROW AGREEMENT

THIS SOURCE CODE ESCROW AGREEMENT (this Agreement), made and entered into as of the 25th day of August, 2000, (the Effective Date), by and among ALLTEL INFORMATION SERVICES, INC ("Licensor"); TOYOTA MOTOR CREDIT CORPORATION, the licensed end-user of Licensor's proprietary software executing this Agreement as such ("Licensee"); and FORT KNOX ESCROW SERVICES INC.  ("Escrow Agent").

This Agreement is supplementary to that certain Software License Agreement, dated August 25, 2000 between Licensor and Licensee (together with any modification, supplement, or replacement thereof agreed to by Licensee, the "License Agreement").  This Agreement is intended to provide certain guidance for the circumstances under which License shall be entitled to protect and retain rights in the Licensed Program(s) (as hereinafter defined), including associated rights in intellectual property.

### WITNESSETH:

WHEREAS, Licensor has granted Licensee a nonexclusive license to use the Licensed Program(s);

WHEREAS, Licensee has required Licensor to furnish it with access to the Source Code (as hereinafter defined) corresponding to the Licensed Programs, and such Source Code is RESTRICTED, CONFIDENTIAL, AND PROPRIETARY, protected under federal copyright law as an unpublished work and under federal and state law as trade secrets;

WHEREAS, Licensor has agreed to place such Source Code in escrow for the benefit of Licensee on the terms and conditions hereof;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

### SECTION 1
### DEFINITIONS

For purposes of this Agreement, the following definitions shall apply to the following respective capitalized terms:

**1.1 Licensed Programs.** The Licensed Programs shall consist of the entire computer programming code, together with all Updates thereto, relating to the most current release of the software programs (as the same may be customized or enhanced) specified in Exhibit A hereto.

**1.2 Update.** An Update shall mean a copy of the source code version of each modification or revision to the Licensed Programs that (a) corrects errors, problems, or defects caused by or resulting from an incorrect functioning of the Licensed Programs, (b) supports new releases of the Licensed Programs made available generally to Licensee, or (c) provides other updates or corrections.

**1.3 Source Code.** The Source Code shall mean a copy of the source code corresponding to the Licensed Programs, including all Updates delivered to the Escrow Agent from time to time pursuant to this Agreement,  and related materials which exist and are available sufficient to

enable a reasonably skilled programmer or analyst to maintain and enhance the Licensed Programs.

**1.4 Support Services.** Support Services shall consist of all installation, error correction, maintenance, and other technical assistance (including warranty service and any undertaking to provide Updates) respecting the Licensed Programs that may be required to be performed by Licensor pursuant to a written agreement between Licensor and Licensee.

**1.5 Impact Event.** An Impact Event shall consist of (a) any rejection or termination of the License Agreement or this Agreement by Licensor or its successors or representatives in breach of the provisions of the License Agreement or this Agreement, including in all events any rejection or termination of the License Agreement or any proposal to do so under Title 11 of the United States Code, as now constituted or hereafter amended (the "Bankruptcy Code"), or any other federal or state bankruptcy, insolvency, receivership, or similar law; (b) failure of a trustee, including Licensor as debtor in possession, in any bankruptcy case hereafter filed by or against Licensor either to assume the License Agreement and this Agreement within fifteen (15) days after the filing of the initial bankruptcy petition or to perform the License Agreement and this Agreement within the meaning of Section 365(a)(4)(i) of the Bankruptcy Code; (c) the termination of substantially all of Licensor's ongoing business operations relating to the subject to the License Agreement and this Agreement; (d) any liquidation of Licensor, or any sale, assignment, or foreclosure of or upon assets that are necessary for the performance by Licensor of its responsibilities under the License Agreement and this Agreement; or (e) Licensor's discontinuance of enhancement and support services for the Licensed Program(s).

## Section 2
## REPRESENTATIONS AND WARRANTIES OF LICENSOR

**2.1 Ownership of Source Code.** Licensor represents and warrants to Licensee that it is the owner of, and holder of all rights in, the Source Code, and has the right to grant to Licensee the license rights to the Source Code pursuant to Section 8 hereof and to deposit the Source Code with Escrow Agent pursuant to the terms of this Agreement.

**2.2 Licensed Programs Correspond With Source Code.** Licensor represents and warrants to Licensee that the Source Code deposited with Escrow Agent will at all times be the source code version of the current release of the Licensed Programs, as offered to Licensee from time to time.

## Section 3
## PURPOSE OF AGREEMENT; DEPOSIT OF SOURCE CODE

**3.1 Deposit and Custody of Source Code.** Escrow Agent shall release copies of the Source Code deposited in escrow pursuant to this Agreement only in accordance with the terms of this Agreement. In each instance where Escrow Agent is authorized to release a copy of the Source Code to Licensee, Escrow Agent may either release a copy on hand (provided that at all times it shall retain at least one copy of the Source Code) or make a duplicate copy to be released to Licensee.

Escrow Agent agrees to accept from Licensor, and Licensor agrees to deposit with Escrow Agent, within thirty (30) days of the Effective Date of this Agreement, two (2) copies of the Source Code relating to the current versions of the Licensed Programs. For each deposit, Escrow Agent

will issue a receipt to Licensor, accompanied by a general list or description of the materials so deposited.

Escrow Agent agrees to accept from Licensor, and Licensor agrees to deposit with Escrow Agent, within thirty (30) days after each Update is made available generally to Licensee, two (2) copies of the Source Code relating to each such Update. For each deposit, Escrow Agent will issue a receipt to Licensor, accompanied by a general list or description of the materials so deposited. In the event that an Update or series of Updates supersede a prior version of the Licensed Programs in their entirety, Licensor may require Escrow Agent to return or destroy the Source Code representing such prior version of the Licensed Programs by so notifying the Escrow Agent and Licensee in writing, provided that any such action on the part of the Escrow Agent may not commence until at least one (1) year after the delivery of the Source Code for all Updates that so supersede the prior version of the Licensed Programs.

Escrow Agent shall exercise reasonable care to protect and safeguard all Source Code delivered pursuant to this Agreement and shall segregate and label such Source Code according to the date of delivery and any other identifying information supplied by Licensor.

**3.2 Verification and Testing of Source Code.** Licensee may appoint a third party verification firm to mutually agreeable to Licensor and Licensee to test, build and review the Source Code (subject to appropriate undertakings of confidentiality and restrictions on subsequent use or disclosure) at any time, and Escrow Agent shall permit such inspections and testing promptly upon request. Except as otherwise authorized by Licensor (which authorization will not be unreasonably withheld), such inspections and testing shall be conducted at the principal offices of the Escrow Agent.

Section 4
CONFIDENTIALITY

Upon receipt of the Source Code, Licensee shall maintain the Source Code in strict confidence, shall use and disclose it only as reasonably appropriate to exercise Licensee's rights in the Licensed Programs in accordance with the License Agreement, and shall use the same degree of care it provides for its own programs in source code form to protect the Source Code as restricted, proprietary, and confidential.

Section 5
FAILURE TO PROVIDE SUPPORT SERVICES A BASIS
FOR RELEASE OF SOURCE CODE

**5.1 Failure to Provide Support Services.** Except upon the occurrence of an Impact Event (the escrow procedures for which are set forth in Section 7 hereof), in the event that either (a) Licensor gives notices of its intention to cease Support Services in accordance with the License Agreement, or (b) Licensor ceases to provide any Support Services which it is obligated to provide (except if excused because of a material breach by Licensee under this Agreement or the License Agreement other than breach of a payment obligation), Licensee shall notify Licensor in writing that Licensee intends to access the escrowed Source Code. Licensee shall simultaneously provide Escrow Agent with a copy of such notice.

**5.2 Dispute by Licensor.** For a period of ten (10) days following its receipt of such notice, Licensor shall have the right to object to release to Licensee of the Source Code by

utilizing the arbitration process set forth in Section 6 hereof.  Failure of Licensor to give timely notice of such an objection shall conclusively establish its consent to the release of the Source Code to Licensee hereunder, whereupon Escrow Agent shall release a copy of the Source Code to Licensee.

Section 6
ARBITRATION OF DISPUTES RESPECTING RELEASE OF SOURCE CODE

**6.1 Arbitration of Disputes.**  In the event of any dispute respecting the release of the Source Code under Section 5 hereof, representatives of Licensor and Licensee shall meet no later than five (5) days after delivery of Licensor's notice objecting to such release and shall enter into good faith negotiations aimed at curing the identified deficiencies alleged to exist.  If such persons are unable to resolve the dispute in a satisfactory manner within the next five (5) days, either Licensor or Licensee may seek binding arbitration hereunder.

**6.2 Arbitration Procedure.**  Upon receipt by Escrow Agent of written notice by Licensor or Licensee calling for arbitration with respect to any dispute, claim, or controversy relating to, involving, or affecting the release of the Source Code to Licensee under Section 5 hereof, the matter shall be submitted to binding arbitration.  Such arbitration shall be conducted under the commercial rules of the American Arbitration Association by a single arbitrator appointed by the American Arbitration Association.  Insofar as possible, such arbitrator shall be, at the time of his selection, a partner or manager of a national or regional accounting firm (including the information processing, management support, and merger and acquisitions operations or affiliates thereof) not regularly employed by the Licensor or Licensee, and such arbitrator shall be required to have substantial experience in the field of computer software technology and licensing.  The sole issue for arbitration shall be whether Licensor has failed to provide any Support Services which it is obligated to provide.  If the arbitrator shall determine such a failure does exist, he shall so notify the parties.  Upon receipt of such notice, Escrow Agent shall release a copy of the Source Code to Licensee.  The decision of the arbitrator shall be final and binding on Licensor, Licensee, and Escrow Agent and may be entered and enforced in any court of competent jurisdiction by any such party.

**6.3 Costs of Arbitration.**  The prevailing party in the arbitration proceedings shall be awarded reasonable attorneys' fees, expert witness costs and expenses, and all other costs and expenses incurred directly or indirectly in connection with the proceedings (including those of the Escrow Agent), unless the arbitrator for good cause determines otherwise.

Section 7
IMPACT EVENT AS BASIS FOR RELEASE OF SOURCE CODE

**7.1 Release.**  If Licensor suffers an Impact Event at any time or for any reason, Licensee may so notify Escrow Agent in writing.  Such notice shall be accompanied by reliable evidence of such occurrence.  Upon receipt of such notice and proof, Escrow Agent shall promptly release and deliver a copy of the Source Code to Licensee.

In addition, following such event, Licensee shall be responsible for any fees or expenses of the Escrow Agent thereafter accruing in conjunction with this Escrow Agreement which would otherwise be payable by Licensor.

A-4

**7.2 Intention.** In the event that Licensor or its successors or representatives rejects or terminates the License Agreement or this Agreement in breach of the provisions thereof or hereof, including as contemplated under Section 365 of the Bankruptcy Code, it is acknowledged that this Agreement contemplates the manner in which Licensee may retain its rights in the Licensed Programs, including associated intellectual property rights, if Licensee chooses to do so in accordance with Section 365(n) of the Bankruptcy Code. This Agreement serves as a contract supplementary to the License Agreement in such regard. It is the parties' intent that the rights Licensee shall be entitled to retain shall be of the scope provided in Section 8 hereof in all items delivered or required to be delivered under the License Agreement and this Agreement. Further, such rights shall be subject to no restriction following an election by Licensor to reject or terminate the License Agreement or this Agreement, except (a) the confidentiality provisions contained in Section 4 of this Agreement, (b) the sublicense terms required of Licensee under Section ..... of the License Agreement, and (c) the territorial limitations contained in Section ..... of the License Agreement. Such rights shall be exclusive and either renewable or perpetual to the extent so provided under the License Agreement.

## Section 8
## LICENSE OF SOURCE CODE

In the event that a copy of the Source Code is authorized hereunder to be delivered out of escrow to Licensee, Licensee shall immediately obtain, without any further action, authorization, or instrument, a license from Licensor with the same term and geographic scope as the license granted for the Licensed Programs under the License Agreement, to use, modify, maintain, and update the Source Code in any manner that may be necessary or appropriate to enable such Licensee to use the Licensed Programs for its intended purposes in accordance with the License Agreement.

## Section 9
## FEES AND PAYMENTS

Licensor and Licensee each shall bear one-half of, and shall pay to Escrow Agent, annually in advance during the term hereof, all fees of the Escrow Agent at its prescribed rate.

## Section 10
## LIMITATION UPON OBLIGATION OF ESCROW AGENT

**10.1 Limited Duty of Inquiry.** Escrow Agent shall not be required to inquire into the truth of any statements or representations contained in any notices, certificates, or other documents required or permitted hereunder, and it may assume that the signatures on any such documents are genuine, that the persons signing on behalf of any party thereto are duly authorized to issue such document, and that all actions necessary to render any such documents binding on any party thereto have been duly undertaken. Without limiting the foregoing, Escrow Agent may in its discretion require from Licensor or Licensee additional documents which it deems to be necessary or appropriate to aid it in the course of performing its obligations hereunder.

**10.2 Right to Interpleader.** Notwithstanding any other provision of this Agreement, in the event Escrow Agent receives conflicting demands from Licensor and Licensee respecting the release of the Source Code to Licensee hereunder, Escrow Agent may, in its sole discretion, file an interpleader action with respect thereto in any court of competent jurisdiction and deposit the

Source Code with the clerk of the court or withhold release of the Source Code until instructed otherwise by court order.

**10.3 Release and Indemnification of Escrow Agent.** Licensor and Licensee do hereby (a) release, and agree to indemnify and hold harmless, Escrow Agent from and against any and all liability for losses, damages, and expenses (including attorneys' fees) that may be incurred by it on account of any action taken by Escrow Agent in good faith pursuant to this Agreement, and (b) agree to defend and indemnify Escrow Agent from and against any and all claims, demands, or actions arising out of or resulting from any action taken by Escrow Agent in good faith pursuant to this Agreement.

Section 11
INDEPENDENT CONTRACTOR STATUS

The parties hereto are and shall be independent contractors under this Agreement, and nothing herein shall be construed to create a partnership, joint venture, or agency relationship between or among the parties hereto. Without limiting the generality of the foregoing, Escrow Agent shall be regarded as an independent custodian of the Source Code and not as an agent or trustee of Licensor.

Section 12
TERM OF AGREEMENT

**12.1 Term.** The term of this Agreement shall commence on the effective date hereof and shall continue from year to year until this Agreement is terminated hereunder.

**12.2 Termination.** This Agreement shall terminate:

1.    By mutual consent of Licensor and Licensee at any time;

2.    By Escrow Agent at any time, provided that Escrow Agent has given Licensor and Licensee notice to that effect in writing at least ninety (90) days before the contemplated date of termination, whereupon Licensor shall diligently attempt to identify an independent successor Escrow Agent, reasonably acceptable to Licensee, who is agreeable to assuming all further obligations of Escrow Agent hereunder;

3.    Automatically, in the event that copies of the Source Code are released to Licensee in accordance with the terms of this Agreement; or

4.    Sixty (60) days after Licensor issues to Licensee and Escrow Agent a certificate confirming that Licensee is no longer entitled to Support Services from Licensor, provided that such termination shall not occur on such basis if Licensee disputes such certificate by sending Licensor and Escrow Agent notice to that effect in writing within such period, and in the event of such objection, the parties shall resort to the arbitration process set forth in Section 6 hereof for resolution of the dispute, in which case, the sole issue for arbitration is whether the Licensee is no longer entitled to Support Services from Licensor. If the arbitrator shall so determine that Licensee is no longer entitled to Support Services from Licensor, he shall so notify the parties. Upon the parties' receipt of such notice, this Agreement shall terminate.

A-6

Upon termination of this Agreement, following distribution of copies to Licensee to the extent so required hereunder, all remaining copies of the Source Code shall be delivered to Licensor, except that in the event of termination at the instance solely of the Escrow Agent, such copies shall be delivered to the successor Escrow Agent.

Section 13
MISCELLANEOUS

**13.1 Compliance with Laws.** The parties hereto agree that they shall comply with all applicable laws and regulations of governmental bodies or agencies in their respective performance of their obligations under this Agreement.

**13.2 No Undisclosed Agency; No Assignment.** Each party represents that it is acting on its own behalf and is not acting as an agent for or on behalf of any third party; and further agrees that it may not assign its rights or obligations under this Agreement without the prior written consent of the other parties hereto (except that an assignment by Licensee of such rights requires only the consent of Licensor, and an assignment by Licensor requires only the consent of Licensee).

**13.3 Notices.** All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be considered effective at the earlier of (a) three days after such notice has been deposited in the United States mail, postage prepaid, and addressed to the respective party at the address shown above (in the case of Licensor and Escrow Agent) or shown in Appendix A hereto, unless by such notice a different address shall have been designated, or (b) the date on which such notice is actually received by the respective party after hand or courier delivery.

**13.4 Governing Law.** All questions concerning the validity, operation, interpretation, and construction of this Agreement shall be governed by and determined in accordance with the laws of the State of New York.

**13.5 No Waiver.** No party shall, by mere lapse of time, without giving notice or taking other action hereunder, be deemed to have waived any breach by the other party(ies) of any of the provisions of this Agreement. Further, the waiver by any party of any particular breach of this Agreement by any other party shall not be construed to constitute a continuing waiver of such breach or of any other breaches of the same or other provisions of this Agreement.

**13.6 Force Majeure.** No party shall be held responsible for any act, failure, event, or circumstance addressed herein if such act, failure, event, or circumstance is caused by conditions beyond such party's reasonable control.

**13.7 Partial Invalidity.** If any provision of this Agreement is held illegal, unenforceable, or in conflict with any law of any federal, state, or local government having jurisdiction over this Agreement, the validity of the remaining provisions hereof shall not be affected thereby.

**13.8 Complete Statement of Agreement.** The parties hereto acknowledge that each has read this Agreement, understands it, and agrees to be bound by its terms. The parties further agree that this Agreement is the complete and exclusive statement of their agreement with respect to the subject matter hereof, and supersedes all oral or written proposals, understandings, representations, warranties, covenants, and communications between the parties relating hereto.

A-7

This Agreement is intended by the parties to constitute an agreement completely independent of any other agreement between or among any combination of the parties hereto, whether or not any such other agreement involves the Licensed Program, except to the limited extent necessary to define the scope of Support Services for purposes of this Agreement. The continuing, contingent, or future rights or obligations of any party under any other agreement whatsoever shall not be regarded as necessary or implied consideration for the execution, validity, or performance of this Agreement.

**13.9 Remedies.** The description of the possible occurrences that would constitute an Impact Event, and the consequences thereof, shall create no presumption that Licensor may or should be permitted to reject or terminate the License Agreement or this Agreement under application law. The parties agree that such a rejection or termination would be highly prejudicial to Licensee's interests, and enforcement of the Agreement will not provide a complete or adequate remedy for the harm to Licensee's interests.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as set forth below.

LICENSOR
ALLTEL INFORMATION SERVICES, INC

By: _____    STEVEN R. PIERCE

Title: SVP/DIRECTOR

Date: 8/25/00


ESCROW AGENT
FORT KNOX ESCROW SERVICES INC.

By: _____

Title: ACCOUNT EXECUTIVE

Date: 9.6.00


LICENSEE
TOYOTA MOTOR CREDIT CORPORATION

By: _____

Title: GVP

Date: 8/29/00


A-9

# Exhibit 4

**FIRST AMENDMENT**
**TO SOURCE CODE ESCROW AGREEMENT**

This **FIRST AMENDMENT** ("First Amendment") is effective as of the 25th day of August, 2000 ("First Amendment Effective Date"), and amends and supplements that certain Source Code Escrow Agreement, dated as of August 25, 2000 ("Agreement"), by and between Toyota Credit Corporation ("Licensor"); ALLTEL Information Services, Inc. ("Licensee") and Fort Knox Escrow Services Inc. ("Escrow Agent").

            **WHEREAS**, Licensor licensed its AP7000 Software to Licensee under certain terms in conditions contained in Product Schedule A to the License Agreement; and

            **WHEREAS**, Licensor and Licensee desires to acknowledge the mutual agreement of the parties with respect to on for defining an Impact Event; and

            **NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

            1.     Notwithstanding anything to the contrary in Section 1.5 of the Agreement, pursuant to Section 7.0 of Product Schedule A (ES Services Default) to the License Agreement, in the event that ALLTEL is unable to resolve a Defect in accordance with the procedures thereunder, such default shall be considered an "Impact Event" (as defined in the Agreement) and TMCC shall be entitled to a release of the AP7000 source code.

            2.     All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

            3.     All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect.

            4.     Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

            5.     This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

**IN WITNESS WHEREOF**, the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

**ALLTEL INFORMATION SERVICES, INC.**

By: _____

Name: _____STEVEN P. PIERCE_____

Title: _____SVP / DIRECTOR_____

Date: _____8/25/00_____

**TOYOTA MOTOR CREDIT CORPORATION**

By: _____

Name: _____MICHAEL DEADERICK_____

Title: _____GVP_____

Date: _____8/29/00_____

**FORT KNOX ESCROW SERVICES INC.**

By: _____

Name: _____CHRISTIAN DOPPER_____

Title: _____ACCOUNT EXECUTIVE_____

Date: _____9.6.00_____

i:\client\toyota\software\sscwamd.doc

# Exhibit 5

Toyota Motor Credit Corporation
Effective Date: _____ , 2000

## PRODUCT SCHEDULE No. 1
## to
## SOFTWARE LICENSE AGREEMENT

The terms and conditions of that certain Master Software License Agreement between ALLTEL Information Services, Inc. ("ALLTEL") and Toyota Motor Credit Corporation ("TMCC"), dated _____ 2000 (the "Agreement") apply to this Product Schedule No. 1 ("Product Schedule"). This Product Schedule is effective on this ___ day of _____, 2000 ("Product Schedule Effective Date"). Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Agreement.

### 1. Scope of License.

1.1    ALLTEL grants to TMCC a perpetual, non-exclusive world-wide license (effective as of the Product Schedule Effective Date) to the ALLTEL Software as defined in the Services Agreement ("AP7000 Software").

1.2    The Software licensed hereunder may be installed on an unlimited number of servers and on up to 600 client workstations ("Base Number") at an unlimited number of locations of choosing (collectively, the "Installation Site"), without payment of additional License Fees, so long as the Software installed at all such locations accesses a single database or an exact copy of that single database (an "Exact Database Copy"). An Exact Database Copy of a database must have the same data content as all other copies of that database, allowances being made for update timing delays inherent in the database replication process.

1.3    TMCC may upgrade or enlarge the hardware at any location on which the AP7000 Software resides without restriction and without payment of additional License Fees. However, the addition of client workstations beyond the Base Number requires payment of additional License Fees for each such additional client workstation as specified in Attachment 1 to this Product Schedule.

1.4    **Additional Database Locations; Enterprise License.** TMCC may install an exact replica of the Software accessing other databases that are not an Exact Database Copy, as specified above ("Server Licenses"), at a location or locations in addition to those designated locations cited above upon payment of an additional License Fee for each such additional location, in the amount designated in Attachment 1 to this Product Schedule, or for an unlimited number of Server Licenses, upon payment of the Enterprise License fee specified on Attachment 1 hereto.

**1.5** ALLTEL will install the AP7000 Software and all related Documentation without any transfer of tangible personal property to TMCC, and will sign an affidavit when ALLTEL has completed delivery, installation and acceptance and has left the Installation Site, stating that no tangible property (including, but not limited to tangible copies of software, disks, training materials, and documentation) has been transmitted to TMCC or left at the Installation Site.

**1.6** The performance of the AP7000 Software depends upon the availability of computer hardware and related operating software and database software, all of which is sufficient in size, speed, type, quantity and functionality to support TMCC's business operations and business volume. If TMCC does not acquire, install, make operational and make available for use by the AP7000 Software, computer hardware that is at least the equal of that specified in the AP7000 configuration guide attached hereto as Attachment 4 and incorporated by reference into this Product Schedule, for TMCC's business type and business volume, then, ALLTEL shall not be responsible for its obligations under the performance warranties set forth herein and in Section 10.2 until such time as TMCC becomes compliant in accordance with this Section.

**1.7** TMCC acknowledges and agrees that it shall be solely responsible for the results obtained from all TMCC credit rules and policies incorporated into the AP7000 Software, whether by TMCC or by ALLTEL on TMCC's behalf, and that ALLTEL shall have no liability whatsoever regarding any failure of such rules and policies to comply with fair lending law, the United States Equal Credit Opportunity Act, any regulation promulgated thereunder, or any other law or regulation. Notwithstanding the foregoing, when setting credit rules and polices, the AP7000 Software will implement such credit rules and policies as set forth in the Documentation.

**1.8** [Intentionally Omitted]

**1.9** Outsourcing. The provisions concerning outsource rights set forth in Section 4 of the Agreement are not applicable to AP7000. For purposes of AP7000, the parties acknowledge that TMCC may outsource the application maintenance processing and the data center operations of the AP7000 Software to a third party operator ("Operator"). (This exception for AP7000 is not intended as a precedent for other products that ALLTEL may sell or license to TMCC in the future). TMCC shall provide to ALLTEL written notice of such outsourcing, with the name and address of the Operator and a contact person at the Operator. TMCC shall cause Operator to enter into an agreement with TMCC which obligates Operator to the confidentiality, proprietary rights, use and ownership provisions and duties set forth in the Master Agreement between ALLTEL and TMCC. TMCC and Operator shall make TMCC's vendors and suppliers intended third party beneficiaries of such agreement. TMCC shall require and enforce such obligations and duties of the Operator. TMCC agrees to be jointly and severally liable to ALLTEL for breaches by the Operator of said obligations and duties, and the cap on certain liabilities in section 11.2 equal to the amount of license fees paid shall not apply to this obligation in this sentence; however the exclusion of consequential damages and other limitations of liability shall apply to the obligations in this sentence.

**2.0** Third Party Software. The Third Party Software that is (or will be) incorporated into the AP7000 Software is identified on Attachment 3 hereto.
ALLTEL hereby provides the following warranty for the Carleton Third Party Software

ALLTEL will assist TMCC in determining that Carleton's Licensed Software referenced in Attachment 3 hereto ("Licensed Software") is in compliance through the use of its established relationship with state regulatory agencies. ALLTEL will provide an array of test loan transactions generated from the AP7000 system for each state the Licensee is a licensed lender. ALLTEL will send the test loan transactions to the appropriate state regulatory agency for compliance approval.

In the event that loan computations generated from the Licensed Software under maintenance are found to be out of compliance, ALLTEL will provide TMCC with supporting documents which explain the basis for computations. ALLTEL will also provide assistance to correct and recast if necessary all loan transactions in violation of compliance. ALLTEL will also make the necessary changes to the Licensed Software on a timely basis so that the Licensed Software is compliant.

ALLTEL warrants that the Licensed Software and all updates and maintenance have been and will be developed and tested using reasonable care; however, the Licensee shall be solely responsible for confirming the Licensed Software for accuracy and compliance with all laws.

THERE ARE NO OTHER WARRANTIES EXCEPT AS STATED ABOVE EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS, FOR ANY PURPOSE IN RELATION TO THE LICENSED SOFTWARE. LICENSEE SHALL BE SOLELY RESPONSIBLE FOR THE SELECTION, USE, EFFICIENCY, AND SUITABILITY OF THE LICENSED PRODUCT.

**3.0    Fees.**

3.1    The License Fees payable to ALLTEL for the Software are as specified in Attachment 1 hereto.

3.2    Within ten (10) days of receipt of ALLTEL's correct invoice therefor following execution of the Product Schedule, TMCC agrees to pay to ALLTEL fifty percent (50%) of the total License Fees for the AP7000 Software defined in Attachment 1 hereto, and the remaining balance of such License Fees following receipt of ALLTEL's correct invoice therefor issued upon the Acceptance Date pursuant to the payment terms of the Agreement.

3.3    TMCC agrees to pay all applicable transportation and shipping charges for the Software from any ALLTEL or manufacturer's location to the destination specified by TMCC, if any.

**4.0    ES Services.** ALLTEL will provide the ES Services, as described more specifically on Attachment 2 hereto, commencing upon the Acceptance of the Software, solely in the United States (and its possessions) and Canada (collectively, herein, "North America"); provided that, the ES Services shall be performed outside of North America by ALLTEL for an additional ES Fee to be mutually agreed between the parties at the time of TMCC's request for any ES Services outside of North America. The initial ES Services fee ("ES Services Fee"), covering the period from Acceptance through the date of the first anniversary of the Warranty Expiration Date (defined below), is specified in Attachment 1 hereto and will be due and payable to ALLTEL upon expiration of the six (6) month warranty period from the Acceptance Date

("Warranty Expiration Date"). From and after the date of the first anniversary of the Warranty Expiration Date, ES Services may be renewed for successive periods of one (1) year each while the Agreement remains in effect with sixty (60) days' prior written notice subject to termination rights described below. ALLTEL agrees to provide TMCC written notice of any increase in ES Fees applicable to any renewal term thereunder not less than one-hundred and twenty (120) days prior to the start of the renewal term. The ES Fees for the AP7000 Software may be increased for the calendar year following the year of the Product Schedule Effective Date and for all subsequent years during the ES Period by multiplying such fee by a fraction, the numerator of which is the Department of Labor Consumer Price Index ("CPI-U"), Other Goods and Services, as of December 31, of the calendar year immediately preceding the year in which such fee is due and the denominator of which is the CPI-U, Other Goods and Services as of December 1 of the calendar year before the Product Schedule Effective Date. In no event, however, shall the annual ES Fee increase for any Software be more than ten percent (10%) or less than three (3.0%) of the previous year's annual ES Fee for such Software. Upon termination of the ES Services hereunder by ALLTEL for any reason other than TMCC's breach hereof, TMCC shall be entitled to access source code held in escrow pursuant to Section 20 of the Agreement. The ES Services will immediately terminate upon termination of the Agreement.

In the event that an Update pursuant to the ES Services shall require TMCC to change its hardware configuration in order to run the AP7000 Software, ALLTEL shall provide TMCC six (6) months advance notice of said Update. TMCC shall have the right not to install said Update in which case ALLTEL shall continue to support the latest Update prior to the change for a period of two (2) years from the notice date.

**5.0     AP7000 Software Testing and Acceptance.**

    **5.1     Acceptance.** Once ALLTEL has completed installation and all modifications of the AP7000 Software as defined in the Statement of Work, dated June 29, 2000, under the Services Agreement, it shall notify TMCC that the AP7000 Software is ready for testing (the "Acceptance Test"). Within a reasonable amount of time prior to the commencement of the Acceptance Test, ALLTEL and TMCC shall mutually agree upon a plan (the "Acceptance Test Plan") that documents the test schedule, Acceptance Criteria (defined below), and procedure for performing the Acceptance Test. The goals of the Acceptance Test are to determine whether: (i) the AP7000 Software performs in accordance with the specifications in the Documentation, (ii) the AP7000 Software performs according to the performance criteria mutually identified by the Parties ("Performance Criteria"); and (ii) the AP7000 Software performs functionally in an operating business unit of TMCC (a "Production Environment"). Collectively, i, ii, and iii above are the "Acceptance Criteria".

    **5.1.1** Unless otherwise agreed to by the Parties, ALLTEL shall install the AP7000 Software in TMCC's test environment. TMCC shall then, for a period agreed to by the Parties and defined by TMCC in the Acceptance Test Plan (the "Acceptance Test Period") and using the Acceptance Criteria documented in the Acceptance Test Plan, perform the Acceptance Test.

    **5.1.2** If the AP7000 Software as delivered does not perform to the Acceptance Criteria, TMCC shall notify ALLTEL in writing (and in accordance with the Issues Management procedure set forth in Section 8.2 of the Statement of Work, dated

June 29, 2000, to the Services Agreement) of any and all Defect(s) during the Acceptance Test. ALLTEL must correct such Defect(s) and deliver corrected AP7000 Software to TMCC, in accordance with the response times defined in the Defect Severity Code Chart in Section 7.1.1 of the Agreement. To the greatest extent possible, the Acceptance Test will proceed concurrently with ALLTEL's efforts to correct any reported Defect(s). Following ALLTEL's delivery of corrected AP7000 Software to TMCC and unless otherwise agreed to by the Parties, TMCC shall have ten (10) business days to install said corrected AP7000 Software in its test environment. If ALLTEL is unable to correct the Defect(s) within the relevant cure period defined in the Severity Code Chart in Section 7.1.1 of the Agreement, or if Defect(s) remain after the corrected AP7000 Software is tested, TMCC may reject the AP7000 Software in accordance with the terms of the Agreement, or at TMCC's discretion, report the Defect(s) again. The Acceptance Test Period will be extended by a reasonable amount of time, not to exceed the amount of time initially allotted for the Acceptance Test.

Upon TMCC's rejection of the AP7000 Software pursuant to the Agreement, TMCC shall be entitled to retain (in addition to receiving a refund from ALLTEL of all License Fees paid for the AP7000 Software) any holdback amounts as defined in the Statement of Work from the Service Fees payable to ALLTEL under the Statement of Work, dated as of June 29, 2000.

**6.0    Performance Warranty.** In addition to the performance warranty (and all other warranties) specified in the Agreement, ALLTEL warrants and represents that, for six (6) months from the Acceptance Date, in the event the AP7000 Software does not perform in accordance with the Acceptance Criteria due to a defect in the server database, ALLTEL shall (i) advise TMCC of the estimated scope of required repairs or other corrections and the estimated timeframe to complete said repairs, and (ii) only upon TMCC's written approval to proceed (to be granted within TMCC's sole discretion), correct the performance Defect by effecting any necessary repair or by replacement with an Oracle database or other similar database at no charge to TMCC; provided that TMCC shall be responsible for licensing any such replacement database. If TMCC declines to proceed with the proposed repairs, TMCC shall be entitled to the breach of warranty remedies provided in Section 10.8 of the Agreement.

**7.0    ES Services Default.** In the event that ALLTEL is unable to resolve a Defect by the date of the applicable Work Around Delivery Date ("Deadline Date"), no later than the close of business (Eastern Standard Time) on the Deadline Date, the Parties shall resort to the Dispute Resolution procedures in Section 22 of the Agreement, on an expedited basis of twenty-four (24) hours for each level of escalation. In the event that, after exhaustion of the foregoing dispute resolution process, the Defect remains unresolved, then, for each day or part of a day that the Defect remains unresolved beyond the applicable Deadline Date (including the period of the above dispute resolution process efforts), ALLTEL shall pay TMCC an amount equal to two times the current annualized ES Fees for the Software divided by three hundred sixty-five (365). In no event shall such penalty be applied for more than thirty (30) days after the applicable Final Resolution Deadline unless TMCC is unable, by agreement or otherwise, to obtain release of source code, in which case said penalty shall continue until TMCC is able to obtain the source code. If a Defect remains unresolved after thirty (30) days after the applicable Final Resolution Deadline, TMCC shall be entitled to release of source code pursuant to the Escrow Agreement, and to all other remedies available at law or in equity.

**8.0    Escrow of AP7000 Software Source Code.**

    **8.1**    Items to be included in the Escrow Deposit for the AP7000 Software, to the extent available and to the extent applicable, are as follows:

- Two (2) copies of the source code for each version of the licensed AP7000 Software, including any integrated Third Party Software on optical media, in the original programming code language;

- Source code print out (on paper, microfilm or CD-ROM);

- All manuals necessary for operation (i.e. installation, operator, user);

- Maintenance tools (test programs, program specification);

- Descriptions of the system/program generation;

- Necessary non-ALLTEL proprietary software or a listing of such software if ALLTEL's rights do not allow deposit in escrow;

- Menu and support programs and subroutine libraries in source and object form;

- Compilation and execution procedures in human and machine readable form (may be supplemented with a video explanation by programming personnel); and

- A list of any encryption keys or passwords used in the materials provided.

    **8.2**    The Escrow Agent shall be FORT KNOX.

    **8.3**    For the AP7000 Software, there shall be attached to the Escrow Agreement for the source code an addendum adding to the definition of "Impact Event" thereunder, ALLTEL's failure to resolve any Defect beyond thirty (30) days after the applicable Final Resolution Deadline after exhaustion of the dispute resolution procedures set forth in Section 7 of this Product Schedule.

**9.0    Termination for Convenience.**  In the event TMCC elects to terminate this Product Schedule for its convenience, in addition to the sums specified in the Agreement, TMCC also shall pay to ALLTEL all service fees related to the AP7000 Software incurred up to the effective date of such termination, including those services under the Statement of Work, dated June 29, 2000, to the Services Agreement, including any holdback amounts defined thereunder, plus thirty-five percent (35%) of the remaining budgeted services fees from such date of termination through conclusion of the services as originally described in the Statement of Work had termination not occurred prior to the Acceptance Date.

**10.0    Additional Specifications:**  The AP7000 Software will contain those specifications set forth in any statements of work (including without limitation, the Gap Analysis as identified in a Statement of Work, dated June 29, 2000, to the Services Agreement) and through any Change Request based on the procedures defined in the Statement of Work to the Services Agreement ("Additional Specifications").

**11.0   Indemnification Exception.**  Notwithstanding anything to the contrary in Section 10.7 of the Agreement, ALLTEL will not be liable for any infringement claims which result from use of the AP7000 Software outside of the United States, including its possessions, and Canada.

Product Manager: _____

TMCC Designated Contact Person: _____

Acceptance Test Plan Delivery Date: _____

Production Environment: _____

Delivery Date: _____

Test Site Address:

      Toyota Motor Credit Corporation

| ALLTEL INFORMATION SERVICES, INC. | TOYOTA MOTOR CREDIT CORPORATION |
|---|---|
| By: _____ | By: _____ |
| Name: STEVEN R. PIERCE | Name: George Borst |
| Title: SVP / Director | Title: Sr. Vice President & Gen. Mgr. TFS |
| Date: 8/25/00 | Date: 8/25/00 |

## ATTACHMENT 1 TO PRODUCT SCHEDULE A
## INVESTMENT SUMMARY FOR TMCC

Software License, Additional Site License and ES Services Fees. All prices are one-time perpetual license fees unless designated "annual" in which case the price represents a recurring annual fee.

| Qty | AP7000 Software Summary | Price |
|---|---|---|
| 1 | AP7000 Base Module - Up to 600 Users connected to one Server Site. Additional licenses for Users beyond 600 are available at $295 per additional User. Additional licenses for Users beyond 600 who are dealers with which TMCC transacts business are available for a fee of $74 per dealer. | $467,855 |
| | AP7000 Document and Image Management Base Module Server License | 4,995 |
| 1 | AP7000 Document and Image Management Base Module User License - Up to 600 Users connected to one Server Site. Additional licenses for Users beyond 600 are available at $295 per additional User. | 177,000 |
| 1 | AP7000 Auto Loan Module - Unlimited Users. | 40,000 |
| 1 | AP7000 Auto Lease Module - Unlimited Users. | 40,000 |
| 1 | AP7000 Auto Business Loan Module - Unlimited Users. | 40,000 |
| 1 | AP7000 Validation & Discounting Module – Retail - Unlimited Users. | 40,000 |
| 1 | AP7000 Validation & Discounting Module – Lease - Unlimited Users. | 40,000 |
| 1 | AP7000 Validation & Discounting Module – Business Lease - Unlimited Users. | 40,000 |
| 1 | AP7000 Entry Module - Unlimited Users. | 57,000 |
| 1 | AP7000 Image Viewer Module - Unlimited Users. | 15,000 |
| 1 | AP7000 Advanced Credit Risk Manager (ACRM) Module – Unlimited Users. | 55,000 |
| 1 | AP7000 ACH Module - Unlimited Users. | 5,000 |
| 1 | AP7000 Compliance Module - 50 states plus Puerto Rico. | 35,850 |
| 1 | AP7000 Black Book Integration Module – Unlimited Users. Retrieval fees billed separately at $0.14 per retrieval for over 50,000 retrievals per month. | 8,000 |
| 1 | AP7000 Kelly Bluebook Integration Module – Unlimited Users. Monthly access fees billed separately directly by Kelly. | 5,000 |
| 1 | AP7000 NADA Collateral Integration Module - Unlimited Users. Retrieval fees billed separately at published rates provided to TMCC from time to time by ALLTEL. | 5,000 |
| 1 | AP7000 ALG Residual Value Interface (plus $0.12 royalty fee per retrieval, payable monthly) | 8,000 |
| | AP7000 FAX Management and Routing Module – Unlimited Users. (The cost of RightFax software and related fax processing hardware is not included in the license fee). | 15,000 |
| 1 | ALLTEL Consumer Credit Bureau Software (Equifax, TRW and TU) annual license fee. A perpetual license is available for a one-time fee of $90,000. | 31,500 |
| 1 | AP7000 D&B Business Bureau Software – basic report – annual license fee. | 10,000 |
| 1 | AP7000 TRW Business Bureau Software – basic report – annual license fee. | 10,000 |
| | TOTAL SOFTWARE LICENSE FEES: | $1,150,000 |
| | ES Services – Extended Support – annual fee. | $172,500 |

| Qty | AP2000 Software Suite | Price |
|-----|----------------------|-------|
| | Additional Server Site Non-Exact Database Copies- 20% of total Software License Fees times the number of additional server sites accessing non-Exact Database Copies. | $ 230,000/copy |
| | Enterprise License (the amount specified for the Enterprise License represents the total sum payable to ALLTEL for an Enterprise License taking into account any sums previously paid to ALLTEL for either a Base License and/or any Additional Non-Exact Database Copy Licenses). | $1,737,647* |

## ATTACHMENT 2 TO PRODUCT SCHEDULE
## ES SERVICES

**1.0    ES Services Availability.** ALLTEL will provide the ES Services set forth in Section 7 of the Agreement and as hereinafter described for the AP7000 Software as outlined below. All times are Eastern time. The Extended Support Option below is exclusive from Standard Support.

Full Extended Support

**Coverage Type:**    Attended telephone support.

**Coverage Hours:**    3:00 AM to 6:00 PM Pacific Standard Time, Monday through Saturday.

**Coverage Type:**    Automatic beeper call transfer support.

**Additional Coverage Hours:**    6:01 PM to 2:59 AM Pacific Standard Time, Monday through Saturday.

**Annual Coverage Cost:**    Included in annual ES Service Fee

**2.0    Access to AP7000 Software.** For any ES Services to be performed for the AP7000 Software at a TMCC designated location, TMCC shall provide ALLTEL full access to TMCC's computer systems, subject to TMCC's security regulations in order to provide the ES Services, and under conditions which will not obstruct ALLTEL's ability to provide such services.

# ATTACHMENT 3 TO PRODUCT SCHEDULE
## THIRD PARTY SOFTWARE
### (Section 2.0)

**Carlton Calculator Generator and Compliance Module for retail auto loans**

## ATTACHMENT 4 TO PRODUCT SCHEDULE
## CONFIGURATION GUIDE

**SEE ATTACHED**



PSI Attachment 4-2



PS1 Attachment 4-3

ATTACHMENT 5 TO PRODUCT SCHEDULE

[INTENTIONALLY DELETED]

Exhibit 6

# FIRST AMENDMENT
## TO
## PRODUCT SCHEDULE NO. 1

This **FIRST AMENDMENT TO PRODUCT SCHEDULE NO. 1** ("First Amendment"), is made and entered into as of this 1st day of March, 2002 ("First Amendment Effective Date"), by and between **TOYOTA MOTOR CREDIT CORPORATION** ("TMCC") and **ALLTEL INFORMATION SERVICES, INC.** ("ALLTEL"), and amends and supplements that certain Product Schedule No. 1 ("Product Schedule No. 1"), executed on August 25, 2000, to that certain Master Software License Agreement, Agreement Number 2000AIS002, executed on August 25, 2000 (the "Agreement"), by and between TMCC and ALLTEL.

**WHEREAS,** TMCC and ALLTEL desire to make certain changes to the Product Schedule No. 1 on the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1. All references in the Product Schedule No. 1 to "AP7000" shall be deemed to refer to "ALS-COM."

2. (a)     Section 1.1 of Product Schedule No. 1 is amended to add the following sentences at the end of Section 1.1:

   "For each Phased Delivery Software (as defined in Section 5.0 below), such license shall be effective as of TMCC's acceptance of such Phased Delivery Software."

   (b)     Section 1.9 of Product Schedule No. 1 is amended and restated in its entirety as follows:

   "**1.9     Outsourcing.** The provisions concerning outsource rights set forth in Section 4.3 of the Agreement, as amended, are not applicable to ALS-COM. For purposes of ALS-COM, the parties acknowledge that TMCC may outsource the application maintenance processing and/or the data center operations of the ALS-COM Software to a third party operator ("Operator"). TMCC shall provide to ALLTEL written notice of such outsourcing, with the name and address of the Operator and a contact person at the Operator. TMCC shall cause Operator to enter into an agreement with TMCC which subjects Operator to effectively the same confidentiality, proprietary rights, and use and ownership provisions and related duties as TMCC is subjected to under the Agreement. TMCC will make a good faith effort to include in the agreement with Operator a provision that will have the effect of making ALLTEL a third party beneficiary of such agreement, although ALLTEL need not be identified by name and a phrase such as "TMCC's vendors and suppliers" may be used. TMCC shall enforce such obligations and duties of the Operator. The indemnification by TMCC pursuant to Section 10.7 of the Agreement is broadened to extend to breaches by the Operator of said obligations and duties, on the terms and conditions provided for in Section 10.7 of the Agreement, and the cap on certain liabilities in Section 11.2 of the Agreement shall not apply to this obligation in this sentence; however, the exclusion of consequential damages and other limitations of liability shall apply to the obligations in this sentence. Notwithstanding this Section

1

1.9, the provisions of Section 4.3.2(c) of the Agreement, as amended, shall apply to ALS-COM. ALLTEL and TMCC agree that TMCC's outsourcing to an Operator of the application maintenance processing and/or the data center operations of the source code version of the ALS-COM Software, following a release to TMCC of source code under the Source Code Escrow Agreement dated as of August 25, 2000 among TMCC, ALLTEL and an escrow agent (the "Escrow Agreement"), shall not be a breach of TMCC's duties under Section 4 of the Escrow Agreement and shall be permitted by the license provided for under Section 8 of the Escrow Agreement."

3.  Section 4.0 of Product Schedule No. 1 is amended and restated in its entirety as follows:

"**4.0    ES Services.**  ALLTEL will provide the ES Services, as described more specifically on Attachment 2 hereto and Section 7.0 of this Product Schedule, commencing upon the Acceptance of the ALS-COM Software or any Phased Delivery Software as described in Section 5.0, solely in the United States (and its possessions) and Canada (collectively, herein "North America"); provided that the ES Services shall be performed outside of North America by ALLTEL for an additional ES Fee to be mutually agreed between the parties at the time of TMCC's request for any ES Services outside North America, and which shall be reasonable in relation to the additional cost and risks of performing the ES Services. The initial annual ES Services fee ("ES Services Fee") is specified in Attachment 1 hereto and will be due and payable as follows:

"(i)    Upon Acceptance of the first Phased Delivery Software, TMCC shall pay pro-rata, fifty percent (50%) of the annual ES Services Fee. Such amount shall be paid based on a one-year period. Should the second Phased Delivery Software be Accepted by TMCC either earlier or later than one year after Acceptance of the first Phased Delivery Software, the amount payable by TMCC under subsection (ii) below upon Acceptance of the second Phased Delivery Software shall either be decreased or increased, respectively, so that such amount takes into account the actual number of days the ES Services were received for the first Phased Delivery Software, payable at the fifty percent (50%) pro rata rate. Should the second Phased Delivery Software be rejected or not delivered, TMCC may continue to pay for ES Services for the first Phased Delivery Software, payable annually, at the fifty percent (50%) pro rata rate, and ALLTEL will continue to provide the ES Services for the first Phased Delivery Software.

"(ii)    Upon Acceptance of the second Phased Delivery Software, if applicable, TMCC shall begin paying one hundred percent (100%) of the ES Services Fee, with the first payment covering the anticipated period from Acceptance of the second Phased Delivery Software and final Acceptance of the ALS-COM Software. Upon final Acceptance of the ALS-COM Software, the amount payable at that time shall be adjusted to reflect the actual duration of such period. Should the ALS-COM Software, in its entirety, be rejected or not delivered, TMCC may continue to pay for ES Services for the first and second Phased Delivery Software, payable annually at one hundred percent (100%) of the ES Services Fee, and ALLTEL will continue to provide the ES Services for the first and second Phased Delivery Software.

"(iii)    Upon final Acceptance of the ALS-COM Software, if applicable, TMCC shall pay for the next one year (twelve months) of ES Services.

"From and after the date of the first anniversary of the date of final Acceptance of the ALS-COM Software, ES Services may be renewed by TMCC for successive periods of one (1) year each while the Agreement remains in effect with sixty (60) days' prior written notice subject

2

to termination rights described below, and the "ES Period" shall be extended to the expiration of such successive renewal period. ALLTEL agrees to provide TMCC written notice of any increase in ES Fees applicable to any renewal term thereunder not less than one hundred and twenty (120) days prior to the start of the renewal term. The ES Fees for the ALS-COM Software may be increased for the annual period following the first annual period after final Acceptance of the ALS-COM Software and for all subsequent annual periods during the ES Period by multiplying the prior annual ES Fee by a fraction, the numerator of which is the Department of Labor Consumer Price Index ("CPI-U"), Other Goods and Services, as of December 31 of the calendar year immediately preceding the year in which such renewal annual fee is due and the denominator of which is the CPI-U, Other Goods and Services as of December 31 of the previous calendar year. In no event, however, shall the annual ES Fee increase for any Software be more than ten percent (10%) or less than three (3.0%) of the previous year's annual ES Fee for such Software. Upon termination of the ES Services hereunder by ALLTEL for any reason other than TMCC's breach hereof, TMCC shall be entitled to access source code held in escrow pursuant to Section 20 of the Agreement and ALLTEL will provide up to six (6) personnel resources who have the relevant subject matter expertise for a period of sixty (60) days to assist in the transfer of knowledge of the ALS-COM software to TMCC. ALLTEL will provide such personnel resources at ALLTEL's then current standard time and material rates. The ES Services will immediately terminate upon termination of the Agreement.

"In the event that an Update pursuant to the ES Services shall require TMCC to change its hardware configuration in order to run the ALS-COM Software, ALLTEL shall provide TMCC six (6) months advance notice of said Update. TMCC shall have the right not to install said Update in which case ALLTEL shall continue to support the latest Update prior to the change for a period of two (2) years from the notice date."

4. Section 5.0 of Product Schedule No. 1 is amended and restated in its entirety as follows:

" **5.0    Software Testing and Acceptance**

5.1 "Acceptance. As used in this Product Schedule, "Phased Delivery Software" has the meaning given it in Section 6.1 of the Agreement, as amended; the description of the phases applicable to ALS-COM Software is as provided in the Statement of Work, as amended (and including the attachments thereto), under the Services Agreement, as amended. Acceptance of the ALS-COM Software and each Phased Delivery Software shall be as provided in Section 6 of the Agreement, except as specifically provided otherwise in this Section 5.0. ALLTEL shall be responsible to install the ALS-COM Software and any Phased Delivery Software in the TMCC test environment and to conduct validation testing. Upon completion by ALLTEL of installation of the ALS-COM Software or any Phased Delivery Software in the TMCC test environment and ALLTEL's validation testing, ALLTEL shall notify TMCC that the ALS-COM Software or Phased Delivery Software is ready for testing. Such ALLTEL notification will start the Acceptance Test Period as described in Section 6.2 of the Agreement. The Acceptance Test Period for the ALS-COM Software and for each Phased Delivery Software is ninety (90) days. If the expiration of such ninety-day period falls on a day that is not a business day, the Acceptance Test Period shall expire on the next-following business day. As provided in Section 6.2 of the Agreement, TMCC may notify ALLTEL of TMCC's completion of the Acceptance Test at any time prior to the expiration of the Acceptance Test Period. Notwithstanding anything to the contrary in Section 6.2 of the Agreement, in

3

the event that TMCC notifies ALLTEL of a known Severity Level One or Severity Level Two Defect in the ALS-COM Software or Phased Delivery Software at any time during the Acceptance Test Period, TMCC may, but shall not be required to, cease testing. Whether or not testing ceases, ALLTEL shall commence the correction of such Severity One or Severity Two Defects upon the notification. Upon ALLTEL's delivery of the corrected ALS-COM Software or Phased Delivery Software, the Acceptance Test Period shall be extended for the number of days the Acceptance Testing was delayed. If ALLTEL is unable to correct any such Severity One or Severity Two Defect within thirty (30) days after notification by TMCC, then TMCC shall have the right to reject the ALS-COM Software or Phased Delivery Software immediately upon notice to ALLTEL. The parties acknowledge that as of the First Amendment Effective Date, it is the intention that the ALS-COM Software shall be delivered in three separate phases.

"5.2 <u>Acceptance Criteria</u>. The ALS-COM Software and any Phased Delivery Software shall perform in conformance to the Acceptance Criteria. For purposes of this Product Schedule, Acceptance Criteria, as defined in subsection 6.1 of the Agreement, shall consist of the items set forth below in subsections a through g. For the ALS-COM Software or any Phased Delivery Software to be deemed to perform in conformance to the Acceptance Criteria, the ALS-COM Software or the Phased Delivery Software must perform in conformity with all of the following subsections a through g:

    a.    TMCC's business functionality customizations as described in that certain Business Requirements Definition Binder, dated as of February 13, 2002;

    b.    Production Hardware Configuration as described in Attachment Four hereto;

    c.    Base ALS-COM functionality as specified in the CD-ROM labeled as "Advance Lending Solutions Comprehensive Origination Manager, User Documentation, Release 3.0, February 6, 2002," and the functionality of each Phased Delivery Software and ALS-COM as specified in the CD-ROM as updated for each Phased Delivery Software and for ALS-COM in its entirety;

    d.    Technical requirements as described in the Oscar Non-Functional Requirements document (version 0.6), dated September 12, 2001;

    e.    The ALS-COM Software or Phased Delivery Software will contain zero (0) Severity One Defects, zero (0) Severity Two Defects, no more than twenty (20) Severity Three Defects, and no more than forty (40) Severity Four Defects as defined in Attachment 2 to the Product Schedule.

    f.    Satisfactory performance on mutually agreeable test cases to be executed that represent the validation steps required for achieving the Business Requirements. Such test cases will be agreed to prior to the Acceptance Test Period and will be limited to reasonable business practices.

    g.    Product functional specifications delivered by ALLTEL to TMCC and approved by TMCC from time to time, on a "gap-by-gap" basis.

"The parties acknowledge that as the documentation is developed and approved by both parties, including, for example, detailed requirements definitions/functional specifications and "Documentation" (as defined in the Agreement) such as user manuals, such documentation will become part of the Acceptance Criteria applicable to determinations following such development and approval.

4

"5.3 Rejection. In the event TMCC rejects the ALS-COM Software or Phased Delivery Software as provided in subsection 6.2 of the Agreement, the following terms will apply:

5.3.1   For TMCC's rejection of the first Phased Delivery Software, TMCC shall be entitled to retain the Original Holdback amount and the First Phase Delivery Holdback amount (as defined in Section 9.3 of the Statement of Work, dated as of June 29, 2000, as amended) and receive a refund of all license fees actually paid for the ALS-COM Software at the time of rejection.

5.3.2   For TMCC's rejection of the second Phased Delivery Software, TMCC shall be entitled to retain the Original Holdback amount and the Second Phase Delivery Holdback amount (as defined in Section 9.3 of the Statement of Work, dated as of June 29, 2000, as amended) and receive a refund of all license fees actually paid for the ALS-COM Software at the time of rejection, and any unearned paid ES Services Fees; provided, however, that if TMCC elects to continue to use the first Phased Delivery Software, TMCC shall not receive such refund amounts.

5.3.3   For TMCC's rejection of the ALS-COM Software following final delivery, TMCC shall be entitled to retain the Original Holdback amount (as defined in Section 9.3 of the Statement of Work, dated as of June 29, 2000, as amended) and receive a refund of all license fees for the ALS-COM Software actually paid at the time of rejection and any unearned paid ES Services Fees; provided, however, that if TMCC elects to continue to use the first and second Phased Delivery Software, TMCC shall not receive such refund amounts.

5.3.4   For rejection under any of the above subsections, TMCC also shall be relieved of any obligation to make any additional payments to ALLTEL, whether under the Statement of Work, as amended, or under this Product Schedule, other than payments of invoices outstanding as of the rejection date; provided, however, that if TMCC elects to continue to use the first Phased Delivery Software following rejection of the second Phased Delivery Software, or the first and second Phased Delivery Software following rejection of the ALS-COM Software after final delivery, TMCC will continue to pay ES Services Fees as provided in this Product Schedule."

5.   Section 6.0 of Product Schedule No. 1 is hereby amended and restated in its entirety as follows:

"6.0   Warranty Period. The Warranty Period for the warranty and representation provided for in Section 10.2 of the Agreement, for Phased Delivery Software and for the ALS-COM Software, shall be for a period commencing upon Acceptance of the respective Phased Delivery Software and, for the ALS-COM Software in its entirety, upon final Acceptance of the ALS-COM Software, and ending six (6) months following TMCC's final Acceptance of ALS-COM including gap customizations. The parties acknowledge that ALLTEL shall provide ES Services during the Warranty Period and TMCC shall pay ALLTEL for such ES Services during the Warranty Period."

5

6.    Section 7.0 of Product Schedule No. 1 (ES Services) is amended and restated in its entirety as follows:

"**7.0**    **ES Services Service Level Commitment Remedies.** Capitalized terms in this Section 7.0 not defined in this Product Schedule may be defined in Attachment 2 to this Product Schedule (the "Commitment"). In the event TMCC and ALLTEL do not agree that a Defect exists, the parties will follow the dispute resolution procedures described in Section 22 of the Agreement. If ALLTEL is unable to meet any of the standards contained in the Commitment Attachment (i.e., a failure to deliver a Work Around within the applicable Work Around Delivery period, or to Resolve a Defect within the applicable Time to Resolve, or to meet the Software Availability or Volume Throughput tests provided for in the Commitment)(each, a "Service Level Commitment"), the parties will commence the procedures described in this Section 7.0.

**7.1**    **Definitions**

　　　　**7.1.1**    "**First Escalation Procedure**" shall mean a process in which the ALS-COM General Manager of ALLTEL shall be promptly notified by TMCC of a failure by ALLTEL to meet any Service Level Commitment. The ALS-COM General Manager of ALLTEL shall contact the Corporate Manager of Systems Development of TMCC via telephone within twelve (12) hours of such notification to discuss the Resolution of the Defect, if applicable, and to present a remediation plan for future compliance with the Service Level Commitment.

　　　　**7.1.2**    "**Second Escalation Procedure**" shall mean a process in which the Account Director for Automotive Finance Division of ALLTEL shall be promptly notified by TMCC of the events constituting a failure to meet a Service Level Commitment. The Account Director for Automotive Finance Division of ALLTEL shall contact the Vice President and Chief Information Officer of TMCC via telephone within two (2) days of notification to schedule a meeting at the office of TMCC between the Vice President and Chief Information Officer of TMCC, or his or her designate, and such Account Director for Automotive Finance Division of ALLTEL, to be held within five (5) business days after the TMCC notification. The Account Director for Automotive Finance Division of ALLTEL will attend such meeting to present a remediation plan for future compliance with applicable Service Level Commitment.

　　　　**7.1.3**    "**Refund**" shall be an amount equal to the most recent paid ES Services Fee (on an annualized basis if not paid for a year) divided by 365, multiplied by 2, (Refund = ES Services Fee / 365 X 2).

　　　　**7.1.4**    "**Augmented Refund**" shall be an amount equal to the most recent paid ES Services Fee (on an annualized basis if not paid for a year) divided by 365, multiplied by ten (10), (Augmented Refund = ES Services Fee / 365 X 10).

　　　　**7.1.5**    "**Termination Remedy**" shall be the right of TMCC to terminate the ES Services, which termination shall entitle TMCC to the source code to the ALS-COM Software as provided in the Escrow Agreement. Upon TMCC's election of the Termination Remedy, ALLTEL shall repay to TMCC any pre-paid ES Fees for

6

ES Services that would have been performed after date of termination, based on a proration. TMCC may elect the Termination Remedy as a Defect Resolution Remedy under Section 7.2 below only after (i) the parties have mutually agreed that a Defect was the cause of the Service Level Commitment failure, in which event TMCC must give ALLTEL written notice of TMCC's intent to terminate within thirty (30) days after the date the Termination Remedy becomes available; or, (ii) if the parties have not reached such an agreement, after TMCC pursues resolution of the dispute through the procedures provided for in Section 22 of the Agreement and either through voluntary settlement or arbitration decision it is accepted or found that a Defect was the cause of the Service Level Commitment failure, in which event TMCC need not give advance written notice of termination after the Termination Remedy becomes available. Upon such termination, ALLTEL will provide up to six (6) personnel resources who have the relevant subject matter expertise for a period of sixty (60) days to assist in the transfer of knowledge of the ALS-COM Software to TMCC. ALLTEL will provide such personnel resources at ALLTEL's then current standard time and material rates.

7.2    **Defect Resolution Remedy.** If ALLTEL is unable to deliver a Work Around within the applicable Work Around Delivery period or Resolve a Defect within the applicable Time to Resolve, the following procedures shall occur:

- **For a Severity One or Two Defect:** If ALLTEL is unable to deliver a Work Around within the applicable Work Around Delivery period or Resolve the Defect within the applicable Time to Resolve, the First Escalation Procedure shall commence. If ALLTEL is unable to deliver a Work Around for that Defect within twenty-four (24) hours after the expiration of the applicable Work Around Delivery period (the "Work Around Deadline") or Resolve that Defect within twenty-four (24) hours after the expiration of the Time to Resolve (the "Deadline to Resolve"), TMCC shall receive a Refund. For each following day that Defect is not Resolved and/or no Work Around is delivered, TMCC shall receive a Refund. (Delivery of a Work Around does not relieve ALLTEL from paying a Refund if the Defect is not Resolved.)

- **For a Severity Three Defect:** If ALLTEL is unable to deliver a Work Around by the applicable Work Around Deadline or Resolve the Defect by the applicable Deadline to Resolve, and there are twenty (20) or more Severity Three Defects that are currently not Resolved, the First Escalation Procedure shall commence. For each day that Defect is not Resolved and/or no Work Around is delivered, and there are twenty (20) or more Severity Three Defects that are currently not Resolved, TMCC shall receive a Refund. (Delivery of a Work Around does not relieve ALLTEL from paying a Refund if the Defect is not Resolved.) Notwithstanding the foregoing, the parties acknowledge that pursuant to Section 5.2(e) herein, if TMCC accepts the ALS-COM Software or Phased Delivery Software with identified Severity Three Defects, such identified Severity Three Defects shall be specified upon Acceptance and shall not be subject to the Refund remedy stated herein or be counted among the twenty (20) Severity Three Defects to determine whether a Refund is payable.

- If a Severity One or Two Defect is not Resolved prior to Time to Resolve Deadline or no Work Around is delivered prior to the Work Around Deadline on more than three (3) occasions within any six (6)-month period, or if any Severity One or Two Defect is

7

7.3    **Availability Remedy.**  If ALLTEL is unable to meet the ALS-COM Software Availability Service Level Commitment provided in Section 4 of the Commitment, the following procedures shall occur:

- **If the ALS-COM Software Availability standard is not met for any given month,** the First Escalation Procedure will commence.

- **If the ALS-COM Software Availability standard is not met for more than two (2) months within any eight- (8) month period, the Second Escalation Procedure will commence and TMCC shall receive an Augmented Refund.**

- **If the ALS-COM Software Availability standard is not met for more than three (3) months within any sixteen (16) month period, or if the ALS-COM Software Availability falls below eighty-five percent (85%) in more than two (2) months within any six (6) month period, or if the ALS-COM Software Availability falls below seventy percent (70%) in more than one (1) month within any six (6) month period,** TMCC may invoke the Termination Remedy.

7.4    **Throughput Remedy.**  If ALLTEL is unable to meet the ALS-COM Software Volume Throughput Service Level Commitment provided in Section 5 of the Commitment, the following procedures shall occur:

- **If the ALS-COM Software Volume Throughput Service Level standard is not met for more than any three (3) hours within any one- (1) week period, the First Escalation Procedure shall commence.**

- **If the ALS-COM Software Volume Throughput Service Level standard is not met for more than any twelve (12) hours within any one (1) month period, the Second Escalation Procedure shall commence and TMCC shall receive an Augmented Refund.**

- **If the ALS-COM Software Volume Throughput Service Level standard is not met for more than any twelve (12) hours in each of any two (2) months during any six (6) month period,** TMCC may invoke the Termination Remedy.

7.5    Notwithstanding the above,

    (i)    For any Refund due to TMCC as provided in this Section 7.0, the Refund shall be payable within thirty (30) days of the Service Level failure event.  Such payment shall be accompanied by a description of the Service Level failure that was the cause of the Refund.  TMCC may offset any overdue and unpaid Refunds against any other amounts payable to ALLTEL.

    (ii)   If a single event causes Service Level failures in multiple Service Level Commitment categories (i.e. a single Defect causes a failure to meet two (2) or more Service Level Commitments), ALLTEL shall be responsible for paying the

(ii)  If a single event causes Service Level failures in multiple Service Level Commitment categories (i.e. a single Defect causes a failure to meet two (2) or more Service Level Commitments), ALLTEL shall be responsible for paying the Refund associated with the single Service Level Commitment category that would result in the largest total Service Level Refund.

(iii)  Regardless of the number of Defects or Service Level failures, in no event shall ALLTEL be liable for aggregate Refund or Augmented Refund payments of more than an amount equal to the annualized ES Service Fees / 365 X 60 in any given ES Period.

(iv)  The remedies in this Section 7.0 shall not be TMCC's sole or exclusive remedies for ALLTEL's failure to comply with the Service Level Commitments."

7.  Section 8.1 shall be amended by adding the following additional bullet point:

- "Two (2) copies of the source code for each Phased Delivery Software upon Acceptance of each Phased Delivery Software, and two (2) copies of the ALS-COM Software in its entirety upon final Acceptance of the ALS-COM Software, including any integrated Third Party Software on optical media, in the original programming code language."

8.  Section 9.0 is amended and restated in its entirety as follows:

"9.0  **Termination for Convenience.**  In the event TMCC elects to terminate this Product Schedule for its convenience, in addition to the sums specified in the Agreement, TMCC also shall pay to ALLTEL all service fees related to the ALS-COM Software incurred up to the effective date of such termination. Also, TMCC shall pay to ALLTEL those fees for services under the Statement of Work, dated June 29, 2000, to the Services Agreement in accordance with Section 2.1 (Termination for Convenience) thereof.

9.  Section 10.0 of the Product Schedule No. 1 (Additional Specifications) is deleted in its entirety and intentionally left blank.

10.  Attachment 2 to Product Schedule No. 1 is hereby amended and restated in its entirety by replacing such Attachment 2 in its entirety with the Attachment 2 "Service Level Commitment" attached to this First Amendment.

11.  Attachment 4 to Product Schedule No. 1 is hereby amended and restated in its entirety by replacing such Attachment 4 in its entirety with the Attachment 4 "Production Hardware Deployment Guide" attached to this First Amendment.

12.  All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

13.  All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect. This First Amendment constitutes the entire agreement between TMCC and ALLTEL relating to the subject matter hereof.

9

14. Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

15. This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

16. This First Amendment shall be governed by and shall be construed in accordance with the laws of State of California.

**IN WITNESS WHEREOF,** the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

| ALLTEL INFORMATION SERVICES, INC. | TOYOTA MOTOR CREDIT CORPORATION |
|---|---|
| By: | By: |
| Name: CLIFF THOMPSON | Name: Shaun Coyne |
| Title: SUP AUTO FINANCE | Title: Vice President & CIO |
| Date: March 4, 2002 | Date: March 5, 2002 |

10

Exhibit 7

## ATTACHMENT 2 TO PRODUCT SCHEDULE NO. 1

## "SERVICE LEVEL COMMITMENT"

1.    **Definitions**

- "Acknowledgement" shall have the meaning described in Section 7.1.2 of the Agreement.

- "Actual Uptime" means the aggregate amount of time, as measured in minutes, during the Scheduled Uptime of the ALS-COM Software in any month that the ALS-COM Software is actually available for use by end users.

- "Defect" shall have the meaning as defined in Section 6.2 of the Agreement. Subject to Section 6 of this Commitment, all Defects must be reproducible and step by step instructions on how to reproduce the Defect shall be documented by TMCC and delivered to ALLTEL.

- "Excusable Downtime" means the aggregate amount of time, as measured in minutes, during Scheduled Uptime in any month during which the ALS-COM Software is not available for business use due to any cause other than a Defect in the ALS-COM Software.

- "Failure Event" means a failure by ALLTEL to fulfill one or more of the service levels set forth in this Service Level Commitment.

- "Fix" means the actual solution that repairs or remedies a Defect.

- "Resolution" (and its antecedents, including "Resolve" and "Resolves") means the delivery or communication to TMCC of a Fix that corrects a Defect.

- "Scheduled Uptime" means that period of time as measured in minutes during which the ALS-COM Software is made available by TMCC for normal business use.

- "ALS-COM Software Availability" means [Actual Uptime] divided by [Scheduled Uptime minus Excusable Downtime] with the result expressed as a percentage.

- "Time to Resolve" means the elapsed time between Acknowledgement of the Defect by ALLTEL and the Resolution of the Defect.

- "Volume Throughput" means the number of credit applications which can be processed by the ALS-COM Software in the times specified in Section 5 of this Commitment.

- "Work Around" shall have the same meaning as defined in subsection 7.1.1 in the Agreement.

2.    **Reserved**

3.    **Response and Resolution**

ALLTEL will resolve Defects in the ALS-COM Software for production environments in accordance with this Section. ALLTEL will provide appropriate telephone and pager numbers in

11

order that: (i) TMCC can report Defects to ALLTEL at any time, and (ii) ALLTEL can acknowledge Defects as provided below. TMCC will report Defects to ALLTEL by utilizing ALLTEL's Hotline. In the event TMCC reports Defects after normal business hours, TMCC will leave a message on ALLTEL's Hotline that will immediately contact ALLTEL on-call support personnel through an automatic page.

In accordance with Section 7.1.2 of the Agreement, ALLTEL's obligations to deliver the Work Around and Resolve the Defect shall commence when ALLTEL has received from TMCC sufficient information regarding the problem reported by TMCC to enable ALLTEL to commence analysis of the Defect (but not more than all information actually available to TMCC when TMCC notifies ALLTEL of the problem). Such information need not be communicated to ALLTEL in writing unless ALLTEL reasonably requires the information to be in writing before ALLTEL can commence such work. However, if TMCC conveys the information to ALLTEL verbally, TMCC will also communicate the information to ALLTEL in writing when it is reasonably possible for TMCC to do so.

If the information reported by TMCC is not sufficient for ALLTEL to commence to analyze the Defect, ALLTEL shall diligently work to acquire such sufficient information, but the Work Around delivery and Time To Resolve time periods shall not begin until either TMCC has reported, or ALLTEL has acquired, sufficient information regarding the problem to enable ALLTEL to commence analysis of the Defect. If the parties disagree as to whether or not a Work Around Delivery period or Time to Resolve has expired due to a disagreement as to if or when such period commenced, the parties shall pursue the First Escalation Procedure and, if the dispute is not resolved, either party may pursue the Second Escalation Procedure. If the dispute is not resolved through the First and Second Escalation Procedures, either party may pursue the dispute resolution process provided for in Section 22 of the Agreement until the dispute is resolved. During the pendency of the First Escalation Procedure, ALLTEL shall not be required to pay any Refund or Augmented Refund relating to the applicable Defect. If the dispute is not resolved through the First Escalation Procedure, ALLTEL will pay one-half of the applicable Refund or Augmented Refund. If the dispute is resolved through the Second Escalation Procedure or the dispute resolution process provided for in Section 22 of the Agreement, either TMCC will reimburse such amounts to ALLTEL, or ALLTEL will pay the additional amounts due to TMCC, as required in light of the resolution of the dispute.

In the event that ALLTEL determines that a problem reported by TMCC is not a Defect, TMCC shall pay ALLTEL for its services at ALLTEL's rates negotiated for TMCC then in effect (if any), and TMCC shall reimburse ALLTEL for any and all reasonable travel and living expenses incurred by ALLTEL in rendering such services, subject to the provisions set forth below. If TMCC does not agree with ALLTEL's determination that a reported problem is not a Defect, the parties shall pursue the First Escalation Procedure and, if the dispute is not resolved, the Second Escalation Procedure, and during the pendency of the First and Second Escalation Procedures TMCC shall not be required to pay such amounts. If the dispute is not resolved through the Second Escalation Procedure, the parties will follow the dispute resolution process provided for in Section 22 of the Agreement until the dispute is resolved and, until the dispute is resolved, TMCC will commence payment of one-half of the amount of the fees and expenses payable pursuant to the second preceding sentence. Upon resolution of the dispute, either ALLTEL will reimburse such amounts to TMCC, or TMCC will pay all such fees and expenses due to ALLTEL, as required in light of the resolution of the dispute.

- **Response and Resolution matrix**

ALLTEL will respond to and Resolve Defects in accordance with the following table.  For the ALS-COM Software (including Phased Delivery Software), information in the following table and the definitions of Severity Levels in this Commitment supersede any contrary information in the table set forth in Section 7.1.2 of the Agreement.

| SEVERITY | ACKNOWLEDGEMENT Attended Telephone Support (3 a.m. to 6 p.m. PT Monday – Saturday) | ACKNOWLEDGEMENT Automatic Beeper/Call Transfer Support (6 p.m. to 3 a.m. PT Monday – Saturday and all of Sunday) | WORK AROUND DELIVERY | TIME TO RESOLVE |
|---|---|---|---|---|
| One | Immediately upon receipt of notice | 1 Hour | 6 Hours | 6 Hours* |
| Two | Immediately upon receipt of notice | 1 Hour | 24 Hours | 10 Days |
| Three | 2 Hours upon receipt of notice | Earliest Available Attended Telephone Support Period | 48 Hours | Next scheduled patch or release |
| Four | Next Business Day upon receipt of notice | Earliest Available Attended Telephone Support Period | Future Update | Future Update |

\*   If a Work Around delivered for a Severity One Defect provides an improvement in the performance of the Software which results in a significant reduction in the impact of the Defect so that the system no longer crashes, aborts and/or halts further production, the Defect shall be reclassified to Severity Level Two.  The Time To Resolve deadline for the reclassified Defect shall be the Time To Resolve deadline provided for Severity Two Defects.

❖  Severity Three and Four Defects will be reported by TMCC during Attended Telephone Support periods, described above.
❖  TMCC will notify ALLTEL of all Severity Three and Four Defects within a reasonable time after TMCC discovers such Severity Three and Four Defects.

The Parties may, upon written mutual agreement, alter the times set forth above in the foregoing table.

- **The Severity Codes** are ranked in order of the severity of their impact to the end user.  Codes are assigned to Defects on the basis of their symptoms, impact and agreed upon definition TMCC will assign a Severity Code when it reports a Defect.  When in agreement with the Severity assignment, ALLTEL will respond based on the table above.  Notwithstanding the foregoing, any disagreements as to a Severity assignment shall be resolved in accordance with the First and Second Escalation Procedures, as defined in Section 7.1 of the Product Schedule, and, if not resolved thereby, the dispute resolution procedures provided for in Section 22 of the Agreement, and ALLTEL may not delay the delivery of a Work Around or a Resolution

pending the outcome of such Escalation Procedures and dispute resolution process. Notwithstanding the foregoing, should TMCC be determined to have assigned Severity Code One to Defects that actually were Severity Code Two, Three or Four, or Severity Code Two to Defects that actually were Severity Code Three or Four, on more than fifteen percent (15%) of the occasions of TMCC's assignment of Severity Code One or Two to Defects within any rolling six-month period, then, for the following six months, on each occasion (if any) TMCC assigns a Severity Code One or Two to a Defect and such Severity Code is determined to be too severe, TMCC will pay to ALLTEL the reasonable incremental cost, if any, of delivering a Work Around and Resolving the Defect at the more severe Severity Code as compared to the Severity Code determined to have been correct.

o    **Severity One**
       Causes the system to crash, abort and/or halt further production.   Example: App Entry function abending for all users; ACRM is down.

o    **Severity Two**
       The program does not abort and halt further production, but a portion of production can not be performed, and/or a serious problem in which a critical system, application or component device is experiencing a partial outage or is performing in a degraded mode.  Example:  Image Server is down.

o    **Severity Three**
       Results in user/operator inconvenience or annoyance but does not interrupt the performance of required functionality.    Severity Three defects do not cause programs to abort or halt, and while defects of this nature may inconvenience users, they do not prevent performance of business requirements.
       Examples: TMCC must notify all of their ALS-COM Analysts that they will need to locate new applications in their Analyst Queue by opening the Analyst Queue, sorting by App ID, and then scrolling down to locate the newest applications instead of using the 'Received Today' feature like they usually do.  This is due to the 'Received today' feature in the Analyst Queue getting broken as a result of a deployment of a new ALS-COM build into Production.

o    **Severity Four**
       Low impact problem that does not affect application operation:   a nuisance problem that does not adversely affect productivity or availability.
       Example:  On the Data Entry/ Res screen for all buyers on the application, when the 'SSN too few characters' is OK'd, the cursor position within the Social Security # field does not return to the 1st cursor position; Get "Error #6 (Overflow)…." Message when Data Entry Complete is attempted and a value of 9,999,999,999 or more is entered into the Income field, or any field within the OtherMonthly Income window, on the Data Entry/Applicant/Emp screen.

4.     **ALS–COM Software Availability**

- ALLTEL shall maintain ALS–COM Software Availability at the level set forth below during Scheduled Uptime.

| ALS-COM Software Availability | |
| --- | --- |
| **Metric** | **Service Level** |
| ALS-COM Software Availability per month during Scheduled Uptime | 98% |

5.     **Volume Throughput.**  For the purpose of this Section 5, the term "process" shall mean taking a credit application from initiation through final decision.  For ALLTEL to meet the Volume Throughput Service Level standard, all of the following must be true:

- The ALS-COM Software shall have the ability to process a standard volume of 4000 credit applications per day and also a standard volume of 600 credit applications per hour during Scheduled Uptime.

- The ALS-COM Software shall have the ability to process a Peak Volume (as defined herein) of 6000 credit applications per day and also a Peak Volume of 900 credit applications per hour. "Peak Volume" standards shall apply to the periods during Scheduled Uptime designated by TMCC.

- The ALS-COM Software shall have the ability to process an Excessive Peak Volume (as defined herein) of 8000 credit applications per day and also an Excessive Peak Volume of 1200 credit applications per hour. "Excessive Peak Volume" standards shall apply to holidays, weekends, tent sales and special events, during Scheduled Uptime, as designated by TMCC.

- Notwithstanding the foregoing, the ALS-COM Software shall have the ability to support an overall volume of applications of 1,400,000 over a seven (7) month period, representing a rolling six (6)-month retention period, with one (1) month of rollover or purge, and to store such applications data and make it available to TMCC.

- The ALS-COM Software shall have the ability to support an anticipated volume growth of fourteen percent (14%) compounded per year for a total of up to one hundred percent (100%) of volume growth over a five (5) year period from the initial ES Services Effective Date.  Such growth rates shall apply to the standard volume standard, the Peak Volume standard, the Excessive Peak Volume standard and the overall volume over a seven-month period.  Thereafter, ALLTEL reserves the right to modify future growth rates supported by the ALS-COM Software.

6.     **TMCC Requirements**

In order for ALLTEL to perform the ES Services and meet the Service Level Commitments described herein, TMCC will make available to ALLTEL (i) access to TMCC's computer systems, subject to TMCC's security regulations, and under conditions which will not unreasonably obstruct ALLTEL's ability to provide such services, (ii) the appropriate qualified personnel to

reasonably assist ALLTEL and (iii) any consents required by third parties (if any) to enable ALLTEL to access TMCC's systems; provided, that ALLTEL shall cooperate with TMCC, at TMCC's reasonable expense, in TMCC obtaining any such required third party consents.

7.    **Excused Nonperformance**

ALLTEL shall not be liable to TMCC for monetary remedies for failure to meet a Service Level Commitment to the extent that such failure is directly attributable to:

(i)     TMCC's material breach of or material failure to perform any of its obligations under the Agreement;

(ii)    Services, software or hardware provided by TMCC to ALLTEL that adversely impacts ALLTEL's ability to fulfill a Service Level;

(iii)   Any other cause or omission beyond the reasonable control of ALLTEL; or

(iv)    Any Service Level Commitment failure not due to a Defect in the ALS-COM Software.

Notwithstanding the foregoing, such non-liability for monetary remedies shall not remain in effect as to any continuing failure to meet a Service Level Commitment following the cure of the breach, the removal of the cause or omission, or the remediation of the services, software or hardware that had directly caused such failure. However, ALLTEL shall not be liable for any monetary remedies that may have accrued prior to such cure, removal or remediation.

8.    **ALLTEL Cooperation**

Notwithstanding any other provision of the Agreement, the Product Schedule or this Commitment, ALLTEL agrees to cooperate with TMCC in the investigation, research, troubleshooting and resolution of problems related to any third-party products (i.e., not developed by ALLTEL) that are listed in the Production Hardware Deployment Guide as of the First Amendment Effective Date, and any additional third-party products listed in the Production Hardware Deployment Guide as such document is revised in connection with the delivery of the Phased Delivery Software and ALS-COM or listed in any release update notes and release documentation (whether or not such products are specifically identified in such Guide, notes or documentation as "third party" or "not owned or developed by ALLTEL")(collectively, the "Third Party Products"). Such cooperation shall include providing access to ALLTEL personnel resources that have expertise in a given Third Party Product and, at TMCC's discretion, providing personnel resources to work with any necessary third parties in the investigation, research, troubleshooting and resolution of such problems (but not actually to correct any defects in any Third Party Product). TMCC agrees to reimburse ALLTEL for its reasonable expenses incurred as a result of such cooperation, unless the cause of the problem is a Defect in ALS-COM or any Phased Delivery Software or a defect in (or integration problem with ALS-COM and) a Third Party Product that is a software product (but not any hardware product).

16

ALLTEL and TMCC agree to make this Service Level Commitment a part of Product Schedule No. 1.

| ALLTEL INFORMATION SERVICES, INC. | TOYOTA MOTOR CREDIT CORPORATION |
|---|---|
| By: _____ | By: _____ |
| Name: CLIFF THOMPSON | Name: _____ |
| Title: SVP AUTO FINANCE | Title: _____ |
| Date: 3/4/02 | Date: _____ |

Exhibit 8





**Shaun J. Coyne**
Vice President and
Chief Information Officer

19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-4393
Fax (310) 381-5484

December 1, 2004
**"VIA OVERNIGHT MAIL"**

Frank Sanchez
President, Strategy &
Product Development Division
Fidelity Information Services
601 Riverside Avenue
Jacksonville, FL 32204

### Re: *OSCAR Project*

Dear Frank:

As you well know, performance of the software provided by Fidelity Information Services' (FIS) on the OSCAR project has been unsatisfactory for a number of years. The project has moved in fits and starts since early 2000 and has consumed more TFS resources (financial and otherwise) than is commercially reasonable or acceptable. Now, after four plus years of effort and with only one of the three phased deliveries of the functionality deployed, the system continues to show signs of failing. In fact, TFS will need to replace the entire system. As your own management has admitted the current system architecture will not support the deployment of the remaining software and certainly will not meet TFS' needs long term. Your refusal to accept responsibility for this issue and fulfill your contractual obligations to provide a system that meets TFS' needs has left us with no choice but to terminate work on the project, transition support of the system to another vendor and end our relationship with FIS. Accordingly, the purpose of this letter is to inform you that TFS deems FIS to be in material breach of its obligations and hereby demands that FIS provide the source code and transition assistance as set forth in the various Agreements between FIS and TFS.

More specifically, pursuant to the terms of the Agreements, TFS:

(1) rejects the Phase 2 discounting software, as well as any Phase 3 software, pursuant to Section 6.1 of the Master License Agreement, Section 2.1 of the Implementation Statement of Work as amended, and section 5.3 of Product Schedule No. 1 as amended;

(2) demands release of the source code from escrow pursuant to Section 9.2 of the Master Software License Agreement as amended, Section 4.0 of Product Schedule No. 1 as amended, Section 7.1 of the Source Code Escrow Agreement, and Paragraph 1 of the First Amendment to the Source Code Escrow Agreement;

(3) demands that FIS provide transition assistance of six people, including Brian McKnight, Brad Martin, Kevin Chin, Adrian Carr, for a period of 60 ("sixty") days to assist in transitioning its maintenance support to a third party vendor pursuant to Section 4.0 of Product Schedule No. 1 as amended, this includes providing assistance with transitioning third party licenses such as Luxor and Blackbook to TFS;

(4) terminates the implementation statement of work pursuant to Section 2.2 of the Services Agreement as amended;

(5) will temporarily continue using the deployed OSCAR software while retaining a third party vendor to maintain the software pursuant to Sections 12.0 and 2.2 of the Services Agreement as amended, Sections 4.3.2 and 6.3 of the Master Software License Agreement as amended, and Sections 1.9 and 5.3.2 of Product Schedule No. 1 as amended;

(6) demands that FIS agree to mediate any disagreement with the above pursuant to Section 15.7 of the Services Agreement (TFS initially selects JAMS/Endispute as the mediation organization).

TFS demands immediate release of the source code. In addition, transition assistance must begin no later than December 6, 2004. TFS has a large potential damages claim as a result of FIS' failure to provide the software as required by the Agreements and reserves all rights to assert those claims in the appropriate forum.

Please respond to this letter as soon as you are able, and in any event, no later than December 6, 2004. If you would prefer, you may have your attorneys contact our attorneys directly. The contact information is as follows:

> Katherine E. Adkins
> Managing Counsel
> Toyota Financial Services
> 19001 S. Western Ave., EF12
> Torrance, CA  90509
> 310-468-3401

Sincerely,

Shaun Coyne
Vice President & Chief Information Officer
Toyota Financial Services

Exhibit 9

**TOYOTA**
FINANCIAL SERVICES

19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-1310

## BY OVERNIGHT COURIER

December 14, 2004

Ms. Paula Smith
IRON MOUNTAIN
2100 Norcross Parkway, Suite 150
Norcross, Georgia 30071

Re:   *Release of the ALSCOM Source Code*

Dear Ms. Smith:

By this letter, Toyota Financial Services, Inc. ("TFS") demands release of Fidelity Information Systems, Inc.'s ("FIS") ALS-COM software per the attached Source Code Escrow Agreement (as amended) (exhibit A). FIS is aware of this demand. The basis for TFS' demand is as follows:

a) FIS has been unable to resolve defects in the ALS-COM software in accordance with the procedures established in section 7.0 of Product Schedule No. 1 of its Master Software License Agreement with TFS.

b) As a result of FIS' failure, TFS has terminated FIS' provision of ES services pursuant to section 7.1.5 of Product Schedule No. 1 (as amended) (attached as Exhibit B)

c) Per section 7.1.5 of Product Schedule No. 1 (as amended) and paragraph 1 of the First Amendment to Source Code Escrow Agreement, TFS' termination entitles TFS to immediately receive the ALS-COM software from escrow.

Sincerely,

Katherine Adkins

cc:   Frank Sanchez
      Fidelity Information Services, Inc.

LA2:744038.1