UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IRON MOUNTAIN INTELLECTUAL
PROPERTY MANAGEMENT, INC.,

              Interpleader-Plaintiff,

v.

FIDELITY INFORMATION SERVICES, INC.,
f/k/a ALLTEL INFORMATION SERVICES,
INC., and TOYOTA MOTOR CREDIT
CORPORATION,

              Interpleader-Defendants.

C.A. No. 05 CV 10018-RGS

## OPPOSITION TO *EX PARTE* APPLICATION
## FOR A TEMPORARY RESTRAINING ORDER

FIDELITY INFORMATION SERVICES, INC.,
By its attorneys,

HOLLAND & KNIGHT LLP

Ieuan G. Mahony (BBO No. 552349)
Joshua C. Krumholz (BBO No. 552573)
10 St. James Avenue
Boston, MA 02116

Dated: January 14, 2005
      Boston, Massachusetts

# 2521143_v6

**Table of Contents**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 1

I.      The Parties, and Fidelity's ALS-COM Product................................................ 1

II.     Toyota Wishes To Incorporate The ALS-COM Project Into Its OSCAR Project,
        And The Parties Execute The Operative Agreements....................................... 3

        A.      Toyota Negotiates A License For Object Code Only ............................ 4

        B.      The Agreements Contemplate A Level Of "Defects," And Establish
                Specific Error Correction Procedures And Software Performance
                Standards .................................................................................................. 4

        C.      The Agreements Specify in Detail The Precise ALS-COM Architecture
                About Which Toyota Now Complains ................................................. 5

III.    Fidelity Fully Complies With the Agreements ................................................. 6

        A.      Phase 1 and 2 Are Delivered; Toyota Accepts Phase 1 And Puts Phase 2
                Into Production ........................................................................................ 7

        B.      The ALS-COM Architecture Performs Properly, And Meets Or Exceeds
                The Contractual Performance Standards................................................. 7

        C.      The Historical System Outages, About Which Toyota Now Complains,
                Were Properly Corrected, Or Were Unrelated To Fidelity's Contributions
                To Toyota's OSCAR System ................................................................... 8

        D.      Toyota Does Not Claim That Any Outages Contravened The Agreements'
                Performance Standards ......................................................................... 10

IV.     Fidelity Continues to Provide Services to Toyota........................................... 10

V.      The Timing of Toyota's Complaints ............................................................. 11

ARGUMENT ..................................................................................................... 12

I.      TOYOTA'S MOTION MUST BE DENIED................................................... 12

II.     TOYOTA WILL NOT SUCCEED ON THE MERITS .................................. 13

        A.      Fidelity Has Not Terminated ES Services .......................................... 14

        B.      The ALS-COM Architecture Meets All Contract Requirements ......... 15

III.    TOYOTA WILL SUFFER NO IRREPARABLE HARM ............................... 17

IV.     THE BALANCING OF THE HARMS FAVORS FIDELITY ........................ 18

CONCLUSION .................................................................................................. 19

## INTRODUCTION

Toyota Motor Credit Corporation ("Toyota") entered into an agreement with Fidelity Information Services, Inc. ("Fidelity") to license a specific product with a specific architecture. The technical requirements for that product, including the precise nature of the architecture, were set forth in multiple contract documents agreed to and signed by the parties. The product delivered by Fidelity meets each and every one of those technical requirements, and meets or exceeds all performance requirements set forth in the various agreements.

Two years after entering into its agreement with Fidelity, however, Toyota now has other business objectives. Fully aware of the benefits and limitations of the product and architecture that it selected and received, Toyota now wants to go in a different direction. It refuses, however, to invest in that new direction. First, Toyota demanded that Fidelity provide numerous product enhancements and comply with heightened performance standards that the parties simply never contemplated. Then, when Fidelity refused to provide those additional services for free, Toyota instead brings the present claims.

As a consequence, Toyota has attempted to create the present "emergency" by refusing Fidelity's services and wrongfully purporting to terminate the contracts. In that way, Toyota hopes to gain unfettered access to Fidelity's source code without having to pay for it. In so arguing, however, even where Toyota's "crisis" is of its own making, Toyota still identifies no exigent circumstance warranting Fidelity's disgorgement of its valuable source code.

## FACTUAL BACKGROUND

### I.    The Parties, and Fidelity's ALS-COM Product

Fidelity provides application software, information processing management, outsourcing services and professional information technology consulting to the financial services and

mortgage industries. *See* Declaration of David Slider (hereinafter "Slider Decl."), ¶4. With forty

years of experience in those industries and over 7,000 employees, Fidelity provides software and

services to 46 of the top 50 U.S. financial services organizations, 24 of the top 50 global

financial services organizations, 7 of the top 10 consumer lending organizations, and 9 of the top

10 mortgage lending organizations in the country. *See id.,* ¶¶5-7. As a result, Fidelity's products

process more than 24 million mortgage loans a year, representing over 40% of all mortgage loans

nationwide, with balances exceeding $3 trillion. *See id.,* ¶7.

Fidelity licenses a suite of software products directed to the loan process and workflow

used by these organizations. *See id.,* ¶9. The stages of the loan process include origination,

servicing and collections. *See id.* One product within that Fidelity's loan processing suite is its

Advanced Lending Solutions-Comprehensive Origination Management ("ALS-COM"). *See id.*

ALS-COM is used by clients in the origination of loans. *See id.* The ALS-COM product is

integrated with a client's other loan processes and systems to facilitate and work within the

client's workflow. *See id.* Fidelity has invested millions of dollars in the research and

development of the ALS-COM product, including $18 million just on enhancements for the

Toyota project alone.[1] *See id.,* ¶42.

Toyota Motor Credit Corporation ("Toyota"), meanwhile, is the United States financing

arm of Toyota Financial Services, which is a subsidiary of Toyota Motors. *See* Hoover's Report,

included at Exhibit 19. With $3.8 billion in revenue and 2,700 employees in 2003, Toyota

provides retail leasing, retail and wholesale financing and other financial services to Toyota

dealers, Lexus dealers and Toyota industrial equipment dealers and their customers. *See id.*

---

[1] ALS-COM, originally known as AP7000, was the loan origination product sold by Alltel Information Services, Inc. ("Alltel"). *See* Slider Decl., ¶42.

II.     **Toyota Wishes To Incorporate The ALS-COM Project Into Its OSCAR Project, And The Parties Execute The Operative Agreements**

After halting the initial ALS-COM project, in early 2002 Toyota and Fidelity agreed to restructure their relationship and the project format. Although not an exclusive list, the following contracts (collectively, the "Agreements") govern the relationship between the parties:

- Master License Software Agreement ("Amended License Agreement"), as amended;
- Product Schedule No. 1, as amended ("Amended Product Schedule");
- Second Amended Implementation Statement of Work
- OSCAR Relaunch Project - - Project Charter ("Project Charter");
- Services Agreement, as amended; and
- Source Code Escrow Agreement

*See* Declaration of Timothy Keil, Esq. ("Keil Decl."), ¶3.[2] Pursuant to the Agreements, ALS-COM was to be enhanced and integrated with Toyota's loan processing system to allow Toyota's Dealer Sales and Service Offices ("DSSOs") to originate and process automobile loans. *See* Project Charter. ALS-COM was one part of Toyota's overall project, known as OSCAR. *See id.* at 1-2. Toyota retained full control of the OSCAR project as the project manager, and retained complete control of the Toyota network environment that would host the ALS-COM software. *See id.,* at 22-34; Exhibit 11.

Fidelity was to deliver ALS-COM object code in three phases under a fixed fee, fixed hour arrangement. *See* Slider Decl., ¶10; Declaration of John Vaughan ("Vaughan Decl."), ¶¶27-28. Phase 1 was to contain most of the functionality, including data entry and decisioning. *See* Vaughan, ¶¶27-28. Phase 2 was to contain additional discounting functionality and change requests that Toyota had requested. *See id.,* ¶28. Phase 3 was a catch-all phase for low priority enhancements and remaining change requests. *See id.*

---

[2] Because of the volume of documents, Fidelity has put all documents into one exhibit binder for ease of use.

# 2521143_v6

- 3 -

A.    **Toyota Negotiates A License For Object Code Only**

Under the Agreements, Toyota acknowledged that Fidelity's software contained valuable trade secrets, and agreed that Toyota would have access only to object code, except in certain limited circumstances. *See* Exhibit 1, §10.1 at 6; Exhibit 3, §5 at 2. Toyota could, and Fidelity in the past has, licensed its source code as well. *See* Slider Decl., ¶43. Had it done so, however, and in light of Fidelity's substantial financial investment in acquiring and further developing ALS-COM, Toyota would have had to pay substantially more for the source code. *See id.* Toyota chose not to make that investment. *See* Exhibit 5, §20.0 at 7.

B.    **The Agreements Contemplate A Level Of "Defects," And Establish Specific Error Correction Procedures And Software Performance Standards**

The Agreements contemplate the presence of a certain level of defects in the software, particularly during the testing, acceptance and deployment process, and the Agreements provide for detailed error correction procedures, both before and after Toyota accepts or provisionally accepts a deliverable. *See* Vaughan Decl., ¶¶23-24; Exhibit 5, §6.2 at 3-4 and §7.1 at 5-6; Exhibit 6, §5 at 3-5 and §7.0 at 6-9. To the extent issues arose, the parties were to engage in a process for identifying, prioritizing and rectifying those issues. *See* Exhibit 5, §6.2 at 3-4 and §7.1 at 5-6; Exhibit 6, §5 at 3-5 and §7.0 at 6-9. In addition, the Agreements contained express performance standards against which to judge the ALS-COM software, as delivered to and installed by Toyota. *See* Vaughn Decl., ¶25. With respect to performance standards, the Agreements provide, in particular, that: (a) the software shall be available 98% of Toyota's normal business hours (the "Uptime Requirement"); and (b) the system shall process 600 credit applications per hour, from initiation through final decision, for a standard volume (the

"Throughput Requirement"). *See id.* The Uptime Requirement provides for not more than 12 hours of downtime in any one month. *See id.*, ¶26.

## C.   The Agreements Specify in Detail The Precise ALS-COM Architecture About Which Toyota Now Complains

As described in the Agreements, ALS-COM software is based on a conventional architecture, common on local area networks (LANs), whereby the application processing takes place physically at the client workstation, and not at the server. *See id.*, ¶6.[3] This architecture is sometimes referred to as a "thick client" architecture, because the software processing takes place at the client, such as a PC. *See id.* A contrasting architecture is a so-called "thin client" architecture, used in web-based applications, where the application processing takes place physically at the server. *See id.*, ¶7. In this instance, the parties were even more specific, employing so-called "terminal servers" as part of the architecture. *See id.*, ¶¶8-9. These servers sit between the client and the network server, and host the application processing that would otherwise take place on the client. *See id.*

In fact, the ALS-COM architecture was the subject of much discussion between the parties before they entered into the Agreements. *See id.*, ¶¶10-13. At a meeting in Jacksonville, Florida on February 28, 2002, Toyota raised questions about re-architecting ALS-COM by migrating to a web-based application architecture (without terminal servers). *See id.*, ¶11. Fidelity responded that such a change was viable, but accomplishing it was outside of Fidelity's obligations in the Agreements, and any such changes would increase the cost and delay implementation of the business functionality. *See id.*, ¶12. Presented with this choice, Toyota

---

[3] Assume, for example, an end-user, sitting before a desktop PC (the "client"), connected to a local area network. The user requests that the system perform an analysis. The analysis will be performed at the user's PC, and not on the network server. *See* Vaughan Decl., ¶6.

decided to implement the new business functionality through the existing architecture, and would address a re-architecture in the future. *See id.*, ¶13.

As a result, the Agreements specify the current architecture, with the terminal server structure, and require that the "architectural design of ALS-COM" comply with these specifications. *See id.*, ¶¶14-21. After the Agreements were executed, the parties further confirmed their understanding concerning the ALS-COM architecture in the project's formal Project Charter. *See id.*, ¶¶17-20. In this charter, Toyota expressly acknowledges as one of the Project Constraints the agreed fact that "[t]he team will need to work within the architectural boundaries of ALS-COM system." *See id.*, ¶19.

Moreover, as part of its responsibilities under the Project Charter, Toyota itself prepared, and circulated to Fidelity, a network diagram showing the full system architecture. This network diagram shows the ALS-COM terminal servers, and thus further demonstrates that Toyota well understood the ALS-COM system architecture. *See id.*, ¶¶21-22.

### III.    Fidelity Fully Complies With the Agreements

Fidelity has unequivocally complied with all requirements under the Agreements. *See id.*, ¶¶4, 38. ALS-COM has met or exceeded each of the performance requirements and contract terms set forth in the Agreements. *See id.* Nevertheless, relying upon a Microsoft report, a conclusory allegation in a declaration and an alleged admission,[4] Toyota claims that Fidelity has breached the Amended License Agreement because the "architecture of the system developed by [Fidelity] would not support the functionality planned for the system." *See* Toyota

---

[4] In the Declaration of Christine Gallucci ("Gallucci Decl."), Ms. Gallucci alleges that John Vaughan of Fidelity admitted that the architecture would not support Phase 2. *See* Gallucci Decl., 14. Despite efforts by Ms. Gallucci to induce such a statement, Mr. Vaughan simply never said what Ms. Gallucci now attributes to him. *See* Vaughan Decl., ¶41. In fact, Toyota never even "presented" the Microsoft report to Mr. Vaughan at all, as Ms. Gallucci claims in her declaration. *See id.*

Memorandum, p. 4. Without expressly saying so, Toyota also implies that the architecture is related to system outages (crashes) mentioned in its papers. *See id.* Both claims are without merit.

## A.    Phase 1 and 2 Are Delivered; Toyota Accepts Phase 1 And Puts Phase 2 Into Production

Fidelity delivered Phase 1 to Toyota and, after acceptance testing, Toyota provisionally accepted Phase 1 in March 2003. *See id.*, ¶29. Toyota provided final acceptance of Phase 1 in August 2003 after outstanding issues had been resolved under the procedures set forth in the Agreements, and paid the final holdback invoice as of October 31, 2003. *See id.*; Slider Decl., ¶10; Exhibits 9 and 10.

By November 2003, Fidelity had delivered Phase 2. *See* Vaughn Decl., ¶31; Slider Decl., ¶10. During development, the scope of Phase 2 changed materially due to Toyota's request that Fidelity include functionality in Phase 2 for Toyota's so-called "Route One" project. *See* Vaughan Decl., ¶30; Slider Decl., ¶10. Although Toyota has not formally accepted Phase 2, and not yet activated its discounting functionality, it has practically accepted the code by placing Phase 2 into production and is using it. *See* Vaughn Decl., ¶32; Slider Decl., ¶10.

## B.    The ALS-COM Architecture Performs Properly, And Meets Or Exceeds The Contractual Performance Standards

The ALS-COM architecture not only performs properly, but strictly conforms with the technical requirements of the Agreements. *See* Vaughan Decl., ¶¶4, 38. It is fully able to support all the functionality in the ALS-COM product, including the Phase 2 discount functionality. *See id.* In fact, Toyota accepted the very architecture in Phase 1 that it now claims is inadequate. *See* Vaughan Decl., ¶29; Slider Decl., ¶10. Fundamentally, Toyota is complaining about architecture to which it expressly agreed and was fully disclosed in the

Agreements, and is complaining about system performance that meets or exceeds all contractual requirements. *See* Vaughan Decl., ¶¶4, 38.

### C.   The Historical System Outages, About Which Toyota Now Complains, Were Properly Corrected, Or Were Unrelated To Fidelity's Contributions To Toyota's OSCAR System

Toyota claims in its papers that OSCAR, of which ALS-COM is only a part, experienced system outages in 2003 and 2004. *See* Toyota Memo, at 3-4. The causes of these outages either (i) have been solved, or (ii) lie outside the ALS-COM software.[5] In any event, there have been no outages attributed to ALS-COM software since the spring of 2004, and Fidelity is aware of no reason why Toyota should experience another outage, at least to the extent ALS-COM might be involved. *See* Declaration of Randy Gillis ("Gillis Decl."), ¶11.

Further, Toyota focuses on issues that arose many months ago, in the spring of 2004. Even in doing so, Toyota's presentation of the situation is significantly inaccurate. Faced with outages and sluggish response times in the spring of 2004, and a range of potential root causes, the parties discussed obtaining outside independent consultants. *See* Vaughan Decl., ¶33; Gillis Decl., ¶4. As a result, a set of consultants, including Microsoft, EMC and Compuware, were engaged to evaluate the entire OSCAR system (both software and hardware) and to make recommendations. *See* Vaughan Decl., ¶¶33-34; Gillis Decl., ¶5. Contrary to Toyota's representations, Fidelity readily agreed to Microsoft's involvement. *See* Vaughan Decl., ¶34.

After the consultants completed their evaluations in late May 2004, a number of contributing root causes were identified, which included: (i) the Toyota database server did not meet specifications provided by Fidelity in the hardware configuration guide; (ii) the server

---

[5] The last outage in July 2004, for instance, was caused by a *Microsoft failure*, not a Fidelity failure. *See* Gillis Decl., ¶11.

configuration tuning for failover was improperly set; (iii) Toyota needed to install Microsoft software service packs; (iv) the drives used within the SAN for the database were substandard; and (v) the ALS-COM software should be performance tuned. *See id.*, ¶35

Microsoft embodied its system evaluation and recommendations in a written report. *See* Exhibit 13. In its papers, Toyota asserts that Microsoft found that Fidelity's ALS-COM software was the "root cause" of the OSCAR system's issues, and found that the ALS-COM system's architecture was "grossly inefficient." *See* Gallucci Decl., ¶13. The Microsoft Report makes no such statements. Instead, the Report provides praise for the ALS-COM software, stating that "the ALS application uses a highly object oriented approach to loading and rescoring an application.... The object and data model is a clean and consistent model that provides significant flexibility within the ALS application." *See* Gillis Decl., ¶8; Exhibit 13, at 4. With this praise, the Report also made suggestions as to potential improvements to ALS-COM software. *See* Gillis Decl., ¶8.

Fidelity subsequently worked with Microsoft for four months to assist with defining improvement opportunities, and Fidelity implemented all changes recommended by Microsoft, with the exception of the "longer term" re-architecting of the software, which fell outside of the Agreements. *See id.,* ¶9. Fidelity implemented these enhancements with a series of "services packs" to improve performance and address other identified issues. *See* Vaughan Decl., ¶37. Each service pack delivered during the plan resulted in improved system performance. *See id.* The ALS-COM system has met or exceeds all contractual performance measures. *See* Vaughan Decl., ¶¶4, 38.

**D.    Toyota Does Not Claim That Any Outages Contravened The Agreements' Performance Standards**

In its papers, Toyota does not claim, because it cannot, that the complained of outages fall outside the performance standards set by the Agreements. The operative document is the Amended Product Schedule, which expressly contemplates the possibility that the ALS-COM software may experience outages. *See* Amended Product Schedule. The Amended Product Schedule specifically states that the ALS-COM system must be available 98% of Toyota's business hours in any given month (which translates to approximately 12 hours of allowable downtime per month). *See* Vaughan Decl., ¶26. If the downtime is exceeded in any given month, Toyota must invoke an escalation clause designed to allow Fidelity an opportunity to rectify the outage problems. *See* Exhibit 6, Amended Product Schedule, §7.2 at 7-8.

Toyota does not allege, and Fidelity is not aware of, any month, let alone three months in an 18-month period, where downtime exceeded two percent. *See* Vaughan Decl., ¶12. Certainly, Toyota never invoked any of the escalation provisions in the Amended Product Schedule. *See* Gillis Decl., ¶12.[6]

**IV.    Fidelity Continues to Provide Services to Toyota**

Fidelity agreed to support and maintain the ALS-COM software by providing to Toyota defined software enhancement and support services, referred to as "ES Services." *See* Exhibit 3, §7.1. Under the Amended Product Schedule, Fidelity is obligated to "provide the ES Services ... commencing upon the Acceptance of the ALS-COM Software or any Phased Delivery Software." *See* Exhibit 6, §4.0 at 2. The term "Phased Delivery Software" refers to the various phases of the ALS-COM project, including Phase 1. *See* Exhibit 6, §6.1 at 3.

---

[6] The Agreements also expressly exculpate Fidelity from any downtime unrelated to its product or outside its control. *See* Exhibit 6, Amended Product Schedule, Attachment 2, p. 17, ¶7. Toyota has made no effort to explain the impact of these provisions in its purported analysis.

Fidelity has and continues to provide services to Toyota under both agreements. *See* Gillis Decl., ¶15. Its position in this regard has been repeatedly stated to Toyota.[7] *See* [letters]. Indeed, as recently as January 6, 2005, Fidelity delivered a service pack to Toyota. *See* Gillis Decl., ¶15. It has not disbanded and reassigned its Toyota team to other projects, nor has it reallocated any assets dedicated to the Toyota project. *See* Slider Decl., ¶31. As such, Fidelity continues to be ready, willing and able to perform those services contemplated by the Agreements. *See* Keil Decl., ¶7.

## V. The Timing of Toyota's Complaints

The OSCAR project has been beset by significant Toyota mismanagement of its obligations. *See* Slider Decl., ¶33. The OSCAR system, independent of ALS-COM, was fraught with serious shortcomings. *See id.* Significant turnover in Toyota project leadership led to a loss in project execution discipline. *See id.*

Beginning in 2004, for example, Toyota decided to unilaterally cancel contractually-mandated project steering committee meetings. *See id.* Such meetings are critical to project management, and provide a clear paper trail of objective performance data. *See id.* Similarly, management of project scope has utterly failed, and change requests have gone out of control. *See id.* Notwithstanding the terms to which they previously had agreed, Toyota management began demanding changes and enhanced performance criteria, including specific response times, that well exceeded any contract requirements. *See id.* When Fidelity refused to provide the upgrades for free, Toyota started to claim a breach. *See id.*

---

[7] Toyota asserts that Tim Keil, Fidelity's in-house counsel, stated that, in light of Toyota's purported termination of the agreements, Fidelity no longer had an "obligation" to provide services. *See* Scarsi Decl., ¶14. Mr. Keil never made that statement. *See* Declaration of Tim Keil (hereinafter "Keil Decl."), ¶7.

The claim of breach, however has been a bit of a moving target. Originally, Toyota tried to rely on purported defects in the Phase 1 software. *See* [letter]. The Agreements, however, contemplate a process for resolving those issues, which Fidelity was meeting. In any event, Toyota already had formally accepted Phase 1. Toyota therefore has shifted in recent times to its re-architecture argument, with all the deficiencies previously identified.

The timing of Toyota's complaints, however, is not consistent with its present claims. During the time of the supposed problems, Toyota labored hard to make sure all of its DSSOs had the supposedly defective software installed on their networks. As late as November 2004, with Toyota loudly complaining about product failures, Toyota was implementing the software in the last - - and largest - - of its DSSOs. *See id.*, ¶12.

Notably, only after Toyota installed the last of its DSSOs did it purport to terminate the Agreements. That purported termination came approximately seven months after the last related system outage, thirteen months after beginning Phase 2 acceptance testing, and sixteen months after accepting the Phase 1 software. It also comes as the deadline for payment of the majority of Toyota's $3.2 million balance to Fidelity approaches. *See id.*, ¶38.

<div align="center">

**ARGUMENT**

</div>

## I.    TOYOTA'S MOTION MUST BE DENIED

A preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely granted." *Abbott Laboratories v. Selfcare, Inc.*, 17 F. Supp. 2d 43, 51 (D. Mass. 1998) (quotation marks omitted). This is particularly true where, as here, the movant seeks to disturb, rather than preserve, the status quo between the parties. *See Rarities Group, Inc. v. Karp*, 98 F. Supp.2d 96, 104 (D. Mass. 2000). The First Circuit has cautioned that such "mandatory" injunctions should be granted "'only in those circumstances when the exigencies of the situation

demand such relief.'" *Id.*, *quoting Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency*, 649 F.2d 71, 76 n. 7 (1st Cir. 1981).

To prevail on its motion for a temporary injunction, Toyota must show that: (1) it has a substantial likelihood of success on the merits of its claim; (2) it faces a significant potential for irreparable harm in the absence of immediate relief; (3) on balance, Toyota would suffer a greater burden in the absence of the injunction than Fidelity would suffer should the injunction issue; and (4) the granting of prompt injunctive relief will promote, or at least not denigrate, the public interest. *See McGuire v. Reilly,* 260 F.3d 36. 42 (1st Cir. 2001). Because preliminary injunctions are "strong medicine," they "should not issue except to prevent a real threat of harm. " *Matos ex rel. Matos v. Clinton School District*, 367 F.3d 68, 73 (1st Cir. 2004). "Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction." *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 902 (1st Cir. 1988).

As discussed below, Toyota cannot meet these requirements or show that the exigencies of the situation demand that the Court disturb the status quo. The injunctive relief Toyota seeks is therefore unwarranted.

## II.    TOYOTA WILL NOT SUCCEED ON THE MERITS

Toyota claims that it is entitled to the source code alternatively because: (1) Fidelity terminated ES Services under the Amended Product Schedule; and/or (2) the inadequacies of the ALS-COM architecture constitute an "Impact Event" and material breach of the Amended License Agreement. *See* Toyota Memorandum, pp. 7-10. Both assertions are utterly without merit.

### A.    Fidelity Has Not Terminated ES Services

In claiming that Fidelity has "terminated" its ES Services to Toyota, Toyota relies in its entirety on a statement by Mr. Scarsi describing an alleged admission by Fidelity's in-house counsel:

> During a telephone meeting on December 20, 2004 with TFS, FIS and Iron Mountain, FIS's in-house counsel Timothy Kyle [sic] confirmed that FIS did not consider itself currently obligated to provide support for the OSCAR program.

*See* Scarsi Decl., ¶14. Notably, Toyota points to no actual notification of termination by Fidelity, nor does it even allege that Fidelity has actually stopped providing services.

The infirmities with this argument are numerous. As a preliminary matter, Mr. Keil never made the statement attributed to him by Mr. Scarsi. *See* Keil Decl., ¶7. Even if he had, however, that statement hardly constitutes a statement of intent. It is a legal opinion by an in-house attorney concerning Fidelity's legal obligations in light of Toyota's conduct. Fidelity has made clear throughout their discussions that it has been, and is, ready, willing and able to provide all services under the Agreements. *See* [letters]. Indeed, the undisputed evidence is that Fidelity has and continues to provide services through the present, and has continued to dedicate personnel and assets to the Toyota project.

In any event, and actually relevant to this analysis, Mr. Keil's statement happens to be correct. Just weeks earlier, Toyota had wrongfully attempted to repudiate the Amended License Agreement. *See* Scarsi Decl., ¶11. In addition, Toyota has refused to pay at least four invoices which it previously had approved and committed to pay. *See* Slider Decl., ¶38. Toyota is in breach of the Amended License Agreement, and the services need not be performed. *See* Exhibit

3, §9.2. As a result, Section 4.0(iii) of the Amended Product Schedule is not triggered, and the

source code may not be released. *See* Toyota Memorandum, p. 7.

### B.    The ALS-COM Architecture Meets All Contract Requirements

Toyota's claim that the ALS-COM architecture is defective is based upon two statements

in Ms. Gallucci's declaration:

> 13.    . . . Microsoft concluded that FIS' software was the root of
> the problems with the OSCAR system and that the system
> architecture was grossly inefficient.
>
> 14.    After being presented with Microsoft's findings, . . .
> John Vaughn [sic] told me that the current architecture
> would not support the Release 2 (discounting)
> functionality. Based on my experience in the business
> technology field and knowledge of the OSCAR project, I
> concur in Mr. Vaughn's [sic] opinion . . .

*See* Gallucci Decl., ¶¶ 13, 14. As previously detailed, Ms. Gallucci has mischaracterized the

Microsoft report and Mr. Vaughan's statement. That leaves Toyota's argument dependent upon

a conclusory affirmation by Ms. Gallucci of a misrepresented opinion. Toyota has not met its

burden.

More fundamentally, however, Toyota's assertion is simply wrong. The Amended

License Agreement provides that, "if Software as delivered does not perform according to the

applicable Documentation and the Acceptance Criteria, such non-performance shall constitute a

defect ('Defect')." *See* Exhibit 5, §6.2. After acceptance, Fidelity's obligations to address

Defects continue, and Fidelity is also obligated to meet the specified uptime and throughput

performance standards. *See* Exhibit 5, §7.1 at 5-6.

Toyota does not claim, nor can it, that the ALS-COM system architecture constitutes a

"Defect" as defined by the Agreements. The architecture conforms to all contract requirements.

The parties expressly agreed to the specific, terminal server structure presented by the architecture. *See* Vaughan Decl., ¶¶10-22. The architecture properly supports the product's functionality, and the product meets all performance standards. In sum, Fidelity delivered exactly what Toyota bought and bargained for. It is black-letter law that a Court will enforce unambiguous contract provisions in accordance with their plain meaning. *See Greenfield v. Philles Records, Inc.,* 780 N.E.2d 166, 170 (N.Y. 2002) ("a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms"); *Coast Plaza Doctors Hospital v. Blue Cross of California,* 99 Cal. Rptr. 2d 809, 815 (Ct. App. 2d Dist. 2000) (a court is "bound to give effect to the plain and ordinary meaning of the language used by the parties"). Fidelity's obligations under the Agreements were clear, and Fidelity has met each of these obligations.

Indeed, Toyota's own conduct belies its stated complaints. Toyota formally accepted Phase 1, the architecture it now seeks to reject. After this acceptance, Toyota integrated the software into all of its DSSOs, including its last and largest DSSO in November 2004. Toyota's application volume in 2004 increased in relation to its 2003 volume by over 500% because, by its own admission, it more fully employed OSCAR in 2004. *See* Gallucci Decl., ¶¶ 17-18. The program has run smoothly for months at historic volumes. *See* Gillis Decl., ¶13. Yet, after all these achievements, and only after Toyota fully integrated ALS-COM into its business and computer network, has Toyota now chosen to terminate because the product architecture supposedly is defective.

Clearly, Toyota has other motives. In a recent conversation with Fidelity, Toyota made clear that, if it received the source code, it intended to outsource the continuing development and support of the software code to a company in India at substantially less cost than Fidelity. *See*

Slider Decl., ¶20. Toyota could, in fact, get out of the contract legally as a "termination for convenience." *See, e.g.,* Exhibit §8.1 at 9. To do so, though, would mean that it would suffer penalties, would have to meet its contractual obligations, and would not get the source code. *See id.* More fundamentally, however, it would not allow Toyota to achieve its business goals.

## III.    TOYOTA WILL SUFFER NO IRREPARABLE HARM

Toyota argues that it must have preliminary relief because, "in the event OSCAR crashes, [Toyota], without access to the OSCAR software, will be unable to repair OSCAR and [Toyota's] business will come to a grinding halt." *See* Toyota Memorandum, p. 10. In fact, this situation is so urgent, according to Toyota, that it maintained to this Court that *ex parte* relief was appropriate. *See id.*

First, any "emergency" is of Toyota's own making. Toyota's alleged insecurity arises from its decision to reject Fidelity's services. The irreparable harm component cannot be met where, as here, the alleged harm is self-inflicted. *See FIBA Leasing Co. v. Airdyne Industries, Inc.*, 826 F. Supp 38, 39 (D. Mass. 1993), citing *San Francisco Real Estate v. Real Estate Investment Trust of America*, 692 F.2d 814, 818 (1st Cir. 1982) ("A preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.")

That point is all the more important where Toyota has not complained about the quality of the services it has purported to terminate. Toyota's rejection of Fidelity's services is not based on the services themselves. Rather, Toyota's sole complaint is that Fidelity will not re-architect the product for free. Toyota has made a conscious decision to shut Fidelity out to set up this claim. The Court should not credit such behavior.

Second, no emergency exists at all. Based upon Toyota's own papers, there has been no network outage since last July. Fidelity has no reason to believe that another outage is even

likely to occur, or that the ALS-COM product would be involved if it did. *See* Gillis Decl., ¶11. ALS-COM is stable and should not cause a system outage. *See id.,* ¶¶11-13.

Indeed, it appears that OSCAR as a whole is quite stable. As a recent internal email at Toyota confirms, Toyota is engaging in routine maintenance of its OSCAR system. *See* Exhibit 27. Certainly, if anything were wrong with the software, Toyota would not be engaging in the type of routine maintenance described in that email. *See* Gillis Decl., ¶17. This conduct is not surprising, as from the outset the parties contemplated that routine maintenance processing would be accomplished without access to source code. *See* Exhibit 5, §4.3.2 at 2; Exhibit 6, §1.9 at 1.

## IV.    THE BALANCING OF THE HARMS FAVORS FIDELITY

Source code is undeniably a valuable trade secret. *See Picker Int'l Corp. v. Imaging Equipment Services, Inc.*, 931 F. Supp. 18, 44 (D. Mass. 1995), *citing Data General Corp. v. Grunman Systems Support Corp.*, 825 F. Supp. 340, 359, *aff'd* 36 F.3d 1147, 1165 (1st Cir. 1994). Toyota may have been able to license Fidelity's source code. Had it done so, it would have had substantial flexibility to use the code to build and improve upon the ALS-COM product. It would have had a relatively unfettered ability, subject of course to confidentiality restrictions, to manipulate the product and adjust it to the company's changing technological needs. Toyota chose not to make that financial commitment. It chose to license only the object code for substantially less fees.

Fidelity has invested millions of dollars in its ALS-COM product. If the Court compels that the code be released to Toyota, Toyota would receive a huge economic windfall. Without showing any actual harm, Toyota will receive benefits for which it never bargained. Fidelity, in contrast, will be irretrievably harmed because it will never be compensated for the release of its

# 2521143_v6

- 18 -

source code. The Court should not allow Toyota to use the court system to cause a fundamental and permanent change in the economic relationship between the parties.

Fidelity has complied with each and every contract term in the parties' agreements. It has provided a product that meets all contractual performance standards and specifications. Toyota brings this motion, and the arbitration demand referenced therein, because it seeks to have more than the rights for which it bargained. It wants to avoid its past due invoices and paying fair value for the source code. It wants a new architecture that is outside the Agreements. It wants enhanced performance. Yet, it is not willing to pay for those things. Instead, Toyota seeks with its present Motion to obtain the system's source code through a preliminary injunction on a truncated record. This Court should deny Toyota's Motion.

## CONCLUSION

Fidelity respectfully requests that the Court deny Toyota's application for a temporary restraining order.

FIDELITY INFORMATION SERVICES, INC.,
By its attorneys,

HOLLAND & KNIGHT LLP

Ieuan G. Mahony (BBO No. 552349)
Joshua C. Krumholz (BBO No. 552573)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700 - Telephone
(617) 523-6850 - Facsimile

Dated: January 14, 2005

# 2521143_v6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IRON MOUNTAIN INTELLECTUAL
PROPERTY MANAGEMENT, INC.,

               Interpleader-Plaintiff,

v.

FIDELITY INFORMATION SERVICES, INC.,
f/k/a ALLTEL INFORMATION SERVICES,
INC., and TOYOTA MOTOR CREDIT
CORPORATION,

               Interpleader-Defendants.

C.A. No. 05 CV 10018-RGS

**APPENDIX OF EXHIBITS IN SUPPORT OF OPPOSITION TO**
***EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

By its attorneys,

HOLLAND & KNIGHT LLP

Ieuan G. Mahony (BBO No. 552349)
Joshua C. Krumholz (BBO No. 552573)
10 St. James Avenue
Boston, MA 02116

Dated: January 14, 2005
       Boston, Massachusetts

APPENDIX OF EXHIBITS IN SUPPORT OF OPPOSITION TO
*EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

| **Exhibit** | **Document Description** | **Date** | **By / Between** | **To** |
|---|---|---|---|---|
| **1** | Services Agreement | 2/7/2000 | Alltel ("Fidelity") | TMCC ("Toyota") |
| **2** | Source Code Escrow Agreement | 8/25/2000 | Fort Knox | Fidelity, Toyota |
| **3** | Master Software License Agreement | 8/25/2000 | Fidelity | Toyota |
| **4** | Second Amendment to Implementation Statement of Work | 3/1/2002 | Fidelity | Toyota |
| **5** | First Amendment To Master Software License Agreement | 3/1/2002 | Fidelity | Toyota |
| **6** | First Amendment to Product Schedule No. 1 | 3/1/2002 | Fidelity | Toyota |
| **7** | Toyota Oscar Relaunch Project Project Charter | 6/14/2002 | Toyota | Fidelity |
| **8** | Letter | 3/10/2003 | A. Fallace, Toyota | C. Thompson, Fidelity |
| **9** | E-mail | 8/20/2003 | D. Switzer, Toyota | D. Martin, Fidelity |
| **10** | Invoice | 9/2/2003 | Fidelity | Toyota |
| **11** | OSCAR Production Environment Flowchart | 3/31/2004 | Toyota | |
| **12** | Invoice | 5/11/2004 | Fidelity | Toyota |
| **13** | Fidelity ALS COM Application Architecture and Design Recommendations | 5/27/2004 | Microsoft Consulting Services | |
| **14** | Letter | 8/10/2004 | S. Coyne, Toyota | F. Sanchez, Fidelity |
| **15** | Letter | 8/18/2004 | D. Slider, Fidelity | S. Coyne, Toyota |

| **Exhibit** | **Document Description** | **Date** | **By / Between** | **To** |
|---|---|---|---|---|
| **16** | Intentionally Omitted | | | |
| **17** | Letter | 10/18/2004 | S. Coyne, Toyota | F. Sanchez, Fidelity |
| **18** | Letter | 10/22/2004 | F. Sanchez, Fidelity | S. Coyne, Toyota |
| **19** | Corporate Report: Toyota Motor Credit Corporation | | Hoovers | |
| **20** | Letter | 11/3/2004 | S. Coyne, Toyota | F. Sanchez, Fidelity |
| **21** | Letter | 11/11/2004 | D. Slider, Fidelity | S. Coyne, Toyota |
| **22** | Letter | 12/1/2004 | S. Coyne, Toyota | F. Sanchez, Fidelity |
| **23** | Letter | 12/13/2004 | K. Adkins, Toyota | C. Dooder, Fort Knox |
| **24** | Letter | 12/20/2004 | S. Coyne, Toyota | F. Sanchez, Fidelity |
| **25** | Letter | 12/23/2004 | F. Sanchez, Fidelity | S. Coyne, Toyota |
| **26** | Email | 1/6/2005 | R. Gillis, Fidelity | L. Cahill-Buss, Toyota |
| **27** | Email | 1/10/2005 | J. Dalton, Toyota | Toyota-OSCAR Users |

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2005, I caused copies of the foregoing document to be served on the following counsel in the manner indicated:

### VIA HAND DELIVERY

Larry L. Varn, Esquire
Samual A. Miller, Esquire
SULLIVAN & WORCHESTER LLP
One Post Office Square
Boston, MA 02109

David B. Chaffin, Esquire
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110

### VIA ELECTRONIC MAIL

Marc C. Scarsi, Esquire
Timothy M. Martin, Esquire
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, CA 90071-2899

_____
Joshua C. Krumholz

# 2530669_v1

EXHIBIT 1

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

DISASTER RECOVERY
PROJECT/
DATE COPIED _2/15/02_

# TOYOTA MOTOR CREDIT CORPORATION

## SERVICES AGREEMENT

## AGREEMENT NUMBER

### 2000AIS001

**THIS SERVICES AGREEMENT** (this "**Agreement**") is made and entered into as of February 7 th, 2000, by and between TOYOTA MOTOR CREDIT CORPORATION, a California corporation (hereinafter referred to as "**TMCC**"), with offices at 19001 South Western Avenue, Torrance, California 90509, and ALLTEL INFORMATION SERVICES, INC. an Arkansas corporation (hereinafter referred to as "**ALLTEL**") with its regional office located at 4001 Rodney Parham Road, Little Rock, Arkansas 72212.

## RECITALS

A.    TMCC is in the business of financing Toyota and Lexus brand motor vehicles.

B.    ALLTEL is in the business of providing information technology services.

C.    TMCC has engaged ALLTEL to assist in information technology services, and both parties desire that ALLTEL provide the services required and desire that all of the rights, duties and obligations of the parties be governed in accordance with the terms of this Agreement.

**NOW, THEREFORE,** based on the foregoing facts and in consideration of the mutual covenants and conditions contained in this Agreement, TMCC and ALLTEL hereby agree as follows:

**1.0    TERM OF AGREEMENT**

This Agreement shall commence on the date set forth above, and shall continue until the earlier of completion of all services/deliverables set forth in the Statement(s) of Work (as defined in **Section 2.0** below) or February 7 th, 2001 (the "**Initial Term**"), unless sooner terminated as set forth in **Section 12.0** below. TMCC may renew this Agreement beyond the Initial Term, at its sole discretion, upon the same terms and conditions as set forth herein, provided notice is given by TMCC to ALLTEL by January 7 th, 2001.

**2.0    SCOPE OF SERVICES**

2.1    During the term of this Agreement, ALLTEL will provide TMCC with the personnel (each, a "**Consultant**") who will perform all of the services and prepare the materials and deliverables (collectively, the "**Services**") in connection with the completion of the system/project, having the qualifications and billing rates as described in certain Statement(s) of Work in the form of the Statement of Work attached hereto and incorporated herein by this reference, which Statement(s) of Work may be modified and amended from time to time in writing by the mutual agreement of the parties (the "**Statement(s) of Work**"). The Services shall be performed in accordance with the general schedule set forth in the relevant Statement of Work (the "**Schedule**"). Not withstanding the above, TMCC may modify a particular Statement of Work by reducing

its scope from time to time by giving ALLTEL twenty (20) business days prior written notice. Unless otherwise agreed in writing by both parties, the services to be rendered by ALLTEL to TMCC are limited to those services, which are specifically described in the Statement(s) of Work. In the event of a conflict between the provisions of a Statement of Work and this Agreement, the specific provisions in the Statement of Work shall govern for that particular Statement of Work.

## 3.0    KEY PERSONNEL

3.1    <u>Key Personnel</u>. The parties hereto acknowledge and agree that the Services of the Consultants specifically identified in a particular Statement of Work are unique and that TMCC has entered this Agreement and each particular Statement of Work on the condition that such personnel's services be made available as reasonably possible to TMCC as described herein and the relevant Statement of Work. ALLTEL shall use its best efforts to provide that such personnel are not removed or reassigned during the term of the relevant Statement of Work. TMCC shall have the right to interview and provide input on and approve any substitute key personnel which approval shall not be unreasonably withheld.    In the event that a Consultant(s) at any time breaches or threatens to breach generally accepted business practices, ALLTEL shall promptly upon request from TMCC replace said Consultant(s) and will do so with other personnel who have the requisite qualifications and experience to perform the services hereunder. In the event that a Consultant(s) (i) fails to abide by generally accepted business practices and such Consultant(s) fails to provide the Services or (ii) is generally unacceptable to TMCC (in which case ALLTEL shall be relieved of any obligations affected by such dismissal), hereunder ALLTEL shall promptly upon request from TMCC replace said Consultant(s) and will do so with other personnel who are approved by TMCC in the manner as set forth above, and who have the requisite qualifications and experience to perform the services hereunder. In the event ALLTEL fails to replace a Consultant(s) with one that is reasonably acceptable to TMCC, within thirty (30) days from TMCC's request, TMCC shall be entitled to terminate the applicable Statement(s) of Work.

3.2    <u>No Hire Restriction</u>. During the term of this Agreement and for twelve (12) months after the termination of services of a particular Consultant under a Statement of Work, TMCC may not solicit for employment, hire or otherwise retain such Consultant employee of ALLTEL who performed services directly related to or in support of the Services provided under this Agreement without prior written approval of ALLTEL. Under the same terms, ALLTEL may not solicit for employment, hire or otherwise retain any employee of TMCC who has been directly involved in providing or receiving the Services during the term of this Agreement and for twelve (12) months after the termination or expiration hereof without the prior written approval of TMCC.

## 4.0    COMPENSATION

In consideration for the Services to be provided by ALLTEL hereunder, TMCC shall pay ALLTEL in the manner and at the rates set forth in the relevant Statement of Work. ALLTEL shall invoice TMCC monthly for the Services performed hereunder (or at the indicated invoice issuance dates set forth in the relevant Statement of Work) with a correct invoice referencing a valid TMCC Purchase Order issued for the purpose(s) outlined in the respective Statement of Work, and TMCC shall pay such invoices within thirty (30) days of receipt of a correct invoice. For all payments not made within thirty (30) days after TMCC's receipt of ALLTEL's invoice,

TMCC shall pay a late fee at the rate of one percent (1.0%) per month from the due date for payment until such payment is made. No failure by ALLTEL to request such payment shall be deemed a waiver by ALLTEL of TMCC's obligation to pay such amounts. A correct invoice is one in which (a) the invoice matches the products and/or services specified on the Purchase Order, and are validated by the responsible TMCC manager, and (b) the invoice references the valid Purchase Order number under which the products and/or services were purchased and/or performed. Unless otherwise specifically set forth in a Statement of Work, ALLTEL shall bear all of its own expenses arising from the performance of its obligations under this Agreement. Final ALLTEL billings and requests for payment must be submitted to the appropriate Toyota accounts payable department no later than ninety (90) days after the expiration date of this Agreement or its related Statement of Work, or its associated Purchase Order. **The parties recognize the TMCC Purchase Order as the sole authorization for ALLTEL to provide products and/or services**. Products and/or services are authorized for acquisition by TMCC when ALLTEL receives a Toyota Purchase Order authorizing ALLTEL to provide such products and/or services at the prices and/or rates stipulated in a Statement of Work.

## 5.0   TAXES

All charges and fees to be paid by TMCC under this Agreement are exclusive of any applicable withholding, sales, use, value added, excise, services or other tax which may be assessed on the provision of the services. In the event that a withholding, sales, use, value added, excise, value added, services or other tax is assessed on the provision of any of the services provided to TMCC under this Agreement, TMCC will pay directly, reimburse or indemnify ALLTEL for such taxes, as well as any applicable interest, penalties and other ALLTEL fees and expenses. The parties will cooperate with each other in determining the extent to which any tax is due and owing under the circumstances, and shall provide and make available to each other any resale certificates, information regarding out-of-state or country use of materials, services or sale, and other exemption certificates or information reasonably requested by either party. ALLTEL shall be responsible to pay to the appropriate taxing authorities any taxes paid by TMCC to ALLTEL. ALLTEL shall assume full responsibility for payment of all federal, state, local taxes or contributions imposed or required under unemployment insurance, social security, workers compensation and income tax laws with respect to its personnel, and any taxes due based on ALLTEL's income. Notwithstanding the foregoing, TMCC shall not be required to pay or otherwise be liable or responsible for, and ALLTEL hereby indemnifies and holds TMCC harmless against, any penalty, additional tax, or interest that may be assessed or levied as a result of the failure of ALLTEL to file any return, form or information statement that may be required to be filed by any governmental agency but only in the event such penalties arise out of ALLTEL's failure to pay taxes already paid by TMCC to ALLTEL.

## 6.0   STATUS

The relationship of ALLTEL (including without limitation, all Consultants) to TMCC shall be that of an independent contractor rendering professional services. Neither ALLTEL nor any Consultants shall have any authority to execute contracts or make commitments on behalf of TMCC. Nothing contained herein shall be deemed to create the relationship of employer and employee, or principal and agent, joint venture or partner between ALLTEL (or any Consultant) and TMCC. Further, ALLTEL recognizes that in view of its status as an independent contractor, neither it nor its employees, contractors or agents will be entitled to participate in or receive any fringe benefits normally granted to TMCC employees under such programs including, but not

limited to, worker's compensation, voluntary disability, travel accident insurance, medical/dental insurance, life insurance, long-term disability, holiday pay, sick pay, salary continuation pay, leaves of absence (paid or unpaid), pension plan and savings plan. ALLTEL shall be responsible for and shall defend, indemnify and hold harmless TMCC, its parent, subsidiaries and affiliates, and their respective agents, employees, representatives, contractors, successors and assigns, against all expenses and liabilities, including without limitation attorneys' fees, in connection with ALLTEL's employment and/or hiring of any Consultant providing any of the Services, including without limitation (i) payment when due wages and benefits; (ii) withholding of all payroll taxes, including but not limited to unemployment insurance, workers' compensation, FICA, and FUTA; (iii) compliance with the Immigration Reform Control Act, and (iv) compliance with any law or regulation relating to employment of any employee of, and/or hiring by, ALLTEL in connection with the Services.

## 7.0    CONFLICT OF INTEREST

For the Services being provided under this Agreement, ALLTEL warrants to the best of its knowledge that the ALLTEL personnel that ALLTEL will assign to work on any Statement(s) of Work are not engaged in any independent consulting or other similar services outside the scope of their employment with ALLTEL which are similar to the services being provided to TMCC ("Conflict of Interest"). ALLTEL shall promptly advise TMCC of any actual or potential Conflict of Interest of which ALLTEL is aware that arises prior to or during the performance of the Services. In the event any such Conflict of Interest that cannot be remedied to the reasonable satisfaction of TMCC, ALLTEL will remove the personnel in the manner as set out in **Section 3.1** of this Agreement.

## 8.0    OBSERVATION OF ALLTEL'S WORK

8.1    <u>Services not at TMCC's Facility</u>. If any Services are to be conducted at a location other than at the offices of TMCC, subject to ALLTEL's confidentiality and security procedures, TMCC may, at its expense, and upon reasonable notice and during business hours, send to ALLTEL, and ALLTEL will permit, TMCC personnel or third party consultants or agents of TMCC ("Authorized Representatives") to observe ALLTEL's performance of its obligations pursuant to this Agreement. TMCC's Authorized Representatives may observe ALLTEL's performance under the following conditions: (i): Authorized Representatives who are ALLTEL's competitors are excluded (provided however, in the event that TMCC provides ALLTEL with a prior written request to permit specific Authorized Representatives who are ALLTEL's competitors to observe ALLTEL's performance, ALLTEL may consent to allow access to such Authorized Representatives, which consent shall not be unreasonably withheld, (ii) all observing Authorized Representatives are bound by Confidentiality Agreements between the employer of the Authorized Representatives and TMCC, which agreements shall have terms and conditions agreeable to ALLTEL, and (iii) TMCC shall be responsible and liable for the acts of its Authorized Representatives. ALLTEL agrees to meet with TMCC in connection with and to provide reports on the Services upon request and to the extent contemplated by the Statement(s) of Work.

8.2  <u>Services at TMCC's Facility</u>.  If ALLTEL's services are to be performed at TMCC offices as designated in a Statement of Work, TMCC shall provide space, equipment, supplies and facilities to ALLTEL's staff commensurate with that provided to TMCC employees to the extent necessary to perform the Services specified by this Agreement, unless otherwise set forth in a particular Statement of Work.

## 9.0  CONFIDENTIALITY

9.1  <u>Confidential Information</u>.    The parties acknowledge and agree that each will be provided certain information originated by or peculiar within the knowledge of the other party which is not generally available to the public and which the other party considers confidential or proprietary (the "Confidential Information").  Each party agrees to treat the other party's Confidential Information in the same manner as it treats its own Confidential Information, which shall in no event be less than in a reasonable manner, to take reasonable security precautions to safeguard the other party's Confidential Information from theft or from access by unauthorized person, to not use the other party's Confidential Information in any way detrimental to such party, and to not directly or indirectly, disclose or divulge any Confidential Information to any third party without the prior written consent of the other party.

9.2  The receiving party shall have no obligation with respect to Confidential Information of the other party when;  (i) it is or becomes publicly known through no wrongful act, fault or negligence of the receiving party; (ii) was known, free of obligations of confidentiality, by the receiving party prior to disclosure; (iii) was disclosed to the receiving party by a third party, other than by an affiliate, subsidiary, parent or agent of the disclosing party, who was free of obligations of confidentiality, directly or indirectly, to the party providing the information; (iv) is approved for release by prior written authorization of the other party (v) is publicly disclosed pursuant to a requirement or request of a governmental agency or disclosure is required by operation of law, provided however, that receiving party  shall first have given written notice to the disclosing party so that the disclosing party may seek an appropriate protective order; (vi) is furnished to a third party, other than to an affiliate, subsidiary, parent or agent of the disclosing party, by the disclosing party without a similar restriction on the third party's rights; or (vii) is independently developed by employees of the receiving party who did not have access to any or all of the Confidential Information.  The receiving party shall have the burden of proof with respect to any of the above events on which the receiving party relies as relieving it of the restrictions hereunder on disclosure or use of Confidential Information.

9.3  The parties acknowledge that this Agreement and each Statement of Work hereto contains Confidential Information that may be considered proprietary by one or both of the parties, and agree to limit distribution of this Agreement and the Statement of Works to those individuals with a need to know the contents of this Agreement and the Statement of Works.  In no event may this Agreement or any Statement of Work be reproduced or copies shown to any third parties (exclusive of , affiliates, subsidiaries parents and their employees, contractors, attorneys, subcontractors and agents who have a need for it) without the prior written consent of the other party, except as may be necessary by reason of legal, accounting, tax or regulatory requirements, in which event TMCC and ALLTEL agree to exercise reasonable diligence in limiting such disclosure to the minimum necessary under the particular circumstances.  The parties agree that the

remedy at law for the breach of any provision of this Section 9 may be inadequate and that the parities will be entitled to injunctive relief without bond, in addition to any other rights or remedies which they may have for such breach.

9.4 <u>Nondisclosure</u>. The receiving party agrees and acknowledges that it shall have no proprietary interest in the Confidential Information of the other party and will not disclose, communicate nor publish the nature or content of such information to any person or entity, nor use, except as authorized in writing by the disclosing party, any of the Confidential Information it produces, receives, acquires or obtains from the disclosing party, subject to the terms of **Section 10** hereof. The receiving party shall take all necessary steps to insure that the Confidential Information is securely maintained. The receiving party's obligations set forth herein shall survive the termination or expiration of this Agreement.

9.5 <u>Remedies</u>. The parties acknowledge and agree that remedy at law for a breach or threatened breach of any of the provisions under this **Section 9.0** would be inadequate and, in recognition of this fact, in the event of a breach or threatened breach by the receiving party of any of the provisions contained in this **Section 9.0**, the disclosing party, without posting any bond, shall be entitled to obtain provisional equitable relief in the form of temporary restraining order and/or temporary injunction or any other provisional equitable remedy which may then be available, and the receiving party hereby agrees not to contest same. Nothing herein contained shall be construed as prohibiting the disclosing party from pursuing any other remedies available to it from such breach or threatened breach. Pursuit of any remedy at law or in equity shall not be deemed as an election of remedies.

## 10.0   TITLE AND LICENSING

10.1 TMCC acknowledges and agrees that any and all specifications, applications, routines, subroutines, systems, programs, formulae, software and discoveries, which, are provided, developed or created in whole or in part by ALLTEL in the performance of ALLTEL's duties under this Agreement (the "ALLTEL Proprietary Information"), are and will be the sole and exclusive property of ALLTEL, and will constitute valuable trade secrets of ALLTEL.

10.2 TMCC hereby assigns and transfers to ALLTEL all of TMCC's present and future interest and rights, including copyright, together with all rights to secure renewals, reissues and extensions of copyright, in the ALLTEL Proprietary Information. TMCC agrees to cooperate with and assist ALLTEL, at ALLTEL's request and expense, in every lawful way to secure, sustain or defend ALLTEL's copyright, patent, trade secret rights and such other proprietary rights in the ALLTEL Proprietary Information, or any renewal or extension of the copyright, patent, trade secret or other proprietary right. TMCC also agrees to authorize and direct TMCC's successors, heirs and personal representatives to provide to ALLTEL the same assistance that TMCC is obligated to provide pursuant to this Section.

10.3 ALLTEL shall incorporate the ALLTEL Proprietary Information into ALLTEL's proprietary software (the "ALLTEL Software"). ALLTEL further agrees to license the ALLTEL Software to TMCC under the terms of that certain Software License

F 00129

Agreement by and between ALLTEL and TMCC, dated _____ (the "License Agreement"). The parties acknowledge and agree that the ALLTEL Proprietary Information shall be subject to the acceptance procedures described in the License Agreement. As of the effective date of this Agreement, and at all times hereafter, ALLTEL shall be the sole and exclusive owner of all right, title, and interest in and to the ALLTEL Software (including, but not limited to, any modification, enhancement, interface, upgrade, change and all software, source code, blueprints, diagrams, flow charts, specifications, functional descriptions or training materials relating thereto) without payment of any compensation to TMCC, or any notice to TMCC, including, without limitation, all intellectual property and other rights with respect to the ALLTEL Software and the accompanying ALLTEL software user manuals and documentation. The parties acknowledge that this Agreement in no way limits or restricts ALLTEL from developing or marketing on their own or for any third party in the United States or any other country the ALLTEL Software, as from time to time constituted.

ALLTEL shall not be precluded from developing for itself, or for others, materials which are competitive with the TMCC Proprietary Information provided hereunder, irrespective of their similarity to the TMCC Proprietary Information, provided that such materials are developed independently from any TMCC Proprietary Information or TMCC Proprietary Information. ALLTEL shall, moreover, be free to use its general knowledge, skills and experience, and any ideas, concepts, know-how and techniques within the scope of its consulting practice that are used in the course of providing the services, provided that such ideas, concepts, know-how and techniques are developed independently from any TMCC Proprietary Information. Nothing herein shall grant to or confer upon TMCC expressly or by implication any rights or license to such proprietary methodologies, software, tools and know-how, other than the license rights expressed in this Section.

10.4    TMCC and ALLTEL shall establish a process prior to the commencement of any Statement(s) of Work in order to determine if certain elements of the ALLTEL Proprietary Information created under this Agreement contain TMCC trade secrets ("TMCC Secret Methodology"). TMCC will identify any such TMCC Secret Methodology in writing to ALLTEL prior to the development of the ALLTEL Software. For the TMCC Secret Methodology identified by TMCC, if ALLTEL agrees, in its sole discretion, to provide services under a Statement(s) of Work, ALLTEL will employ special segmentation techniques when incorporating any TMCC Secret Methodology into the ALLTEL Software and those techniques will allow ALLTEL to restrict distribution of the elements of the ALLTEL Software that contain TMCC Secret Methodology to TMCC alone and to no other user of the ALLTEL Software. ALLTEL agrees that any TMCC Secret Methodology is Confidential Information as defined in section 9.0 of this Agreement.

10.5    ALLTEL acknowledges and agrees that any and all specifications, applications, routines, subroutines, systems, programs, formulae, software and discoveries, which, are provided, developed or created in whole or in part by ALLTEL in the performance of ALLTEL's duties under this Agreement that are not related to any ALLTEL Software (the "TMCC Proprietary Information"), are and will be the sole and exclusive property of TMCC and will constitute valuable trade secrets of TMCC.

**11.0 WARRANTIES OF ALLTEL FOR SERVICES AND SOFTWARE NOT COVERED BY LICENSE AGREEMENT WARRANTY (TMCC PROPRIETARY INFORMATION)**

**11.1 WARRANTIES AND REMEDIES FOR SERVICES PERFORMED IN CONNECTION WITH TMCC PROPRIETARY INFORMATION**

11.1.1 <u>Compliance With Description of Services</u>. Solely with respect to Services which relate to TMCC Proprietary Information, ALLTEL represents and warrants that for a period of two (2) years after the date of production implementation thereof, its deliverables will comply in all material respects with the descriptions and representations as to the Services (including performance, capabilities, accuracy, completeness, characteristics, specifications, configurations, standards, functions and requirements) set forth in the applicable Statement(s) of Work or in any amendment hereto or thereto. EXCEPT AS EXPRESSLY PROVIDED IN THIS SUBSECTION 11.1, WITH RESPECT TO SERVICES WHICH RELATE TO TMCC PROPRIETARY INFORMATION, ALLTEL MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO SUCH SERVICES RENDERED OR THE RESULTS OBTAINED, AND TMCC AGREES THAT ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES THAT ARE NOT PROVIDED IN THIS AGREEMENT ARE HEREBY EXCLUDED AND DISCLAIMED.

11.1.2 <u>Remedy</u>. Except as set forth in a Statement(s) of Work, TMCC's sole remedy under the limited warranties contained in subsection 11.1.1 is to return any deliverables for replacement or correction within ten (10) days but not to exceed thirty (30) days. If the problem persists following such replacement or correction, ALLTEL shall refund the fees paid (prorated on a two (2) year schedule) for the statement of work pursuant to which the Services were performed for TMCC hereunder, provided TMCC returns the defective deliverables to ALLTEL.

**11.2 WARRANTIES AND REMEDIES FOR SOFTWARE DEVELOPED AS TMCC PROPRIETARY INFORMATION**

11.2.1 <u>Compliance With Description of Services</u>. With respect to software developed by ALLTEL that is TMCC Proprietary Information, ALLTEL represents and warrants for a period of two (2) years after production implementation by TMCC that such software will comply in all material respects with the descriptions and representations (including performance, capabilities, accuracy, completeness, characteristics, specifications, configurations, standards, functions and requirements) set forth in the respective Statement(s) of Work or in any amendment hereto or thereto.

F 00131

11.2.2  Title.  With respect to software developed by ALLTEL that is TMCC Proprietary Information, ALLTEL represents and warrants that it is the lawful owner or licensee of all software used by it in the performance of the Services contemplated hereunder that has not been provided by TMCC, that such software has been lawfully developed or acquired by ALLTEL, and that ALLTEL has the right to transfer title to TMCC or to license or permit TMCC access to or use of such software

11.2.3  Viruses, Disabling Devices, etc.  With respect to software developed by ALLTEL that is TMCC Proprietary Information, ALLTEL represents and warrants that such software shall be free, at the time of receipt by TMCC, of any programs, subroutines, code, instructions, data or functions, (including but not limited to viruses, worms, disabling devices, date bombs or time bombs), the purpose of which is to intentionally cause the software to cease operating, or to damage, interrupt, interfere with or hinder the operation of the software, the system in which it resides, or any other software or data on such system or any other system with which it is capable of communicating.

11.2.4  Date Compliance.

11.2.4.1  Definitions.  "Date Compliant" shall mean that all dates, including, without limitation, the years 1900 - 1999, 2000 and thereafter, encountered and/or processed by the programs will be correctly recognized, calculated, compared, sorted, stored, displayed and/or otherwise processed on the hardware platform set forth in the product schedule set forth in the statement of work and with the software, files and interfaces with which it is to be utilized.

11.2.4.2.  Representations.  With respect to software developed by ALLTEL that is TMCC Proprietary Information, ALLTEL represents and warrants for a period of two (2) years after acceptance by TMCC: (a) that such software is Date Compliant; is designed to be used prior to, during, and after the calendar year 2000 AD; will operate consistently, predictably and accurately, without interruption or manual intervention, and in accordance with all requirements of this Agreement, including without limitation all specifications and/or functionality and performance requirements, during each such time period, and the transitions between them, in relation to dates it encounters or processes; (b) that all date recognition and processing by such software will correctly recognize and process the date of February 29, and any related data, during Leap Years; and (c) that all date sorting by such software that includes a "year category" shall be done based on the Four Digit Year Format (or a two digit year format with windowing techniques which result will be in a Four Digit Year Format).

11.2.4.3.  Limitation on Liability. If TMCC is entitled to modify any software developed by ALLTEL that is TMCC Proprietary Information, TMCC agrees not to modify such software in a manner that would cause it to fail to meet warranties set forth herein. Accordingly, with respect to software developed by ALLTEL that is TMCC Proprietary Information, ALLTEL shall not be liable for failure of such software to conform to the warranties hereunder to the extent that any such failure is attributable to a modification of the programs by TMCC.

11.2.5  WITH RESPECT TO SOFTWARE DEVELOPED BY ALLTEL THAT IS TMCC PROPRIETARY INFORMATION, EXCEPT AS EXPRESSLY PROVIDED IN THIS SUBSECTION 11.2, ALLTEL MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND TMCC AGREES THAT ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXCLUDED AND DISCLAIMED.

11.2.6  Remedy.  Except as set forth in a Statement(s) of Work, and except for representations and warranties set forth in subsection 11.2.2 above (Title) (which is not covered by or limited to this subsection 11.2.6 or its remedy), TMCC's sole remedy under the limited warranties contained in subsection 11.2 shall be to have ALLTEL correct the defect within ten (10) days after receipt of notice thereof from TMCC. If ALLTEL is unable to correct the defect within ten (10) days but not to exceed thirty (30) days, TMCC may return the software and receive from ALLTEL a refund (prorated on a two (2) year schedule) of the fees paid for the statement(s) of work pursuant to which the software was developed for TMCC, provided TMCC returns to ALLTEL all copies of the applicable software.

## 12.0  TERMINATION

TMCC, upon sixty (60) days advance written notice, may terminate all or part of the Services. In the event of such termination, and so long as ALLTEL is not in default hereunder, TMCC shall be obligated to pay ALLTEL, within thirty (30) days after termination, the agreed price for activities performed by ALLTEL through the effective date of termination, except however, in the event TMCC requests ALLTEL to halt all Services within thirty (30) days of notice of termination, ALLTEL shall use reasonable efforts to re-deploy affected personnel within thirty (30) business days and TMCC shall continue to pay for Services during such re-deployment period. Either party may terminate this Agreement upon written notice if the other party breaches any of its obligations hereunder in any material respect, which breach is not cured within thirty (30) days of receipt of written notice of such breach. TMCC is entitled to utilize all material and products developed and delivered under this agreement for which it has paid subject to ALLTEL's enforcement of its intellectual property rights.

## 13.0    INSURANCE

ALLTEL shall obtain and/or maintain during the term of this Agreement:

(1)     commercial general liability insurance with minimum coverage of One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage,

(2)     employer's liability insurance in a minimum amount of One Million Dollars ($1,000,000), as well as worker's compensation insurance in an amount satisfying applicable laws,

(3)     automobile liability insurance with the following minimum limits: One Million Dollars ($1,000,000) bodily injury each person, One Million Dollars ($1,000,000) property damage each accident, and

(4)     electronic errors and omissions insurance in the amount of Three Million Dollars ($3,000,000).

ALLTEL shall name TMCC, its parent, subsidiaries and affiliated corporations as additional insureds on the general liability insurance required hereunder, which insurance policy shall cover risks of loss, damage or injury associated directly or indirectly with the performance of ALLTEL's obligations under this Agreement. ALLTEL shall provide TMCC with proof of the acquisition of all of the insurance coverages required hereunder in the form of one or more Certificates of Insurance within five (5) business days of the effective date of this Agreement and/or upon request. The insurance policies must provide that TMCC shall receive at least thirty (30) days written notice prior to any change, cancellation or reduction of such coverages. TMCC reserves the right to review, and must be satisfied with, the types and level of coverage to be obtained and maintained hereunder.   All insurance coverages required hereunder shall be procured from insurers with an A.M. Best's performance rating of at least A and with a financial size category of at least Class VII.

## 14.0    INDEMNIFICATION

14.1    The parties hereto shall each defend, indemnify and hold the other party, its parent, subsidiaries, affiliates, and their respective directors, officers, agents, representatives, contractors, employees, successors and assigns, harmless from and against any and all costs, expenses, damages, claims, suits, actions, liabilities, losses and judgments, including, without limitation, attorneys' fees and legal expenses, based upon personal injury and/or death, claims of infringement, property damage, and breaches of confidentiality arising out of the performance of the indemnifying party's obligations under this Agreement, or otherwise in connection with the acts or omissions of the indemnifying party, its employees, agents or contractors at no expense to the indemnified party, except to the extent those claims are caused by the negligence or willful misconduct of the indemnified party or its employees.  This obligation shall extend beyond the termination or expiration of this Agreement. The indemnified party shall fully cooperate with the indemnifying party in the defense and settlement of such action.  The indemnifying party shall have the sole right to conduct the defense of any such claim or action and all negotiations for its settlement or compromise, provided, however, that if any such compromise or settlement does not provide at least one of the remedies specified in Section 14.2 at no additional cost or obligation to the indemnifying party, no such action, claim, or liability shall be settled without the prior written consent of the indemnified party adversely affect the indemnified party's rights hereunder or impose any obligations upon the indemnified party in addition to those set forth herein. No such action, claim, or liability shall be settled without the prior written consent of the indemnified party to the extent that the indemnified party has responsibility or liability for any portion of such settlement which cannot be fulfilled by the payment of money by the

indemnifying party. The indemnified party agrees to give the indemnifying party prompt written notice of any written threat, warning or notice of any such claim or action.

14.2    If in any such suit relating to infringement of a party's intellectual property is so defended and is held to constitute an infringement or violation of any other party's intellectual property rights and is enjoined, or if in respect of any claim of infringement, the indemnifying party deems it advisable to do so, the indemnifying party shall, at its sole option, take one or more of the following actions at no additional cost or obligation to the indemnified party: (a) procure the right to continue the use of the same without material interruption for the indemnified party; (b) replace the same with non-infringing software that meets the specifications identified in the applicable Statement of Work, or where TMCC is the indemnifying party with respect to a claim of infringement, TMCC may direct ALLTEL to immediately cease further use of materials which are allegedly infringing; and relieve ALLTEL of any affected obligation as it may relate to services being provided to TMCC under the applicable Statement of Work (c) modify said software so as to be non-infringing, provided that the software as modified meets all of the specifications; or (d) take back the infringing software and credit the indemnified party with an amount equal to its purchase price if the software is taken back within two years of execution of the Agreement; and, thereafter, credit the indemnified party with an amount equal to its purchase price less straight line depreciation for the amount of time in excess of two (2) years, the software was used by the indemnified party over a three (3) year depreciation time schedule. The foregoing represents the sole and exclusive remedy with regard to any of the above infringements or alleged infringements.

## 15.0    GENERAL PROVISIONS

15.1    <u>Notices</u>. All notices, accountings, payments, etc., which either party desires or is required to give to the other shall be given in writing by personal delivery, overnight courier, or sent by United States mail postage prepaid, return receipt requested or facsimile transmission acknowledged as received followed by personal or mail delivery addressed as follows:

To                          Toyota Motor Credit Corporation
                            19001 South Western Avenue
                            Torrance, California 90509
                            Attention:    Business Systems Development
                                          Mail Stop FS20


                            With a copy to:

                            Toyota Motor Credit Corporation
                            19001 South Western Avenue
                            Torrance, California 90509
                            Attention:    Legal Department
                                          Mail Stop FN23

To                          ALLTEL INFORMATION SERVICES, INC.
                            One Mecca Way
                            Norcross, Ga. 30093
                            Attn:  Legal Department

All such notices shall be effective upon receipt or refusal thereof. Either party may change its notice address by a notice given to the other in the manner provided for in this Section.

15.2    Governing Law.    The laws of the State of California shall be applicable to the interpretation of this Agreement without regard to conflicts of law principles thereof.

15.3    Waiver.    The waiver of any of the terms or provisions of this Agreement in any one or more instances shall not be deemed a permanent waiver thereof or a waiver of this entire Agreement. No waiver shall be effective unless in writing signed by the waiving party.

15.4    Severability.    In the event that any provision of this Agreement shall be held illegal or otherwise unenforceable, such provision shall be severed and the entire Agreement shall not fail on account thereof and the balance of this Agreement shall continue in full force and effect.

15.5    Headings.    The captions and headings in this Agreement are inserted only as a matter of convenience and for reference and in no way define the scope or content of this Agreement or the construction of any provision hereof or of any document or instrument referred to herein.

15.6    Compliance with Law.    In performing its obligations under this Agreement, ALLTEL shall comply with all applicable federal, state and local laws, rules and regulations.

15.7    Alternative Dispute Resolution.    Except for claims for provisional equitable relief, all disputes arising hereunder shall be settled in an amicable discussion between the signatories to this Agreement including their appointee or successors. If any dispute should arise between the parties which cannot be resolved in such manner, before resorting to any other legal remedy (other than provisional equitable remedies such as temporary injunction and/or restraining order), the parties shall attempt in good faith to resolve any such controversy or claim by mediation before and in compliance with the rules established by any mutually acceptable alternative dispute resolution organization, including, but not limited to, Endispute, the Center for Public Resources ("**CPR**"), the Private Adjudication Center, or what is commonly referred to as Rent-a-Judge. The selection of an organization shall be made within ten (10) business days after notification from one party to the other of a desire to mediate a dispute. If an organization/judge and applicable rules have not been agreed upon within such ten-day period, then the dispute shall be mediated in accordance with the Center for Public Resources Model Procedure for Mediation of Business Disputes, and a single mediator will be chosen by CPR. If the parties are unable to resolve the dispute within sixty (60) days of submission to the mediation organization, then either party may file suit solely in any court of competent jurisdiction in the County of Los Angeles, State of California.

15.8    Assignment.    With the prior written consent of the other party, which consent shall not be unreasonably withheld, either party may assign this Agreement and all of its rights and obligations hereunder to a third party. Notwithstanding the foregoing, either party may assign this Agreement to a parent, affiliate or subsidiary, provided that the scope and character of the license use remains unchanged and such parents, affiliates or subsidiaries agree in writing to be bound by the terms of this Agreement.

15.9    Entire Agreement/Modification.    This Agreement constitutes the entire agreement between TMCC and ALLTEL relating to the transactions contemplated hereby. This Agreement may not be modified or amended except by a written agreement signed by an authorized representative of each party.

15.10   Use of Toyota Name.    ALLTEL shall not have any right to use the names, logos, symbols and/or any other trademarks of TMCC (the "**Toyota Marks**"), unless and until each such use is approved in advance and in writing by TMCC. ALLTEL shall not directly or indirectly obtain or attempt to obtain during the term hereof or at any time thereafter, any right, title or interest in or to said Toyota Marks. ALLTEL's permission to use the Toyota Marks may be withdrawn by TMCC at any time at its sole discretion upon written notice to ALLTEL by TMCC.

15.11   Delivery of Software.    ALLTEL will install all software related to any Statement of Work under this agreement without any transfer of tangible personal property to TMCC, and will sign an affidavit when it has completed delivery and installation and has left TMCC premises, stating that no tangible property (including, but not limited to tangible copies of software, disks, training materials, and documentation) has been transmitted to TMCC or left at TMCC premises.

## 16.0    LIMITATION OF LIABILITY.

Except for liabilities, losses, damages and expenses related to (i) death, personal injury or damage to property, or (ii) third party claims regarding infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, and (iii) Section 11.2.2, ALLTEL's liability for any breach of any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement shall be limited to TMCC's direct out-of-pocket damages, actually incurred, which under no circumstances shall exceed in the aggregate the amount paid by TMCC to ALLTEL under this Agreement.

Except for liabilities, losses, damages and expenses related to (i) death, personal injury or damage to property, or (ii) third party claims regarding infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, TMCC's liability for any breach of any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement shall be limited to ALLTEL's direct out-of-pocket damages, actually incurred, which under no circumstances shall exceed in the aggregate the amount paid by TMCC to ALLTEL under this Agreement.

In no event shall either party be liable to the other party for the other party's indirect, special, punitive, incidental or consequential damages, including, without limitation, loss of profits or business, of any kind whatsoever , whether or not a party has been advised of the possibility of such damages.

## 17.0    FORCE MAJEURE

If due performance of this Agreement by either party is delayed (except for delay or failure of payment) in whole or in part from any cause beyond its reasonable control and without its fault or negligence, including but not limited to any act of God, strikes,  riots, acts of war or revolution,

F 00137

epidemics, fires, communication line failures, power failures, earthquakes, floods, unusually severe weather conditions or other disasters, it shall give notice thereof to the other party and shall be under no liability for any loss, damage, injury, or expense (whether direct or consequential) suffered by the other party due to such delay of performance. The time for performance hereunder by the party claiming force majeure shall be enlarged to the extent necessitated by such force majeure event.

**18.0    SURVIVAL UPON TERMINATION**

The provisions of Sections 3.2(No Hire Restriction), 5.0(Taxes), 9.0(Confidentiality and Proprietary Rights), 11.0 (Warranties of ALLTEL for Any Services Not Covered By License Agreement Warranty), 14.0(Indemnification), 15.2(Governing Law), 15.10 (Use of Toyota Name) and 16.0(Limitation of Liability), shall survive the term and/or termination of this Agreement, unless otherwise agreed to in writing by both parties.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

TOYOTA MOTOR CREDIT CORPORATION.          ALLTEL INFORMATION SERVICES, INC.

By: _____          By: _____

Name: George E. Borst                        Name: Steven R. Pierce

Title: Senior Vice President and General Manager    Title: Senior Vice President/Director

Date: _____          Date: 2-9-00



RECEIVED
FEB 1 1 2002
LEGAL DEPARTMENT

REVIEWED AND APPROVED

By:  Barbra Cooper

Title:  Group VP & CIO Information Systems

Date: *Barbara Cooper*

2/9/00

EXHIBIT 2

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

## SOURCE CODE ESCROW AGREEMENT

THIS SOURCE CODE ESCROW AGREEMENT (this Agreement), made and entered into as of the 25th day of August, 2000, (the Effective Date), by and among ALLTEL INFORMATION SERVICES, INC ("Licensor"); TOYOTA MOTOR CREDIT CORPORATION, the licensed end-user of Licensor's proprietary software executing this Agreement as such ("Licensee"); and FORT KNOX ESCROW SERVICES INC.    ("Escrow Agent").

This Agreement is supplementary to that certain Software License Agreement, dated August 25, 2000 between Licensor and Licensee (together with any modification, supplement, or replacement thereof agreed to by Licensee, the "License Agreement").   This Agreement is intended to provide certain guidance for the circumstances under which License shall be entitled to protect and retain rights in the Licensed Program(s) (as hereinafter defined), including associated rights in intellectual property.

### WITNESSETH:

WHEREAS, Licensor has granted Licensee a nonexclusive license to use the Licensed Program(s);

WHEREAS, Licensee has required Licensor to furnish it with access to the Source Code (as hereinafter defined) corresponding to the Licensed Programs, and such Source Code is RESTRICTED, CONFIDENTIAL, AND PROPRIETARY, protected under federal copyright law as an unpublished work and under federal and state law as trade secrets;

WHEREAS, Licensor has agreed to place such Source Code in escrow for the benefit of Licensee on the terms and conditions hereof;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

### SECTION 1
### DEFINITIONS

For purposes of this Agreement, the following definitions shall apply to the following respective capitalized terms:

**1.1 Licensed Programs.**   The Licensed Programs shall consist of the entire computer programming code, together with all Updates thereto, relating to the most current release of the software programs (as the same may be customized or enhanced) specified in Exhibit A hereto.

**1.2 Update.**   An Update shall mean a copy of the source code version of each modification or revision to the Licensed Programs that (a) corrects errors, problems, or defects caused by or resulting from an incorrect functioning of the Licensed Programs, (b) supports new releases of the Licensed Programs made available generally to Licensee, or (c) provides other updates or corrections.

**1.3 Source Code.** The Source Code shall mean a copy of the source code corresponding to the Licensed Programs, including all Updates delivered to the Escrow Agent from time to time pursuant to this Agreement,   and related materials which exist and are available sufficient to

F 00013

enable a reasonably skilled programmer or analyst to maintain and enhance the Licensed Programs.

**1.4 Support Services.** Support Services shall consist of all installation, error correction, maintenance, and other technical assistance (including warranty service and any undertaking to provide Updates) respecting the Licensed Programs that may be required to be performed by Licensor pursuant to a written agreement between Licensor and Licensee.

**1.5 Impact Event.** An Impact Event shall consist of (a) any rejection or termination of the License Agreement or this Agreement by Licensor or its successors or representatives in breach of the provisions of the License Agreement or this Agreement, including in all events any rejection or termination of the License Agreement or any proposal to do so under Title 11 of the United States Code, as now constituted or hereafter amended (the "Bankruptcy Code"), or any other federal or state bankruptcy, insolvency, receivership, or similar law; (b) failure of a trustee, including Licensor as debtor in possession, in any bankruptcy case hereafter filed by or against Licensor either to assume the License Agreement and this Agreement within fifteen (15) days after the filing of the initial bankruptcy petition or to perform the License Agreement and this Agreement within the meaning of Section 365(a)(4)(i) of the Bankruptcy Code; (c) the termination of substantially all of Licensor's ongoing business operations relating to the subject to the License Agreement and this Agreement; (d) any liquidation of Licensor, or any sale, assignment, or foreclosure of or upon assets that are necessary for the performance by Licensor of its responsibilities under the License Agreement and this Agreement; or (e) Licensor's discontinuance of enhancement and support services for the Licensed Program(s).

<div align="center">

Section 2
REPRESENTATIONS AND WARRANTIES OF LICENSOR

</div>

**2.1 Ownership of Source Code.** Licensor represents and warrants to Licensee that it is the owner of, and holder of all rights in, the Source Code, and has the right to grant to Licensee the license rights to the Source Code pursuant to Section 8 hereof and to deposit the Source Code with Escrow Agent pursuant to the terms of this Agreement.

**2.2 Licensed Programs Correspond With Source Code.** Licensor represents and warrants to Licensee that the Source Code deposited with Escrow Agent will at all times be the source code version of the current release of the Licensed Programs, as offered to Licensee from time to time.

<div align="center">

Section 3
PURPOSE OF AGREEMENT; DEPOSIT OF SOURCE CODE

</div>

**3.1 Deposit and Custody of Source Code.** Escrow Agent shall release copies of the Source Code deposited in escrow pursuant to this Agreement only in accordance with the terms of this Agreement. In each instance where Escrow Agent is authorized to release a copy of the Source Code to Licensee, Escrow Agent may either release a copy on hand (provided that at all times it shall retain at least one copy of the Source Code) or make a duplicate copy to be released to Licensee.

Escrow Agent agrees to accept from Licensor, and Licensor agrees to deposit with Escrow Agent, within thirty (30) days of the Effective Date of this Agreement, two (2) copies of the Source Code relating to the current versions of the Licensed Programs. For each deposit, Escrow Agent

<div align="center">

A-2

</div>

will issue a receipt to Licensor, accompanied by a general list or description of the materials so deposited.

Escrow Agent agrees to accept from Licensor, and Licensor agrees to deposit with Escrow Agent, within thirty (30) days after each Update is made available generally to Licensee, two (2) copies of the Source Code relating to each such Update.  For each deposit, Escrow Agent will issue a receipt to Licensor, accompanied by a general list or description of the materials so deposited.  In the event that an Update or series of Updates supersede a prior version of the Licensed Programs in their entirety, Licensor may require Escrow Agent to return or destroy the Source Code representing such prior version of the Licensed Programs by so notifying the Escrow Agent and Licensee in writing, provided that any such action on the part of the Escrow Agent may not commence until at least one (1) year after the delivery of the Source Code for all Updates that so supersede the prior version of the Licensed Programs.

Escrow Agent shall exercise reasonable care to protect and safeguard all Source Code delivered pursuant to this Agreement and shall segregate and label such Source Code according to the date of delivery and any other identifying information supplied by Licensor.

**3.2 Verification and Testing of Source Code.**  Licensee may appoint a third party verification firm to mutually agreeable to Licensor and Licensee to test, build and review the Source Code (subject to appropriate undertakings of confidentiality and restrictions on subsequent use or disclosure) at any time, and Escrow Agent shall permit such inspections and testing promptly upon request.  Except as otherwise authorized by Licensor (which authorization will not be unreasonably withheld), such inspections and testing shall be conducted at the principal offices of the Escrow Agent.

<div align="center">

Section 4
CONFIDENTIALITY

</div>

Upon receipt of the Source Code, Licensee shall maintain the Source Code in strict confidence, shall use and disclose it only as reasonably appropriate to exercise Licensee's rights in the Licensed Programs in accordance with the License Agreement, and shall use the same degree of care it provides for its own programs in source code form to protect the Source Code as restricted, proprietary, and confidential.

<div align="center">

Section 5
FAILURE TO PROVIDE SUPPORT SERVICES A BASIS
FOR RELEASE OF SOURCE CODE

</div>

**5.1  Failure to Provide Support Services.**  Except upon the occurrence of an Impact Event (the escrow procedures for which are set forth in Section 7 hereof),  in the event that either (a) Licensor gives notices of its intention to cease Support Services in accordance with the License Agreement, or (b) Licensor ceases to provide any Support Services which it is obligated to provide (except if excused because of a material breach by Licensee under this Agreement or the License Agreement other than breach of a payment obligation), Licensee shall notify Licensor in writing that Licensee intends to access the escrowed Source Code.   Licensee shall simultaneously provide Escrow Agent with a copy of such notice.

**5.2  Dispute by Licensor.**  For a period of ten (10) days following its receipt of such notice, Licensor shall have the right to object to release to Licensee of the Source Code by

<div align="center">A-3</div>

utilizing the arbitration process set forth in Section 6 hereof.  Failure of Licensor to give timely notice of such an objection shall conclusively establish its consent to the release of the Source Code to Licensee hereunder, whereupon Escrow Agent shall release a copy of the Source Code to Licensee.

<div align="center">

Section 6

ARBITRATION OF DISPUTES RESPECTING RELEASE OF SOURCE CODE

</div>

**6.1 Arbitration of Disputes.**  In the event of any dispute respecting the release of the Source Code under Section 5 hereof, representatives of Licensor and Licensee shall meet no later than five (5) days after delivery of Licensor's notice objecting to such release and shall enter into good faith negotiations aimed at curing the identified deficiencies alleged to exist.  If such persons are unable to resolve the dispute in a satisfactory manner within the next five (5) days, either Licensor or Licensee may seek binding arbitration hereunder.

**6.2 Arbitration Procedure.**  Upon receipt by Escrow Agent of written notice by Licensor or Licensee calling for arbitration with respect to any dispute, claim, or controversy relating to, involving, or affecting the release of the Source Code to Licensee under Section 5 hereof, the matter shall be submitted to binding arbitration.  Such arbitration shall be conducted under the commercial rules of the American Arbitration Association by a single arbitrator appointed by the American Arbitration Association.  Insofar as possible, such arbitrator shall be, at the time of his selection, a partner or manager of a national or regional accounting firm (including the information processing, management support, and merger and acquisitions operations or affiliates thereof) not regularly employed by the Licensor or Licensee, and such arbitrator shall be required to have substantial experience in the field of computer software technology and licensing.  The sole issue for arbitration shall be whether Licensor has failed to provide any Support Services which it is obligated to provide.  If the arbitrator shall determine such a failure does exist, he shall so notify the parties.  Upon receipt of such notice, Escrow Agent shall release a copy of the Source Code to Licensee.  The decision of the arbitrator shall be final and binding on Licensor, Licensee, and Escrow Agent and may be entered and enforced in any court of competent jurisdiction by any such party.

**6.3 Costs of Arbitration.**  The prevailing party in the arbitration proceedings shall be awarded reasonable attorneys' fees, expert witness costs and expenses, and all other costs and expenses incurred directly or indirectly in connection with the proceedings (including those of the Escrow Agent), unless the arbitrator for good cause determines otherwise.

<div align="center">

Section 7

IMPACT EVENT AS BASIS FOR RELEASE OF SOURCE CODE

</div>

**7.1 Release.**  If Licensor suffers an Impact Event at any time or for any reason, Licensee may so notify Escrow Agent in writing.  Such notice shall be accompanied by reliable evidence of such occurrence.  Upon receipt of such notice and proof, Escrow Agent shall promptly release and deliver a copy of the Source Code to Licensee.

In addition, following such event, Licensee shall be responsible for any fees or expenses of the Escrow Agent thereafter accruing in conjunction with this Escrow Agreement which would otherwise be payable by Licensor.

F 00016

**7.2 Intention.**  In the event that Licensor or its successors or representatives rejects or terminates the License Agreement or this Agreement in breach of the provisions thereof or hereof, including as contemplated under Section 365 of the Bankruptcy Code, it is acknowledged that this Agreement contemplates the manner in which Licensee may retain its rights in the Licensed Programs, including associated intellectual property rights, if Licensee chooses to do so in accordance with Section 365(n) of the Bankruptcy Code.  This Agreement serves as a contract supplementary to the License Agreement in such regard.  It is the parties' intent that the rights Licensee shall be entitled to retain shall be of the scope provided in Section 8 hereof in all items delivered or required to be delivered under the License Agreement and this Agreement.  Further, such rights shall be subject to no restriction following an election by Licensor to reject or terminate the License Agreement or this Agreement, except (a) the confidentiality provisions contained in Section 4 of this Agreement, (b) the sublicense terms required of Licensee under Section ..... of the License Agreement, and (c) the territorial limitations contained in Section ..... of the License Agreement.  Such rights shall be exclusive and either renewable or perpetual to the extent so provided under the License Agreement.

## Section 8
## LICENSE OF SOURCE CODE

In the event that a copy of the Source Code is authorized hereunder to be delivered out of escrow to Licensee, Licensee shall immediately obtain, without any further action, authorization, or instrument, a license from Licensor with the same term and geographic scope as the license granted for the Licensed Programs under the License Agreement, to use, modify, maintain, and update the Source Code in any manner that may be necessary or appropriate to enable such Licensee to use the Licensed Programs for its intended purposes in accordance with the License Agreement.

## Section 9
## FEES AND PAYMENTS

Licensor and Licensee each shall bear one-half of, and shall pay to Escrow Agent, annually in advance during the term hereof, all fees of the Escrow Agent at its prescribed rate.

## Section 10
## LIMITATION UPON OBLIGATION OF ESCROW AGENT

**10.1 Limited Duty of Inquiry.**  Escrow Agent shall not be required to inquire into the truth of any statements or representations contained in any notices, certificates, or other documents required or permitted hereunder, and it may assume that the signatures on any such documents are genuine, that the persons signing on behalf of any party thereto are duly authorized to issue such document, and that all actions necessary to render any such documents binding on any party thereto have been duly undertaken.  Without limiting the foregoing, Escrow Agent may in its discretion require from Licensor or Licensee additional documents which it deems to be necessary or appropriate to aid it in the course of performing its obligations hereunder.

**10.2 Right to Interpleader.**  Notwithstanding any other provision of this Agreement, in the event Escrow Agent receives conflicting demands from Licensor and Licensee respecting the release of the Source Code to Licensee hereunder, Escrow Agent may, in its sole discretion, file an interpleader action with respect thereto in any court of competent jurisdiction and deposit the

A-5

F 00017

Source Code with the clerk of the court or withhold release of the Source Code until instructed otherwise by court order.

**10.3 Release and Indemnification of Escrow Agent.** Licensor and Licensee do hereby (a) release, and agree to indemnify and hold harmless, Escrow Agent from and against any and all liability for losses, damages, and expenses (including attorneys' fees) that may be incurred by it on account of any action taken by Escrow Agent in good faith pursuant to this Agreement, and (b) agree to defend and indemnify Escrow Agent from and against any and all claims, demands, or actions arising out of or resulting from any action taken by Escrow Agent in good faith pursuant to this Agreement.

<div align="center">

Section 11
INDEPENDENT CONTRACTOR STATUS

</div>

The parties hereto are and shall be independent contractors under this Agreement, and nothing herein shall be construed to create a partnership, joint venture, or agency relationship between or among the parties hereto. Without limiting the generality of the foregoing, Escrow Agent shall be regarded as an independent custodian of the Source Code and not as an agent or trustee of Licensor.

<div align="center">

Section 12
TERM OF AGREEMENT

</div>

**12.1 Term.** The term of this Agreement shall commence on the effective date hereof and shall continue from year to year until this Agreement is terminated hereunder.

**12.2 Termination.** This Agreement shall terminate:

1.     By mutual consent of Licensor and Licensee at any time;

2.     By Escrow Agent at any time, provided that Escrow Agent has given Licensor and Licensee notice to that effect in writing at least ninety (90) days before the contemplated date of termination, whereupon Licensor shall diligently attempt to identify an independent successor Escrow Agent, reasonably acceptable to Licensee, who is agreeable to assuming all further obligations of Escrow Agent hereunder;

3.     Automatically, in the event that copies of the Source Code are released to Licensee in accordance with the terms of this Agreement; or

4.     Sixty (60) days after Licensor issues to Licensee and Escrow Agent a certificate confirming that Licensee is no longer entitled to Support Services from Licensor, provided that such termination shall not occur on such basis if Licensee disputes such certificate by sending Licensor and Escrow Agent notice to that effect in writing within such period, and in the event of such objection, the parties shall resort to the arbitration process set forth in Section 6 hereof for resolution of such dispute, in which case, the sole issue for arbitration is whether the Licensee is no longer entitled to Support Services from Licensor.   If the arbitrator shall so determine that Licensee is no longer entitled to Support Services from Licensor, he shall so notify the parties. Upon the parties' receipt of such notice, this Agreement shall terminate.

<div align="center">

A-6

</div>

Upon termination of this Agreement, following distribution of copies to Licensee to the extent so required hereunder, all remaining copies of the Source Code shall be delivered to Licensor, except that in the event of termination at the instance solely of the Escrow Agent, such copies shall be delivered to the successor Escrow Agent.

Section 13
MISCELLANEOUS

**13.1 Compliance with Laws.**  The parties hereto agree that they shall comply with all applicable laws and regulations of governmental bodies or agencies in their respective performance of their obligations under this Agreement.

**13.2 No Undisclosed Agency; No Assignment.**  Each party represents that it is acting on its own behalf and is not acting as an agent for or on behalf of any third party; and further agrees that it may not assign its rights or obligations under this Agreement without the prior written consent of the other parties hereto (except that an assignment by Licensee of such rights requires only the consent of Licensor, and an assignment by Licensor requires only the consent of Licensee).

**13.3 Notices.**  All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be considered effective at the earlier of (a) three days after such notice has been deposited in the United States mail, postage prepaid, and addressed to the respective party at the address shown above (in the case of Licensor and Escrow Agent) or shown in Appendix A hereto, unless by such notice a different address shall have been designated, or (b) the date on which such notice is actually received by the respective party after hand or courier delivery.

**13.4 Governing Law.**  All questions concerning the validity, operation, interpretation, and construction of this Agreement shall be governed by and determined in accordance with the laws of the State of New York.

**13.5 No Waiver.**  No party shall, by mere lapse of time, without giving notice or taking other action hereunder, be deemed to have waived any breach by the other party(ies) of any of the provisions of this Agreement.  Further, the waiver by any party of any particular breach of this Agreement by any other party shall not be construed to constitute a continuing waiver of such breach or of any other breaches of the same or other provisions of this Agreement.

**13.6 Force Majeure.**  No party shall be held responsible for any act, failure, event, or circumstance addressed herein if such act, failure, event, or circumstance is caused by conditions beyond such party's reasonable control.

**13.7 Partial Invalidity.**  If any provision of this Agreement is held illegal, unenforceable, or in conflict with any law of any federal, state, or local government having jurisdiction over this Agreement, the validity of the remaining provisions hereof shall not be affected thereby.

**13.8 Complete Statement of Agreement.**  The parties hereto acknowledge that each has read this Agreement, understands it, and agrees to be bound by its terms.  The parties further agree that this Agreement is the complete and exclusive statement of their agreement with respect to the subject matter hereof, and supersedes all oral or written proposals, understandings, representations, warranties, covenants, and communications between the parties relating hereto.

A-7

This Agreement is intended by the parties to constitute an agreement completely independent of any other agreement between or among any combination of the parties hereto, whether or not any such other agreement involves the Licensed Program, except to the limited extent necessary to define the scope of Support Services for purposes of this Agreement.  The continuing, contingent, or future rights or obligations of any party under any other agreement whatsoever shall not be regarded as necessary or implied consideration for the execution, validity, or performance of this Agreement.

**13.9 Remedies.**  The description of the possible occurrences that would constitute an Impact Event, and the consequences thereof, shall create no presumption that Licensor may or should be permitted to reject or terminate the License Agreement or this Agreement under application law.  The parties agree that such a rejection or termination would be highly prejudicial to Licensee's interests, and enforcement of the Agreement will not provide a complete or adequate remedy for the harm to Licensee's interests.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as set forth below.

LICENSOR
ALLTEL INFORMATION SERVICES, INC

By: _____    STEVEN. R. PIERCE

Title: SVP / Director

Date: 8/25/00

ESCROW AGENT
FORT KNOX ESCROW SERVICES INC.

By: _____

Title: Account Executive

Date: 9-6-00

LICENSEE
TOYOTA MOTOR CREDIT CORPORATION

By: _____

Title: GVP

Date: 8/29/00

A-9

F 00020

**Exhibit A**
LICENSED PROGRAMS

F 00021

**Appendix A**
PARTY NOTICE ADDRESSES


ALLTEL INFORMATION SERVICES, INC.,
4001 Rodney Parham Road,
Little Rock, Arkansas 72212

TOYOTA MOTOR CREDIT CORPORATION,
19001 South Western Avenue,
Torrance, California  90509-2991

F 00022

# FIRST AMENDMENT
## TO SOURCE CODE ESCROW AGREEMENT

This **FIRST AMENDMENT** ("First Amendment") is effective as of the 25th day of August, 2000 ("First Amendment Effective Date"), and amends and supplements that certain Source Code Escrow Agreement, dated as of August 25, 2000 ("Agreement"), by and between Toyota Credit Corporation ("Licensor"); ALLTEL Information Services, Inc. ("Licensee") and Fort Knox Escrow Services Inc. ("Escrow Agent").

**WHEREAS,** Licensor licensed its AP7000 Software to Licensee under certain terms in conditions contained in Product Schedule A to the License Agreement; and

**WHEREAS,** Licensor and Licensee desires to acknowledge the mutual agreement of the parties with respect to on for defining an Impact Event; and

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.      Notwithstanding anything to the contrary in Section 1.5 of the Agreement, pursuant to Section 7.0 of Product Schedule A (ES Services Default) to the License Agreement, in the event that ALLTEL is unable to resolve a Defect in accordance with the procedures thereunder, such default shall be considered an "Impact Event" (as defined in the Agreement) and TMCC shall be entitled to a release of the AP7000 source code.

2.      All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

3.      All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect.

4.      Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

5.      This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

**IN WITNESS WHEREOF,** the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

**ALLTEL INFORMATION SERVICES, INC.**

By:

Name:  STEVEN R. PIERCE

Title:  SVP / DIRECTOR

Date:  8/25/00

**TOYOTA MOTOR CREDIT CORPORATION**

By:

Name:  MICHAEL DEADERICK

Title:  GRP VP

Date:  8/29/00

**FORT KNOX ESCROW SERVICES INC.**

By:

Name:  CHRISTIAN DODDER

Title:  ACCOUNT EXECUTIVE

Date:  9-6-00

i:\client\toyota\software\escwamd.doc

F 00023

EXHIBIT 3

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

DISASTER RECOVERY
SEE PRO 030 PROJECT
DATE COPIED: _9-14-2000_

# MASTER SOFTWARE LICENSE AGREEMENT

## AGREEMENT NUMBER 2000AIS002

This Software License Agreement ("**Agreement**"), dated _August 25_, 2000 (the "**Effective Date**"), is made and entered into by and between ALLTEL INFORMATION SERVICES, INC., an Arkansas corporation with its principal place of business at 4001 Rodney Parham Road, Little Rock, Arkansas 72212 ("**ALLTEL**"), and TOYOTA MOTOR CREDIT CORPORATION, a California corporation with its principal place of business at 19001 South Western Avenue, Torrance, California 90509-2991 ("**TMCC**") (collectively the "**Parties**"). For purposes of this Agreement, the term "Affiliate" shall mean any entity (a) which directly or indirectly (i) controls TMCC; (ii) is controlled by TMCC; (iii) is under common control with TMCC; or (iv) is under common ownership of Toyota Motor Corporation (Japan). For purposes of this Agreement, "control" shall mean the direct or beneficial ownership of a voting interest of at least fifty percent (50%). ALLTEL and TMCC acknowledge that they are parties to that certain Services Agreement Number 2000AIS001, dated as of February 7, 2000 (the "Services Agreement"), wherein services defined in a Statement of Work ("Statement of Work") thereto which pertain to or result in the development of "ALLTEL Software" (as defined therein) shall be licensed to TMCC under the terms of this Agreement.

**1.     Provision of Software.** ALLTEL agrees to license and furnish to TMCC certain computer software programs (the "**Software**") as more particularly described in those certain Product Schedules ("**Product Schedule(s)**") executed between the Parties and attached to and made a part of this Agreement. In the event of a conflict between the terms of a particular Product Schedule(s) and the terms of this Agreement, the terms of the Product Schedule(s) will prevail.

**2.     Delivery.** For every applicable Product Schedule(s), ALLTEL shall deliver to TMCC each item of Software listed therein at the location(s) designated in the Product Schedule(s) ("**Installation Site**") on or before the date requested for delivery (the "**Delivery Date**"), or at such other time to which the Parties may agree. TMCC may change the Installation Site with written notice to ALLTEL within a reasonable time after such change. Upon such notice of change of Installation Site, TMCC will promptly cease use of the Software at the old Installation Site. Furthermore, for backup purposes, TMCC may change the backup site at any time and, if it intends to do so, TMCC shall notify ALLTEL of the address of the site that will become the new backup site and shall stop using the Software and the Documentation at the "former" backup site as promptly as practicable.

**3.     Documentation.** ALLTEL shall deliver to TMCC a complete set of: (i) operating instructions and/or manuals for each item of Software delivered; (ii) other related documentation, research and software tools generally made available by ALLTEL; and (iii) other related documentation research and software tools developed specifically to support any customized software, if applicable, specified in a Product Schedule(s) and/or a Statement of Work ("**Support Documentation**"). Collectively (i), (ii) and (iii) above shall be known as the "**Documentation**". Subject to the disclosure restrictions set forth herein, TMCC may copy the Documentation at no additional fee or may request additional copies from ALLTEL, which ALLTEL shall provide at its then standard fees.

**4.     Software License and Use.** For the Software set forth on the applicable Product Schedule(s), ALLTEL grants to TMCC, and TMCC accepts, a non-exclusive license to the

F 00025

Software (the "**License**") for TMCC, its Affiliates and its Authorized Representatives (as defined in Section 5) to use the Software solely for TMCC's own internal businesses, and to reproduce the Software for archival and backup purposes, subject to the restrictions set forth in Section 5 hereof.  Said License shall commence on the applicable Product Schedule(s) Effective Date and continue thereafter until termination of said License in accordance with its terms.  It is the intention of the parties that (i) the Affiliates using the Software pursuant to this License shall be bound by the terms and conditions of this Agreement, (ii) all of the systems and services provided under this Agreement be made available to such Affiliates, and (iii) TMCC guarantees the performance of and the payment by (as applicable) each such Affiliate of any and all obligations and liabilities under this Agreement.  ALLTEL will provideTMCC advance written notice of any separate agreement subjecting the Affiliate to the terms of this Agreement between any Affiliate and Alltel to which TMCC is not also a party.  For production purposes, there shall be only one Installation Site, which shall be identified in the applicable Product Schedule.  For regular offsite backup, temporary emergency relocation and the operation of Non-Production Copies (defined below), at no additional charge, TMCC, its Affiliates and its Authorized Representatives may use the Software and Documentation at any (unlimited number) of additional TMCC, Affiliates' or dealer locations.  For purposes of this Agreement, "Non-Production Copies" are defined as copies of the Software used exclusively for purposes other than as used in a live production environment.  TMCC, its Affiliates and its Authorized Representatives also may keep a copy of the Software and the Documentation at a backup site exclusively for backup and disaster recovery purposes.  TMCC agrees that the Affiliates and the Authorized Representatives will not make copies, or similar versions of the Software or any part thereof without the prior written consent of ALLTEL, except as expressly provided otherwise herein.  TMCC is not authorized to use or allow any other party to use the Software for service bureau purposes or to act as a processor for any third parties, except as may be mutually agreed to by ALLTEL and TMCC.  TMCC can outsource the application maintenance processing and the data center operations of the object code version of the Software to a third party operator ("Operator") subject to the following conditions:  (i) the Operator enters into an Operating Agreement with ALLTEL and TMCC, in substantially the form attached as Exhibit B to this Agreement (unless otherwise provided in the Product Schedule) ("Operating Agreement") and ALLTEL will not unreasonably withhold signing such Operating Agreement provided that it is substantially similar to the terms of the form attached as Exhibit B to this Agreement; and (ii) in addition to all other fees payable hereunder, for Software subject to a per account fee as provided in the applicable Product Schedule only, TMCC pays to ALLTEL a mutually agreed annual outsourcing fee ("Outsourcing Fee") not to exceed twenty-five percent (25%) of the then current per account charges applicable to the Software, which Outsourcing Fee is payable on the same terms as the per account charges in the applicable Product Schedule.  TMCC agrees to be jointly and severally liable for the actions of the Operator. Notwithstanding anything to the contrary, this Agreement shall not be construed to preclude TMCC from using the License for the Software and Documentation for the purposes of processing information (a) for entities formed to acquire and securitize receivables owned by TMCC or its Affiliates and/or (b) for TMCC's administration of a third party's financial services portfolio.  For purposes hereof, "administration" by TMCC means a combination of information technology services and administrative services for financial services portfolios.

**5.    Confidentiality and Safeguards.**    TMCC acknowledges that the Software and Documentation constitute valuable assets and trade secrets of ALLTEL, that neither legal nor equitable title to the Software passes to TMCC under the terms of this Agreement, and that all information with respect to the Software is confidential.  TMCC agrees to use its best efforts to prevent disclosure of any part of the Software or Documentation, and shall assure that it does

F 00026

not, through its employees or representatives, "unlock", decompile, reverse-assemble or reverse-engineer the binary, object or executable code of the Software, sell, lease, assign, or otherwise transfer (except as provided for in Section 14 hereof), disclose, or make available, in whole or in part, the licensed Software or Documentation to any third party for any reason (except for employees of TMCC, its consultants, contractors and subcontractors, and the dealers with which TMCC transacts business (collectively, the "Authorized Representatives"), or as otherwise authorized under the Operating Agreement (if any), as necessary for the use of the Software and Documentation by TMCC, for auditing purposes by independent certified public accountants, or for complying with applicable governmental laws, regulations, or court orders). TMCC represents that prior to disclosure of any part of the Software or Documentation to its Authorized Representatives, (i) the Authorized Representatives (other than the dealers) are bound by confidentiality agreements between the employer of the Authorized Representatives and TMCC which terms and conditions are no less restrictive than as set forth herein; (ii) that TMCC shall be responsible and liable for the acts of its Authorized Representatives; (iii) that in no event shall the dealers be given access to Software source code or source code documentation; and (iv) that if TMCC knows or has reason to believe that any unauthorized access to the Software or Documentation has occurred, TMCC will promptly notify ALLTEL thereof and, if ALLTEL asks TMCC to do so, TMCC will assign to ALLTEL any and all rights, remedies and causes of action which TMCC may have with respect to any such unauthorized access. Except as otherwise approved by ALLTEL in writing (including in the event of outsourcing as provided in Section 4 above), in no event shall any competitor of ALLTEL be furnished with any information concerning the Software or Documentation. For purposes of this Agreement, a "competitor" is any person, firm or corporation engaged in the business of developing, marketing or licensing application software products, or engaged in the business of providing like technology services to financial services companies.

**5.1    Acknowledgement and Precautions.** The Parties acknowledge and agree that each will be provided certain information originated by or uniquely within the knowledge of the other Party (the "**Disclosing Party**") which is not generally available to the public and which the Disclosing Party considers confidential or proprietary (the "**Confidential Information**"). Each Party agrees to: (i) treat the Confidential Information in the same manner as it treats its own Confidential Information, which shall in no event be less than in a reasonable manner; (ii) take reasonable security precautions to safeguard the Confidential Information from theft or from access by unauthorized person(s); (iii) not use the Confidential Information in any way detrimental to the Disclosing Party; and (iv) not directly or indirectly disclose or divulge any Confidential Information to any third party without the prior written consent of the Disclosing Party.

**5.2    Exclusions.** The Party receiving the Confidential Information (the "**Receiving Party**") shall have no confidentiality obligation to the Disclosing Party with respect to information which: (i) is or becomes publicly known through no wrongful act, fault or negligence of the Receiving Party; (ii) was known, free of obligations of confidentiality, by the Receiving Party prior to disclosure by the Disclosing Party; (iii) was disclosed to the Receiving Party by a third party, other than an affiliate, subsidiary, parent or agent of the Disclosing Party, who was free of obligations of confidentiality, directly or indirectly, to the party providing said third party the information; (iv) is approved for release by prior written authorization of the Disclosing Party; (v) is publicly disclosed pursuant to a requirement or request of a governmental agency or disclosure is required by operation of law, provided, however, that the Receiving Party shall first have given written notice to the Disclosing Party so that the Disclosing Party may seek an appropriate protective

3

F 00027

order; (vi) is furnished to a third party, other than to an affiliate, subsidiary, parent or agent of the Disclosing Party, by the Disclosing Party without a similar restriction on the third party's rights; or (vii) is independently developed by employees of the Receiving Party who did not have access to any or all of the Confidential Information. The Receiving Party shall have the burden of proof with respect to any of the above events on which the Receiving Party relies as relieving it of the restrictions hereunder on disclosure or use of Confidential Information.

**5.3    Limited Disclosure.**  This Agreement and each Product Schedule attached hereto contain Confidential Information that may be considered proprietary by one or both of the Parties.  Thus, the Parties agree to limit the distribution of said Agreement and Product Schedule(s) to those individuals with a need to know their contents. Neither Party may reproduce this Agreement or any Product Schedule, nor show copies to any third parties (exclusive of employees and Authorized Representatives of TMCC and its Affiliates,) except as otherwise provided herein without the prior written consent of the Disclosing Party, except as may be necessary by reason of legal, accounting, tax or regulatory requirements, in which event the Parties shall exercise reasonable diligence in limiting the number of such disclosures to the minimum necessary under the particular circumstances.

**5.4    Nondisclosure.**  The Receiving Party agrees and acknowledges that it shall have no proprietary interest in the Confidential Information of the Disclosing Party and will not disclose, communicate nor publish the nature or content of such information to any person or entity, nor use, except as authorized in writing by the Disclosing Party, any of the Confidential Information it produces, receives, acquires or obtains from the Disclosing Party, subject to the terms of this Section 5 hereof.  The Receiving Party shall take all necessary steps to insure that the Confidential Information is securely maintained.    The Receiving Party's obligations set forth herein shall survive the termination or expiration of this Agreement.

**5.5    Remedies.**  The Parties acknowledge and agree that any remedy at law for a breach or threatened breach of any of the provisions under this Section 5 would be inadequate and, in recognition of this fact, in the event of a breach or threatened breach by the Receiving Party of any of the provisions contained in this Section 5, the Disclosing Party, without posting any bond, shall be entitled to obtain provisional equitable relief in the form of a temporary restraining order and/or temporary injunction or any other provisional equitable remedy which may then be available, and the Receiving Party hereby agrees not to contest same.  Nothing herein contained shall be construed as prohibiting the Disclosing Party from pursuing any other remedies available to it from such breach or threatened breach.  Pursuit of any remedy at law or in equity shall not be deemed as an election of remedies.

6.    **Testing and Acceptance.**

**6.1    Acceptance Test Plan; Acceptance Criteria.**  The provisions for acceptance of the software by TMCC ("**Acceptance**"), will be in accordance with an acceptance test plan that is mutually agreed upon by the parties pursuant to the applicable product schedule ("**Acceptance Test**") and mutually agreed acceptance criteria as described in the applicable Product Schedule ("**Acceptance Criteria**").    At a minimum, the Acceptance Criteria shall include the following requirements:    (a) that the Software

F 00028

perform in accordance with the specifications in the Documentation and any Applicable Specifications (defined in the Product Schedule), (b) that the Software perform according to mutually agreed performance criteria identified in the applicable Product Schedule, and (c) that the Software perform functionally in a live operating business unit of TMCC.

**6.2    Procedure.**  If, during the Acceptance Test period for any Software designated in the applicable Product Schedule ("**Acceptance Test Period**") the Software as delivered does not perform to the applicable Documentation and Acceptance Criteria, which shall constitute a Defect within the meaning of that term as defined in Section 7.1 below, TMCC shall notify ALLTEL in writing in accordance with the procedures specified in the Acceptance Test Plan of any and all such Defects, and ALLTEL shall use all reasonable efforts to promptly correct any and all such Defects during the Acceptance Test Period.    To the greatest extent possible, the Acceptance Test will proceed concurrently with ALLTEL's efforts to correct any reported Defects.  Following ALLTEL's delivery of corrected Software to TMCC and unless otherwise agreed to by the Parties in the Product Schedule, TMCC shall have an agreed upon time to install said corrected Software in its test environment and re-conduct the Acceptance Test procedures.  If, at the end of such mutually-agreed correction testing period, the Software does not conform to the Acceptance Criteria, at TMCC's election, TMCC (i) may reject the Software as provided for in Section 6.3 below, or (ii) report any Defects in the corrected Software, which will start the correction and re-testing process described above anew (and such re-correction and re-testing process shall be conducted in accordance with the timeframes agreed to by the parties).  In the event TMCC elects to report the Defects for correction by ALLTEL, the original Acceptance Test Period will be extended as necessary, by a reasonable amount of time, not to exceed the amount of time initially allotted for the Acceptance Test.

For purposes of this Agreement, the "**Acceptance Date**" of TMCC's Acceptance of the Software shall mean the earlier to occur of either:  (i) TMCC's commencement of use of the Software in a Production Environment (not to include any testing of the Software in a Production Environment that is a documented and agreed to be part of the Acceptance Test as per the applicable Product Schedule), or (ii) TMCC's provision to ALLTEL of written notice that it has accepted the Software.  If TMCC has not provided written notice of its Acceptance of the Software within the specified time frames set out in the Acceptance Test Plan, then ALLTEL will notify TMCC in writing that ALLTEL has not received such notice and TMCC shall respond to such notice within five (5) business days of its Acceptance or rejection of the Software.  If TMCC does not so respond, the Software will be deemed accepted as of the sixth (6th) day following ALLTEL's notice.

**6.3    Rejection.**  As provided in Section 6.2 above, if by the end of the Acceptance Test Period, the Software does not conform to the applicable Acceptance Criteria, TMCC may reject such Software by notifying ALLTEL in writing of said rejection.  TMCC's rejection of such Software shall entitle TMCC to terminate the applicable Product Schedule.  Upon such termination, ALLTEL shall promptly refund to TMCC all license fees paid to ALLTEL for such Software (as defined in the applicable Product Schedule), and any other sums to which TMCC is entitled upon such rejection pursuant to the Product Schedule.    TMCC shall then discontinue all use of the terminated Software and Documentation, and shall return to ALLTEL (or destroy) all copies thereof in TMCC's possession or control.

F 00029

7.    **Software Enhancement and Support Services.**

**7.1**    ALLTEL will provide Software Enhancement and Support Services ("**ES Services**") for the Software as set forth below (a) for no charge, during the Warranty Period for such Software (defined below), and (b) in accordance with the terms hereof, for the specified periods of time set forth in the applicable Product Schedule (the "**ES Period**"):    ALLTEL shall correct and repair any failure, malfunction, defect, or nonconformity ("Defect") in the Software, if such Defect prevents the Software from operating and performing in accordance with the Acceptance Criteria.

**7.1.1**    In the event of a Defect in the Software during the Warranty Period and/or ES Period, ALLTEL shall correct and repair such Defect per the severity classifications and descriptions in the chart below.  If ALLTEL cannot immediately resolve the Defect, then no later than the applicable Work-Around Delivery Date Deadline set forth in the chart below for such Defect, ALLTEL shall deliver a suitable work around.  In all cases, resolution of the Defect shall be achieved no later than the applicable Final Resolution Deadline specified in the chart below (calculated from the date of the Acknowledgement (defined below)) or a Final Resolution Deadline which may be mutually agreed to by the parties.  For purposes of this Agreement, a "**Work Around**" shall mean a temporary fix for the Defect, consisting of sufficient programming and operating instructions to implement the modification or addition to the Software which, when made or added to the Software, will bring the Software into material conformity with the Acceptance Criteria and/or a new procedure or routine that, when observed in the regular operation of the Software, avoids the practical adverse effect of such Defect.

**7.1.2**    TMCC agrees to provide in writing and in reasonable detail a description of each such Defect.  Defects are described and categorized in the chart below.  The five (5) severity classifications are ranked in order of the severity of their impact to the end user.  Codes are assigned to problems strictly on the basis of their symptoms, and not according to frequency of occurrence, likelihood of being seen, or difficulty of reproducing.  Per the chart below, an "**Acknowledgement**" is a verbal (evidenced by TMCC's written log) or written statement from ALLTEL to TMCC verifying that a problem has been identified by TMCC and reported to ALLTEL and that ALLTEL is in the process of solving the problem.  In the event that ALLTEL determines that a problem reported by TMCC is not a Defect, TMCC shall pay ALLTEL for its services at ALLTEL's rates negotiated for TMCC then in effect (if any), and TMCC will reimburse ALLTEL for any and all reasonable travel and living expenses incurred by ALLTEL in rendering such services.

| Defect Severity Code | Type | Description | Acknowledgement | Effort | Work-Around Delivery | Final Resolution Deadline |
|---|---|---|---|---|---|---|
| 0 | Fatal Problem | Causes system to crash or halt | 2 hours | Immediate and Continuous | 24 Hours | Ten (10) Days |

F 00030

| | | or destroys data | | | | |
|---|---|---|---|---|---|---|
| 1 | Major Problem | Renders major system function unusable | 4 hours | Immediate and Continuous | 24 Hours | Ten (10) Days |
| 2 | Minor Problem | Renders a minor system function unusable. | 24 hours | Immediate and Continuous | 48 Hours if work-around exists or mutually agreeable schedule if no work-around exists. | Thirty (30) Days |
| 3 | Nuisance Problem | Minor system nuisance which does not limit system functionality. | 24 hours | Reasonable Assistance | (see next column) | By issuance date of second Update issued after date of Acknowledge-ment |
| 4 | Document-ation Problem | Documentation correction/ addition required. | 24 hours | Reasonable Assistance | (see next column) | By issuance date of second Update issued after date of Acknowledge-ment |

**7.1.3** Remedies.  See applicable Product Schedule.

**7.1.4** ALLTEL agrees to provide to TMCC all revisions, modifications, corrections and enhancements generally released to customers for the Software listed in the applicable Product Schedule(s) (the "Updates"), which Updates shall become a part of the licensed Software for all purposes described herein.  ALLTEL shall provide TMCC with all such Updates, together with the corresponding Documentation, as soon as they are made commercially available to other users and/or licensees of the Software.

**7.1.5** ALLTEL shall provide reasonable remote technical assistance and consultation by telephone, facsimile, mail, email or web based support services to TMCC in accordance with the Product Schedule(s) provided that the Software being used by TMCC is within two (2) Updates or within Updates made available within two (2) years of the then-current Updates generally available, whichever is the greater period.

**7.2** To the extent that TMCC modifies the Software, fails to install Updates to the extent required by Section 7.1.5 above, or interrupts ES Services, ALLTEL shall continue to perform the ES Services but shall be relieved of its responsibilities and liability for any Defect or improper operation of the affected Software.

**7.3** Following the initial ES Period TMCC may purchase continuing ES Services at rates to be mutually agreed upon and amended in the applicable Product Schedule,

F 00031

subject to a price increase cap as agreed to in the applicable Product Schedule. ALLTEL may provide TMCC with twelve (12) months written notice of its intention to discontinue such ES Services on any item of Software following the expiration of the ES Period.

8.    **Invoicing and Payment.**

**8.1**    For the licensing of the Software pursuant to the terms and conditions of this Agreement, TMCC will pay to ALLTEL a license fee as set forth in the applicable Product Schedule(s) ("**Software License Fee**").

**8.2    ES Services Fee.**  For the ES Services described in Section 7, TMCC shall pay to ALLTEL the amounts reflected in the applicable Product Schedule(s) for the ES Services applicable to such Software ("**ES Fees**")..

**8.3    Payment Terms.**  Except as otherwise expressly stated in a Product Schedule, all sums due from TMCC to ALLTEL are payable thirty (30) calendar days after receipt of a correct invoice referencing a valid purchase order. For all payments not made within thirty (30) days after TMCC's receipt of ALLTEL's correct invoice, TMCC shall pay a late fee at the rate of one percent (1%) per month from the due date for payment until such payment is made. No failure by ALLTEL to request such payment shall be deemed a waiver by ALLTEL of TMCC's obligation to pay such amounts.  A correct invoice is one in which (a) the invoice matches the products and/or services specified on the Purchase Order, and (b) the invoice references the valid Purchase Order number under which the products and/or services were purchased and/or performed.

9.    **Termination.**

**9.1    Termination for Convenience.**  At any time prior to the Acceptance Date for a particular item of Software, TMCC shall have the right to terminate any Product Schedule upon sixty (60) days advance written notice to ALLTEL.  In the event of such a termination by TMCC, (i) ALLTEL shall retain any License Fees already paid to ALLTEL pertinent to the affected Software as of such termination date by TMCC, and (ii) such other termination for convenience fees as may be specified and mutually agreed between the Parties in the applicable Product Schedule.

**9.2    Termination for Cause.**  For material breach of this Agreement by either Party, the non-breaching Party may terminate this Agreement if cure is not effected within thirty (30) days of receipt of notice thereof.  In the event of a threatened or actual breach by TMCC of Section 4, or by either Party of Section 5 of this Agreement, monetary damages alone shall not be an adequate remedy, and the non-breaching Party shall be entitled to injunctive, equitable, and other legal relief against such breach as may be awarded by a court of competent jurisdiction, plus reasonable expenses (including attorneys' fees).  Except as specifically provided herein, no election of any remedy shall be construed as a waiver of or prohibition against any other remedy in the event of breach hereunder.  In the event of TMCC's material breach of this Agreement, ALLTEL may terminate the licenses arising hereunder.  Upon such termination, TMCC agrees to promptly cease using and return to ALLTEL (or destroy) all Software, Documentation, and copies thereof, accompanied by written certification by an officer of TMCC verifying the accomplishment of such return or destruction.

8

F 00032

**9.3    Effect on Confidential Information.**  Upon termination of this Agreement or any Product Schedule for any reason, the Parties each shall cease all use of the other Party's Confidential Information and return the same to such other Party accompanied by written certification by a corporate officer verifying all Confidential Information has been returned or destroyed.

**10.    Warranties**.

**10.1    Unencumbered Rights.**  ALLTEL warrants to TMCC that (1) the Software and Documentation are free of all liens, claims and encumbrances; and (2) TMCC shall have the right of quiet enjoyment of the Software and Documentation.  ALLTEL warrants that it has full title to and ownership of the Software licensed to TMCC under this Agreement, and that it has full power and authority to grant the licenses granted to TMCC by this Agreement.  TMCC's use of the Software will in no way constitute an infringement or other violation of any copyright, trade secret, trademark, patent, or other proprietary right of any third party.  There is currently no actual or threatened suit by any third party based on an alleged violation of its rights by ALLTEL.  To the extent that, as identified on the applicable Product Schedule, any software programs, modifications, applications owned by third parties ("**Third Party Software**") are integrated into and function as a component of the Software, ALLTEL will warrant such Third Party Software as ALLTEL-owned Software as described herein.  Notwithstanding, to the extent that Third Party Software is provided but not integrated as a component of the Software, the Product Schedule will so identify any such Third Party Software ("**Provided Third Party Software**"), and ALLTEL makes no warranty of any type with respect to any such Provided Third Party Software, but hereby assigns and transfers to TMCC, to the extent permitted by ALLTEL's agreement with any such third party, the benefit of any warranties relating to such Provided Third Party Software that may be provided by the vendor of such software.  ALLTEL shall have only those maintenance and support obligations with respect to the Software owned by ALLTEL.

**10.2    Performance.**  For six (6) months from the Acceptance Date as defined in relevant Product Schedule(s) or such longer period as may be specified by the Parties in the applicable Product Schedule ("**Warranty Period**"), x, ALLTEL warrants and represents that the Software and any Updates as delivered will perform in the manner and environment described in the applicable Acceptance Criteria in the applicable Product Schedule(s) (the "**Specifications**").

**10.3    Date Compliance.**

**10.3.1    Definitions.**  "**Date Compliant**" shall mean that all dates, including, without limitation, the years 1900 - 1999, 2000 and thereafter, encountered and/or processed by the Software will be correctly recognized, calculated, compared, sorted, stored, displayed and/or otherwise processed on the hardware platform set forth in the applicable Product Schedule and with the software, files and interfaces with which said hardware platform is to be utilized.

**10.3.2    Representations.**  ALLTEL represents and warrants at delivery of the Software and at delivery of each Update: (a) that such Software is Date Compliant, is designed to be used prior to, during, and after the calendar year 2000 AD, will operate

F 00033

consistently, predictably and accurately, without interruption or manual intervention, and in accordance with all requirements of this Agreement, including without limitation all specifications and/or functionality and performance requirements, during each such time period, and the transitions between them, in relation to dates it encounters or processes; (b) that all date recognition and processing by such software will correctly recognize and process the date of February 29, and any related data, during Leap Years; and (c) that all date sorting by such software that includes a "year category" shall be done based on the Four Digit Year Format (or a two digit year format with windowing techniques which result will be in a Four Digit Year Format).

**10.4   No Viruses.**  ALLTEL represents and warrants that at delivery the Software does not contain any computer virus and has undergone and passed generally accepted virus checking procedures for known software viruses.   ALLTEL further represents and warrants the Software does not contain any logic devices, other programs, or password-activated security devices that will cause the Software to cease functioning due to the elapse of time or for any other reason.

**10.5   Rights in Data**  ALLTEL represents and warrants that all data created and/or processed by the Software shall be and remain the property of TMCC and ALLTEL shall not have any rights in or to the data of TMCC.

**10.6   Disclaimer.**  EXCEPT AS PROVIDED HEREIN, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXPRESSLY DISCLAIMED.

**10.7   Hold Harmless.**  The parties hereto shall each defend, indemnify and hold the other party, its parent, subsidiaries, affiliates, and their respective directors, officers, agents, representatives, contractors, employees, successors and assigns, harmless from and against any and all costs, expenses, damages, claims, suits, actions, liabilities, losses and judgments, including, without limitation, attorneys' fees and legal expenses, based upon personal injury and/or death, claims of infringement, property damage, and breaches of confidentiality arising out of the performance of the indemnifying party's obligations under this Agreement, or otherwise in connection with the acts or omissions of the indemnifying party, its employees, agents or contractors, including claims made by or on behalf of third parties for whom TMCC administers financial services portfolios, at no expense to the indemnified party, except to the extent those claims are caused by the negligence or willful misconduct of the indemnified party or its employees.  This obligation shall extend beyond the termination or expiration of this Agreement. The indemnified party shall fully cooperate with the indemnifying party in the defense and settlement of such action.  The indemnifying party shall have the sole right to conduct the defense of any such claim or action and all negotiations for its settlement or compromise, provided, however, that if any such compromise or settlement does not provide at least one of the remedies specified in Section 10.8 at no additional cost or obligation to the indemnifying party, no such action, claim, or liability shall be settled without the prior written consent of the indemnified party adversely affect the indemnified party's rights hereunder or impose any obligations upon the indemnified party in addition to those set forth herein.  The indemnified party agrees to give the indemnifying party prompt written notice of any written threat, warning or notice of any such claim or action.

F 00034

**10.8     Remedies**.

**10.8.1** If, during the Warranty Period, the Software does not conform to the warranties made by ALLTEL in this Agreement and if ALLTEL is unable to correct all such errors or non-conformities by the Final Resolution Deadline specified in Section 7.1.1, then, following written notice from TMCC of such warranty defects, TMCC may elect to terminate the applicable Product Schedule as to such Software, and in such event, ALLTEL promptly shall refund to TMCC all license fees paid to ALLTEL for the affected Software.  Upon TMCC's receipt of the License Fees from ALLTEL upon such breach of warranty, TMCC shall return or destroy all copies of the affected Software and Documentation, and at such time the applicable Product Schedule shall terminate as to the affected Software.

**10.8.2** If, at any time, in any suit relating to infringement of a party's intellectual property is so defended and is held to constitute an infringement or violation of any other party's intellectual property rights and is enjoined, or if in respect of any claim of infringement, the indemnifying party deems it advisable to do so, the indemnifying party shall, at its sole option, take one or more of the following actions to the extent relevant, at no additional cost or obligation to the indemnified party: (a) procure the right to continue the use of the same without material interruption for the indemnified party; (b) replace the same with non-infringing software that meets the specifications identified in the relevant Documentation pursuant to the applicable Product Schedule(s), or where TMCC is the indemnifying party with respect to a claim of infringement, TMCC may direct ALLTEL to immediately cease further use of materials which are allegedly infringing; and relieve ALLTEL of any affected obligation as it may relate to services being provided to TMCC under the applicable Product Schedule(s); (c) modify said software so as to be non-infringing, provided that the software as modified meets all of the specifications; or (d) take back the infringing software and credit the indemnified party with an amount equal to the license fee paid for that portion of the Software deemed to be infringing if the software is taken back within two (2) years of execution of the Agreement; and, thereafter, credit the indemnified party with an amount equal to the license fee paid for that portion of the Software deemed to be infringing less straight line depreciation for the amount of time in excess of two (2) years the software was used by the indemnified party over a three (3) year depreciation time schedule.  The foregoing represents the sole and exclusive remedy with regard to any of the above infringements or alleged infringements

**11.     Limitation of Liability.**                                    F 00035

**11.1     Erroneous Processing.**  Except as specifically described in Section 7 and 10, ALLTEL has no obligation or liability, either express or implied, with respect to any erroneous processing attributable to any error in the Software.

**11.2**  Except for liabilities, losses, damages and expenses related to: (i) death, personal injury or damage to property; or (ii) third party claims of infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, the liability of either Party to the other hereunder for any breach or any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement shall be limited to actual direct damages incurred by the other Party, and, except as to excepted claims, in no event shall either Party's aggregate liability

*inserted per email*
*agreement  9/19/00.*
*JGBerkpr*
*al qlra*

**10.8    Remedies**.

**10.8.1** If, during the Warranty Period, the Software does not conform to the warranties made by ALLTEL in this Agreement and if ALLTEL is unable to correct all such errors or non-conformities by the Final Resolution Deadline specified in Section 7.1.1, then, following written notice from TMCC of such warranty defects, TMCC may elect to terminate the applicable Product Schedule as to such Software, and in such event, ALLTEL promptly shall refund to TMCC all license fees paid to ALLTEL for the affected Software.  Upon TMCC's receipt of the License Fees from ALLTEL upon such breach of warranty, TMCC shall return or destroy all copies of the affected Software and Documentation, and at such time the applicable Product Schedule shall terminate as to the affected Software.

**10.8.2** If, at any time, in any suit relating to infringement of a party's intellectual property is so defended and is held to constitute an infringement or violation of any other party's intellectual property rights and is enjoined, or if in respect of any claim of infringement, the indemnifying party deems it advisable to do so, the indemnifying party shall, at its sole option, take one or more of the following actions to the extent relevant, at no additional cost or obligation to the indemnified party: (a) procure the right to continue the use of the same without material interruption for the indemnified party; (b) replace the same with non-infringing software that meets the specifications identified in the relevant Documentation pursuant to the applicable Product Schedule(s), or where TMCC is the indemnifying party with respect to a claim of infringement, TMCC may direct ALLTEL to immediately cease further use of materials which are allegedly infringing; and relieve ALLTEL of any affected obligation as it may relate to services being provided to TMCC under the applicable Product Schedule(s); (c) modify said software so as to be non-infringing, provided that the software as modified meets all of the specifications; or (d) take back the infringing software and credit the indemnified party with an amount equal to the license fee paid for that portion of the Software deemed to be infringing if the software is taken back within two (2) years of execution of the Agreement; and, thereafter credit the indemnified party with an amount equal to the license fee paid for that portion of the Software deemed to be infringing less straight line depreciation for the amount of time in excess of two (2) years the software was used by the indemnified party over a three (3) year depreciation time schedule.  The foregoing represents the sole and exclusive remedy with regard to any of the above infringements or alleged infringements

**11.    Limitation of Liability.**

**11.1    Erroneous Processing.**  Except as specifically described in Section 7 and 10, ALLTEL has no obligation or liability, either express or implied, with respect to any erroneous processing attributable to any error in the Software.

**11.2**    Except for liabilities, losses, damages and expenses related to: (i) death, personal injury or damage to property; or (ii) third party claims of infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, the liability of either Party to the other hereunder for any breach or any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement shall be limited to actual direct damages incurred by TMCC, and, except as to excepted claims, in no event shall either Party's aggregate liability

11

F 00036

exceed the license fees actually paid to ALLTEL by TMCC hereunder. Neither party shall be liable for any special, indirect, incidental or consequential damages suffered by such party.

**12.    Taxes.**  All charges and fees to be paid by TMCC under this Agreement are exclusive of any applicable withholding, sales, use, value added, excise, services or other tax which may be assessed on the provision of the services.  In the event that a withholding, sales, use, value added, excise, services or other tax is assessed on the provision of any of the services provided to TMCC under this Agreement, TMCC will pay directly, reimburse or indemnify ALLTEL for such taxes, as well as any applicable interest, penalties and other ALLTEL fees and expenses. The parties will cooperate with each other in determining the extent to which any tax is due and owing under the circumstances, and shall provide and make available to each other any resale certificates, information regarding out-of-state or country use of materials, services or sale, and other exemption certificates or information reasonably requested by either party. ALLTEL shall be responsible to pay to the appropriate taxing authorities any taxes paid by TMCC to ALLTEL. ALLTEL shall assume full responsibility for payment of all federal, state, local taxes or contributions imposed or required under unemployment insurance, social security, workers compensation and income tax laws with respect to its personnel, and any taxes due based on ALLTEL's income. Notwithstanding the foregoing, TMCC shall not be required to pay or otherwise be liable or responsible for, and ALLTEL hereby indemnifies and holds TMCC harmless against, any penalty, additional tax, or interest that may be assessed or levied as a result of the failure of ALLTEL to file any return, form or information statement that may be required to be filed by any governmental agency but only in the event such penalties arise out of ALLTEL's failure to pay taxes already paid by TMCC to ALLTEL.

**13.    Excusable Delay.**  If due performance of this Agreement by either Party is delayed (except for delay or failure of payment) in whole or in part from any cause beyond its reasonable control and without its fault or negligence, including but not limited to any act of God, strikes, riots, acts of war or revolution, epidemics, fires, communication line failures, power failures, earthquakes, floods, unusually severe weather conditions or other disasters, it shall give notice thereof to the other Party and shall be under no liability for any loss, damage, injury, or expense (whether direct or consequential) suffered by the other Party due to such delay of performance.  The time for performance hereunder by the Party claiming force majeure shall be enlarged to the extent necessitated by such force majeure event.

**14.    Assignment.**    Neither Party may assign this Agreement and all of its rights and obligations hereunder to a third party without the prior written consent of the other Party, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, TMCC may assign this Agreement to a parent, affiliate or subsidiary, provided that the scope and character of the license use remains unchanged and such parents, affiliates or subsidiaries agree in writing to be bound by the terms of this agreement.

**15.    Governing Law.**  The laws of the State of New York shall be applicable to the interpretation of this Agreement without regard to conflicts of law principles thereof.

**16.    Advertising or Publicity.**  Neither party shall use the name of the other in media advertising or publicity releases of any sort without securing the prior written consent of the other.

F 00037

**17.    Employment.**  During the term of this Agreement and for twelve (12) months after the termination hereof, neither party may solicit for employment, hire or otherwise retain any current employee of the other Party who performed services directly related to or in support of the objectives of this Agreement, without prior written approval of the other Party.

**18.    Entire Agreement.**  This Agreement, together with all attachments and amendments, and the Services Agreement Number 2000AIS001, dated as of February 7, 2000 and the Statement of Work thereto, constitutes the entire Software license agreement between the Parties and supersedes all prior understandings, either written or oral between them, as to the subject matter hereof.  Each provision of this Agreement is severable and shall be stricken in the event the provision is void, voidable, or unenforceable.

**19.    Liability Insurance Provisions.**  ALLTEL shall obtain and/or maintain during the effectiveness of any and all Product Schedules under the terms and conditions of this Agreement:

    (a)    commercial general liability insurance with minimum coverage of One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage,

    (b)    employer's liability insurance in a minimum amount of One Million Dollars ($1,000,000), as well as worker's compensation insurance in an amount satisfying applicable laws,

    (c)    automobile liability insurance with the following minimum limits: One Million Dollars ($1,000,000) bodily injury each person, One Million Dollars ($1,000,000) property damage each accident, and

    (d)    electronic errors and omissions insurance in the amount of Three Million Dollars ($3,000,000).

ALLTEL shall name TMCC, its parent, subsidiaries and affiliated corporations as additional insureds on the general liability insurance required hereunder, which insurance policy shall cover risks of loss, damage or injury associated directly or indirectly with the performance of ALLTEL's obligations under this Agreement.  ALLTEL shall provide TMCC with proof of the acquisition of all of the insurance coverages required hereunder in the form of one or more Certificates of Insurance within five (5) business days of the effective date of this Agreement and/or upon request.  The insurance policies must provide that TMCC shall receive at least thirty (30) days written notice prior to any change, cancellation or reduction of such coverages.  TMCC reserves the right to review, and must be satisfied with, the types and level of coverage to be obtained and maintained hereunder.  All insurance coverages required hereunder shall be procured from insurers with an A.M. Best's performance rating of at least A and with a financial size category of at least Class VII.

**20.    Agreement to Escrow for Software Source Code.**  For any Software to which ALLTEL grants a license (in object code form only) to TMCC under this Agreement, ALLTEL will deposit with a third party escrow agent identified in the applicable Product Schedule ("**Escrow Agent**") the source code of such Software and related materials which exist and is available sufficient to enable a reasonably skilled programmer or analyst to maintain and enhance the Software, as more particularly described in the applicable Product Schedule ("**Escrow**

F 00038

Deposit"). The Escrow Deposit for any particular (or all the) Software licensed hereunder will be made available to TMCC, pursuant to the terms of an escrow agreement to be entered into by and among ALLTEL, TMCC and the Escrow Agent, in substantially the form of Exhibit A hereto ("**Escrow Agreement**"), upon the occurrence of any of the following events: (1) ALLTEL becomes insolvent; (2) ALLTEL is sold to a third party that is a competitor of TMCC; or (3) ALLTEL terminates ES Services (except for TMCC's breach) during an ES Period or ceases to support the Software.

**21.    Survival Upon Expiration or Termination.**    The provisions of Sections 5 (Confidentiality and Safeguards), 9 (Termination), 10,4, 10.6, 10.7 (Warranties), 11 (Limitation of Liability), 12 (Taxes), and 15 (Governing Law), shall survive the expiration or termination of this Agreement, unless otherwise agreed to in writing by both parties.

**22.    Dispute Resolution.**

> **22.1.**    Escalation.  Except for claims for provisional equitable relief, if any party shall have any dispute with respect to the terms and conditions of this Agreement, or any subject matter referred to in or governed by this Agreement, that party shall provide written notification to the other party in the form of a claim identifying the issue and including a detailed reason for the claim is made shall respond in writing to the claim within ten (10) days from the date of receipt of the claim document.  The party filing the claim shall have an additional five (5) days after the receipt of the response to either accept the resolution offered by the other party or request that the claim be escalated.  If the above negotiation procedures do not lead to resolution of the underlying dispute or claim to the satisfaction of a party involved in such negotiations as set forth above, then either party may notify the other in writing that such party desires to elevate the dispute or claim for resolution to the next level of management responsible for the project which is the subject matter of this Agreement ("**Senior Manager**") of each Party ("**Second Level Escalation**).  Immediately upon issuance of a Second Level Escalation notice by a party, the dispute or claim shall be so elevated and the Senior Managers of each Party shall negotiate in good faith and undertake to resolve such dispute or claim, within five (5) days of the issuance of the Second Level Escalation notice.  If the immediately preceding negotiation procedures do not lead to resolution of the underlying dispute or claim to the satisfaction of a party involved in such negotiations as set forth above, then either party may notify the other in writing that such party desires to elevate the dispute or claim again for resolution to the President of Financial Services (or similar title) of ALLTEL and the Senior Vice President and General Manager (or similar title) of TMCC for resolution.  Upon receipt by the other party of such written notice, the dispute or claim shall be so elevated and the President of Financial Services of ALLTEL and the President and General Manager of TMCC shall negotiate in good faith and undertake to resolve such dispute or claim within three (3) days of the issuance of the notice of such escalation. The location, format, frequency, duration and conclusion of these elevated discussions shall be left to the discretion of the representatives involved.  If the negotiations conducted pursuant to this Section 22.1 do not lead to resolution of the underlying dispute or claim to the satisfaction of a party involved in such negotiations, then either party may seek binding arbitration pursuant to Section 22.2 below.  The adherence to or failure to follow these dispute resolution procedures shall not waive either party's rights or duties under this Agreement.

F 00039

22.2    **Arbitration.** Upon a party's receipt of written notice from the other party calling for arbitration hereunder, except for claims for provisional equitable relief, the matter shall be submitted to binding arbitration. Such arbitration shall be conducted under the commercial rules of the American Arbitration Association by a single arbitrator appointed by the American Arbitration Association. Insofar as possible, such arbitrator shall be, at the time of his selection, a partner or manager of a national or regional accounting firm (including the information processing, management support, and merger and acquisitions operations or affiliates thereof) not regularly employed by either party, and such arbitrator shall be required to have substantial experience in the field of computer software technology and licensing. The decision of the arbitrator shall be final and binding on the parties, and may be entered and enforced in any court of competent jurisdiction by any such party. The prevailing party in the arbitration proceedings shall be awarded reasonable attorneys' fees, expert witness costs and expenses, and all other costs and expenses incurred directly or indirectly in connection with the proceedings, unless the arbitrator for good cause determines otherwise.

23.    **Export Controls.** TMCC acknowledges that the Software constitutes "technical data" for purposes of export control laws of the United States of America and relevant regulations issued by the U.S. Department of Commerce and Department of State. TMCC covenants to comply with such laws and regulations and any other applicable laws and regulations. Without limiting the generality of the foregoing, TMCC will not at any time export, re-export, divert or transfer, directly or indirectly any Software nor any copies or direct products of them (as defined in such regulations) to Cuba, Iran, Iraq, Libya, North Korea or any other country that is the subject of a U.S. embargo pursuant to any Executive Order or to any country for which an export license is required under regulations promulgated by the U.S. Department of Commerce, unless specifically authorized by ALLTEL and where required, the United States government.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Signing Date by their duly authorized representatives.

ALLTEL INFORMATION SERVICES, INC.

By: _____

Name: STEVEN R. PIERCE

Title: SVP / DIRECTOR

Date: 8/25/00

TOYOTA MOTOR CREDIT CORPORATION

By: _____

Name: George Borst

Title: Sr. Vice President & Gen. Mgr. TFS

Date: 8/25/06



15

F 00040

**EXHIBIT A**

**FORM OF ESCROW AGREEMENT**
**[See Attached]**

F 00041

## SOURCE CODE ESCROW AGREEMENT

THIS SOURCE CODE ESCROW AGREEMENT (this Agreement), made and entered into as of the ..... day of ....., ......., (the Effective Date), by and among ..... ("Licensor"); the licensed end-user of Licensor's proprietary software executing this Agreement as such ("Licensee"); and ……………........ ("Escrow Agent").

This Agreement is supplementary to that certain ………………… between Licensor and Licensee (together with any modification, supplement, or replacement thereof agreed to by Licensee, the "License Agreement").    This Agreement is intended to provide certain guidance for the circumstances under which License shall be entitled to protect and retain rights in the Licensed Program(s) (as hereinafter defined), including associated rights in intellectual property.

### WITNESSETH:

WHEREAS, Licensor has granted Licensee a nonexclusive license to use the Licensed Program(s);

WHEREAS, Licensee has required Licensor to furnish it with access to the Source Code (as hereinafter defined) corresponding to the Licensed Programs, and such Source Code is RESTRICTED, CONFIDENTIAL, AND PROPRIETARY, protected under federal copyright law as an unpublished work and under federal and state law as trade secrets;

WHEREAS, Licensor has agreed to place such Source Code in escrow for the benefit of Licensee on the terms and conditions hereof;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

### SECTION 1
### DEFINITIONS

For purposes of this Agreement, the following definitions shall apply to the following respective capitalized terms:

**1.1 Licensed Programs.**  The Licensed Programs shall consist of the entire computer programming code, together with all Updates thereto, relating to the most current release of the software programs (as the same may be customized or enhanced) specified in Exhibit A hereto.

**1.2 Update.**  An Update shall mean a copy of the source code version of each modification or revision to the Licensed Programs that (a) corrects errors, problems, or defects caused by or resulting from an incorrect functioning of the Licensed Programs, (b) supports new releases of the Licensed Programs made available generally to Licensee, or (c) provides other updates or corrections.

**1.3 Source Code.**  The Source Code shall mean a copy of the source code corresponding to the Licensed Programs, including all Updates delivered to the Escrow Agent from time to time pursuant to this Agreement,  and related materials which exist and are available sufficient to enable a reasonably skilled programmer or analyst to maintain and enhance the Licensed Programs.

A-2

F 00042

**1.4 Support Services.**  Support Services shall consist of all installation, error correction, maintenance, and other technical assistance (including warranty service and any undertaking to provide Updates) respecting the Licensed Programs that may be required to be performed by Licensor pursuant to a written agreement between Licensor and Licensee.

**1.5 Impact Event.**  An Impact Event shall consist of (a) any rejection or termination of the License Agreement or this Agreement by Licensor or its successors or representatives in breach of the provisions of the License Agreement or this Agreement, including in all events any rejection or termination of the License Agreement or any proposal to do so under Title 11 of the United States Code, as now constituted or hereafter amended (the "Bankruptcy Code"), or any other federal or state bankruptcy, insolvency, receivership, or similar law; (b) failure of a trustee, including Licensor as debtor in possession, in any bankruptcy case hereafter filed by or against Licensor either to assume the License Agreement and this Agreement within fifteen (15) days after the filing of the initial bankruptcy petition or to perform the License Agreement and this Agreement within the meaning of Section 365(a)(4)(i) of the Bankruptcy Code; (c) the termination of substantially all of Licensor's ongoing business operations relating to the subject to the License Agreement and this Agreement; (d) any liquidation of Licensor, or any sale, assignment, or foreclosure of or upon assets that are necessary for the performance by Licensor of its responsibilities under the License Agreement and this Agreement; or (e) Licensor's discontinuance of enhancement and support services for the Licensed Program(s).

<div align="center">

Section 2
REPRESENTATIONS AND WARRANTIES OF LICENSOR

</div>

**2.1 Ownership of Source Code.**  Licensor represents and warrants to Licensee that it is the owner of, and holder of all rights in, the Source Code, and has the right to grant to Licensee the license rights to the Source Code pursuant to Section 8 hereof and to deposit the Source Code with Escrow Agent pursuant to the terms of this Agreement.

**2.2 Licensed Programs Correspond With Source Code.**  Licensor represents and warrants to Licensee that the Source Code deposited with Escrow Agent will at all times be the source code version of the current release of the Licensed Programs, as offered to Licensee from time to time.

<div align="center">

Section 3
PURPOSE OF AGREEMENT; DEPOSIT OF SOURCE CODE

</div>

**3.1 Deposit and Custody of Source Code.** Escrow Agent shall release copies of the Source Code deposited in escrow pursuant to this Agreement only in accordance with the terms of this Agreement.  In each instance where Escrow Agent is authorized to release a copy of the Source Code to Licensee, Escrow Agent may either release a copy on hand (provided that at all times it shall retain at least one copy of the Source Code) or make a duplicate copy to be released to Licensee.

Escrow Agent agrees to accept from Licensor, and Licensor agrees to deposit with Escrow Agent, within thirty (30) days of the Effective Date of this Agreement, two (2) copies of the Source Code relating to the current versions of the Licensed Programs.  For each deposit, Escrow Agent will issue a receipt to Licensor, accompanied by a general list or description of the materials so deposited.

<div align="center">A-3</div>

F 00043

Escrow Agent agrees to accept from Licensor, and Licensor agrees to deposit with Escrow Agent, within thirty (30) days after each Update is made available generally to Licensee, two (2) copies of the Source Code relating to each such Update. For each deposit, Escrow Agent will issue a receipt to Licensor, accompanied by a general list or description of the materials so deposited. In the event that an Update or series of Updates supersede a prior version of the Licensed Programs in their entirety, Licensor may require Escrow Agent to return or destroy the Source Code representing such prior version of the Licensed Programs by so notifying the Escrow Agent and Licensee in writing, provided that any such action on the part of the Escrow Agent may not commence until at least one (1) year after the delivery of the Source Code for all Updates that so supersede the prior version of the Licensed Programs.

Escrow Agent shall exercise reasonable care to protect and safeguard all Source Code delivered pursuant to this Agreement and shall segregate and label such Source Code according to the date of delivery and any other identifying information supplied by Licensor.

**3.2 Verification and Testing of Source Code.** Licensee may appoint a third party verification firm to mutually agreeable to Licensor and Licensee to test, build and review the Source Code (subject to appropriate undertakings of confidentiality and restrictions on subsequent use or disclosure) at any time, and Escrow Agent shall permit such inspections and testing promptly upon request. Except as otherwise authorized by Licensor (which authorization will not be unreasonably withheld), such inspections and testing shall be conducted at the principal offices of the Escrow Agent.

<div align="center">

Section 4
CONFIDENTIALITY

</div>

Upon receipt of the Source Code, Licensee shall maintain the Source Code in strict confidence, shall use and disclose it only as reasonably appropriate to exercise Licensee's rights in the Licensed Programs in accordance with the License Agreement, and shall use the same degree of care it provides for its own programs in source code form to protect the Source Code as restricted, proprietary, and confidential.

<div align="center">

Section 5
FAILURE TO PROVIDE SUPPORT SERVICES A BASIS
FOR RELEASE OF SOURCE CODE

</div>

**5.1 Failure to Provide Support Services.** Except upon the occurrence of an Impact Event (the escrow procedures for which are set forth in Section 7 hereof), in the event that either (a) Licensor gives notices of its intention to cease Support Services in accordance with the License Agreement, or (b) Licensor ceases to provide any Support Services which it is obligated to provide (except if excused because of a material breach by Licensee under this Agreement or the License Agreement other than breach of a payment obligation), Licensee shall notify Licensor in writing that Licensee intends to access the escrowed Source Code. Licensee shall simultaneously provide Escrow Agent with a copy of such notice.

**5.2 Dispute by Licensor.** For a period of ten (10) days following its receipt of such notice, Licensor shall have the right to object to release to Licensee of the Source Code by utilizing the arbitration process set forth in Section 6 hereof. Failure of Licensor to give timely notice of such an objection shall conclusively establish its consent to the release of the Source

F 00044

Code to Licensee hereunder, whereupon Escrow Agent shall release a copy of the Source Code to Licensee.

Section 6
ARBITRATION OF DISPUTES RESPECTING RELEASE OF SOURCE CODE

**6.1 Arbitration of Disputes.**  In the event of any dispute respecting the release of the Source Code under Section 5 hereof, representatives of Licensor and Licensee shall meet no later than five (5) days after delivery of Licensor's notice objecting to such release and shall enter into good faith negotiations aimed at curing the identified deficiencies alleged to exist.  If such persons are unable to resolve the dispute in a satisfactory manner within the next five (5) days, either Licensor or Licensee may seek binding arbitration hereunder.

**6.2 Arbitration Procedure.**  Upon receipt by Escrow Agent of written notice by Licensor or Licensee calling for arbitration with respect to any dispute, claim, or controversy relating to, involving, or affecting the release of the Source Code to Licensee under Section 5 hereof, the matter shall be submitted to binding arbitration.  Such arbitration shall be conducted under the commercial rules of the American Arbitration Association by a single arbitrator appointed by the American Arbitration Association.  Insofar as possible, such arbitrator shall be, at the time of his selection, a partner or manager of a national or regional accounting firm (including the information processing, management support, and merger and acquisitions operations or affiliates thereof) not regularly employed by the Licensor or Licensee, and such arbitrator shall be required to have substantial experience in the field of computer software technology and licensing.  The sole issue for arbitration shall be whether Licensor has failed to provide any Support Services which it is obligated to provide.  If the arbitrator shall determine such a failure does exist, he shall so notify the parties.  Upon receipt of such notice, Escrow Agent shall release a copy of the Source Code to Licensee.  The decision of the arbitrator shall be final and binding on Licensor, Licensee, and Escrow Agent and may be entered and enforced in any court of competent jurisdiction by any such party.

**6.3 Costs of Arbitration.**  The prevailing party in the arbitration proceedings shall be awarded reasonable attorneys' fees, expert witness costs and expenses, and all other costs and expenses incurred directly or indirectly in connection with the proceedings (including those of the Escrow Agent), unless the arbitrator for good cause determines otherwise.

Section 7
IMPACT EVENT AS BASIS FOR RELEASE OF SOURCE CODE

**7.1 Release.**  If Licensor suffers an Impact Event at any time or for any reason, Licensee may so notify Escrow Agent in writing.  Such notice shall be accompanied by reliable evidence of such occurrence.  Upon receipt of such notice and proof, Escrow Agent shall promptly release and deliver a copy of the Source Code to Licensee.

In addition, following such event, Licensee shall be responsible for any fees or expenses of the Escrow Agent thereafter accruing in conjunction with this Escrow Agreement which would otherwise be payable by Licensor.

**7.2 Intention.**  In the event that Licensor or its successors or representatives rejects or terminates the License Agreement or this Agreement in breach of the provisions thereof or hereof, including as contemplated under Section 365 of the Bankruptcy Code, it is acknowledged that this

F 00045

Agreement contemplates the manner in which Licensee may retain its rights in the Licensed Programs, including associated intellectual property rights, if Licensee chooses to do so in accordance with Section 365(n) of the Bankruptcy Code. This Agreement serves as a contract supplementary to the License Agreement in such regard. It is the parties' intent that the rights Licensee shall be entitled to retain shall be of the scope provided in Section 8 hereof in all items delivered or required to be delivered under the License Agreement and this Agreement. Further, such rights shall be subject to no restriction following an election by Licensor to reject or terminate the License Agreement or this Agreement, except (a) the confidentiality provisions contained in Section 4 of this Agreement, (b) the sublicense terms required of Licensee under Section ..... of the License Agreement, and (c) the territorial limitations contained in Section ..... of the License Agreement. Such rights shall be exclusive and either renewable or perpetual to the extent so provided under the License Agreement.

## Section 8
## LICENSE OF SOURCE CODE

In the event that a copy of the Source Code is authorized hereunder to be delivered out of escrow to Licensee, Licensee shall immediately obtain, without any further action, authorization, or instrument, a license from Licensor with the same term and geographic scope as the license granted for the Licensed Programs under the License Agreement, to use, modify, maintain, and update the Source Code in any manner that may be necessary or appropriate to enable such Licensee to use the Licensed Programs for its intended purposes in accordance with the License Agreement.

## Section 9
## FEES AND PAYMENTS

Licensor and Licensee each shall bear one-half of, and shall pay to Escrow Agent, annually in advance during the term hereof, all fees of the Escrow Agent at its prescribed rate.

## Section 10
## LIMITATION UPON OBLIGATION OF ESCROW AGENT

**10.1 Limited Duty of Inquiry.** Escrow Agent shall not be required to inquire into the truth of any statements or representations contained in any notices, certificates, or other documents required or permitted hereunder, and it may assume that the signatures on any such documents are genuine, that the persons signing on behalf of any party thereto are duly authorized to issue such document, and that all actions necessary to render any such documents binding on any party thereto have been duly undertaken. Without limiting the foregoing, Escrow Agent may in its discretion require from Licensor or Licensee additional documents which it deems to be necessary or appropriate to aid it in the course of performing its obligations hereunder.

**10.2 Right to Interpleader.** Notwithstanding any other provision of this Agreement, in the event Escrow Agent receives conflicting demands from Licensor and Licensee respecting the release of the Source Code to Licensee hereunder, Escrow Agent may, in its sole discretion, file an interpleader action with respect thereto in any court of competent jurisdiction and deposit the Source Code with the clerk of the court or withhold release of the Source Code until instructed otherwise by court order.

**F 00046**

**10.3 Release and Indemnification of Escrow Agent.** Licensor and Licensee do hereby (a) release, and agree to indemnify and hold harmless, Escrow Agent from and against any and all liability for losses, damages, and expenses (including attorneys' fees) that may be incurred by it on account of any action taken by Escrow Agent in good faith pursuant to this Agreement, and (b) agree to defend and indemnify Escrow Agent from and against any and all claims, demands, or actions arising out of or resulting from any action taken by Escrow Agent in good faith pursuant to this Agreement.

Section 11
INDEPENDENT CONTRACTOR STATUS

The parties hereto are and shall be independent contractors under this Agreement, and nothing herein shall be construed to create a partnership, joint venture, or agency relationship between or among the parties hereto. Without limiting the generality of the foregoing, Escrow Agent shall be regarded as an independent custodian of the Source Code and not as an agent or trustee of Licensor.

Section 12
TERM OF AGREEMENT

**12.1 Term.** The term of this Agreement shall commence on the effective date hereof and shall continue from year to year until this Agreement is terminated hereunder.

**12.2 Termination.** This Agreement shall terminate:

1.    By mutual consent of Licensor and Licensee at any time;

2.    By Escrow Agent at any time, provided that Escrow Agent has given Licensor and Licensee notice to that effect in writing at least ninety (90) days before the contemplated date of termination, whereupon Licensor shall diligently attempt to identify an independent successor Escrow Agent, reasonably acceptable to Licensee, who is agreeable to assuming all further obligations of Escrow Agent hereunder;

3.    Automatically, in the event that copies of the Source Code are released to Licensee in accordance with the terms of this Agreement; or

4.    Sixty (60) days after Licensor issues to Licensee and Escrow Agent a certificate confirming that Licensee is no longer entitled to Support Services from Licensor, provided that such termination shall not occur on such basis if Licensee disputes such certificate by sending Licensor and Escrow Agent notice to that effect in writing within such period, and in the event of such objection, the parties shall resort to the arbitration process set forth in Section 6 hereof for resolution of the dispute, in which case, the sole issue for arbitration is whether the Licensee is no longer entitled to Support Services from Licensor. If the arbitrator shall so determine that Licensee is no longer entitled to Support Services from Licensor, he shall so notify the parties. Upon the parties' receipt of such notice, this Agreement shall terminate.

Upon termination of this Agreement, following distribution of copies to Licensee to the extent so required hereunder, all remaining copies of the Source Code shall be delivered to Licensor, except that in the event of termination at the instance solely of the Escrow Agent, such copies shall be delivered to the successor Escrow Agent.

A-7                                                                     F 00047

Section 13
MISCELLANEOUS

**13.1 Compliance with Laws.** The parties hereto agree that they shall comply with all applicable laws and regulations of governmental bodies or agencies in their respective performance of their obligations under this Agreement.

**13.2 No Undisclosed Agency; No Assignment.** Each party represents that it is acting on its own behalf and is not acting as an agent for or on behalf of any third party; and further agrees that it may not assign its rights or obligations under this Agreement without the prior written consent of the other parties hereto (except that an assignment by Licensee of such rights requires only the consent of Licensor, and an assignment by Licensor requires only the consent of Licensee).

**13.3 Notices.** All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be considered effective at the earlier of (a) three days after such notice has been deposited in the United States mail, postage prepaid, and addressed to the respective party at the address shown above (in the case of Licensor and Escrow Agent) or shown in Appendix A hereto, unless by such notice a different address shall have been designated, or (b) the date on which such notice is actually received by the respective party after hand or courier delivery.

**13.4 Governing Law.** All questions concerning the validity, operation, interpretation, and construction of this Agreement shall be governed by and determined in accordance with the laws of the State of New York.

**13.5 No Waiver.** No party shall, by mere lapse of time, without giving notice or taking other action hereunder, be deemed to have waived any breach by the other party(ies) of any of the provisions of this Agreement. Further, the waiver by any party of any particular breach of this Agreement by any other party shall not be construed to constitute a continuing waiver of such breach or of any other breaches of the same or other provisions of this Agreement.

**13.6 Force Majeure.** No party shall be held responsible for any act, failure, event, or circumstance addressed herein if such act, failure, event, or circumstance is caused by conditions beyond such party's reasonable control.

**13.7 Partial Invalidity.** If any provision of this Agreement is held illegal, unenforceable, or in conflict with any law of any federal, state, or local government having jurisdiction over this Agreement, the validity of the remaining provisions hereof shall not be affected thereby.

**13.8 Complete Statement of Agreement.** The parties hereto acknowledge that each has read this Agreement, understands it, and agrees to be bound by its terms. The parties further agree that this Agreement is the complete and exclusive statement of their agreement with respect to the subject matter hereof, and supersedes all oral or written proposals, understandings, representations, warranties, covenants, and communications between the parties relating hereto. This Agreement is intended by the parties to constitute an agreement completely independent of any other agreement between or among any combination of the parties hereto, whether or not any such other agreement involves the Licensed Program, except to the limited extent necessary to define the scope of Support Services for purposes of this Agreement. The continuing, contingent,

A-8

or future rights or obligations of any party under any other agreement whatsoever shall not be regarded as necessary or implied consideration for the execution, validity, or performance of this Agreement.

**13.9 Remedies.**  The description of the possible occurrences that would constitute an Impact Event, and the consequences thereof, shall create no presumption that Licensor may or should be permitted to reject or terminate the License Agreement or this Agreement under application law.  The parties agree that such a rejection or termination would be highly prejudicial to Licensee's interests, and enforcement of the Agreement will not provide a complete or adequate remedy for the harm to Licensee's interests.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as set forth below.

LICENSOR

By: ...............

Title: ...............

Date: ...............


ESCROW AGENT

By: ...............

Title: ...............

Date: ...............


LICENSEE

By: ...............

Title: ...............

Date: ...............

F 00049

**Exhibit A**
LICENSED PROGRAMS

F 00050

**Appendix A**
PARTY NOTICE ADDRESSES

F 00051

# FIRST AMENDMENT
## TO SOURCE CODE ESCROW AGREEMENT

This **FIRST AMENDMENT** ("First Amendment") is effective as of the __ day of _____ 2000 ("First Amendment Effective Date"), and amends and supplements that certain Source Code Escrow Agreement, dated as of _____ ("Agreement"), by and between Toyota Credit Corporation ("Licensor"); ALLTEL Information Services, Inc. ("Licensee") and Fort Knox ("Escrow Agent").

**WHEREAS,** Licensor licensed its AP7000 Software to Licensee under certain terms in conditions contained in Product Schedule A to the License Agreement; and

**WHEREAS,** Licensor and Licensee desires to acknowledge the mutual agreement of the parties with respect to on for defining an Impact Event; and

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.     Notwithstanding anything to the contrary in Section 1.5 of the Agreement, pursuant to Section 7.0 of Product Schedule A (ES Services Default) to the License Agreement, in the event that ALLTEL is unable to resolve a Defect in accordance with the procedures thereunder, such default shall be considered an "Impact Event" (as defined in the Agreement) and TMCC shall be entitled to a release of the AP7000 source code.

2.     All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

3.     All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect.

4.     Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

5.     This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

**IN WITNESS WHEREOF,** the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

**ALLTEL INFORMATION SERVICES, INC.**            **TOYOTA MOTOR CREDIT CORPORATION**

By: _____                By: _____

Name: _____                Name: _____

Title: _____                Title: _____

Date: _____                Date: _____

**FORT KNOX**

By: _____

Name: _____

Title: _____

Date: _____

i:\client\toyota\software\escwamd.doc

**F 00052**

**EXHIBIT B**

**FORM OF OPERATING AGREEMENT**
**[See Attached]**

**F 00053**

## OPERATING AGREEMENT

This **OPERATING AGREEMENT** ("Agreement") dated as of the _____ day of _____ ("Effective Date") and is made by and among **ALLTEL INFORMATION SERVICES, INC.,** located at 4001 Rodney Parham Road, Little Rock, Arkansas 72212, U.S.A. ("ALLTEL"), Toyota Motor Credit Corporation ("Client"), located at _____ and _____ , located at _____ ("Processor")

**WHEREAS,** ALLTEL has developed and owns software systems and related processes, techniques, know how and information more specifically described in the attached Exhibit B which is incorporated herein by reference.

**WHEREAS,** Client has entered into an agreement with Processor for Processor to provide data center operations and infrastructure.

**WHEREAS,** Client desires the right to allow Processor to provide the Managed Operations services using the Software for the sole and exclusive benefit of Client; and

**WHEREAS,** the parties hereto wish to set forth the terms and conditions relating to access and use of the Software to protect the security and confidentiality of, and ALLTEL's proprietary rights to, the Software.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein the parties hereto agree as follows:

1.    **DEFINITIONS.** As used in this Agreement, the following terms shall have the indicated meanings:

    **1.1**    **"Agreement"** shall mean this Operating Agreement.

    **1.2**    **"Data Center"** shall mean the site(s) where the Software is installed in accordance with the License Agreement as of the Effective Date of this Agreement. Neither Client nor Processor may change the location of the Data Center without ALLTEL's prior written consent, which consent shall not be unreasonably withheld.

    **1.3**    **"Effective Date"** shall mean the date indicated as the Effective Date in the first paragraph of this Agreement.

    **1.4**    **"License Agreement"** shall mean that certain Master Software License Agreement Number 2000AIS002, between Client and ALLTEL, together with all amendments thereto, dated as of the _____ .

    **1.5**    **"Managed Operations"** shall mean the applications maintenance processing and data center operations services provided to Client by Processor; provided, however, that the Managed Operations shall not include applications development or ES Services for the Software (as defined in the License Agreement), or any other function that requires or involves any disclosure to Processor of the source code, technical documentation or user documentation (except as otherwise expressly provided herein) designated by ALLTEL for the Software.

**F 00054**

1.6 **"Operational ALLTEL Property"** shall mean the object code version of the Software, the operations manuals related to the Software, and the other information about the Software that is disclosed to Processor described in Exhibit B hereto; Operational ALLTEL Property excludes, without limitation, source code, technical manuals or user documentation (except as expressly identified on Exhibit B hereto).

1.7 **"Software"** shall mean all ALLTEL software systems and related documentation licensed pursuant to the License Agreement and identified on Exhibit B hereto; all modifications, supplements or alterations to the Software; related processes, techniques, know how; and information described on Exhibit B hereto.

2. <u>**USE OF OPERATIONAL ALLTEL PROPERTY BY PROCESSOR.**</u>  Subject to the terms and conditions of this Agreement, the parties hereto agree that Client will provide the Operational ALLTEL Property to Processor and Processor will use the Operational ALLTEL Property to provide the Managed Operations for Client at the Data Center.

3. <u>**OWNERSHIP OF THE SOFTWARE.**</u> Client and Processor acknowledge that the Software is owned by ALLTEL, that neither legal nor equitable title to any portion of the Software passes to Client or Processor under the terms of the License Agreement or this Agreement, and that the Software is confidential and constitutes a trade secret of ALLTEL.

4. <u>**RESTRICTIONS ON USE OF THE SOFTWARE.**</u>  Without prejudice to the terms of the License Agreement (which provisions are not intended to be restricted as to Client hereby), during the term of this Agreement, neither Client nor Processor shall:

      (i)    make available the Software, or any part thereof to any third party person or entity;

      (ii)    reveal to any third party or entity any information that Client or Processor may have concerning the design or programming of the Software;

      (iii)    reverse engineer or otherwise disassemble the Software; or

      (iv)    copy the Software except for archival or backup purpose.

5. <u>**NO DISCLOSURE OF SOURCE CODE, TECHNICAL MANUALS OR USER MANUALS TO PROCESSOR.**</u>  As a material inducement to ALLTEL to enter into this Agreement, Processor covenants and agrees that it shall not, at any time, directly or indirectly, (i) have access to any of the source code or technical manuals with respect to the Software, or to any portion of the information included in the user manuals, (ii) use the Operational ALLTEL Property to process any loans or data of any party other than Client, (iii) operate any type of service bureau arrangement using the Operational ALLTEL Property, or (iv) use the Operational ALLTEL Property in any manner that is inconsistent with the terms and conditions of this Agreement. Notwithstanding the foregoing, ALLTEL acknowledges that the installation and use of the Software in the Data Center necessarily requires that the source code version of the Software will be potentially accessible by Processor. However, Processor agrees that it will not actually access, and Client agrees that it will not disclose to Processor, any portion of the source code version of the Software. All information concerning the Software that is disclosed to the

F 00055

Processor in tangible form or reduced to any tangible medium by the Processor shall be destroyed or returned to ALLTEL or Client immediately upon termination of this Agreement without retention by Processor of any copies thereof. Any such destruction or return hereunder shall be evidenced by an affidavit signed by an executive officer of Processor that all copies of such information for which Processor is accountable were destroyed or returned.

6.  **ALLTEL NOT LIABLE TO PROCESSOR.** In no event shall ALLTEL be liable to Processor for damages arising from the use by Processor of the Software.

7.  **ADHERENCE TO SECURITY STANDARDS.** Processor and Client shall at all times and in all respects adhere to the security standards and procedures agreed to by the parties, as described in Exhibit A attached hereto and made a part hereof.

8.  **NO OTHER ACCESS PERMITTED.** Processor shall have access to information related to the Software only as provided in this Agreement and Exhibit A, and its obligations regarding maintaining the confidentiality of such information, as set forth above, shall be consistent with that access.

9.  **RESTRICTIONS ON COMPETITIVE USE.** Processor shall not use any part of the Software in any way to the competitive disadvantage of ALLTEL and will take steps designed to assure its compliance with this provision. For so long as an employee of Processor, to whom the Operational ALLTEL Property has been disclosed, in whole or in part, shall remain an employee of Processor, Processor will not assign such a person to (i) work on or contribute to the development of the Software for the benefit of Client or any similar software for the benefit of any third party for a period of two years after his last date of access to the Software, or (ii) provide the same or substantially similar services involving any other ALLTEL software to any other third party licensee of ALLTEL for a period of two years after his last date of access to the Software. Processor shall, upon reasonable request by ALLTEL, furnish to ALLTEL, information regarding the provisions of this Section 9 and the names of any employees of Processor that have access to the Operational ALLTEL Property pursuant to this Agreement.

10. **RESTRICTIONS ON MODIFICATION.** Except as necessary to change the operational documentation or the application JCL to support the permitted use of the Operational ALLTEL Property, Processor shall make no modifications to the Operational ALLTEL Property.

11. **EQUITABLE REMEDIES.** Client and Processor agree that, upon the occurrence of any material breach of this Agreement, monetary damages alone may not be sufficient remedy or protection and ALLTEL shall be entitled to such injunctive or other equitable relief as may be deemed proper or necessary by a court of competent jurisdiction, without posting any bond.

12. **RESTRICTIONS ON SOLICITATION OF OTHER POTENTIAL DATA CENTER CUSTOMERS.** Neither Client nor Processor will solicit any third party to have its data processed in the Data Center by Processor using the Software.

13. **CONFIDENTIAL AGREEMENT.** Client and Processor each agree that the terms and conditions of this Agreement are strictly and highly confidential, and shall not be disclosed to any third party.

**F 00056**

14. **JOINT AND SEVERAL LIABILITY.**   Client agrees that it shall be jointly and severally responsible and liable to ALLTEL for the performance of Processor of each and all of Processor's obligations hereunder.

15. **TERM OF AGREEMENT.**   The term of this Agreement shall begin on the Effective Date and shall continue until the earlier to occur of (i) the termination of this Agreement pursuant to the terms hereof; (ii) termination of maintenance services under License Agreement, (iii) termination or expiration of the License Agreement; or (iv) the termination of the agreement between Client and Processor pursuant to which Processor provides Managed Operations to Client.

16. **MATERIAL BREACH.**   If Processor or Client commits a material breach of its obligations under this Agreement and fails to cure such breach within thirty (30) days following receipt of a written notice from ALLTEL specifying in reasonable detail the nature and extent of the alleged breach, ALLTEL may terminate this Agreement effective on the expiration of such thirty (30) day period with no further notice.

17. **LIMITATIONS ON LIABILITY.**

   (a)   Upon a termination or expiration of this Agreement pursuant to Section 15 or 16, above, Processor shall immediately cease all operation or use of the Software and the Operational ALLTEL Property and return all Operational ALLTEL Property and Software to Client or ALLTEL as described in Section 5 above.  If there is an uncured material breach ALLTEL shall be entitled to receive all remedies available at law and/or equity.  In particular, if there is a material breach of Section 4, 5 or 9 hereof by Client or Processor that is not cured as contemplated by Section 16, ALLTEL shall be entitled to recover any loss of profits, business, and revenues, and any damage to ALLTEL's business reputation that ALLTEL demonstrates was the direct result of such material breach.  Subject to the specific provisions of this Section 17, it is the intent of the parties that each party shall be liable only for direct damages actually incurred by a non-breaching party as a result of a breaching party's failure to perform its obligations in the manner required by this Agreement.

   (b)   EXCEPT AS SPECIFICALLY SET FORTH ABOVE WITH RESPECT TO LIABILITY FOR A MATERIAL BREACH OF SECTIONS 4, 5 OR 9, IN NO EVENT, WHETHER IN CONTRACT OR IN TORT INCLUDING BREACH OF WARRANTY, NEGLIGENCE AND STRICT LIABILITY IN TORT) SHALL A PARTY BE LIABLE FOR INDIRECT OR CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

   (c)   Sections 3, 4, 5, 6, 9, 11, 12, 13, and 16 through 23, inclusively, shall survive termination or expiration of this Agreement.

18. **DISCLAIMER OF WARRANTIES.**   ALL WARRANTIES ON THE PART OF ALLTEL, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXPRESSLY DISCLAIMED AND EXCLUDED.

**F 00057**

19. **ASSIGNMENT.**    This Agreement shall be binding upon the parties and their respective permitted successors and assigns.  A party may not sell, assign, convey or transfer any of its rights or obligations hereunder without the prior written consent of the other parties and any such attempted transfer shall be void.

20. **GOVERNING LAW; JURISDICTION; VENUE.**    The validity of this Agreement, the construction and enforcement of its terms, and the interpretation of the rights and duties of the parties shall be governed by the laws of the State of Arkansas.  The parties agree that exclusive jurisdiction and venue for the resolution of disputes arising under this Agreement shall be in the appropriate state and federal courts in Pulaski County, Arkansas.  The parties specifically waive their rights to any other jurisdiction or venue.

21. **NO WAIVER.**  No modification, amendment, supplement to or waiver of this Agreement or any of its provisions shall be binding upon the parties hereto unless made in writing and duly signed by the parties or the party to be charged, as appropriate under the circumstances.  A failure or delay of any party to this Agreement to enforce at any time of the provisions of this Agreement, or to exercise any option which is herein provided, or to require any time operation which is herein provided, or to require at any time performance of any of the provisions hereof, shall in no way be construed to be a waiver of such provision of this Agreement.

22. **NOTICES.**    Except as otherwise provided under this Agreement, all notices, demands or requests which may be given by any party to the other party shall be in writing and shall be deemed to have been duly given when received, written notice may be delivered in person, or sent via facsimile, or internationally recognized courier service, and addressed as set forth below:

        If to ALLTEL:        ALLTEL Information Services, Inc.
                                   4001 Rodney Parham Rd.
                                   Little Rock, AR 72212, U.S.A.
                                   Attn:  President, Financial Services Division

        With a copy to: Attn: General Counsel (at the same address as immediately above)

        If to Client:     _____

        If to Processor:     _____

                      Attention:  _____

23. **CONFLICTS.**  In the event of any conflict between the provisions of this Agreement and those of the License Agreement, the provisions of this Agreement shall prevail.

F 00058

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date by the undersigned duly authorized representatives.

**ALLTEL INFORMATION SERVICES, INC.**          **_____ (Client)**

By:_____          By:_____

Name:_____          Name:_____

Title:_____          Title:_____

Date:_____          Date:_____

**\_\_\_\_ (Processor)**

By:_____

Name:_____

Title:_____

Date:_____

**F 00059**

**EXHIBIT A**

**SECURITY PROCEDURES AND STANDARDS**

1.      The following security procedures shall apply to the Operational ALLTEL Property:

      (a)      The tapes containing the Software or any component thereof shall be kept in a locked, secure environment;

      (b)      There shall be established an operating environment on Processor's CPU through the operating system software or security software, or a combination thereof, providing secure object libraries and job control statements for production accessible to Processor's employees requiring access for the purposes contemplated by this Agreement.

      (c)      Processor shall take steps designed to assure that it is in compliance with the security procedures.

      (d)      Client and Processor have joint responsibility for security administration of the Software.

2.      For the sole purpose of auditing and ensuring that the security procedures and standard described above are adhered to by Client and Processor, Processor will allow ALLTEL reasonable access to the Data Center during ordinary business hours during the term of this Agreement.

3.      Client or Processor shall bear all expense relating to the installation and operation of the required security procedures.

**F 00060**

**EXHIBIT B**

**OPERATIONAL ALLTEL PROPERTY**

Operational ALLTEL Property shall consist only of the following:

-   Object code
-   Operations manuals
-   Master files
-   Field descriptions
-   Record layouts
-   Run documentation
-   Job control listings

related to the following Software applications only:

- _____

**F 00061**

DISASTER RECOVERY
FILE ROOM PROJECT
DATE COPIED 7/26/02

# FIRST AMENDMENT
## TO
## MASTER SOFTWARE LICENSE AGREEMENT

This **FIRST AMENDMENT TO MASTER SOFTWARE LICENSE AGREEMENT** ("First Amendment") is made and entered into by and between **TOYOTA MOTOR CREDIT CORPORATION** ("TMCC") and **ALLTEL INFORMATION SERVICES, INC.** ("ALLTEL") effective as of the 1st day of March, 2002 ("First Amendment Effective Date"), and amends and supplements that certain Master Software License Agreement by and between TMCC and ALLTEL executed on August 25, 2000 (sometimes referred to herein as the "Agreement").

**WHEREAS,** TMCC and ALLTEL desire to make certain changes to the Master Software License Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.    Section 4 of the Master Software License Agreement shall be deleted in its entirety and replaced as follows:

**"4.0    Software License and Use.**  For the Software set forth on the applicable Product Schedule(s), ALLTEL grants to TMCC, and TMCC accepts, a non-exclusive license to the Software (including Phased Delivery Software as defined in Section 6.1 herein) (the "**License**") for TMCC, its Affiliates and its Authorized Representatives (as defined in Section 5) to use the Software solely for TMCC's own internal businesses, and to reproduce the Software for archival and backup purposes, subject to the restrictions set forth in this Section 5 hereof.  Said License shall commence on the applicable Product Schedule(s) Effective Date and continue thereafter until termination of said License in accordance with its terms.

**"4.1    Affiliates Use.**  It is the intention of the parties that (i) the Affiliates using the Software pursuant to this License shall be bound by the terms and conditions of this Agreement, (ii) all of the systems and services provided under this Agreement be made available to such Affiliates, and (iii) TMCC guarantees the performance of and the payment by (as applicable) each such Affiliate of any and all obligations and liabilities under this Agreement.  ALLTEL will provide TMCC advance written notice of any separate agreement subjecting the Affiliate to the terms of this Agreement between any Affiliate and ALLTEL to which TMCC is not also a party.

**"4.2    Locations.**  For production purposes, there shall be only one Installation Site, which shall be identified in the applicable Product Schedule. For regular offsite backup, temporary emergency relocation and the operation of Non-Production Copies (defined below), at no additional charge, TMCC, its Affiliates and its Authorized Representatives may use the Software and Documentation at any (unlimited number) of additional TMCC, Affiliates' or dealer locations.  For purposes of this Agreement, "Non-Production Copies" are defined as copies of the Software used exclusively for purposes other than as used in a live production environment.  TMCC, its Affiliates and its Authorized Representatives also may keep a copy of the Software and the Documentation at a backup site exclusively for backup and disaster recovery purposes.  TMCC agrees that the Affiliates and the Authorized Representatives will not make copies, or similar versions of the

1

**F 00062**

Software or any part thereof without the prior written consent of ALLTEL, except as expressly provided otherwise herein.

### "4.3    Use Restrictions.

"**4.3.1** TMCC is not authorized to use or allow any other party to use the Software for service bureau purposes or to act as a processor for any third parties, except as may be mutually agreed to by ALLTEL and TMCC.

### "4.3.2    Outsourcing.

"(a)   At any time after the Effective Date, TMCC may outsource the application maintenance processing and/or the data center operations of the object code version of Software to a third party operator ("Operator"), subject to the following conditions: (i) the outsourcing is a part of the outsourcing by TMCC or its Affiliates of a material portion of its applications; (ii) Operator is a publicly traded company with a market capitalization of at least 1 billion dollars at some time within the three (3) months prior to the time TMCC elects to outsource or is controlled by such a company; (iii) the outsourcing operations are performed in the United States of America; and (iv) the Operator enters into an Operating Agreement with ALLTEL and TMCC, in substantially the form attached as Exhibit B to this Agreement (unless otherwise provided in the Product Schedule) ("Operating Agreement"); provided, however, that ALLTEL will not unreasonably withhold signing such Operating Agreement if it is substantially similar to the terms of the form attached as Exhibit B to this Agreement. Any change to the market capitalization of Operator or its controlling entity following the date of the Operating Agreement shall not affect the continuing validity of the Operating Agreement for this purpose.

"(b)   If any time after the Effective Date, TMCC elects to outsource the application maintenance processing and/or the data center operations of Software under any circumstances other than those described in Section 4.3.2(a) above, TMCC may do so subject to the following conditions: (i) the Operator enters into an Operating Agreement as described in Section 4.3.2(a) above (and such condition is subject to the proviso in Section 4.3.2(a) above) and (ii) in addition to all other fees payable hereunder, TMCC pays to ALLTEL a mutually agreed annual outsourcing fee ("Outsourcing Fee") not to exceed twenty-five percent (25%) of the then current annual maintenance fees for the Software as provided in the applicable Product Schedule, which Outsourcing Fee is payable on the same terms as the maintenance fees in the applicable Product Schedule. TMCC agrees that at any time that TMCC considers outsourcing the services described in this Section 4.3.2(b) that TMCC will provide ALLTEL an opportunity to submit a proposal to perform such services. In the event that ALLTEL and TMCC enter into an agreement for ALLTEL to provide such services, TMCC shall not be required to pay an Outsourcing Fee as described herein.

F 00063

"(c) Notwithstanding anything to the contrary, this Agreement shall not be construed to preclude TMCC from using the License for the Software and Documentation for the purposes of processing information for entities formed to acquire and securitize receivables owned by TMCC or its Affiliates, for Affiliates, or for affiliates of Southeast Toyota Distributors LLC or of Toyota Material Handling, U.S.A., Inc. and/or for TMCC's administration of such third parties' financial services portfolios. For purposes hereof, "administration" by TMCC means a combination of information technology services and administrative services for financial services portfolios."

2.    Section 6.1 of the Master Software License Agreement is hereby amended by adding the following new paragraphs:

"If the Software as agreed upon is scheduled to be delivered to TMCC in specific phases, or delivered in portions less than the totality of the Software ("Phased Delivery Software") such Phased Delivery Software shall be described (including the content and delivery date) in the particular Product Schedule or in the related Statement of Work ("Statement of Work") under that certain Services Agreement dated as of February 7, 2000 by and between ALLTEL and TMCC, as amended (the "Services Agreement"), or in documents attached to or referred to in the Product Schedule or the related Statement of Work. References to "Software" in this Agreement shall include such Phased Delivery Software."

3.    Section 6.2 of the Master Software License Agreement is hereby amended by replacing the first paragraph in its entirety with the following new paragraphs:

"Each Product Schedule or the related Statement of Work shall provide for an acceptance test period (the "Acceptance Test Period") for the Software under the Product Schedule, and shall indicate which party is responsible for installation of Software and conduct of verification testing. The length of the Acceptance Test Period for any Software shall be set forth in the Product Schedule or the related Statement of Work, may vary from Software to Software, and may be extended in accordance with the Product Schedule or the applicable Statement of Work. The event or events that cause the Acceptance Test Period to commence shall be set forth in each Product Schedule or the applicable Statement of Work.

"Following installation of Software in TMCC's test environment and verification testing, TMCC will conduct the Acceptance Test. If Software as delivered does not perform according to the applicable Documentation and the Acceptance Criteria, such non-performance shall constitute a defect ("Defect"). In the case of Software which comprises multiple elements, the failure of any such element to perform according to the Acceptance Criteria applicable to such element shall constitute a Defect. TMCC shall notify ALLTEL in writing of any and all such known Defects promptly after they become known, but not later than TMCC's notification to ALLTEL of the completion of the Acceptance Test, which shall occur no later than the expiration of the Acceptance Test Period for that Software. TMCC shall give ALLTEL the notification of Defects not less frequently than once weekly, if any Defects become known during such week. The Acceptance Test Plan shall specify any requirements as to the form of the notification, but in the absence of any provisions to the contrary TMCC may give such notification in the form of adding a description of the Defect to an "issues log" to be maintained for this purpose.

F 00064

"Promptly after receipt of notification of a Defect in Software, ALLTEL, at its own expense, shall commence the taking of reasonable efforts to correct the Defect so that the Software meets the applicable Documentation and Acceptance Criteria, and shall continue such efforts diligently until the Defect is corrected, or until the Software (including Phased Delivery Software) is accepted or rejected, whichever first occurs, except as the parties may otherwise agree. If the Defect identified by TMCC pertains to a particular element of Software, upon correction of that element of the Software ALLTEL may, but shall not be required to, deliver to TMCC the correction to the Defect (unless the identified Defect has caused a cessation of or delay in TMCC's conduct of the Acceptance Test, in which case ALLTEL will deliver the correction to the Defect promptly). Notwithstanding the foregoing, not later than thirty (30) days after TMCC notifies ALLTEL of the completion of the Acceptance Test or thirty (30) days after the expiration of the Acceptance Test Period, whichever first occurs, ALLTEL shall: (i) correct the Software (including a Phased Delivery Software) so that such Software or Phased Delivery Software performs according to the applicable Documentation and Acceptance Criteria; and (ii) if the respective Product Schedule provides for ALLTEL to install Software in the TMCC test environment and conduct validation testing, ALLTEL will reinstall the corrected Software in the TMCC test environment in its entirety and conduct validation testing. If the respective Product Schedule provides for TMCC to install Software in its test environment, the thirty-day period shall expire upon ALLTEL's delivery of the corrected Software to TMCC.

"ALLTEL's efforts to correct any such Defects shall, to the extent reasonably possible, not delay TMCC's conduct of the Acceptance Test of Software or elements of Software not materially affected by such reported Defects.

"Upon delivery and reinstallation in TMCC's test environment of corrected Software (including an entire Phased Delivery Software), TMCC shall have an additional Acceptance Test Period to re-conduct the Acceptance Test. The additional Acceptance Test Period for Software shall be of the same duration as the initial Acceptance Test Period for that Software. If the identified Defect or Defects have not been corrected or the Software otherwise does not perform according to the applicable Documentation and Acceptance Criteria, TMCC at TMCC's sole discretion: (i) may reject the Software as provided for in Section 6.3; or (ii) may propose to ALLTEL an agreement providing for the resolution of Defects in the Software upon mutually acceptable terms and conditions, and if such an agreement is entered into in writing, the Software shall be deemed neither to be accepted nor rejected when such agreement is entered into; or (iii) may propose to accept the Software with known Defects provided that ALLTEL agrees to fix the Defects at ALLTEL's expense within a specified period, and if such an agreement is entered into in writing, TMCC will accept the Software with such known Defects. If TMCC elects option (ii) or (iii) above, TMCC retains the right to reject the Software until the written agreement is entered into. In the case of option (ii), above, the agreement shall provide that upon resolution of Defects within a period specified in the agreement and upon satisfaction of any other conditions contained in the agreement, TMCC will accept the Software; and the agreement shall provide that TMCC may reject the Software if such conditions are not satisfied.

"TMCC shall notify ALLTEL of its election provided for in the prior paragraph at or prior to the expiration of the additional Acceptance Test Period for the re-delivered Software. TMCC may make such election prior to the expiration of the additional Acceptance Test Period for the re-delivered Software. The parties acknowledge and agree that in the case of Phased Delivery Software, (i) such additional Acceptance Test Period does not commence until the delivery of the corrected Phased Delivery Software in its entirety, and (ii) Phased Delivery Software will not be

4

considered to perform according to the applicable Documentation and Acceptance Criteria unless all elements of the Phased Delivery Software perform according to the applicable Documentation and Acceptance Criteria.

"ALLTEL agrees that TMCC's Acceptance of any Software prior to final Acceptance of all Software covered by a Product Schedule (including, without limitation, TMCC's Acceptance of Phased Delivery Software) shall not limit TMCC's right to reject the Software covered by a Product Schedule in its entirety if any of such Software does not meet the applicable Documentation and Acceptance Criteria. TMCC may place in use any Phased Delivery Software upon Acceptance."

4.     Section 6.3 of the Master Software License Agreement is hereby amended and restated in its entirety as follows:

"**6.3     Rejection.** As provided in Section 6.2 above, if TMCC notifies ALLTEL of any Defect in Software (including Phased Delivery Software) and ALLTEL either does not deliver corrected Software within the period specified in Section 6.2 or such redelivered Software does not perform according to the Documentation and the Acceptance Criteria, TMCC may reject such Software or Phased Delivery Software by notifying ALLTEL in writing of said rejection. TMCC's rejection of Software shall entitle TMCC to terminate the applicable Product Schedule. Upon such termination, ALLTEL shall promptly refund to TMCC all license fees paid to ALLTEL for such Software (as defined in the applicable Product Schedule), and any other sums to which TMCC is entitled upon such rejection pursuant to the Product Schedule. TMCC shall then discontinue all use of the terminated Software and Documentation, and shall return to ALLTEL (or destroy) all copies thereof in TMCC's possession or control. Notwithstanding the foregoing, for a Product Schedule that provides for Phased Delivery Software, if TMCC rejects any Phased Delivery Software, TMCC may elect not to terminate the Product Schedule and not to discontinue use of any Phased Delivery Software TMCC had previously Accepted ("In-Use Phased Software") and any related Documentation. In such event, (a) TMCC shall have no duty to return to ALLTEL (or destroy) any copies of the In-Use Phased Software or the related Documentation; (b) ALLTEL shall not be obligated to refund to TMCC license fees TMCC had paid to ALLTEL under such Product Schedule; (c) TMCC shall have no duty to pay any additional license fees to ALLTEL under such Product Schedule; (d) ALLTEL shall continue to provide ES Services for the In-Use Phased Software on the terms provided for in the Product Schedule; and (e) the ES Services Fee for the In-Use Phased Software shall be the ES Services Fee provided for under the Product Schedule applicable to the period immediately following TMCC's acceptance of the In-Use Phased Software."

5.     Section 7.1 of the Master Software License Agreement is hereby amended by replacing Section 7.1 in its entirety (but not subsections 7.1.1 through 7.1.5) with the following:

"ALLTEL will provide Software Enhancement and Support Services ("ES Services") for the Software as set forth below unless explicitly stated to the contrary in the applicable Product Schedule. Except as expressly provided otherwise in an applicable Product Schedule, the ES Services shall be provided at no charge during the Warranty Period, as defined in Section 10.2 below, for the Software, and, in accordance with the terms hereof, for the periods of time set forth in the applicable Product Schedule ("ES Period"). ALLTEL shall correct and repair any Defect in the Software if such Defect prevents the Software from operating and performing in accordance

5

with the Documentation and the Acceptance Criteria or in accordance with any service level commitments, if any, provided for in a Product Schedule."

6.    Section 7.1.1 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end of sub-section 7.1.1:

"Notwithstanding the foregoing, a temporary fix that includes any operating instructions, new procedure, or new routine that, when implemented, requires TMCC to incur additional expense including hiring additional personnel or buying additional equipment or software to implement such operating instructions, new procedure, or new routine shall not be considered a Work Around."

7.    Section 7.3 of the Master Software License Agreement is hereby amended by adding the following new sentence at the end this section:

"ALLTEL's discontinuance of such ES Services shall be considered an Impact Event as defined in the Source Code Escrow Agreement dated August 25, 2000."

8.    Section 9.2 of the Master Software License Agreement is hereby amended by adding the following new sentence at the end this section:

"In the event of ALLTEL's material breach of this Agreement, TMCC may terminate this Agreement and, without limiting TMCC's other rights or remedies, such termination shall be considered an Impact Event as defined in the Source Code Escrow Agreement dated August 25, 2000."

9.    Section 11.2 of the Master Software License Agreement is hereby amended and restated in its entirety as follows:

"11.2  Except for liabilities, losses, damages and expenses related to:  (i) death, personal injury or damage to property; or (ii) third party claims of infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, the liability of either Party to the other hereunder for any breach or any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement or the Services Agreement shall be limited to actual direct damages incurred by the other Party, and, except as to excepted claims, in no event shall either Party's aggregate liability for any and all claims exceed the aggregate amount actually paid to ALLTEL by TMCC under this Agreement (including Product Schedules hereunder) and under the Services Agreement (including Statements of Work thereunder) whether such claim or claims are brought under this Agreement or the Services Agreement or both.  Neither party shall be liable for any special, indirect, incidental or consequential damages suffered by such party."

10.    Section 13.0 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end this section:

"If it is foreseen that a force majeure event claimed by a party will cause a delay in performance to exceed six (6) months, then the party not making the claim shall have the option to terminate the applicable Product Schedule to the Agreement without the payment of any termination for convenience fees provided for in such Product Schedule or the related Statement of Work.  Further, during a force majeure event, ALLTEL shall to the extent practicable maintain any ES Services

6

service level commitments set forth in a Product Schedule. Upon the conclusion of a force majeure event, the effectiveness and enforcement of such ES Services service level commitments shall be restored and ALLTEL shall perform its obligations in conformity therewith."

11.   Section 17.0 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end this section:

"Notwithstanding anything to the contrary herein, neither party shall not be bound to the restrictions contained herein this Section 17 in the event of (i) a party commencing any proceeding under Title 11 of the United States Code ("Bankruptcy Code") or any other federal or state bankruptcy, insolvency, receivership, or similar law, or if a party is made subject to such a proceeding involuntarily; (ii) the termination of substantially all of a party's ongoing business operations relating to the subject of the Agreement; (iii) any liquidation of a party or any sale, assignment, or foreclosure of or upon assets that are necessary for the performance by a party of its responsibilities under this Agreement, or (iv) ALLTEL discontinuing ES Services."

12.   Section 18.0 of the Master Software License Agreement shall be amended to add the following sentence at the end of such section:

"Appendices and exhibits to this Agreement or to any Product Schedule are incorporated into and made a part of this Agreement or such Product Schedule, respectively."

13.   Section 20.0 of the Master Software License Agreement is hereby amended by deleting the first sentence and replacing it as follows:

"For any Software or Phased Delivery Software to which ALLTEL grants a license (in object code form only) to TMCC under this Agreement, within thirty (30) days after such license is granted ALLTEL will deposit with a third party escrow agent identified in the applicable Product Schedule ("Escrow Agent") the source code of such Software and related materials which exist and is available sufficient to enable a reasonably skilled programmer or analyst to maintain and enhance the Software, as more particularly described in the applicable Product Schedule ("Escrow Deposit").

14.   The parties will use their best efforts to amend the Source Code Escrow Agreement dated August 25, 2000 to modify the definition of "Impact Event" therein as provided in paragraphs 7 and 8 of this First Amendment.

15.   All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

16.   All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect. This First Amendment constitutes the entire agreement between TMCC and ALLTEL relating to the subject matter hereof.

17.   Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

18.   This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

F 00068

19.  This First Amendment shall be governed by and shall be construed in accordance with the laws of State of California.

**IN WITNESS WHEREOF**, the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

**ALLTEL INFORMATION SERVICES, INC.**

By:  _Clif Jly_

Name:  _CLIFF THOMPSON_

Title:  _SVP  AUTO  FINANCE_

Date:  _MarcH  4,  2002_

**TOYOTA MOTOR CREDIT CORPORATION**

By:  _Shaun Coyne_

Name:  Shaun Coyne

Title:  Vice President & CIO

Date:  March 5, 2002

8

**F 00069**

**Lotus cc:Mail for Rhonda S Harkins**

```
Author:   Rhonda S Harkins at ATIS_061
Date:     9/19/00  9:59 AM
Priority: Urgent
Receipt Requested
TO: John_Burguieres_Jr@toyota.com at INTERNET
CC: Tim Keil, Steve Pierce at ATISMBPO
Subject: Re[8]: TMCC-Alltel Master License Agreement
```
-------------------------------- Message Contents --------------------------------

John:

The change to Section 11.2 is acceptable.  As you suggested, I will
insert the revised page into the document and this email will be
evidence of the parties agreement to this change.

Thanks again.

Rhonda


_____ Reply Separator _____
```
Subject: Re: Re[6]: TMCC-Alltel Master License Agreement
Author:  John_Burguieres_Jr@toyota.com at INTERNET
Date:    9/15/00 2:34 PM
```

Rhonda-
I changed page 11, section 11.2 to read ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Let me
know if this is OK with you.  (The last line on the page stops short so I could
avoid any changes to page 12).

Let me know if you would want to simply change pages by removing the old page 11
with the typo and inserting the new page 11(without the necessity of initialing,
etc.).  Our exchanged e-mails can be kept as evidence of our intent to make the
change.
However if you prefer to have the change initialed by both parties, please have
two copies of new page 11 initialed and sent to me.  I will get them initialed
by TMCC and one copy returned to you.
John
(See attached file: Alltel MastrLicense-8.24At-pg11.doc)

*Sent 9/19/00*

*R Harkins*

**F 00070**

Toyota Motor Credit Corporation
Effective Date: _____ , 2000

**PRODUCT SCHEDULE No. 1**
**to**
**SOFTWARE LICENSE AGREEMENT**

The terms and conditions of that certain Master Software License Agreement between ALLTEL Information Services, Inc. ("ALLTEL") and Toyota Motor Credit Corporation ("TMCC"), dated _____ 2000 (the **"Agreement"**) apply to this Product Schedule No. 1 (**"Product Schedule"**). This Product Schedule is effective on this ___ day of _____, 2000 (**"Product Schedule Effective Date"**). Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Agreement.

**1. Scope of License.**

**1.1** ALLTEL grants to TMCC a perpetual, non-exclusive world-wide license (effective as of the Product Schedule Effective Date) to the ALLTEL Software as defined in the Services Agreement ("**AP7000 Software**").

**1.2** The Software licensed hereunder may be installed on an unlimited number of servers and on up to 600 client workstations ("**Base Number**") at an unlimited number of locations of choosing (collectively, the "**Installation Site**"), without payment of additional License Fees, so long as the Software installed at all such locations accesses a single database or an exact copy of that single database (an "**Exact Database Copy**"). An Exact Database Copy of a database must have the same data content as all other copies of that database, allowances being made for update timing delays inherent in the database replication process.

**1.3** TMCC may upgrade or enlarge the hardware at any location on which the AP7000 Software resides without restriction and without payment of additional License Fees. However, the addition of client workstations beyond the Base Number requires payment of additional License Fees for each such additional client workstation as specified in Attachment 1 to this Product Schedule.

**1.4 Additional Database Locations; Enterprise License.** TMCC may install an exact replica of the Software accessing other databases that are not an Exact Database Copy, as specified above ("**Server Licenses**"), at a location or locations in addition to those designated locations cited above upon payment of an additional License Fee for each such additional location, in the amount designated in Attachment 1 to this Product Schedule, or for an unlimited number of Server Licenses, upon payment of the Enterprise License fee specified on Attachment 1 hereto.

F 00071

**1.5**     ALLTEL will install the AP7000 Software and all related Documentation without any transfer of tangible personal property to TMCC, and will sign an affidavit when ALLTEL has completed delivery, installation and acceptance and has left the Installation Site, stating that no tangible property (including, but not limited to tangible copies of software, disks, training materials, and documentation) has been transmitted to TMCC or left at the Installation Site.

**1.6**     The performance of the AP7000 Software depends upon the availability of computer hardware and related operating software and database software, all of which is sufficient in size, speed, type, quantity and functionality to support TMCC's business operations and business volume.  If TMCC does not acquire, install, make operational and make available for use by the AP7000 Software, computer hardware that is at least the equal of that specified in the AP7000 configuration guide attached hereto as Attachment 4 and incorporated by reference into this Product Schedule, for TMCC's business type and business volume, then, ALLTEL shall not be responsible for its obligations under the performance warranties set forth herein and in Section 10.2 until such time as TMCC becomes compliant in accordance with this Section.

**1.7**     TMCC acknowledges and agrees that it shall be solely responsible for the results obtained from all TMCC credit rules and policies incorporated into the AP7000 Software, whether by TMCC or by ALLTEL on TMCC's behalf, and that ALLTEL shall have no liability whatsoever regarding any failure of such rules and policies to comply with fair lending law, the United States Equal Credit Opportunity Act, any regulation promulgated thereunder, or any other law or regulation.  Notwithstanding the foregoing, when setting credit rules and polices, the AP7000 Software will implement such credit rules and policies as set forth in the Documentation.

**1.8**     **[Intentionally Omitted]**

**1.9**     **Outsourcing.**  The provisions concerning outsource rights set forth in Section 4 of the Agreement are not applicable to AP7000.  For purposes of AP7000, the parties acknowledge that TMCC may outsource the application maintenance processing and the data center operations of the AP7000 Software to a third party operator ("Operator"). (This exception for AP7000 is not intended as a precedent for other products that ALLTEL may sell or license to TMCC in the future).  TMCC shall provide to ALLTEL written notice of such outsourcing, with the name and address  of the Operator and a contact person at the Operator.  TMCC shall cause Operator to enter into an agreement with TMCC which obligates Operator to the confidentiality, proprietary rights, use and ownership provisions and duties set forth in the Master Agreement between ALLTEL and TMCC.  TMCC and Operator shall make TMCC's vendors and suppliers intended third party beneficiaries of such agreement.  TMCC shall require and enforce such obligations and duties of the Operator.  TMCC agrees to be jointly and severally liable to ALLTEL for breaches by the Operator of said obligations and duties, and the cap on certain liabilities in section 11.2 equal to the amount of license fees paid shall not apply to this obligation in this sentence; however the exclusion of consequential damages and other limitations of liability shall apply to the obligations in this sentence.

**2.0**     **Third Party Software.**  The Third Party Software that is (or will be) incorporated into the AP7000 Software is identified on Attachment 3 hereto.
ALLTEL hereby provides the following  warranty for the Carleton Third Party Software

F 00072

ALLTEL will assist TMCC in determining that Carleton's Licensed Software referenced in Attachment 3 hereto ("Licensed Software") is in compliance through the use of its established relationship with state regulatory agencies. ALLTEL will provide an array of test loan transactions generated from the AP7000 system for each state the Licensee is a licensed lender. ALLTEL will send the test loan transactions to the appropriate state regulatory agency for compliance approval.

In the event that loan computations generated from the Licensed Software under maintenance are found to be out of compliance, ALLTEL will provide TMCC with supporting documents which explain the basis for computations. ALLTEL will also provide assistance to correct and recast if necessary all loan transactions in violation of compliance. ALLTEL will also make the necessary changes to the Licensed Software on a timely basis so that the Licensed Software is compliant.

ALLTEL warrants that the Licensed Software and all updates and maintenance have been and will be developed and tested using reasonable care: however, the Licensee shall be solely responsible for confirming the Licensed Software for accuracy and compliance with all laws.

**THERE ARE NO OTHER WARRANTIES EXCEPT AS STATED ABOVE EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS, FOR ANY PURPOSE IN RELATION TO THE LICENSED SOFTWARE. LICENSEE SHALL BE SOLELY RESPONSIBLE FOR THE SELECTION, USE, EFFICIENCY, AND SUITABILITY OF THE LICENSED PRODUCT.**

**3.0    Fees.**

    **3.1**    The License Fees payable to ALLTEL for the Software are as specified in Attachment 1 hereto.

    **3.2**    Within ten (10) days of receipt of ALLTEL's correct invoice therefor following execution of the Product Schedule, TMCC agrees to pay to ALLTEL fifty percent (50%) of the total License Fees for the AP7000 Software defined in Attachment 1 hereto, and the remaining balance of such License Fees following receipt of ALLTEL's correct invoice therefor issued upon the Acceptance Date pursuant to the payment terms of the Agreement.

    **3.3**    TMCC agrees to pay all applicable transportation and shipping charges for the Software from any ALLTEL or manufacturer's location to the destination specified by TMCC, if any.

**4.0    ES Services.** ALLTEL will provide the ES Services, as described more specifically on Attachment 2 hereto, commencing upon the Acceptance of the Software, solely in the United States (and its possessions) and Canada (collectively, herein, **"North America"**); provided that, the ES Services shall be performed outside of North America by ALLTEL for an additional ES Fee to be mutually agreed between the parties at the time of TMCC's request for any ES Services outside of North America. The initial ES Services fee ("ES Services Fee"), covering the period from Acceptance through the date of the first anniversary of the Warranty Expiration Date (defined below), is specified in Attachment 1 hereto and will be due and payable to ALLTEL upon expiration of the six (6) month warranty period from the Acceptance Date

F 00073

("**Warranty Expiration Date**"). From and after the date of the first anniversary of the Warranty Expiration Date, ES Services may be renewed for successive periods of one (1) year each while the Agreement remains in effect with sixty (60) days' prior written notice subject to termination rights described below. ALLTEL agrees to provide TMCC written notice of any increase in ES Fees applicable to any renewal term thereunder not less than one-hundred and twenty (120) days prior to the start of the renewal term. The ES Fees for the AP7000 Software may be increased for the calendar year following the year of the Product Schedule Effective Date and for all subsequent years during the ES Period by multiplying such fee by a fraction, the numerator of which is the Department of Labor Consumer Price Index ("**CPI-U**"), Other Goods and Services, as of December 31, of the calendar year immediately preceding the year in which such fee is due and the denominator of which is the CPI-U, Other Goods and Services as of December 1 of the calendar year before the Product Schedule Effective Date. In no event, however, shall the annual ES Fee increase for any Software be more than ten percent (10%) or less than three (3.0%) of the previous year's annual ES Fee for such Software. Upon termination of the ES Services hereunder by ALLTEL for any reason other than TMCC's breach hereof, TMCC shall be entitled to access source code held in escrow pursuant to Section 20 of the Agreement.    The ES Services will immediately terminate upon termination of the Agreement.

In the event that an Update pursuant to the ES Services shall require TMCC to change its hardware configuration in order to run the AP7000 Software, ALLTEL shall provide TMCC six (6) months advance notice of said Update. TMCC shall have the right not to install said Update in which case ALLTEL shall continue to support the latest Update prior to the change for a period of two (2) years from the notice date.

**5.0    AP7000 Software Testing and Acceptance.**

    **5.1    Acceptance.**  Once ALLTEL has completed installation and all modifications of the AP7000 Software as defined in the Statement of Work, dated June 29, 2000, under the Services Agreement, it shall notify TMCC that the AP7000 Software is ready for testing (the "**Acceptance Test**"). Within a reasonable amount of time prior to the commencement of the Acceptance Test, ALLTEL and TMCC shall mutually agree upon a plan (the "**Acceptance Test Plan**") that documents the test schedule, Acceptance Criteria (defined below), and procedure for performing the Acceptance Test. The goals of the Acceptance Test are to determine whether: (i) the AP7000 Software performs in accordance with the specifications in the Documentation, (ii) the AP7000 Software performs according to the performance criteria mutually identified by the Parties ("**Performance Criteria**"); and (ii) the AP7000 Software performs functionally in an operating business unit of TMCC (a "**Production Environment**"). Collectively, i, ii, and iii above are the "**Acceptance Criteria**".

    **5.1.1**  Unless otherwise agreed to by the Parties, ALLTEL shall install the AP7000 Software in TMCC's test environment. TMCC shall then, for a period agreed to by the Parties and defined by TMCC in the Acceptance Test Plan (the "**Acceptance Test Period**") and using the Acceptance Criteria documented in the Acceptance Test Plan, perform the Acceptance Test.

    **5.1.2**  If the AP7000 Software as delivered does not perform to the Acceptance Criteria, TMCC shall notify ALLTEL in writing (and in accordance with the Issues Management procedure set forth in Section 8.2 of the Statement of Work, dated

F 00074

June 29, 2000, to the Services Agreement) of any and all Defect(s) during the Acceptance Test. ALLTEL must correct such Defect(s) and deliver corrected AP7000 Software to TMCC, in accordance with the response times defined in the Defect Severity Code Chart in Section 7.1.1 of the Agreement. To the greatest extent possible, the Acceptance Test will proceed concurrently with ALLTEL's efforts to correct any reported Defect(s). Following ALLTEL's delivery of corrected AP7000 Software to TMCC and unless otherwise agreed to by the Parties, TMCC shall have ten (10) business days to install said corrected AP7000 Software in its test environment. If ALLTEL is unable to correct the Defect(s) within the relevant cure period defined in the Severity Code Chart in Section 7.1.1 of the Agreement, or if Defect(s) remain after the corrected AP7000 Software is tested, TMCC may reject the AP7000 Software in accordance with the terms of the Agreement, or at TMCC's discretion, report the Defect(s) again. The Acceptance Test Period will be extended by a reasonable amount of time, not to exceed the amount of time initially allotted for the Acceptance Test.

Upon TMCC's rejection of the AP7000 Software pursuant to the Agreement, TMCC shall be entitled to retain (in addition to receiving a refund from ALLTEL of all License Fees paid for the AP7000 Software) any holdback amounts as defined in the Statement of Work from the Service Fees payable to ALLTEL under the Statement of Work, dated as of June 29, 2000.

**6.0    Performance Warranty.** In addition to the performance warranty (and all other warranties) specified in the Agreement, ALLTEL warrants and represents that, for six (6) months from the Acceptance Date, in the event the AP7000 Software does not perform in accordance with the Acceptance Criteria due to a defect in the server database, ALLTEL shall (i) advise TMCC of the estimated scope of required repairs or other corrections and the estimated timeframe to complete said repairs, and (ii) only upon TMCC's written approval to proceed (to be granted within TMCC's sole discretion), correct the performance Defect by effecting any necessary repair or by replacement with an Oracle database or other similar database at no charge to TMCC; provided that TMCC shall be responsible for licensing any such replacement database. If TMCC declines to proceed with the proposed repairs, TMCC shall be entitled to the breach of warranty remedies provided in Section 10.8 of the Agreement.

**7.0    ES Services Default.** In the event that ALLTEL is unable to resolve a Defect by the date of the applicable Work Around Delivery Date ("**Deadline Date**"), no later than the close of business (Eastern Standard Time) on the Deadline Date, the Parties shall resort to the Dispute Resolution procedures in Section 22 of the Agreement, on an expedited basis of twenty-four (24) hours for each level of escalation. In the event that, after exhaustion of the foregoing dispute resolution process, the Defect remains unresolved, then, for each day or part of a day that the Defect remains unresolved beyond the applicable Deadline Date (including the period of the above dispute resolution process efforts), ALLTEL shall pay TMCC an amount equal to two times the current annualized ES Fees for the Software divided by three hundred sixty-five (365). In no event shall such penalty be applied for more than thirty (30) days after the applicable Final Resolution Deadline unless TMCC is unable, by agreement or otherwise, to obtain release of source code, in which case said penalty shall continue until TMCC is able to obtain the source code. If a Defect remains unresolved after thirty (30) days after the applicable Final Resolution Deadline, TMCC shall be entitled to release of source code pursuant to the Escrow Agreement, and to all other remedies available at law or in equity.

F 00075

**8.0    Escrow of AP7000 Software Source Code.**

    **8.1**    Items to be included in the Escrow Deposit for the AP7000 Software, to the extent available and to the extent applicable, are as follows:

- Two (2) copies of the source code for each version of the licensed AP7000 Software, including any integrated Third Party Software on optical media, in the original programming code language;

- Source code print out (on paper, microfilm or CD-ROM);

- All manuals necessary for operation (i.e. installation, operator, user);

- Maintenance tools (test programs, program specification);

- Descriptions of the system/program generation;

- Necessary non-ALLTEL proprietary software or a listing of such software if ALLTEL's rights do not allow deposit in escrow;

- Menu and support programs and subroutine libraries in source and object form;

- Compilation and execution procedures in human and machine readable form (may be supplemented with a video explanation by programming personnel); and

- A list of any encryption keys or passwords used in the materials provided.

    **8.2**    The Escrow Agent shall be FORT KNOX.

    8.3    For the AP7000 Software, there shall be attached to the Escrow Agreement for the source code an addendum adding to the definition of "Impact Event" thereunder, ALLTEL's failure to resolve any Defect beyond thirty (30) days after the applicable Final Resolution Deadline after exhaustion of the dispute resolution procedures set forth in Section 7 of this Product Schedule.

**9.0    Termination for Convenience.**  In the event TMCC elects to terminate this Product Schedule for its convenience, in addition to the sums specified in the Agreement, TMCC also shall pay to ALLTEL all service fees related to the AP7000 Software incurred up to the effective date of such termination, including those services under the Statement of Work, dated June 29, 2000, to the Services Agreement, including any holdback amounts defined thereunder, plus thirty-five percent (35%) of the remaining budgeted services fees from such date of termination through conclusion of the services as originally described in the Statement of Work had termination not occurred prior to the Acceptance Date.

**10.0    <u>Additional Specifications</u>:**  The AP7000 Software will contain those specifications set forth in any statements of work (including without limitation, the Gap Analysis as identified in a Statement of Work, dated June 29, 2000, to the Services Agreement) and through any Change Request based on the procedures defined in the Statement of Work to the Services Agreement ("Additional Specifications").

F 00076

**11.0    Indemnification Exception.**  Notwithstanding anything to the contrary in Section 10.7 of the Agreement, ALLTEL will not be liable for any infringement claims which result from use of the AP7000 Software outside of the United States, including its possessions, and Canada.

Product Manager: _____

TMCC Designated Contact Person: _____

Acceptance Test Plan Delivery Date: _____

Production Environment: _____

Delivery Date: _____

Test Site Address:

    Toyota Motor Credit Corporation

ALLTEL INFORMATION SERVICES, INC.

By: _____

Name: STEVEN R. PIERCE

Title: SUP / DIRECTOR

Date: 8/25/00

TOYOTA MOTOR CREDIT CORPORATION

By: _____

Name: George Borst

Title: Sr. Vice President & Gen. Mgr. TFS

Date: 8/28/00

PS1-7

**F 00077**

**ATTACHMENT 1 TO PRODUCT SCHEDULE A**
**INVESTMENT SUMMARY FOR TMCC**

Software License, Additional Site License and ES Services Fees. All prices are one-time perpetual license fees unless designated "annual" In which case the price represents a recurring annual fee.

| Qty. | AP7000 Software Suite | Price |
|------|------------------------|-------|
| 1 | **AP7000 Base Module** - Up to 600 Users connected to one Server Site. Additional licenses for Users beyond 600 are available at $295 per additional User. Additional licenses for Users beyond 600 who are dealers with which TMCC transacts business are available for a fee of $74 per dealer. | $ 467,855 |
| 1 | **AP7000 Document and Image Management Base Module Server License** | 4,995 |
| 1 | **AP7000 Document and Image Management Base Module User License** - Up to 600 Users connected to one Server Site. Additional licenses for Users beyond 600 are available at $295 per additional User. | 177,000 |
| 1 | **AP7000 Auto Loan Module** - Unlimited Users. | 40,000 |
| 1 | **AP7000 Auto Lease Module** - Unlimited Users. | 40,000 |
| 1 | **AP7000 Auto Business Loan Module** - Unlimited Users. | 40,000 |
| 1 | **AP7000 Validation & Discounting Module – Retail** - Unlimited Users. | 40,000 |
| 1 | **AP7000 Validation & Discounting Module – Lease** - Unlimited Users. | 40,000 |
| 1 | **AP7000 Validation & Discounting Module – Business Lease** - Unlimited Users. | 40,000 |
| 1 | **AP7000 Entry Module** - Unlimited Users. | 57,000 |
| 1 | **AP7000 Image Viewer Module** - Unlimited Users. | 15,000 |
| 1 | **AP7000 Advanced Credit Risk Manager (ACRM) Module – Unlimited Users.** | 55,000 |
| 1 | **AP7000 ACH Module** - Unlimited Users. | 5,000 |
| 1 | **AP7000 Compliance Module** - 50 states plus Puerto Rico. | 35,650 |
| 1 | **AP7000 Black Book Integration Module – Unlimited Users. Retrieval fees billed separately at $0.14 per retrieval for over 50,000 retrievals per month.** | 8,000 |
| 1 | **AP7000 Kelly Bluebook Integration Module – Unlimited Users. Monthly access fees billed separately directly by Kelly.** | 5,000 |
| 1 | **AP7000 NADA Collateral Integration Module** - Unlimited Users. Retrieval fees billed separately at published rates provided to TMCC from time to time by ALLTEL. | 5,000 |
| 1 | **AP7000 ALG Residual Value Interface** (plus $0.12 royalty fee per retrieval, payable monthly) | 8,000 |
| | **AP7000 FAX Management and Routing Module** – Unlimited Users. (The cost of RightFax software and related fax processing hardware is not included in the license fee). | 15,000 |
| 1 | **ALLTEL Consumer Credit Bureau Software** (Equifax, TRW and TU) **annual** license fee. A perpetual license is available for a one-time fee of $90,000. | 31,500 |
| 1 | **AP7000 D&B Business Bureau Software** – basic report –**annual** license fee. | 10,000 |
| 1 | **AP7000 TRW Business Bureau Software** – basic report –**annual** license fee. | 10,000 |
| | **TOTAL SOFTWARE LICENSE FEES:** | $ 1,150,000 |
| - | **ES Services** –Extended Support – **annual** fee. | $ 172,500 |

PS1 Attachment 1-1

F 00078

| Qty | AP7000 Software Suite | Price |
|---|---|---|
| - | **Additional Server Site Non-Exact Database Copies**- 20% of total Software License Fees times the number of additional server sites accessing non-Exact Database Copies. | $ 230,000/copy |
| | **Enterprise License** (the amount specified for the Enterprise License represents the total sum payable to ALLTEL for an Enterprise License taking into account any sums previously paid to ALLTEL for either a Base License and/or any Additional Non-Exact Database Copy Licenses). | $1,737,647* |

PS1-2

F 00079

## ATTACHMENT 2 TO PRODUCT SCHEDULE
## ES SERVICES

**1.0    ES Services Availability.**  ALLTEL will provide the ES Services set forth in Section 7 of the Agreement and as hereinafter described  for the AP7000 Software as outlined below.  All times are Eastern time.  The Extended Support Option below  is  exclusive from Standard Support.

Full Extended Support

**Coverage Type:**      Attended telephone support.

**Coverage Hours:**     3:00 AM to 6:00 PM Pacific Standard Time, Monday through Saturday.

**Coverage Type:**      Automatic beeper call transfer support.

**Additional Coverage Hours:**       6:01 PM to 2:59 AM Pacific Standard Time, Monday through Saturday.

**Annual Coverage Cost:**      Included in annual ES Service Fee

**2.0    Access to AP7000 Software.**  For any ES Services to be performed for the AP7000 Software at a TMCC designated location, TMCC shall provide ALLTEL full access to TMCC's computer systems, subject to TMCC's security regulations in order to provide the ES Services. and under conditions which will not obstruct ALLTEL's ability to provide such services.

**ATTACHMENT 3 TO PRODUCT SCHEDULE**
**THIRD PARTY SOFTWARE**
**(Section 2.0)**

**Carlton Calculator Generator and Compliance Module for retail auto loans**

F 00081

**ATTACHMENT 4 TO PRODUCT SCHEDULE
CONFIGURATION GUIDE**

**SEE ATTACHED**

F 00082

Objects with dashed outlines represent
expansions to production system.

**HARDWARE DESCRIPTION**

**4-way Servers** - 700+ MHz Pentium III
Xeon Quad processor, Profusion
chipset, ECC, 3GB RAM, 20GB Disk,
Windows NT Server

**Application Servers** - Terminal Server
and MetaFrame software in addition to
components described for other 4-way
servers.

**8-way Servers** - 700+ MHz Pentium III
Xeon 8-way processor, Profusion
chipset, ECC, 2MB Level 2 Cache with
Accelerator (each processor), 4GB
RAM, 200GB 3 Channel RAID 5 Disk
Array, Windows NT Server, SQL
Server 7.0+

**Workstations** - WIN95 compatible PCs

Fax Lines — Fax Server A (4-way) ← *Automatic Failover of Comm. and Network Resources* → Fax Server B (4-way) — Fax Lines

Credit Bureaus — Bureau Server A (4-way) ← *Automatic Failover of Comm. and Network Resources* → Bureau Server B (4-way) — Credit Bureaus

External Data Sources — Spectrum Server A (4-way) ← *Automatic Failover of Comm. and Network Resources* → Spectrum Server B (4-way) — External Data Sources

ACRM Library A — Decision Server A (4-way) ← *Automatic Failover of Data and Network Resources* → Decision Server B (4-way) — ACRM Library B

Image Data A — Image Server A (4-way) ← *Automatic Failover of Data and Network Resources* → Image Server B (4-way) — Image Data B

Database A — Database Server A (8-way) ← *Automatic Failover of Data and Network Resources* → Database Server B (8-way) — Database B

Application Server A1 (4-way), Application Server A2 (4-way), Application Server A3 (4-way), Application Server B1 (4-way), Application Server B2 (4-way), Application Server B3 (4-way)

Centralized Application Entry Workstations — LAN

MetaFrame Load Balancing and Distribution Layer

WAN

Branch 1 Workstations, Branch 2 Workstations, Branch 3 Workstations, Branch 4 Workstations, Branch 5 Workstations, Branch 6 Workstations, Branch 7 Workstations, Branch 8 Workstations, Branch 9 Workstations, Branch 10 Workstations, Branch 11 Workstations, Branch N Workstations

F 00083

PS1 Attachment 4-2

**HARDWARE DESCRIPTION**

**4-way Servers** - 700+ MHz Pentium III Xeon Quad processor, Profusion chipset, ECC, 3GB RAM, 20GB Disk, NT Server for application volumes of less than 120,000 per month, Windows 2000 Server for application volumes of 120,000 per month or higher.

**Application Servers** - Terminal Server and MetaFrame software in addition to components described for other 4-way servers.

**8-way Servers** - 700+ MHz Pentium III Xeon 8-way processor, Profusion chipset, ECC, 2MB Level 2 Cache with Accelerator (each processor), 4GB RAM, 200GB 3 Channel RAID 5 Disk Array, SQL Server 7.0+, NT Server for application volumes of less than 120,000 per month, Windows 2000 Server for application volumes of 120,000 per month or higher.

**Workstations** - WIN95 compatible PCs

F 00084

**ATTACHMENT 5 TO PRODUCT SCHEDULE**

**[INTENTIONALLY DELETED]**

**F 00085**

EXHIBIT 4

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

DISASTER RECOVERY
FILE ROOM PROJECT
DATE COPIED _7/26/06_

<div align="center">

**SECOND AMENDMENT
TO
IMPLEMENTATION STATEMENT OF WORK**

</div>

This **SECOND AMENDMENT TO IMPLEMENTATION STATEMENT OF WORK** ("Second Amendment"), is made and entered into by and between **TOYOTA MOTOR CREDIT CORPORATION** ("TMCC") and **ALLTEL INFORMATION SERVICES, INC.** ("ALLTEL"), effective as of the _1ST_ day of March, 2002 (the "Second Amendment Effective Date"), and amends and supplements that certain Implementation Statement of Work dated as of April 10, 2000 (the "Implementation Statement of Work"), to that certain Services Agreement, Agreement Number 2000AIS001, dated as of February 7, 2000, as amended (the "Agreement"), by and between TMCC and ALLTEL.

**WHEREAS,** TMCC and ALLTEL desire to make certain changes to the Implementation Statement of Work on the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.  All references in the Implementation Statement of Work to "AP7000" shall be deemed to refer to "ALS-COM."

2.  Section 2.0 of the Implementation Statement of Work shall be amended and restated in its entirety as follows:

    "**2.0    Term**

    "The services described in this Statement of Work will commence on April 10, 2000 ("Commencement Date"), and unless otherwise terminated or extended, will terminate on or about December 31, 2004, as indicated in the version of the Project Plan as of the Second Amendment Effective Date.

    **2.1    Termination for Convenience**

    "Notwithstanding the provisions of Section 12.0 of the Agreement, TMCC may terminate for its convenience this Statement of Work, upon written notice to ALLTEL. TMCC may terminate this Statement of Work as a result of TMCC's rejection of Phased Delivery Software or the ALS-COM Software pursuant to Product Schedule No. 1, as amended, to the Master Software License Agreement between TMCC and ALLTEL dated August 25, 2000, as amended, and such termination shall not constitute a termination of this Statement of Work for convenience. Effective upon ALLTEL's receipt of TMCC's notice to terminate for convenience, ALLTEL shall cease performing any services hereunder except as TMCC may request pursuant to this Section 2.1. TMCC shall pay to ALLTEL within thirty (30) days of termination for convenience an amount equal to the Hourly Rate (as defined in Section 9.1.7), multiplied by the number of hours of work projected to be performed by ALLTEL personnel according to the then-current Master Plan during the ninety (90) day period commencing with the notice of termination, but excluding any hours

<div align="center">

Page 1

</div>

projected to be performed during such period relating to those Gap Requirements to be implemented at no cost to TMCC pursuant to Section 3.2.1 (the "Termination Payment"). Following such termination for convenience, ALLTEL shall use reasonable efforts to re-deploy the affected personnel. In the event that ALLTEL is able to re-deploy any affected personnel during such ninety (90) day period, ALLTEL shall refund to TMCC any pro-rata amounts paid for such re-deployed personnel for the period after re-deployment; and if such redeployment occurs prior to the due date for the Termination Payment, such redeployment shall be taken into account in calculating the Termination Payment. TMCC may request ALLTEL to provide services during the ninety (90) day period after termination for convenience. If such services are Initial Scope Services (as defined in Section 9.1.1), ALLTEL will provide such services at the Hourly Rate. If such services are New Services (as defined in Section 9.1.2), ALLTEL will provide such services at ALLTEL's then current time and materials rates. TMCC's election to terminate this Statement of Work for convenience shall bar TMCC from bringing any subsequent claims for breach by ALLTEL of any terms of the Agreement related to this Statement of Work (i) unless TMCC discovers the breach after giving notice to ALLTEL to terminate this Statement of Work for convenience, or (ii) unless, at the time of giving notice of the termination of this Statement of Work for convenience, TMCC notifies ALLTEL of facts or circumstances which TMCC believes may constitute a breach by ALLTEL and of TMCC's preservation of its rights to make a claim for breach in respect of such facts or circumstances; provided, however, that the exception provided by in the foregoing clause (ii) shall not be applicable unless TMCC shall have notified ALLTEL of such facts and/or circumstances a reasonable time (but not more than thirty days) prior to TMCC giving notice of termination, which advance notice shall be for the purpose of giving ALLTEL an opportunity to address performance issues relative to such facts or circumstances. Nothing in the previous sentence shall limit TMCC's right to terminate this Statement of Work for convenience."

3. Section 3.0 of the Implementation Statement of Work (Project Summary) is hereby amended by adding the following at the end of the first paragraph:

"The parties acknowledge that the work estimate for the deliverables under this Statement of Work is set forth on a gap-by-gap basis in Appendix E (the "Gap Matrix") and on an activity basis in Appendix M (the "Key Activity Summary List"); and provides that the work hereunder be performed in three phases (each, a "Phase"), with deliverables to be delivered primarily upon the completion of each such Phase (the "First, Second and Third Phase Delivery"). In the event ALLTEL determines that the work estimate required for the correction of any such gap or for the completion of any such activity will be exceeded, ALLTEL will invoke the change control process provided for in Section 8.3 (the "Change Control Process") to obtain authorization from TMCC prior to ALLTEL proceeding with the work effort for that gap or activity; provided, however, that ALLTEL need not invoke the Change Control Process with respect to any gap or activity unless ALLTEL's revised estimate of the total number of hours required to correct the gap or perform the activity is either (i) more than 25% greater than or (ii) more than 100 hours higher than the original number of hours for that gap or activity as set forth on Appendix E or M."

The Implementation Statement of Work is hereby amended to add an Appendix M thereto, in the form of Attachment 16 hereto, entitled "Key Activity Summary List."

4. Section 3.1 of the Implementation Statement of Work (Project Preparation) is hereby amended by adding the following new paragraph:

2

F 00316

"A responsibility assignment matrix ("Responsibility Assignment Matrix"), in the form of Appendix K attached hereto, will be utilized to identify each of the deliverables of each Phase and the parties associated with each deliverable and their respective responsibilities and rights to accept or reject the deliverable.  At the commencement of each subsequent Phase of the Project, new documents will be prepared, including a detailed work breakdown structure of tasks to be performed in that Phase, with a responsible party identified for each task, and updated project management documents, including the Project Schedule in Niku, Master Plan (as defined in Section 5.3), Detailed Project Plan (as defined in Section 5.3), Project Charter, Quality Plan, Risk Management Plan and Communication Plan.  Unless the Responsibility Assignment Matrix for such subsequent Phase provides otherwise, the responsibility for preparation and acceptance of each such deliverable shall be as provided on the Responsibility Assignment Matrix for the first Phase."

The Implementation Statement of Work is hereby amended to add an Appendix K thereto, in the form of Attachment 13 hereto, entitled "Responsibility Assignment Matrix."

5.  Section 3.2 of the Implementation Statement of Work (Development) (but not subsections 3.2.1 through 3.2.4) is deleted in its entirety and replaced as follows:

**3.2    Development**

"The Project Development will consist of the work required to meet the Customization/Enhancement Gap Requirements, Standard Installation Tasks, Installation Customization, and Interface requirements identified in the Gap Matrix and the Key Activity Summary List.  Such development services will follow a cycle of requirement definition and sign-off, design, architectural impact, programming, documentation, and quality assurance testing.  The architectural design of ALS-COM including Gap Requirement customizations will comply with the Production Hardware Configuration Guide attached hereto as Appendix L.  In the event ALLTEL changes the architecture of ALS-COM, ALLTEL agrees to provide six months prior written notice to TMCC.  Such notice will include any impact expected on TMCC's architecture and production standards.  This effort also consists of ALLTEL's delivery of certain identified planned product enhancements that are to be in place prior to the implementation of ALS-COM and the required feature functionality and interfaces revealed during the Gap Analysis."

The Implementation Statement of Work is hereby amended to add an Appendix L thereto, in the form of Attachment 15 hereto, entitled "Production Hardware Deployment Guide."

6.  Section 3.2.1 of the Implementation Statement of Work (Customization/Enhancement Gap Requirements) is hereby amended to add the following:

"The following Gap Requirements as defined at the conclusion of the Requirements Definition Assessment Stage (described in Amendment One to the Implementation Statement of Work, dated as of July 1, 2001) are to be implemented in ALS-COM by ALLTEL at no cost to TMCC and are to be delivered according to the Master Plan and Detailed Project Plan.  Notwithstanding the foregoing, the following Gap Requirements are subject to the Change Management provisions set forth in Section 8.3 of this Implementation Statement of Work:

    1)  ACRM (gaps 107, 113,114, 145, 147, 150, 151, 153, 155, 158, 159, 160, 161, 177)
    2)  Mega-dealers (gaps 43 and 44)

3

   3) Business deals (gaps 77 and 78)"

7. (a)  Section 3.3.1 of the Implementation Statement of Work (Test Phase) is hereby deleted in its entirety and replaced as follows:

**"3.3.1 Test Phase**

"The Test Phase includes the environmental test performed by the ALLTEL Project Team and the integration/system test performed by the TMCC Project Team."

  (b)  The last sentence of Section 3.3.2 of the Implementation Statement of Work is deleted.

8. Sections 5.1 and 5.2 of the Implementation Statement of Work are hereby amended and restated in their entirety as set forth on Attachment 12 to this Second Amendment, except that the following provisions are added to the paragraph under the title "Scope Assumptions" in Section 5.2:

"The parties acknowledge that the scope assumptions for this project are described in this Section 5.2. In the event that either party becomes aware that an assumption is not valid, both parties agree to use the escalation process as set forth in section 8.2 (the "Escalation Process"). If either party becomes aware of an assumption that is not met and fails to follow the Escalation Process, the assumption not met may not be relied upon as a reason for non-performance."

9. The first paragraph of Section 5.3 of the Implementation Statement of Work (Development and Implementation Approach) is hereby amended and restated in its entirety as follows:

"ALLTEL will develop, maintain and update a detailed project plan (the "Detailed Project Plan") for ALLTEL activities in TMCC's then current project management tool based on utilizing mutually agreed upon milestones and dependencies. The Detailed Project Plan will be reviewed by the ALLTEL and TMCC Project Managers at the start of each Phase, and will be updated by ALLTEL throughout the Phase to reflect the progression of work and changes in the Project. The Detailed Project Plan will include a breakdown of the work under this Statement of Work sufficiently detailed to facilitate effective project tracking, separate identification and tracking of contingency hours, separate identification and tracking of change request hours, the number of hours already expended by ALLTEL in the performance of any task for which the Gap Matrix or the Key Activity Summary List sets forth an estimate of the total number of hours required, ALLTEL's then-current best estimate of the remaining number of hours required for ALLTEL to complete each such task, and the additional information provided for below with respect to "Milestone Tasks". ALLTEL will provide the Detailed Project Plan to TMCC electronically, and in a manner that will allow TMCC to incorporate information from the Detailed Project Plan into TMCC's master plan (the "Master Plan") through an automated process. TMCC will provide ALLTEL with sufficient access to project management software tools to allow ALLTEL to deliver the Detailed Project Plan electronically and in such manner. ALLTEL will update the Detailed Project Plan weekly. ALLTEL will include in the Detailed Project Plan sufficient detail, so that when information from the Detailed Project Plan is incorporated into the Master Plan, the Master Plan will contain the information necessary to permit TMCC to determine, upon each presentation of an invoice by ALLTEL, whether the amount of such invoice was determined in accordance with Section 9.1 hereof and whether the work performed covered by such invoice is in accordance with the Detailed Project Plan and the Master Plan. The ALLTEL Project Manager will be responsible

4

F 00318

for managing the ALLTEL tasks as described in the Detailed Project Plan. The Master Plan will be used, among other uses, for project management reporting."

10. Section 5.3 of the Implementation Statement of Work (Development and Implementation Approach) is hereby amended by replacing the remainder of Section 5.3 after the second paragraph (but not Sections 5.3.1 through 5.3.3) with the following:

"The implementation of ALS-COM (in Phases and in totality), will be described in the Detailed Project Plan and the Master Plan. The Master Plan will include the mutually pre-determined content and delivery date of ALS-COM, the content and delivery date of each Phase Delivery of ALS-COM, the date for completion of each of the other tasks identified on Appendix G ("Oscar Relaunch Timeline"), and detail with respect to the content of each such other task identified on Appendix G. The Phased Deliveries, the delivery of ALS-COM and each task identified on Appendix G are referred to herein as the "Milestone Tasks" (each, a "Milestone Task"). ALLTEL will prepare, maintain and update the Detailed Project Plan with sufficient information as to the progress made on each separate task so as to permit TMCC to assess ALLTEL's progress on completing each of the Milestone Tasks and whether or not each Milestone Task will be completed or delivered on or prior to its respective completion or delivery date. If ALLTEL determines that any such Milestone Task will not be completed or delivered on or prior to its respective completion or delivery date, ALLTEL will initiate the Change Control Process to seek to modify such completion or delivery date. If ALLTEL and TMCC do not reach agreement as to any such modified completion or delivery dates through application of the Change Control Process, the issue shall be addressed in accordance with the Escalation Process. Notwithstanding anything to the contrary in the Change Control Process or the Escalation Process, the modification of a completion or delivery date for a Milestone Task through the Change Control Process or the Escalation Process shall require TMCC's and ALLTEL's approval. ALLTEL will complete or deliver each Milestone Task on or before the Milestone Task's respective completion or delivery date, unless (and solely to the extent that) the non-completion or non-delivery is attributable to (a) TMCC's non-completion on a timely basis of tasks identified in the Master Plan to be undertaken by TMCC, or (b) a scope assumption contained in Section 5.2 not being met by reason of TMCC's failure to undertake an activity or satisfy a requirement that is provided in the scope assumption to be undertaken or satisfied by TMCC; and the adverse effect of such non-completion of tasks by TMCC, or such scope assumption not being met, on the delivery or completion of the respective Milestone Task by ALLTEL could not have been avoided through reasonable mitigation by ALLTEL. If either of subsections (a) or (b) are applicable, and ALLTEL and TMCC do not reach an agreement with respect to setting a new completion or delivery date for a Milestone Task, such delivery or completion date shall be extended to the extent reasonably necessitated by such non-completion of tasks by TMCC or such scope assumption not being met, assuming reasonable mitigation by ALLTEL.

"The testing and acceptance of the ALS-COM Software and of each Phased Delivery Software will be conducted according to the terms of that certain Master Software License Agreement, between the parties, dated August 25, 2000, as amended (the Software License Agreement"), and the additional provisions applicable to the testing and acceptance of the ALS-COM and the Phased Delivery Software contained in Product Schedule No. 1, as amended (the "Product Schedule"), to the Software License Agreement. Certain consequences of rejection of a Phased Delivery Software or of the ALS-COM Software are set forth in Section 5.3 of the Product Schedule."

F 00319

11. Section 5.3.2 of the Implementation Statement of Work (QA and Testing Methodology) is deleted in its entirety and replaced as follows:

**"5.3.2  QA and Testing Methodology**

"The following steps will be followed by ALLTEL internally to meet quality standards.

- Each standard and patch release will be tested at the ALLTEL Site for stability, and completeness, and performance against the latest benchmark.

- After testing is completed, the release will be installed at the TMCC Site and re-tested by ALLTEL QA for stability, and completeness, and performance against the latest benchmark. ALLTEL will turn the testing over to the TMCC Project Team for integration/system test and user acceptance testing."

12. Section 5.3.3 Item 3 of the Implementation Statement of Work is amended by adding at the end of Item 3 a new sentence as follows:

"Training material and training guides will be defined and produced by ALLTEL and TMCC will have the right to copy such materials or guides for TMCC's internal purpose. ALLTEL shall provide an electronic copy of all training material and training guides."

13. Section 6.0 of the Implementation Statement of Work (Risk Assessment) is replaced in its entirety with Attachment 3 "Risk Management" to this Second Amendment.

14. Sections 7.0, 7.1, and 7.2 of the Implementation Statement of Work are replaced in their entirety with Attachment 4 "Project Organization" to this Second Amendment.

15. Section 8.1 of the Implementation Statement of Work is deleted in its entirety and replaced with the following:

"The general schedule for the performance of Services under this Statement of Work from and after the Second Amendment Effective Date is contained on Appendix G to this Statement of Work."

The Implementation Statement of Work is hereby amended to add an Appendix G thereto, in the form of Attachment 2 hereto, entitled "OSCAR Relaunch Timeline."

16. Section 8.2 of the Implementation Statement of Work (Issue Management) is amended and restated in its entirety as set forth on Attachment 5 "Escalation Process" to this Second Amendment.

17. Section 8.0 of the Implementation Statement of Work (Project Management Approach) is amended by replacing subsection 8.3 in its entirety with Attachment 6 "Change Control Process" to this Second Amendment.

18. Section 8.4 of the Implementation Statement of Work (Approvals and Acceptance) is hereby deleted in its entirety and replaced as follows:

6

F 00320

**"8.4    Approvals and Acceptance**

"This Section 8.4 is applicable only to deliverables other than those which are software or similar deliverables susceptible to testing in a computer environment. The Responsibility Assignment Matrix shall set forth, among other information for each deliverable, the party responsible for the preparation of the deliverable (the "Preparer"), the party responsible for reviewing the deliverable (the "Reviewer"), and the length of time (if other than ten days) the Reviewer has to review the deliverable following the Preparer's delivery thereof. The parties acknowledge that unless as may otherwise be mutually agreed to in writing, a deliverable outline (a sample of which is contained in Appendix H), must be completed by the Preparer and approved by the Reviewer prior to the Preparer beginning work on a project deliverable. The deliverable outline will be in accord with the description of the deliverable contained in the List of Deliverables, and shall provide additional detail as to the content of the deliverable and any applicable additional acceptance criteria for the deliverable. The Preparer will prepare the deliverable in accordance with the deliverable outline. Once a deliverable is completed, a deliverable sign-off procedure will be followed as described in Appendix H; provided, however, that Reviewer shall have the right to accept or reject each deliverable based upon the conformity of the deliverable to the deliverable outline. The Reviewer will notify the Preparer of the acceptance or rejection of the deliverable within ten days after receipt of the deliverable or such other period as may be set forth in the deliverable outline. If the deliverable is rejected, the Preparer will revise the deliverable at its own expense so that it conforms to the deliverable outline, and will deliver the revised deliverable to the Reviewer promptly, but not later than ten days after rejection, or within such other time period as may be set forth in the deliverable outline or as the parties may otherwise agree. The parties shall attempt to resolve any ongoing dispute as to whether a deliverable conforms to the deliverable outline through the Escalation Process and, if unsuccessful, through the Dispute Resolution Process. In the event of such a dispute relating to a deliverable prepared by ALLTEL, TMCC may delay payment for such deliverable through the pendency of the Escalation Process and, if the dispute is not resolved through the Escalation Process, TMCC will commence the payment of one-half of such amounts pending the final outcome of the dispute, at which time either ALLTEL shall reimburse the amount or amounts paid by TMCC or TMCC shall pay the additional amount required, as required in light of the resolution of the dispute."

The Implementation Statement of Work is hereby amended to add an Appendix H thereto, in the form of Attachment 7 hereto, entitled "Deliverable Sign Off Procedure."

19. Section 8.5 of the Implementation Statement of Work (Status Reporting) is hereby deleted in its entirety and replaced as follows:

**"8.5    Status Reporting**

- The ALLTEL Project Manager will provide the TMCC Project Manager a weekly written status report of the activities provided for by this Statement of Work in a format provided by TMCC.
- Project meetings will be scheduled on a weekly basis to review the Project tasks, to be attended by the ALLTEL and TMCC Project Managers and their invitees. Meeting notes will be distributed to the ALLTEL and TMCC Project Managers after each meeting in order to document the main proceedings and action items. In addition, the ALLTEL Project Manager will provide an oral status update report in the weekly Project meetings.

F 00321

- Time reporting will be accomplished through the Time Reporting Process described in Appendix I (attached hereto)."

The Implementation Statement of Work hereby is amended to add an Appendix I thereto, in the form of Attachment 8 hereto, entitled "Time Reporting Process."

20. Section 8.0 of the Implementation Statement of Work is hereby amended by adding the following new subsection:

**"8.6    Project Issue Avoidance**

"During the term of the Project, the parties' Project Managers will each specify in a weekly written status report any problem or circumstance ("Project Issue") encountered by the respective party, or of which the party gained knowledge during the prior two (2) week period (including without limitation the failure of the other party to perform, any delay of performing, or inadequacy in the performance by the other party of any of its respective obligations) that prevented or could prevent either party from completing any Project task by the applicable task completion date or which may increase the scope of the task and increase either party's estimated cost to complete such task."

21. Section 9.1 shall be deleted in its entirety and replaced as follows.

**"9.1    Price**

**"9.1.1    Fixed Fee Amount.** ALLTEL will complete the services provided for in this Statement of Work (including appendices), as amended from time to time, the Business Requirements Definition Binder dated as of February 13, 2002, and the detailed requirements definitions/functional specifications as they are developed and approved from time to time, but only to the extent such detailed requirements and specifications are more detailed elaborations of the "mid-level" requirements contained in the above-referenced Binder and compatible with such "mid-level" requirements (collectively, the "Initial Scope Services"), for a fee for services performed from and after the Second Amendment Effective Date equal to an amount (the "Fixed Fee") determined in accordance with this Section 9.1, plus travel and living expenses reimbursable by TMCC in accordance with Section 9.2 below. The initial amount of the Fixed Fee is $4,383,596.66, and the Fixed Fee is subject to adjustment pursuant to subsections 9.1.3 and 9.1.4 below. In addition to the Fixed Fee, a contingency for New Services, as defined below, is established in the amount of 5,899 hours (the "Change Control Contingency"), which corresponds to $333,170 at the initial amount of the Hourly Rate.

**"9.1.2    Change Requests for Scope Changes.** From time to time TMCC may request ALLTEL to perform services other than Initial Scope Services ("New Services"), through the Change Control Process. Through the Change Control Process, the Master Plan may be modified to establish a schedule for performance and budgeted numbers of hours and/or dollar amounts for such New Services. New Services shall be treated as services under this Statement of Work. TMCC will pay for New Services on a time and materials basis, with the hourly rate determined as follows:

"(a)    New Services will be charged at the Hourly Rate per hour of New Services performed, until the total number of hours of New Services performed equals or exceeds the Change Control Contingency of 5,899 hours.

F 00322

"(b)    From and after the exhaustion of the Change Control Contingency, any additional New Services shall be billed to TMCC on a time and materials basis, using ALLTEL's standard personnel billing rates then in effect.

"The amount of New Services requested shall have no effect on the Fixed Fee for the Initial Scope Services.

"**9.1.3    Increased Fees.** If ALLTEL submits a Change Request to TMCC in accordance with Section 3.0 following ALLTEL's determination that the completion of a particular task will exceed the work estimate for that task, and such circumstance is attributable to (a) TMCC's non-completion on a timely basis of tasks identified in the Master Plan to be undertaken by TMCC, or (b) a scope assumption contained in Section 5.2 not being met by reason of TMCC's failure to undertake an activity or satisfy a requirement that is provided in the scope assumption to be undertaken or satisfied by TMCC; and the adverse effect of such non-completion of tasks by TMCC, or such scope assumption not being met, on the number of hours required by ALLTEL to complete the task could not have been avoided through reasonable mitigation by ALLTEL, then ALLTEL may submit a Change Request to TMCC to seek an increase in the fee for that task and a corresponding and equal increase to the Fixed Fee, based on the Hourly Rate multiplied by the incremental hours required. Notwithstanding the foregoing, the fee for the task and the Fixed Fee will not be increased unless and until the 10% work hour contingency provided for in Appendices E and M is exhausted in the aggregate. Any issue as to whether the fee for a task and the Fixed Fee shall be increased will be addressed through the Escalation Process and, if unresolved, through the dispute resolution process provided for in Section 15.7 of the Services Agreement.

"**9.1.4    Annual Escalation.** The unutilized portion of the Fixed Fee shall be increased by three percent (3%) on an annual basis commencing as of January 1, 2003 and annually thereafter during the term of this Statement of Work. For this purpose, the "unutilized" portion of the Fixed Fee as of a date shall be calculated by deducting from the Fixed Fee all amounts billed for Initial Scope Services performed through that date (including amounts billed after that date for such services), including amounts allocated to the holdbacks provided for in Section 9.3 below.

"**9.1.5    Invoicing.** ALLTEL shall invoice TMCC on a monthly basis for Initial Scope Services against the Fixed Fee. The amount of each invoice shall be the sum of the amounts due for the tasks and activities undertaken in the month. The parties shall agree in writing as to the method of invoicing for each task or activity provided for under this Statement of Work. For tasks which the Detailed Project Plan and/or Master Plan provides to be performed over a period of time according to a schedule of hours (rather than on a equal monthly basis or on a one-time basis), exclusive of tasks relating to the Gap Requirements to be implemented at no cost to TMCC pursuant to Section 3.2.1, the applicable method generally will be as described as follows:

"The amount due for that task for a month shall be that amount which, when combined with amounts previously invoiced for that task, is the same percentage of the total amount payable for the completed task (as determined below), as the percentage of the task completed as of the end of that month, which is calculated by dividing (i) the number of hours already performed for that task by (ii) the number of hours already performed for that task plus ALLTEL's then-current estimate of the additional number of hours required to complete the task. The total amount payable for the completed task shall be the Hourly Rate in effect for the period during which the task is scheduled to be performed, multiplied by the number of hours in the initial work estimate for that task. For a task to be performed over two periods, the hours in the initial work estimate for the task shall be assigned to the two periods and the

<div align="center">9</div>

Hourly Rate in effect for a period shall apply to the calculation of the amount due for services performed in that period.

"Each monthly invoice shall include fees for any New Services performed during the month; provided, that if the Master Plan had been modified to establish a schedule for performance and budgeted numbers of hours and/or dollar amounts for such New Services, ALLTEL will not invoice TMCC for hours or amount in excess of the hours or amounts provided for in the then-current Master Plan. In addition, ALLTEL shall include in such monthly invoice travel and living expenses not previously invoiced and reimbursable pursuant to Section 9.2.

"Each monthly invoice will detail the hours expended by each person engaged in providing services for the preceding month, the work performed by each person, the billing category and rate for each person (for New Services), the dollar amount for each person, and the totals for all persons. The invoice shall reflect any applicable holdbacks provided for in Section 9.3 below. Any issue as to whether an invoice is accurate and satisfies the requirements of this Section 9.0 shall be addressed through the Escalation Process and, if unresolved, through the dispute resolution process provided for in Section 15.7 of the Services Agreement.

"**9.1.6    Completion of Initial Scope Services.**  Notwithstanding any other provision of this Section 9, if the cumulative amount TMCC has paid or allocated to holdbacks for the Initial Scope Services performed after the Second Amendment Effective Date equals or exceeds the Fixed Fee, but ALLTEL has not yet completed the Initial Scope Services, ALLTEL will complete the Initial Scope Services at its own expense.

"**9.1.7    "Hourly Rate" Definition.**  As used in this Statement of Work, the phrase "Hourly Rate" refers to an hourly amount, initially equal to $63.41 per hour, which amount shall be increased by three percent (3%) on January 1, 2003 and by three percent (3%) annually thereafter during the term of this Statement of Work."

Set forth on Attachment 18 to this Second Amendment is a high-level list that identifies the invoicing method for certain categories of Project tasks.

22. The parties agree that ALLTEL's standard personnel billing rates as of the Second Amendment Effective Date are as set forth in Attachment 17 to this Second Amendment.

23. Section 9.2 of the Implementation Statement of Work (Travel and Living Expenses) is hereby deleted in its entirety and replaced as follows:

"**9.2    Travel and Living Expenses**

"In addition to other amounts provided to be paid hereunder, TMCC agrees that it will reimburse ALLTEL for any and all business expenses incurred in the provision of services hereunder provided that such expenses are in accordance with TMCC's travel policy, a copy of which is attached hereto as Appendix J.    Expenses incurred in traveling on TMCC's behalf will be at ALLTEL's actual cost.  Total expenses for travel and living to be incurred after the Second Amendment Effective Date are estimated to be $400,000.00.

"ALLTEL will provide a monthly report detailing actual travel and expenses incurred to the TMCC Project Manager along with a forecast for the next months' expenses.

F 00324

ALLTEL will include within the monthly report a trend analysis of actual expenses versus original estimated expenses highlighting when expenses reach approximately 25%, 50% and 75% of the estimate for expenses for a given task or phase allowing TMCC to assess and adjust the ALLTEL travel and expense budget. ALLTEL will be responsible for any expenses that exceed the estimates without prior approval from the TMCC Project Manager."

The Implementation Statement of Work is hereby amended to add an Appendix J thereto, in the form of Attachment 9 hereto, entitled "Travel Policy."

24. Section 9.3 shall be deleted in its entirety and replaced as set forth below. In addition, the parties acknowledge and agree that, pursuant to the First Amendment to the Statement of Work dated July 1, 2001, a "Future Fees Credit" was established in the amount of $700,000; and that as of the Second Amendment Effective Date the remaining amount of such Future Fees Credit is $134,942.96. Accordingly, TMCC may apply such amount to any invoices for Initial Scope Services received from ALLTEL until such amount is exhausted.

**"9.3      Payment Terms; Holdbacks**

"TMCC will make monthly payments to ALLTEL as set forth in the Services Agreement for the services provided under this Statement of Work based on invoices meeting the requirements of Section 9.1, holding back from each payment a sum equal to the amounts defined below until the date specified below. The parties acknowledge that as of the Second Amendment Effective Date, a holdback amount has accrued from the Effective Date of this Statement of Work through the Second Amendment Effective Date in the amount of $966,719.40 (the "Original Holdback"). Other holdback funds will be accrued and paid independent of the Original Holdback as set forth below (subject to Section 5.3 of the Product Schedule in the event of TMCC's rejection of Phased Delivery Software or the ALS-COM Software). For such purpose, each service (including any New Service) provided by ALLTEL following the Second Amendment Effective Date shall be allocated to the First, Second or Third Phase Delivery.

- 30% of the labor invoiced for services provided from and after the Second Amendment Effective Date relating to the First Phase Delivery (to be payable within thirty (30) days of acceptance of the First Phase Delivery);
- 20% of the labor invoiced for services provided from and after the Second Amendment Effective Date relating to the Second Phase Delivery (to be payable within thirty (30) days of acceptance of Second Phase Delivery);
- 0% of the labor invoiced for services provided from and after the Second Amendment Effective Date relating to the Third Phase Delivery.
- The Original Holdback will be paid upon Final Acceptance of the ALS-COM Software."

25. Appendix C of the Implementation Statement of Work "Tools for Deliverable Development / Maintenance" is replaced in its entirety with a new Appendix C attached to this Second Amendment as Attachment 1.

26. Appendix D of the Implementation Statement of Work "List of Deliverables" is replaced in its entirety with a new Appendix D attached to this Second Amendment as Attachment 14.

11                           F 00325

27. Appendix E of the Implementation Statement of Work is hereby amended and restated in its entirety as set forth on Attachment 10 to this Second Amendment.

28. Appendix F of the Implementation Statement of Work, "AP7000 Standard Reports Index", is hereby amended and restated in its entirety as set forth on Attachment 11 to this Second Amendment and is retitled "ALS COM Standard Reports List."

29. The parties acknowledge and agree that Appendix A of the Implementation Statement of Work, "Gap Analysis Reference", and Appendix B of the Implementation Statement of Work, "Preliminary Project Plan", are inapplicable to Services performed from and after the Second Amendment Effective Date.

30. All capitalized terms in this Second Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

31. All terms and conditions of the Implementation Statement of Work not amended by this Second Amendment remain in full force and effect.  This Second Amendment constitutes the entire agreement between TMCC and ALLTEL relating to the subject matter hereof.

32. Except as herein expressly amended, the Implementation Statement of Work is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its terms.

33. This Second Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

34. This Second Amendment shall be governed by and shall be construed in accordance with the laws of State of California.

**IN WITNESS WHEREOF,** the parties have executed this Second Amendment as of the Second Amendment Effective Date by their duly authorized representatives.

| **ALLTEL INFORMATION SERVICES, INC.** | **TOYOTA MOTOR CREDIT CORPORATION** |
|---|---|
| By: | By: |
| Name: _CLIFF THOMPSON_ | Name: Shaun Coyne |
| Title: _SUP AUTO FINANCE_ | Title: Vice President & CIO |
| Date: _March 4, 2002_ | Date: March 5, 2002 |

12

**F 00326**



OSCAR
Online System for Contract
Acquisition & Reporting

# Attachment Fifteen

# Appendix L

# Production Hardware Deployment Guide

10/26/2001
Version 0.2

 **Production Hardware Deployment Guide**

### Revision History

| Version | Date | Author(s) | Revision Notes |
|---------|------|-----------|----------------|
| 0.1 | 10/26/2001 | Terry Troisi | First Draft |
| 0.2 | 11/1/01 | Terry Troisi | Modified per input from Toyota and with additional information from the lLab Database Performance Test. |
| | | | |
| | | | |
| | | | |

F 00405



**Production Hardware Deployment Guide**

## Table of Contents

**1    SCOPE OF THE DOCUMENT** ....................................................................... 1

ALS COM Components ............................................................................................. 1

Hardware / Software Configurations ...................................................................... 2

Component Availability ............................................................................................ 5

Upgrade Matrix ........................................................................................................ 6

Network Diagram ..................................................................................................... 7



**Production Hardware Deployment Guide**

<u>Scope of the Document</u>

This document outlines the production hardware and software recommended requirements to deploy ALS COM. This recommendation has been made through the results of the Performance Testing activities occurring within the Assessment Phase and in conjunction with the results of the Non Functional Requirements signed off by the OSCAR PM team.

## ALS COM Components

The following ALS COM components will be referenced throughout this document:

| Component | Function |
|-----------|----------|
| Database Server | Houses the ALS COM and related SQL databases |
| Bureau Server | Provides connectivity to credit reporting agencies |
| Image Server | Stores image data |
| WorkFlow Server | Provides workflow functionality for the BridgeWare Server |
| BridgeWare Server | Provides interface connectivity between ALS COM and external components |
| Fax Server | Receives faxed applications and sends outbound faxes |
| Terminal Server | Runs the ALS COM Client |
| Workstation | Runs the Microsoft Terminal Server client software |

F 00407



**Production Hardware Deployment Guide**

## Hardware / Software Configurations

The following are the minimum hardware and software requirements required to deploy ALS COM at the following usage levels:

- Concurrent Users: 1000
- Application Rate: 1776 per hour
- Database Size: 1,087,800 applications
- Contract Percentage: 80%

| Database Server | |
|---|---|
| Hardware (2 Servers) | <ul><li>8 CPU</li><li>8 GB RAM</li><li>3 Array Controllers – 1 Raid 5 for Db data file, 1 Raid 5 for operating system files, 1 mirror set for Db log file</li><li>1 External Drive Array</li><li>320 GB Drive Space in the external drive cage – 2 Db data files – 1 active database, 1 reporting database (150Kb per application)</li><li>20 GB Internal Drive Space – 12 GB for operating system (8 GB page file, 4 GB operating system files), 8 GB for log file (2 4 GB drives mirrored)</li></ul> |
| Software | <ul><li>Windows 2000 Advanced Server service pack 2 with PAE enabled</li><li>Microsoft Cluster Service enabled</li><li>MS SQL 2000 Enterprise Edition service pack 1</li><li>ALS COM Database</li></ul> |
| Notes | <ul><li>Two servers configured in an Active – Active fail over configuration as detailed in the availability section</li></ul> |
| **Bureau Server** | |
| Hardware (3 Servers) | <ul><li>2 CPU</li><li>1 GB RAM</li><li>1 Array Controller – 1 Raid 5 partition</li><li>5 GB Drive Space – 1 GB for page file, 4 GB for operating system files</li></ul> |
| Software | <ul><li>Windows 2000 Server service pack 2</li><li>MDAC 2.5 service pack 2</li><li>ALS COM Bureau Monitor</li><li>ALS COM Bureau Processor</li></ul> |
| Notes | <ul><li>Average 3 seconds per bureau pull over 56K leased line – 2 servers to cover maximum volume plus one for availability</li></ul> |
| **Image Server** | |
| Hardware (1 Server) | <ul><li>1 CPU</li></ul> |

F 00408



**Production Hardware Deployment Guide**

| | | |
|---|---|---|
| | • | 512 MB RAM |
| | • | 1 Array Controller – 1 Raid 5 partition |
| | • | 2120 GB Drive Space – 5 GB for page file and operating system files, 2115 GB for images (8 images per funded application at 300Kb per image, 2 images per declined application at 300Kb per image) |
| Software | • | Windows 2000 Server service pack 2 |
| Notes | • | The Image Server may be replaced by existing network storage, such as a SAN or other network share |
| **WorkFlow Server** | | |
| Hardware (2 Servers) | • | 2 CPU |
| | • | 1 GB RAM |
| | • | 1 Array Controller – 1 Raid 5 partition |
| | • | External Drive Cage |
| | • | 5 GB Drive Space |
| Software | • | Windows 2000 Advanced Server service pack 2 |
| | • | Microsoft Cluster Server enabled |
| | • | MDAC 2.5 service pack 2 |
| | • | ALS COM WorkFlow Server |
| Notes | • | Exact sizing and configuration may vary depending on final interface requirements |
| **BridgeWare Server** | | |
| Hardware (2 Servers) | • | 2 CPU |
| | • | 1 GB RAM |
| | • | 1 Array Controller – 1 Raid 5 partition |
| | • | External Drive Cage |
| | • | 5 GB Drive Space |
| Software | • | Windows 2000 Advanced Server service pack 2 |
| | • | Microsoft Cluster Server enabled |
| | • | MDAC 2.5 service pack 2 |
| | • | ALS COM Bridgeware Server |
| | • | BizTalk 2000 SP1a |
| Notes | • | Exact sizing and configuration may vary depending on final interface requirements |
| **Fax Server** | | |
| Hardware (2 Servers) | • | 1 CPU |
| | • | 512 MB RAM |
| | • | 1 Array Controller – 1 Raid 5 partition |
| | • | 5 GB Drive Space |
| Software | • | Windows 2000 Server service pack 2 |
| | • | RightFax software V7.2 or higher |
| Notes | | |

F 00409



**Production Hardware Deployment Guide**

| Terminal Server | |
|---|---|
| Hardware (40 rack mounted Servers est. w/30 sessions per server) | <ul><li>2 CPU</li><li>4 GB RAM</li><li>1 Array Controller – 1 Raid 5 partition</li><li>5 GB drive space</li><li>3-4 Server Racks</li></ul> |
| Software | <ul><li>Windows 2000 Advanced Server service pack 2</li><li>MS Terminal Services enabled</li><li>MS Network Load Balancing enabled</li><li>MS Office 2000</li><li>MDAC 2.5 service pack 2</li><li>ALS COM Client Software</li><li>Kelley Bluebook KarPower versioned by release date (May be installed on the Image Server if desired)</li></ul> |
| Additional Software | This software is required to run ALS COM, however it will be built into the ALS COM system and maintained by ALLTEL. Periodic data file updates may need to be obtained by Toyota, but any versioning issues will be maintained by ALLTEL.<ul><li>Carleton Compliance</li><li>Black Book</li><li>ALG</li><li>NADA</li></ul> |
| **Workstation** | |
| Hardware | <ul><li>1 CPU</li><li>128 MB RAM</li><li>1 GB Drive Space</li></ul> |
| Software | <ul><li>Microsoft Terminal Server RDP Client and any operating system that supports the client</li></ul> |
| Notes | |

F 00410

 **Production Hardware Deployment Guide**

## Component Availability

This section outlines the recommended hardware configurations to maximize ALS COM component availability.

| Database Server |
| --- |
| 2 MS SQL Servers will be configured in an Active - Active cluster configuration with a shared drive array.  One server will be the active production database server - the second will act as a reporting server.  In the event of a failure on the production server, the production database will fail over to the reporting server, allowing production activities to continue uninterrupted.  Reporting activities will cease until the production server is repaired and brought back online.  The process for halting reporting activities is outlined in the Reporting Requirements document. |
| **Bureau Server** |
| 3 Bureau Servers will be deployed.  At an estimated 3 seconds per bureau pull, 2 servers can process 2,400 requests per hour, allowing production to continue unhindered until the third can be repaired. |
| **Terminal Server** |
| Terminal Servers are configured to utilize Microsoft Network Load Balancing.  The client will see all servers as one virtual component.  If a server goes offline, the remaining servers in the cluster would service any requests intended for the downed server.  The number of servers in the cluster will be enough to support the maximum work load if two servers go down simultaneously. |
| **WorkFlow Server** |
| The WorkFlow server can be clustered in an Active – Passive configuration.  The second server will come online in the event of a failure. |
| **BridgeWare Server** |
| The BridgeWare server can be clustered in an Active – Passive configuration.  The second server will come online in the event of a failure. |
| **Fax Server, Image Server** |
| The Fax and Image servers can achieve a guaranteed level of up time utilizing various hardware and software vendor configurations such as redundant NIC's and power supplies, and RAID 5 drive configurations |



**Production Hardware Deployment Guide**

## Upgrade Matrix

The following chart can be used to anticipate hardware and software upgrades of various ALS COM components based on estimated application and user volume growth rates.

| Database Server |
|---|
| The tests results from ILab shows the recommended database configuration supported<br>• 1000 users at 2775 applications per hour with 605,000 online applications<br>• 1000 users at 1776 application per hour with 2,525,000 online applications<br>within the framework of the non-functional requirements. An increase above these usage levels would indicate a potential need for increased hardware inline with the data modeling effort reported in the database benchmark results document. |
| **Bureau Server** |
| The Bureau Servers can process 1200 requests per hour (3 seconds per pull). When the maximum number of requests per hour surpasses the ability of the total number of Bureau Servers minus one for redundancy to process, an additional server should be added. |
| **Image Server** |
| (6 months of online data) x ((80% contract rate x 8 images per contract) + (20% decline rate x 2 images per decline) ) x (monthly application rate) x (300K per image) = disk space required to hold application related images. A rise in any of these number will require additional hard drive space on the Image Server. |
| **WorkFlow Server** |
| *estimated. When the primary workflow server reaches 70% CPU utilization for normal periods of work, it is time to add another server or migrate to faster CPUs. When the workflow server reaches 80% utilization during peak workloads, it is time to add another server or migrate to faster CPUs. |
| **BridgeWare Server** |
| *estimated. When the primary bridgeware server reaches 70% CPU utilization for normal periods of work, it is time to add another server or migrate to faster CPUs. When the workflow server reaches 80% utilization during peak workloads, it is time to add another server or migrate to faster CPUs. |
| **Terminal Server** |
| *estimated. When the available capacity of the recommended configuration is balanced against the maximum usage period, the number and/or size (i.e. CPUs, memory) of the servers can be incremented or decremented to achieve the desired capability. This is determined by the (capacity required to support the maximum concurrent number of user sessions + desired capacity overhead for fail-over and reliability = number of servers required) |

F 00412



**Production Hardware Deployment Guide**

## Network Diagram



F 00413

EXHIBIT 5

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

**FIRST AMENDMENT**
**TO**
**MASTER SOFTWARE LICENSE AGREEMENT**

This **FIRST AMENDMENT TO MASTER SOFTWARE LICENSE AGREEMENT** ("First Amendment") is made and entered into by and between **TOYOTA MOTOR CREDIT CORPORATION** ("TMCC") and **ALLTEL INFORMATION SERVICES, INC.** ("ALLTEL") effective as of the 1st day of March, 2002 ("First Amendment Effective Date"), and amends and supplements that certain Master Software License Agreement by and between TMCC and ALLTEL executed on August 25, 2000 (sometimes referred to herein as the "Agreement").

**WHEREAS,** TMCC and ALLTEL desire to make certain changes to the Master Software License Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.  Section 4 of the Master Software License Agreement shall be deleted in its entirety and replaced as follows:

    "**4.0    Software License and Use.**  For the Software set forth on the applicable Product Schedule(s), ALLTEL grants to TMCC, and TMCC accepts, a non-exclusive license to the Software (including Phased Delivery Software as defined in Section 6.1 herein) (the "**License**") for TMCC, its Affiliates and its Authorized Representatives (as defined in Section 5) to use the Software solely for TMCC's own internal businesses, and to reproduce the Software for archival and backup purposes, subject to the restrictions set forth in this Section 5 hereof.  Said License shall commence on the applicable Product Schedule(s) Effective Date and continue thereafter until termination of said License in accordance with its terms.

    "**4.1    Affiliates Use.**  It is the intention of the parties that (i) the Affiliates using the Software pursuant to this License shall be bound by the terms and conditions of this Agreement, (ii) all of the systems and services provided under this Agreement be made available to such Affiliates, and (iii) TMCC guarantees the performance of and the payment by (as applicable) each such Affiliate of any and all obligations and liabilities under this Agreement.  ALLTEL will provide TMCC advance written notice of any separate agreement subjecting the Affiliate to the terms of this Agreement between any Affiliate and ALLTEL to which TMCC is not also a party.

    "**4.2    Locations.**  For production purposes, there shall be only one Installation Site, which shall be identified in the applicable Product Schedule.  For regular offsite backup, temporary emergency relocation and the operation of Non-Production Copies (defined below), at no additional charge, TMCC, its Affiliates and its Authorized Representatives may use the Software and Documentation at any (unlimited number) of additional TMCC, Affiliates' or dealer locations.  For purposes of this Agreement, "Non-Production Copies" are defined as copies of the Software used exclusively for purposes other than as used in a live production environment.  TMCC, its Affiliates and its Authorized Representatives also may keep a copy of the Software and the Documentation at a backup site exclusively for backup and disaster recovery purposes.  TMCC agrees that the Affiliates and the Authorized Representatives will not make copies, or similar versions of the

1

F 00087

Software or any part thereof without the prior written consent of ALLTEL, except as expressly provided otherwise herein.

"**4.3    Use Restrictions.**

"**4.3.1**  TMCC is not authorized to use or allow any other party to use the Software for service bureau purposes or to act as a processor for any third parties, except as may be mutually agreed to by ALLTEL and TMCC.

"**4.3.2  Outsourcing.**

"(a)  At any time after the Effective Date, TMCC may outsource the application maintenance processing and/or the data center operations of the object code version of Software to a third party operator ("Operator"), subject to the following conditions:  (i) the outsourcing is a part of the outsourcing by TMCC or its Affiliates of a material portion of its applications; (ii) Operator is a publicly traded company with a market capitalization of at least 1 billion dollars at some time within the three (3) months prior to the time TMCC elects to outsource or is controlled by such a company; (iii) the outsourcing operations are performed in the United States of America; and (iv) the Operator enters into an Operating Agreement with ALLTEL and TMCC, in substantially the form attached as Exhibit B to this Agreement (unless otherwise provided in the Product Schedule) ("Operating Agreement"); provided, however, that ALLTEL will not unreasonably withhold signing such Operating Agreement if it is substantially similar to the terms of the form attached as Exhibit B to this Agreement.  Any change to the market capitalization of Operator or its controlling entity following the date of the Operating Agreement shall not affect the continuing validity of the Operating Agreement for this purpose.

"(b)  If any time after the Effective Date, TMCC elects to outsource the application maintenance processing and/or the data center operations of Software under any circumstances other than those described in Section 4.3.2(a) above, TMCC may do so subject to the following conditions: (i) the Operator enters into an Operating Agreement as described in Section 4.3.2(a) above (and such condition is subject to the proviso in Section 4.3.2(a) above) and (ii) in addition to all other fees payable hereunder, TMCC pays to ALLTEL a mutually agreed annual outsourcing fee ("Outsourcing Fee") not to exceed twenty-five percent (25%) of the then current annual maintenance fees for the Software as provided in the applicable Product Schedule, which Outsourcing Fee is payable on the same terms as the maintenance fees in the applicable Product Schedule. TMCC agrees that at any time that TMCC considers outsourcing the services described in this Section 4.3.2(b) that TMCC will provide ALLTEL an opportunity to submit a proposal to perform such services. In the event that ALLTEL and TMCC enter into an agreement for ALLTEL to provide such services, TMCC shall not be required to pay an Outsourcing Fee as described herein.

F 00088

"(c) Notwithstanding anything to the contrary, this Agreement shall not be construed to preclude TMCC from using the License for the Software and Documentation for the purposes of processing information for entities formed to acquire and securitize receivables owned by TMCC or its Affiliates, for Affiliates, or for affiliates of Southeast Toyota Distributors LLC or of Toyota Material Handling, U.S.A., Inc. and/or for TMCC's administration of such third parties' financial services portfolios. For purposes hereof, "administration" by TMCC means a combination of information technology services and administrative services for financial services portfolios."

2.    Section 6.1 of the Master Software License Agreement is hereby amended by adding the following new paragraphs:

"If the Software as agreed upon is scheduled to be delivered to TMCC in specific phases, or delivered in portions less than the totality of the Software ("Phased Delivery Software") such Phased Delivery Software shall be described (including the content and delivery date) in the particular Product Schedule or in the related Statement of Work ("Statement of Work") under that certain Services Agreement dated as of February 7, 2000 by and between ALLTEL and TMCC, as amended (the "Services Agreement"), or in documents attached to or referred to in the Product Schedule or the related Statement of Work. References to "Software" in this Agreement shall include such Phased Delivery Software."

3.    Section 6.2 of the Master Software License Agreement is hereby amended by replacing the first paragraph in its entirety with the following new paragraphs:

"Each Product Schedule or the related Statement of Work shall provide for an acceptance test period (the "Acceptance Test Period") for the Software under the Product Schedule, and shall indicate which party is responsible for installation of Software and conduct of verification testing. The length of the Acceptance Test Period for any Software shall be set forth in the Product Schedule or the related Statement of Work, may vary from Software to Software, and may be extended in accordance with the Product Schedule or the applicable Statement of Work. The event or events that cause the Acceptance Test Period to commence shall be set forth in each Product Schedule or the applicable Statement of Work.

"Following installation of Software in TMCC's test environment and verification testing, TMCC will conduct the Acceptance Test. If Software as delivered does not perform according to the applicable Documentation and the Acceptance Criteria, such non-performance shall constitute a defect ("Defect"). In the case of Software which comprises multiple elements, the failure of any such element to perform according to the Acceptance Criteria applicable to such element shall constitute a Defect. TMCC shall notify ALLTEL in writing of any and all such known Defects promptly after they become known, but not later than TMCC's notification to ALLTEL of the completion of the Acceptance Test, which shall occur no later than the expiration of the Acceptance Test Period for that Software. TMCC shall give ALLTEL the notification of Defects not less frequently than once weekly, if any Defects become known during such week. The Acceptance Test Plan shall specify any requirements as to the form of the notification, but in the absence of any provisions to the contrary TMCC may give such notification in the form of adding a description of the Defect to an "issues log" to be maintained for this purpose.

F 00089

"Promptly after receipt of notification of a Defect in Software, ALLTEL, at its own expense, shall commence the taking of reasonable efforts to correct the Defect so that the Software meets the applicable Documentation and Acceptance Criteria, and shall continue such efforts diligently until the Defect is corrected, or until the Software (including Phased Delivery Software) is accepted or rejected, whichever first occurs, except as the parties may otherwise agree. If the Defect identified by TMCC pertains to a particular element of Software, upon correction of that element of the Software ALLTEL may, but shall not be required to, deliver to TMCC the correction to the Defect (unless the identified Defect has caused a cessation of or delay in TMCC's conduct of the Acceptance Test, in which case ALLTEL will deliver the correction to the Defect promptly). Notwithstanding the foregoing, not later than thirty (30) days after TMCC notifies ALLTEL of the completion of the Acceptance Test or thirty (30) days after the expiration of the Acceptance Test Period, whichever first occurs, ALLTEL shall: (i) correct the Software (including a Phased Delivery Software) so that such Software or Phased Delivery Software performs according to the applicable Documentation and Acceptance Criteria; and (ii) if the respective Product Schedule provides for ALLTEL to install Software in the TMCC test environment and conduct validation testing, ALLTEL will reinstall the corrected Software in the TMCC test environment in its entirety and conduct validation testing. If the respective Product Schedule provides for TMCC to install Software in its test environment, the thirty-day period shall expire upon ALLTEL's delivery of the corrected Software to TMCC.

"ALLTEL's efforts to correct any such Defects shall, to the extent reasonably possible, not delay TMCC's conduct of the Acceptance Test of Software or elements of Software not materially affected by such reported Defects.

"Upon delivery and reinstallation in TMCC's test environment of corrected Software (including an entire Phased Delivery Software), TMCC shall have an additional Acceptance Test Period to re-conduct the Acceptance Test. The additional Acceptance Test Period for Software shall be of the same duration as the initial Acceptance Test Period for that Software. If the identified Defect or Defects have not been corrected or the Software otherwise does not perform according to the applicable Documentation and Acceptance Criteria, TMCC at TMCC's sole discretion: (i) may reject the Software as provided for in Section 6.3; or (ii) may propose to ALLTEL an agreement providing for the resolution of Defects in the Software upon mutually acceptable terms and conditions, and if such an agreement is entered into in writing, the Software shall be deemed neither to be accepted nor rejected when such agreement is entered into; or (iii) may propose to accept the Software with known Defects provided that ALLTEL agrees to fix the Defects at ALLTEL's expense within a specified period, and if such an agreement is entered into in writing, TMCC will accept the Software with such known Defects. If TMCC elects option (ii) or (iii) above, TMCC retains the right to reject the Software until the written agreement is entered into. In the case of option (ii), above, the agreement shall provide that upon resolution of Defects within a period specified in the agreement and upon satisfaction of any other conditions contained in the agreement, TMCC will accept the Software; and the agreement shall provide that TMCC may reject the Software if such conditions are not satisfied.

"TMCC shall notify ALLTEL of its election provided for in the prior paragraph at or prior to the expiration of the additional Acceptance Test Period for the re-delivered Software. TMCC may make such election prior to the expiration of the additional Acceptance Test Period for the re-delivered Software. The parties acknowledge and agree that in the case of Phased Delivery Software, (i) such additional Acceptance Test Period does not commence until the delivery of the corrected Phased Delivery Software in its entirety, and (ii) Phased Delivery Software will not be

F 00090

considered to perform according to the applicable Documentation and Acceptance Criteria unless all elements of the Phased Delivery Software perform according to the applicable Documentation and Acceptance Criteria.

"ALLTEL agrees that TMCC's Acceptance of any Software prior to final Acceptance of all Software covered by a Product Schedule (including, without limitation, TMCC's Acceptance of Phased Delivery Software) shall not limit TMCC's right to reject the Software covered by a Product Schedule in its entirety if any of such Software does not meet the applicable Documentation and Acceptance Criteria. TMCC may place in use any Phased Delivery Software upon Acceptance."

4.  Section 6.3 of the Master Software License Agreement is hereby amended and restated in its entirety as follows:

"**6.3    Rejection.** As provided in Section 6.2 above, if TMCC notifies ALLTEL of any Defect in Software (including Phased Delivery Software) and ALLTEL either does not deliver corrected Software within the period specified in Section 6.2 or such redelivered Software does not perform according to the Documentation and the Acceptance Criteria, TMCC may reject such Software or Phased Delivery Software by notifying ALLTEL in writing of said rejection. TMCC's rejection of Software shall entitle TMCC to terminate the applicable Product Schedule.  Upon such termination, ALLTEL shall promptly refund to TMCC all license fees paid to ALLTEL for such Software (as defined in the applicable Product Schedule), and any other sums to which TMCC is entitled upon such rejection pursuant to the Product Schedule. TMCC shall then discontinue all use of the terminated Software and Documentation, and shall return to ALLTEL (or destroy) all copies thereof in TMCC's possession or control. Notwithstanding the foregoing, for a Product Schedule that provides for Phased Delivery Software, if TMCC rejects any Phased Delivery Software, TMCC may elect not to terminate the Product Schedule and not to discontinue use of any Phased Delivery Software TMCC had previously Accepted ("In-Use Phased Software") and any related Documentation. In such event, (a) TMCC shall have no duty to return to ALLTEL (or destroy) any copies of the In-Use Phased Software or the related Documentation; (b) ALLTEL shall not be obligated to refund to TMCC license fees TMCC had paid to ALLTEL under such Product Schedule; (c) TMCC shall have no duty to pay any additional license fees to ALLTEL under such Product Schedule; (d) ALLTEL shall continue to provide ES Services for the In-Use Phased Software on the terms provided for in the Product Schedule; and (e) the ES Services Fee for the In-Use Phased Software shall be the ES Services Fee provided for under the Product Schedule applicable to the period immediately following TMCC's acceptance of the In-Use Phased Software."

5.  Section 7.1 of the Master Software License Agreement is hereby amended by replacing Section 7.1 in its entirety (but not subsections 7.1.1 through 7.1.5) with the following:

"ALLTEL will provide Software Enhancement and Support Services ("ES Services") for the Software as set forth below unless explicitly stated to the contrary in the applicable Product Schedule.  Except as expressly provided otherwise in an applicable Product Schedule, the ES Services shall be provided at no charge during the Warranty Period, as defined in Section 10.2 below, for the Software, and, in accordance with the terms hereof, for the periods of time set forth in the applicable Product Schedule ("ES Period"). ALLTEL shall correct and repair any Defect in the Software if such Defect prevents the Software from operating and performing in accordance

F 00091

with the Documentation and the Acceptance Criteria or in accordance with any service level commitments, if any, provided for in a Product Schedule."

6.    Section 7.1.1 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end of sub-section 7.1.1:

"Notwithstanding the foregoing, a temporary fix that includes any operating instructions, new procedure, or new routine that, when implemented, requires TMCC to incur additional expense including hiring additional personnel or buying additional equipment or software to implement such operating instructions, new procedure, or new routine shall not be considered a Work Around."

7.    Section 7.3 of the Master Software License Agreement is hereby amended by adding the following new sentence at the end this section:

"ALLTEL's discontinuance of such ES Services shall be considered an Impact Event as defined in the Source Code Escrow Agreement dated August 25, 2000."

8.    Section 9.2 of the Master Software License Agreement is hereby amended by adding the following new sentence at the end this section:

"In the event of ALLTEL's material breach of this Agreement, TMCC may terminate this Agreement and, without limiting TMCC's other rights or remedies, such termination shall be considered an Impact Event as defined in the Source Code Escrow Agreement dated August 25, 2000."

9.    Section 11.2 of the Master Software License Agreement is hereby amended and restated in its entirety as follows:

"11.2  Except for liabilities, losses, damages and expenses related to:  (i) death, personal injury or damage to property; or (ii) third party claims of infringement or violation of any patent, copyright, trademark, trade secret or other intellectual property right, the liability of either Party to the other hereunder for any breach or any claim or cause of action whether based in contract, tort or otherwise which arises under or is related to this Agreement or the Services Agreement shall be limited to actual direct damages incurred by the other Party, and, except as to excepted claims, in no event shall either Party's aggregate liability for any and all claims exceed the aggregate amount actually paid to ALLTEL by TMCC under this Agreement (including Product Schedules hereunder) and under the Services Agreement (including Statements of Work thereunder) whether such claim or claims are brought under this Agreement or the Services Agreement or both.  Neither party shall be liable for any special, indirect, incidental or consequential damages suffered by such party."

10.    Section 13.0 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end this section:

"If it is foreseen that a force majeure event claimed by a party will cause a delay in performance to exceed six (6) months, then the party not making the claim shall have the option to terminate the applicable Product Schedule to the Agreement without the payment of any termination for convenience fees provided for in such Product Schedule or the related Statement of Work.  Further, during a force majeure event, ALLTEL shall to the extent practicable maintain any ES Services

6

service level commitments set forth in a Product Schedule. Upon the conclusion of a force majeure event, the effectiveness and enforcement of such ES Services service level commitments shall be restored and ALLTEL shall perform its obligations in conformity therewith."

11.    Section 17.0 of the Master Software License Agreement is hereby amended by adding the following new sentence to the end this section:

"Notwithstanding anything to the contrary herein, neither party shall not be bound to the restrictions contained herein this Section 17 in the event of (i) a party commencing any proceeding under Title 11 of the United States Code ("Bankruptcy Code") or any other federal or state bankruptcy, insolvency, receivership, or similar law, or if a party is made subject to such a proceeding involuntarily; (ii) the termination of substantially all of a party's ongoing business operations relating to the subject of the Agreement; (iii) any liquidation of a party or any sale, assignment, or foreclosure of or upon assets that are necessary for the performance by a party of its responsibilities under this Agreement, or (iv) ALLTEL discontinuing ES Services."

12.    Section 18.0 of the Master Software License Agreement shall be amended to add the following sentence at the end of such section:

"Appendices and exhibits to this Agreement or to any Product Schedule are incorporated into and made a part of this Agreement or such Product Schedule, respectively."

13.    Section 20.0 of the Master Software License Agreement is hereby amended by deleting the first sentence and replacing it as follows:

"For any Software or Phased Delivery Software to which ALLTEL grants a license (in object code form only) to TMCC under this Agreement, within thirty (30) days after such license is granted ALLTEL will deposit with a third party escrow agent identified in the applicable Product Schedule ("Escrow Agent") the source code of such Software and related materials which exist and is available sufficient to enable a reasonably skilled programmer or analyst to maintain and enhance the Software, as more particularly described in the applicable Product Schedule ("Escrow Deposit").

14.    The parties will use their best efforts to amend the Source Code Escrow Agreement dated August 25, 2000 to modify the definition of "Impact Event" therein as provided in paragraphs 7 and 8 of this First Amendment.

15.    All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

16.    All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect. This First Amendment constitutes the entire agreement between TMCC and ALLTEL relating to the subject matter hereof.

17.    Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

18.    This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

F 00093

19.     This First Amendment shall be governed by and shall be construed in accordance with the laws of State of California.

**IN WITNESS WHEREOF,** the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

| **ALLTEL INFORMATION SERVICES, INC.** | **TOYOTA MOTOR CREDIT CORPORATION** |
|---|---|
| By: _____ | By: _____ |
| Name: _CLIEF THOMPSON_ | Name: _Shaun Coyne_ |
| Title: _SVP AUTO FINANCE_ | Title: _Vice President & CIO_ |
| Date: _March 4, 2002_ | Date: _March 5, 2002_ |

F 00094

EXHIBIT 6

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

RGS PER RECOVERY
FILE ROOM PROJECT
DATE COPIED 3/26/02

**FIRST AMENDMENT**
**TO**
**PRODUCT SCHEDULE NO. 1**


This **FIRST AMENDMENT TO PRODUCT SCHEDULE NO. 1** ("First Amendment"), is made and entered into as of this *1st* day of March, 2002 ("First Amendment Effective Date"), by and between **TOYOTA MOTOR CREDIT CORPORATION** ("TMCC") and **ALLTEL INFORMATION SERVICES, INC.** ("ALLTEL"), and amends and supplements that certain Product Schedule No. 1 ("Product Schedule No. 1"), executed on August 25, 2000, to that certain Master Software License Agreement, Agreement Number 2000AIS002, executed on August 25, 2000 (the "Agreement"), by and between TMCC and ALLTEL.

**WHEREAS,** TMCC and ALLTEL desire to make certain changes to the Product Schedule No. 1 on the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.   All references in the Product Schedule No. 1 to "AP7000" shall be deemed to refer to "ALS-COM."

2.   (a)      Section 1.1 of Product Schedule No. 1 is amended to add the following sentences at the end of Section 1.1:

"For each Phased Delivery Software (as defined in Section 5.0 below), such license shall be effective as of TMCC's acceptance of such Phased Delivery Software."

(b)      Section 1.9 of Product Schedule No. 1 is amended and restated in its entirety as follows:

"**1.9     Outsourcing.**   The provisions concerning outsource rights set forth in Section 4.3 of the Agreement, as amended, are not applicable to ALS-COM.  For purposes of ALS-COM, the parties acknowledge that TMCC may outsource the application maintenance processing and/or the data center operations of the ALS-COM Software to a third party operator ("Operator").  TMCC shall provide to ALLTEL written notice of such outsourcing, with the name and address of the Operator and a contact person at the Operator.  TMCC shall cause Operator to enter into an agreement with TMCC which subjects Operator to effectively the same confidentiality, proprietary rights, and use and ownership provisions and related duties as TMCC is subjected to under the Agreement.  TMCC will make a good faith effort to include in the agreement with Operator a provision that will have the effect of making ALLTEL a third party beneficiary of such agreement, although ALLTEL need not be identified by name and a phrase such as "TMCC's vendors and suppliers" may be used.  TMCC shall enforce such obligations and duties of the Operator.  The indemnification by TMCC pursuant to Section 10.7 of the Agreement is broadened to extend to breaches by the Operator of said obligations and duties, on the terms and conditions provided for in Section 10.7 of the Agreement, and the cap on certain liabilities in Section 11.2 of the Agreement shall not apply to this obligation in this sentence; however, the exclusion of consequential damages and other limitations of liability shall apply to the obligations in this sentence.  Notwithstanding this Section

1                                    F 00096

1.9, the provisions of Section 4.3.2(c) of the Agreement, as amended, shall apply to ALS-COM. ALLTEL and TMCC agree that TMCC's outsourcing to an Operator of the application maintenance processing and/or the data center operations of the source code version of the ALS-COM Software, following a release to TMCC of source code under the Source Code Escrow Agreement dated as of August 25, 2000 among TMCC, ALLTEL and an escrow agent (the "Escrow Agreement"), shall not be a breach of TMCC's duties under Section 4 of the Escrow Agreement and shall be permitted by the license provided for under Section 8 of the Escrow Agreement."

3.    Section 4.0 of Product Schedule No. 1 is amended and restated in its entirety as follows:

"**4.0    ES Services.** ALLTEL will provide the ES Services, as described more specifically on Attachment 2 hereto and Section 7.0 of this Product Schedule, commencing upon the Acceptance of the ALS-COM Software or any Phased Delivery Software as described in Section 5.0, solely in the United States (and its possessions) and Canada (collectively, herein "North America"); provided that the ES Services shall be performed outside of North America by ALLTEL for an additional ES Fee to be mutually agreed between the parties at the time of TMCC's request for any ES Services outside North America, and which shall be reasonable in relation to the additional cost and risks of performing the ES Services. The initial annual ES Services fee ("ES Services Fee") is specified in Attachment 1 hereto and will be due and payable as follows:

"(i)    Upon Acceptance of the first Phased Delivery Software, TMCC shall pay pro-rata, fifty percent (50%) of the annual ES Services Fee. Such amount shall be paid based on a one-year period. Should the second Phased Delivery Software be Accepted by TMCC either earlier or later than one year after Acceptance of the first Phased Delivery Software, the amount payable by TMCC under subsection (ii) below upon Acceptance of the second Phased Delivery Software shall either be decreased or increased, respectively, so that such amount takes into account the actual number of days the ES Services were received for the first Phased Delivery Software, payable at the fifty percent (50%) pro rata rate. Should the second Phased Delivery Software be rejected or not delivered, TMCC may continue to pay for ES Services for the first Phased Delivery Software, payable annually, at the fifty percent (50%) pro rata rate, and ALLTEL will continue to provide the ES Services for the first Phased Delivery Software.

"(ii)    Upon Acceptance of the second Phased Delivery Software, if applicable, TMCC shall begin paying one hundred percent (100%) of the ES Services Fee, with the first payment covering the anticipated period from Acceptance of the second Phased Delivery Software and final Acceptance of the ALS-COM Software. Upon final Acceptance of the ALS-COM Software, the amount payable at that time shall be adjusted to reflect the actual duration of such period. Should the ALS-COM Software, in its entirety, be rejected or not delivered, TMCC may continue to pay for ES Services for the first and second Phased Delivery Software, payable annually at one hundred percent (100%) of the ES Services Fee, and ALLTEL will continue to provide the ES Services for the first and second Phased Delivery Software.

"(iii)    Upon final Acceptance of the ALS-COM Software, if applicable, TMCC shall pay for the next one year (twelve months) of ES Services.

"From and after the date of the first anniversary of the date of final Acceptance of the ALS-COM Software, ES Services may be renewed by TMCC for successive periods of one (1) year each while the Agreement remains in effect with sixty (60) days' prior written notice subject

2

to termination rights described below, and the "ES Period" shall be extended to the expiration of such successive renewal period. ALLTEL agrees to provide TMCC written notice of any increase in ES Fees applicable to any renewal term thereunder not less than one hundred and twenty (120) days prior to the start of the renewal term. The ES Fees for the ALS-COM Software may be increased for the annual period following the first annual period after final Acceptance of the ALS-COM Software and for all subsequent annual periods during the ES Period by multiplying the prior annual ES Fee by a fraction, the numerator of which is the Department of Labor Consumer Price Index ("CPI-U"), Other Goods and Services, as of December 31 of the calendar year immediately preceding the year in which such renewal annual fee is due and the denominator of which is the CPI-U, Other Goods and Services as of December 31 of the previous calendar year. In no event, however, shall the annual ES Fee increase for any Software be more than ten percent (10%) or less than three (3.0%) of the previous year's annual ES Fee for such Software. Upon termination of the ES Services hereunder by ALLTEL for any reason other than TMCC's breach hereof, TMCC shall be entitled to access source code held in escrow pursuant to Section 20 of the Agreement and ALLTEL will provide up to six (6) personnel resources who have the relevant subject matter expertise for a period of sixty (60) days to assist in the transfer of knowledge of the ALS-COM software to TMCC. ALLTEL will provide such personnel resources at ALLTEL's then current standard time and material rates. The ES Services will immediately terminate upon termination of the Agreement.

"In the event that an Update pursuant to the ES Services shall require TMCC to change its hardware configuration in order to run the ALS-COM Software, ALLTEL shall provide TMCC six (6) months advance notice of said Update. TMCC shall have the right not to install said Update in which case ALLTEL shall continue to support the latest Update prior to the change for a period of two (2) years from the notice date."

4.  Section 5.0 of Product Schedule No. 1 is amended and restated in its entirety as follows:

   **" 5.0    Software Testing and Acceptance**

      5.1  "Acceptance. As used in this Product Schedule, "Phased Delivery Software" has the meaning given it in Section 6.1 of the Agreement, as amended; the description of the phases applicable to ALS-COM Software is as provided in the Statement of Work, as amended (and including the attachments thereto), under the Services Agreement, as amended. Acceptance of the ALS-COM Software and each Phased Delivery Software shall be as provided in Section 6 of the Agreement, except as specifically provided otherwise in this Section 5.0. ALLTEL shall be responsible to install the ALS-COM Software and any Phased Delivery Software in the TMCC test environment and to conduct validation testing. Upon completion by ALLTEL of installation of the ALS-COM Software or any Phased Delivery Software in the TMCC test environment and ALLTEL's validation testing, ALLTEL shall notify TMCC that the ALS-COM Software or Phased Delivery Software is ready for testing. Such ALLTEL notification will start the Acceptance Test Period as described in Section 6.2 of the Agreement. The Acceptance Test Period for the ALS-COM Software and for each Phased Delivery Software is ninety (90) days. If the expiration of such ninety-day period falls on a day that is not a business day, the Acceptance Test Period shall expire on the next-following business day. As provided in Section 6.2 of the Agreement, TMCC may notify ALLTEL of TMCC's completion of the Acceptance Test at any time prior to the expiration of the Acceptance Test Period. Notwithstanding anything to the contrary in Section 6.2 of the Agreement, in

F 00098

the event that TMCC notifies ALLTEL of a known Severity Level One or Severity Level Two Defect in the ALS-COM Software or Phased Delivery Software at any time during the Acceptance Test Period, TMCC may, but shall not be required to, cease testing. Whether or not testing ceases, ALLTEL shall commence the correction of such Severity One or Severity Two Defects upon the notification. Upon ALLTEL's delivery of the corrected ALS-COM Software or Phased Delivery Software, the Acceptance Test Period shall be extended for the number of days the Acceptance Testing was delayed. If ALLTEL is unable to correct any such Severity One or Severity Two Defect within thirty (30) days after notification by TMCC, then TMCC shall have the right to reject the ALS-COM Software or Phased Delivery Software immediately upon notice to ALLTEL. The parties acknowledge that as of the First Amendment Effective Date, it is the intention that the ALS-COM Software shall be delivered in three separate phases.

"5.2 <u>Acceptance Criteria</u>. The ALS-COM Software and any Phased Delivery Software shall perform in conformance to the Acceptance Criteria. For purposes of this Product Schedule, Acceptance Criteria, as defined in subsection 6.1 of the Agreement, shall consist of the items set forth below in subsections a through g. For the ALS-COM Software or any Phased Delivery Software to be deemed to perform in conformance to the Acceptance Criteria, the ALS-COM Software or the Phased Delivery Software must perform in conformity with all of the following subsections a through g:

a.    TMCC's business functionality customizations as described in that certain Business Requirements Definition Binder, dated as of February 13, 2002;

b.    Production Hardware Configuration as described in Attachment Four hereto;

c.    Base ALS-COM functionality as specified in the CD-ROM labeled as "Advance Lending Solutions Comprehensive Origination Manager, User Documentation, Release 3.0, February 6, 2002," and the functionality of each Phased Delivery Software and ALS-COM as specified in the CD-ROM as updated for each Phased Delivery Software and for ALS-COM in its entirety;

d.    Technical requirements as described in the Oscar Non-Functional Requirements document (version 0.6), dated September 12, 2001;

e.    The ALS-COM Software or Phased Delivery Software will contain zero (0) Severity One Defects, zero (0) Severity Two Defects, no more than twenty (20) Severity Three Defects, and no more than forty (40) Severity Four Defects as defined in Attachment 2 to the Product Schedule.

f.    Satisfactory performance on mutually agreeable test cases to be executed that represent the validation steps required for achieving the Business Requirements. Such test cases will be agreed to prior to the Acceptance Test Period and will be limited to reasonable business practices.

g.    Product functional specifications delivered by ALLTEL to TMCC and approved by TMCC from time to time, on a "gap-by-gap" basis.

"The parties acknowledge that as the documentation is developed and approved by both parties, including, for example, detailed requirements definitions/functional specifications and "Documentation" (as defined in the Agreement) such as user manuals, such documentation will become part of the Acceptance Criteria applicable to determinations following such development and approval.

F 00099

4

"5.3 <u>Rejection</u>.   In the event TMCC rejects the ALS-COM Software or Phased Delivery Software as provided in subsection 6.2 of the Agreement, the following terms will apply:

5.3.1   For TMCC's rejection of the first Phased Delivery Software, TMCC shall be entitled to retain the Original Holdback amount and the First Phase Delivery Holdback amount (as defined in Section 9.3 of the Statement of Work, dated as of June 29, 2000, as amended) and receive a refund of all license fees actually paid for the ALS-COM Software at the time of rejection.

5.3.2   For TMCC's rejection of the second Phased Delivery Software, TMCC shall be entitled to retain the Original Holdback amount and the Second Phase Delivery Holdback amount (as defined in Section 9.3 of the Statement of Work, dated as of June 29, 2000, as amended) and receive a refund of all license fees actually paid for the ALS-COM Software at the time of rejection, and any unearned paid ES Services Fees; provided, however, that if TMCC elects to continue to use the first Phased Delivery Software, TMCC shall not receive such refund amounts.

5.3.3   For TMCC's rejection of the ALS-COM Software following final delivery, TMCC shall be entitled to retain the Original Holdback amount (as defined in Section 9.3 of the Statement of Work, dated as of June 29, 2000, as amended) and receive a refund of all license fees for the ALS-COM Software actually paid at the time of rejection and any unearned paid ES Services Fees; provided, however, that if TMCC elects to continue to use the first and second Phased Delivery Software, TMCC shall not receive such refund amounts.

5.3.4   For rejection under any of the above subsections, TMCC also shall be relieved of any obligation to make any additional payments to ALLTEL, whether under the Statement of Work, as amended, or under this Product Schedule, other than payments of invoices outstanding as of the rejection date; provided, however, that if TMCC elects to continue to use the first Phased Delivery Software following rejection of the second Phased Delivery Software, or the first and second Phased Delivery Software following rejection of the ALS-COM Software after final delivery, TMCC will continue to pay ES Services Fees as provided in this Product Schedule."

5.    Section 6.0 of Product Schedule No. 1 is hereby amended and restated in its entirety as follows:

"**6.0     Warranty Period.**  The Warranty Period for the warranty and representation provided for in Section 10.2 of the Agreement, for Phased Delivery Software and for the ALS-COM Software, shall be for a period commencing upon Acceptance of the respective Phased Delivery Software and, for the ALS-COM Software in its entirety, upon final Acceptance of the ALS-COM Software, and ending six (6) months following TMCC's final Acceptance of ALS-COM including gap customizations.  The parties acknowledge that ALLTEL shall provide ES Services during the Warranty Period and TMCC shall pay ALLTEL for such ES Services during the Warranty Period."

**F 00100**

6.    Section 7.0 of Product Schedule No. 1 (ES Services) is amended and restated in its entirety as follows:

"**7.0    ES Services Service Level Commitment Remedies.** Capitalized terms in this Section 7.0 not defined in this Product Schedule may be defined in Attachment 2 to this Product Schedule (the "Commitment"). In the event TMCC and ALLTEL do not agree that a Defect exists, the parties will follow the dispute resolution procedures described in Section 22 of the Agreement. If ALLTEL is unable to meet any of the standards contained in the Commitment Attachment (i.e., a failure to deliver a Work Around within the applicable Work Around Delivery period, or to Resolve a Defect within the applicable Time to Resolve, or to meet the Software Availability or Volume Throughput tests provided for in the Commitment)(each, a "Service Level Commitment"), the parties will commence the procedures described in this Section 7.0.

**7.1    Definitions**

    **7.1.1    "First Escalation Procedure"** shall mean a process in which the ALS-COM General Manager of ALLTEL shall be promptly notified by TMCC of a failure by ALLTEL to meet any Service Level Commitment. The ALS-COM General Manager of ALLTEL shall contact the Corporate Manager of Systems Development of TMCC via telephone within twelve (12) hours of such notification to discuss the Resolution of the Defect, if applicable, and to present a remediation plan for future compliance with the Service Level Commitment.

    **7.1.2    "Second Escalation Procedure"** shall mean a process in which the Account Director for Automotive Finance Division of ALLTEL shall be promptly notified by TMCC of the events constituting a failure to meet a Service Level Commitment. The Account Director for Automotive Finance Division of ALLTEL shall contact the Vice President and Chief Information Officer of TMCC via telephone within two (2) days of notification to schedule a meeting at the office of TMCC between the Vice President and Chief Information Officer of TMCC, or his or her designate, and such Account Director for Automotive Finance Division of ALLTEL, to be held within five (5) business days after the TMCC notification. The Account Director for Automotive Finance Division of ALLTEL will attend such meeting to present a remediation plan for future compliance with applicable Service Level Commitment.

    **7.1.3    "Refund"** shall be an amount equal to the most recent paid ES Services Fee (on an annualized basis if not paid for a year) divided by 365, multiplied by 2, (Refund = ES Services Fee / 365 X 2).

    **7.1.4    "Augmented Refund"** shall be an amount equal to the most recent paid ES Services Fee (on an annualized basis if not paid for a year) divided by 365, multiplied by ten (10), (Augmented Refund = ES Services Fee / 365 X 10).

    **7.1.5    "Termination Remedy"** shall be the right of TMCC to terminate the ES Services, which termination shall entitle TMCC to the source code to the ALS-COM Software as provided in the Escrow Agreement. Upon TMCC's election of the Termination Remedy, ALLTEL shall repay to TMCC any pre-paid ES Fees for

6

F 00101

ES Services that would have been performed after date of termination, based on a proration. TMCC may elect the Termination Remedy as a Defect Resolution Remedy under Section 7.2 below only after (i) the parties have mutually agreed that a Defect was the cause of the Service Level Commitment failure, in which event TMCC must give ALLTEL written notice of TMCC's intent to terminate within thirty (30) days after the date the Termination Remedy becomes available; or, (ii) if the parties have not reached such an agreement, after TMCC pursues resolution of the dispute through the procedures provided for in Section 22 of the Agreement and either through voluntary settlement or arbitration decision it is accepted or found that a Defect was the cause of the Service Level Commitment failure, in which event TMCC need not give advance written notice of termination after the Termination Remedy becomes available. Upon such termination, ALLTEL will provide up to six (6) personnel resources who have the relevant subject matter expertise for a period of sixty (60) days to assist in the transfer of knowledge of the ALS-COM Software to TMCC. ALLTEL will provide such personnel resources at ALLTEL's then current standard time and material rates.

7.2     **Defect Resolution Remedy.**  If ALLTEL is unable to deliver a Work Around within the applicable Work Around Delivery period or Resolve a Defect within the applicable Time to Resolve, the following procedures shall occur:

- **For a Severity One or Two Defect:**  If ALLTEL is unable to deliver a Work Around within the applicable Work Around Delivery period or Resolve the Defect within the applicable Time to Resolve, the First Escalation Procedure shall commence. If ALLTEL is unable to deliver a Work Around for that Defect within twenty-four (24) hours after the expiration of the applicable Work Around Delivery period (the "Work Around Deadline") or Resolve that Defect within twenty-four (24) hours after the expiration of the Time to Resolve (the "Deadline to Resolve"), TMCC shall receive a Refund. For each following day that Defect is not Resolved and/or no Work Around is delivered, TMCC shall receive a Refund. (Delivery of a Work Around does not relieve ALLTEL from paying a Refund if the Defect is not Resolved.)

- **For a Severity Three Defect:**  If ALLTEL is unable to deliver a Work Around by the applicable Work Around Deadline or Resolve the Defect by the applicable Deadline to Resolve, and there are twenty (20) or more Severity Three Defects that are currently not Resolved, the First Escalation Procedure shall commence. For each day that Defect is not Resolved and/or no Work Around is delivered, and there are twenty (20) or more Severity Three Defects that are currently not Resolved, TMCC shall receive a Refund. (Delivery of a Work Around does not relieve ALLTEL from paying a Refund if the Defect is not Resolved.) Notwithstanding the foregoing, the parties acknowledge that pursuant to Section 5.2(e) herein, if TMCC accepts the ALS-COM Software or Phased Delivery Software with identified Severity Three Defects, such identified Severity Three Defects shall be specified upon Acceptance and shall not be subject to the Refund remedy stated herein or be counted among the twenty (20) Severity Three Defects to determine whether a Refund is payable.

- **If a Severity One or Two Defect** is not Resolved prior to Time to Resolve Deadline or no Work Around is delivered prior to the Work Around Deadline on more than three (3) occasions within any six (6)-month period, or if any Severity One or Two Defect is

7

7.3   **Availability Remedy.**   If ALLTEL is unable to meet the ALS-COM Software Availability Service Level Commitment provided in Section 4 of the Commitment, the following procedures shall occur:

- **If the ALS-COM Software Availability standard is not met** for any given month, the First Escalation Procedure will commence.

- **If the ALS-COM Software Availability standard is not met** for more than two (2) months within any eight- (8) month period, the Second Escalation Procedure will commence and TMCC shall receive an Augmented Refund.

- **If the ALS-COM Software Availability standard is not met** for more than three (3) months within any sixteen (16) month period, or if the ALS-COM Software Availability falls below eighty-five percent (85%) in more than (2) months within any six (6) month period, or if the ALS-COM Software Availability falls below seventy percent (70%) in more than one (1) month within any six (6) month period, TMCC may invoke the Termination Remedy.

7.4   **Throughput Remedy.**   If ALLTEL is unable to meet the ALS-COM Software Volume Throughput Service Level Commitment provided in Section 5 of the Commitment, the following procedures shall occur:

- **If the ALS-COM Software Volume Throughput Service Level standard is not met** for more than any three (3) hours within any one- (1) week period, the First Escalation Procedure shall commence.

- **If the ALS-COM Software Volume Throughput Service Level standard is not met** for more than any twelve (12) hours within any one (1) month period, the Second Escalation Procedure shall commence and TMCC shall receive an Augmented Refund.

- **If the ALS-COM Software Volume Throughput Service Level standard is not met** for more than any twelve (12) hours in each of any two (2) months during any six (6) month period, TMCC may invoke the Termination Remedy.

7.5   Notwithstanding the above,

(i)   For any Refund due to TMCC as provided in this Section 7.0, the Refund shall be payable within thirty (30) days of the Service Level failure event. Such payment shall be accompanied by a description of the Service Level failure that was the cause of the Refund. TMCC may offset any overdue and unpaid Refunds against any other amounts payable to ALLTEL.

(ii)   If a single event causes Service Level failures in multiple Service Level Commitment categories (i.e. a single Defect causes a failure to meet two (2) or more Service Level Commitments), ALLTEL shall be responsible for paying the

F 00103

     (ii)     If a single event causes Service Level failures in multiple Service Level Commitment categories (i.e. a single Defect causes a failure to meet two (2) or more Service Level Commitments), ALLTEL shall be responsible for paying the Refund associated with the single Service Level Commitment category that would result in the largest total Service Level Refund.

     (iii)    Regardless of the number of Defects or Service Level failures, in no event shall ALLTEL be liable for aggregate Refund or Augmented Refund payments of more than an amount equal to the annualized ES Service Fees / 365 X 60 in any given ES Period.

     (iv)    The remedies in this Section 7.0 shall not be TMCC's sole or exclusive remedies for ALLTEL's failure to comply with the Service Level Commitments."

7.     Section 8.1 shall be amended by adding the following additional bullet point:

- "Two (2) copies of the source code for each Phased Delivery Software upon Acceptance of each Phased Delivery Software, and two (2) copies of the ALS-COM Software in its entirety upon final Acceptance of the ALS-COM Software, including any integrated Third Party Software on optical media, in the original programming code language."

8.     Section 9.0 is amended and restated in its entirety as follows:

     **"9.0    Termination for Convenience.** In the event TMCC elects to terminate this Product Schedule for its convenience, in addition to the sums specified in the Agreement, TMCC also shall pay to ALLTEL all service fees related to the ALS-COM Software incurred up to the effective date of such termination. Also, TMCC shall pay to ALLTEL those fees for services under the Statement of Work, dated June 29, 2000, to the Services Agreement in accordance with Section 2.1 (Termination for Convenience) thereof.

9.     Section 10.0 of the Product Schedule No. 1 (Additional Specifications) is deleted in its entirety and intentionally left blank.

10.    Attachment 2 to Product Schedule No. 1 is hereby amended and restated in its entirety by replacing such Attachment 2 in its entirety with the Attachment 2 "Service Level Commitment" attached to this First Amendment.

11.    Attachment 4 to Product Schedule No. 1 is hereby amended and restated in its entirety by replacing such Attachment 4 in its entirety with the Attachment 4 "Production Hardware Deployment Guide" attached to this First Amendment.

12.    All capitalized terms in this First Amendment shall have the same meaning as set forth in the Agreement, unless defined herein.

13.    All terms and conditions of the Agreement not amended by this First Amendment remain in full force and effect. This First Amendment constitutes the entire agreement between TMCC and ALLTEL relating to the subject matter hereof.

F 00104

14. Except as herein expressly amended, the Agreement is ratified, confirmed and remains unchanged in all respects and shall remain in full force and effect in accordance with its respective terms.

15. This First Amendment may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same document.

16. This First Amendment shall be governed by and shall be construed in accordance with the laws of State of California.

**IN WITNESS WHEREOF**, the parties have executed this First Amendment as of the First Amendment Effective Date by their duly authorized representatives.

**ALLTEL INFORMATION SERVICES, INC.**

By: _____

Name: _CLIFF THOMPSON_____

Title: _SVP AUTO FINANCE_____

Date: _March 4, 2002_____

**TOYOTA MOTOR CREDIT CORPORATION**

By: _____

Name: _Shaun Coyne_____

Title: _Vice President & CIO_____

Date: _March 5, 2002_____

10

F 00105

**ATTACHMENT 2 TO PRODUCT SCHEDULE NO. 1**

**"SERVICE LEVEL COMMITMENT"**

1.    **Definitions**

- "Acknowledgement" shall have the meaning described in Section 7.1.2 of the Agreement.

- "Actual Uptime" means the aggregate amount of time, as measured in minutes, during the Scheduled Uptime of the ALS-COM Software in any month that the ALS-COM Software is actually available for use by end users.

- "Defect" shall have the meaning as defined in Section 6.2 of the Agreement.  Subject to Section 6 of this Commitment, all Defects must be reproducible and step by step instructions on how to reproduce the Defect shall be documented by TMCC and delivered to ALLTEL.

- "Excusable Downtime" means the aggregate amount of time, as measured in minutes, during Scheduled Uptime in any month during which the ALS-COM Software is not available for business use due to any cause other than a Defect in the ALS-COM Software.

- "Failure Event" means a failure by ALLTEL to fulfill one or more of the service levels set forth in this Service Level Commitment.

- "Fix" means the actual solution that repairs or remedies a Defect.

- "Resolution" (and its antecedents, including "Resolve" and "Resolves") means the delivery or communication to TMCC of a Fix that corrects a Defect.

- "Scheduled Uptime" means that period of time as measured in minutes during which the ALS-COM Software is made available by TMCC for normal business use.

- "ALS-COM Software Availability" means [Actual Uptime] divided by [Scheduled Uptime minus Excusable Downtime] with the result expressed as a percentage.

- "Time to Resolve" means the elapsed time between Acknowledgement of the Defect by ALLTEL and the Resolution of the Defect.

- "Volume Throughput" means the number of credit applications which can be processed by the ALS-COM Software in the times specified in Section 5 of this Commitment.

- "Work Around" shall have the same meaning as defined in subsection 7.1.1 in the Agreement.

2.    **Reserved**

3.    **Response and Resolution**

ALLTEL will resolve Defects in the ALS-COM Software for production environments in accordance with this Section.  ALLTEL will provide appropriate telephone and pager numbers in

11                                    F 00106

order that: (i) TMCC can report Defects to ALLTEL at any time, and (ii) ALLTEL can acknowledge Defects as provided below. TMCC will report Defects to ALLTEL by utilizing ALLTEL's Hotline. In the event TMCC reports Defects after normal business hours, TMCC will leave a message on ALLTEL's Hotline that will immediately contact ALLTEL on-call support personnel through an automatic page.

In accordance with Section 7.1.2 of the Agreement, ALLTEL's obligations to deliver the Work Around and Resolve the Defect shall commence when ALLTEL has received from TMCC sufficient information regarding the problem reported by TMCC to enable ALLTEL to commence analysis of the Defect (but not more than all information actually available to TMCC when TMCC notifies ALLTEL of the problem). Such information need not be communicated to ALLTEL in writing unless ALLTEL reasonably requires the information to be in writing before ALLTEL can commence such work. However, if TMCC conveys the information to ALLTEL verbally, TMCC will also communicate the information to ALLTEL in writing when it is reasonably possible for TMCC to do so.

If the information reported by TMCC is not sufficient for ALLTEL to commence to analyze the Defect, ALLTEL shall diligently work to acquire such sufficient information, but the Work Around delivery and Time To Resolve time periods shall not begin until either TMCC has reported, or ALLTEL has acquired, sufficient information regarding the problem to enable ALLTEL to commence analysis of the Defect. If the parties disagree as to whether or not a Work Around Delivery period or Time to Resolve has expired due to a disagreement as to if or when such period commenced, the parties shall pursue the First Escalation Procedure and, if the dispute is not resolved, either party may pursue the Second Escalation Procedure. If the dispute is not resolved through the First and Second Escalation Procedures, either party may pursue the dispute resolution process provided for in Section 22 of the Agreement until the dispute is resolved. During the pendency of the First Escalation Procedure, ALLTEL shall not be required to pay any Refund or Augmented Refund relating to the applicable Defect. If the dispute is not resolved through the First Escalation Procedure, ALLTEL will pay one-half of the applicable Refund or Augmented Refund. If the dispute is resolved through the Second Escalation Procedure or the dispute resolution process provided for in Section 22 of the Agreement, either TMCC will reimburse such amounts to ALLTEL, or ALLTEL will pay the additional amounts due to TMCC, as required in light of the resolution of the dispute.

In the event that ALLTEL determines that a problem reported by TMCC is not a Defect, TMCC shall pay ALLTEL for its services at ALLTEL's rates negotiated for TMCC then in effect (if any), and TMCC shall reimburse ALLTEL for any and all reasonable travel and living expenses incurred by ALLTEL in rendering such services, subject to the provisions set forth below. If TMCC does not agree with ALLTEL's determination that a reported problem is not a Defect, the parties shall pursue the First Escalation Procedure and, if the dispute is not resolved, the Second Escalation Procedure, and during the pendency of the First and Second Escalation Procedures TMCC shall not be required to pay such amounts. If the dispute is not resolved through the Second Escalation Procedure, the parties will follow the dispute resolution process provided for in Section 22 of the Agreement until the dispute is resolved and, until the dispute is resolved, TMCC will commence payment of one-half of the amount of the fees and expenses payable pursuant to the second preceding sentence. Upon resolution of the dispute, either ALLTEL will reimburse such amounts to TMCC, or TMCC will pay all such fees and expenses due to ALLTEL, as required in light of the resolution of the dispute.

12

F 00107

- **Response and Resolution matrix**

ALLTEL will respond to and Resolve Defects in accordance with the following table.  For the ALS-COM Software (including Phased Delivery Software), information in the following table and the definitions of Severity Levels in this Commitment supersede any contrary information in the table set forth in Section 7.1.2 of the Agreement.

| | | | | |
|---|---|---|---|---|
| One | Immediately upon receipt of notice | 1 Hour | 6 Hours | 6 Hours* |
| Two | Immediately upon receipt of notice | 1 Hour | 24 Hours | 10 Days |
| Three | 2 Hours upon receipt of notice | Earliest Available Attended Telephone Support Period | 48 Hours | Next scheduled patch or release |
| Four | Next Business Day upon receipt of notice | Earliest Available Attended Telephone Support Period | Future Update | Future Update |

\* If a Work Around delivered for a Severity One Defect provides an improvement in the performance of the Software which results in a significant reduction in the impact of the Defect so that the system no longer crashes, aborts and/or halts further production, the Defect shall be reclassified to Severity Level Two.  The Time To Resolve deadline for the reclassified Defect shall be the Time To Resolve deadline provided for Severity Two Defects.

❖ Severity Three and Four Defects will be reported by TMCC during Attended Telephone Support periods, described above.
❖ TMCC will notify ALLTEL of all Severity Three and Four Defects within a reasonable time after TMCC discovers such Severity Three and Four Defects.

The Parties may, upon written mutual agreement, alter the times set forth above in the foregoing table.

- **The Severity Codes** are ranked in order of the severity of their impact to the end user.  Codes are assigned to Defects on the basis of their symptoms, impact and agreed upon definition TMCC will assign a Severity Code when it reports a Defect.  When in agreement with the Severity assignment, ALLTEL will respond based on the table above.  Notwithstanding the foregoing, any disagreements as to a Severity assignment shall be resolved in accordance with the First and Second Escalation Procedures, as defined in Section 7.1 of the Product Schedule, and, if not resolved thereby, the dispute resolution procedures provided for in Section 22 of the Agreement, and ALLTEL may not delay the delivery of a Work Around or a Resolution

13

F 00108

pending the outcome of such Escalation Procedures and dispute resolution process. Notwithstanding the foregoing, should TMCC be determined to have assigned Severity Code One to Defects that actually were Severity Code Two, Three or Four, or Severity Code Two to Defects that actually were Severity Code Three or Four, on more than fifteen percent (15%) of the occasions of TMCC's assignment of Severity Code One or Two to Defects within any rolling six-month period, then, for the following six months, on each occasion (if any) TMCC assigns a Severity Code One or Two to a Defect and such Severity Code is determined to be too severe, TMCC will pay to ALLTEL the reasonable incremental cost, if any, of delivering a Work Around and Resolving the Defect at the more severe Severity Code as compared to the Severity Code determined to have been correct.

- o   **Severity One**
  Causes the system to crash, abort and/or halt further production.   Example:  App Entry function abending for all users; ACRM is down.

- o    **Severity Two**
  The program does not abort and halt further production, but a portion of production can not be performed, and/or a serious problem in which a critical system, application or component device is experiencing a partial outage or is performing in a degraded mode.  Example:  Image Server is down.

- o   **Severity Three**
  Results in user/operator inconvenience or annoyance but does not interrupt the performance of required functionality.    Severity Three defects do not cause programs to abort or halt, and while defects of this nature may inconvenience users, they do not prevent performance of business requirements.
  Examples:  TMCC must notify all of their ALS-COM Analysts that they will need to locate new applications in their Analyst Queue by opening the Analyst Queue, sorting by App ID, and then scrolling down to locate the newest applications instead of using the 'Received Today' feature like they usually do.  This is due to the 'Received today' feature in the Analyst Queue getting broken as a result of a deployment of a new ALS-COM build into Production.

- o   **Severity Four**
  Low impact problem that does not affect application operation:   a nuisance problem that does not adversely affect productivity or availability.
  Example:  On the Data Entry/ Res screen for all buyers on the application, when the 'SSN too few characters' is OK'd, the cursor position within the Social Security # field does not return to the 1st cursor position; Get "Error #6 (Overflow)...." Message when Data Entry Complete is attempted and a value of 9,999,999,999 or more is entered into the Income field, or any field within the OtherMonthly Income window, on the Data Entry/Applicant/Emp screen.

F 00109

4.    **ALS-COM Software Availability**

- ALLTEL shall maintain ALS-COM Software Availability at the level set forth below during Scheduled Uptime.

| ALS-COM Software Availability | |
|---|---|
| **Metric** | **Service Level** |
| ALS-COM Software Availability per month during Scheduled Uptime | 98% |

5.    **Volume Throughput.** For the purpose of this Section 5, the term "process" shall mean taking a credit application from initiation through final decision. For ALLTEL to meet the Volume Throughput Service Level standard, all of the following must be true:

- The ALS-COM Software shall have the ability to process a standard volume of 4000 credit applications per day and also a standard volume of 600 credit applications per hour during Scheduled Uptime.

- The ALS-COM Software shall have the ability to process a Peak Volume (as defined herein) of 6000 credit applications per day and also a Peak Volume of 900 credit applications per hour. "Peak Volume" standards shall apply to the periods during Scheduled Uptime designated by TMCC.

- The ALS-COM Software shall have the ability to process an Excessive Peak Volume (as defined herein) of 8000 credit applications per day and also an Excessive Peak Volume of 1200 credit applications per hour. "Excessive Peak Volume" standards shall apply to holidays, weekends, tent sales and special events, during Scheduled Uptime, as designated by TMCC.

- Notwithstanding the foregoing, the ALS-COM Software shall have the ability to support an overall volume of applications of 1,400,000 over a seven (7) month period, representing a rolling six (6)-month retention period, with one (1) month of rollover or purge, and to store such applications data and make it available to TMCC.

- The ALS-COM Software shall have the ability to support an anticipated volume growth of fourteen percent (14%) compounded per year for a total of up to one hundred percent (100%) of volume growth over a five (5) year period from the initial ES Services Effective Date. Such growth rates shall apply to the standard volume standard, the Peak Volume standard, the Excessive Peak Volume standard and the overall volume over a seven-month period. Thereafter, ALLTEL reserves the right to modify future growth rates supported by the ALS-COM Software.

6.    **TMCC Requirements**

In order for ALLTEL to perform the ES Services and meet the Service Level Commitments described herein, TMCC will make available to ALLTEL (i) access to TMCC's computer systems, subject to TMCC's security regulations, and under conditions which will not unreasonably obstruct ALLTEL's ability to provide such services, (ii) the appropriate qualified personnel to

F 00110

reasonably assist ALLTEL and (iii) any consents required by third parties (if any) to enable ALLTEL to access TMCC's systems; provided, that ALLTEL shall cooperate with TMCC, at TMCC's reasonable expense, in TMCC obtaining any such required third party consents.

7.    **Excused Nonperformance**

ALLTEL shall not be liable to TMCC for monetary remedies for failure to meet a Service Level Commitment to the extent that such failure is directly attributable to:

(i)      TMCC's material breach of or material failure to perform any of its obligations under the Agreement;

(ii)     Services, software or hardware provided by TMCC to ALLTEL that adversely impacts ALLTEL's ability to fulfill a Service Level;

(iii)    Any other cause or omission beyond the reasonable control of ALLTEL; or

(iv)     Any Service Level Commitment failure not due to a Defect in the ALS-COM Software.

Notwithstanding the foregoing, such non-liability for monetary remedies shall not remain in effect as to any continuing failure to meet a Service Level Commitment following the cure of the breach, the removal of the cause or omission, or the remediation of the services, software or hardware that had directly caused such failure. However, ALLTEL shall not be liable for any monetary remedies that may have accrued prior to such cure, removal or remediation.

8.    **ALLTEL Cooperation**

Notwithstanding any other provision of the Agreement, the Product Schedule or this Commitment, ALLTEL agrees to cooperate with TMCC in the investigation, research, troubleshooting and resolution of problems related to any third-party products (i.e., not developed by ALLTEL) that are listed in the Production Hardware Deployment Guide as of the First Amendment Effective Date, and any additional third-party products listed in the Production Hardware Deployment Guide as such document is revised in connection with the delivery of the Phased Delivery Software and ALS-COM or listed in any release update notes and release documentation (whether or not such products are specifically identified in such Guide, notes or documentation as "third party" or "not owned or developed by ALLTEL")(collectively, the "Third Party Products"). Such cooperation shall include providing access to ALLTEL personnel resources that have expertise in a given Third Party Product and, at TMCC's discretion, providing personnel resources to work with any necessary third parties in the investigation, research, troubleshooting and resolution of such problems (but not actually to correct any defects in any Third Party Product). TMCC agrees to reimburse ALLTEL for its reasonable expenses incurred as a result of such cooperation, unless the cause of the problem is a Defect in ALS-COM or any Phased Delivery Software or a defect in (or integration problem with ALS-COM and) a Third Party Product that is a software product (but not any hardware product).

16

F 00111

ALLTEL and TMCC agree to make this Service Level Commitment a part of Product Schedule No. 1.

| **ALLTEL INFORMATION SERVICES, INC.** | **TOYOTA MOTOR CREDIT CORPORATION** |
|---|---|
| By: _Cliff Thompson (signature)_ | By: _____ |
| Name: _CLIFF THOMPSON_ | Name: _____ |
| Title: _SVP AUTO FINANCE_ | Title: _____ |
| Date: _March 4, 2002_ | Date: _____ |

17

F 00112

EXHIBIT 7

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

Toyota Financial Services Confidential

OSCAR Relaunch Project Charter





# TOYOTA FINANCIAL SERVICES

## OSCAR Relaunch Project

## PROJECT CHARTER

Version: 1.1
Date: June 14, 2002
Confidential

F 01412

# *Document Information*

## REVISION HISTORY

The following table summarizes the revision history of this document. Included within this table is the name of the source file of this document and a log of the revisions made to the document.

*Table: Document Revision History*

*File Name*

| Version | Date | Author∑ | Revision Notes |
|---|---|---|---|
| 0.1 | 03/13/02 | Danette Weatherholt | Initial conversion from RDA phase charter |
| 0.2 | 4/1/02 | Diane Switzer | Updated for Relaunch |
| 0.3 | 4/2/02 | Diane Switzer | Updated for Relaunch |
| 0.5 | 4/8/02 | Diane Switzer | Updated to include PM team feedback |
| 0.6 | 4/11/02 | Arlene Feliz – Danette Weatherholt | Added ALLTEL Deliverable List; Updated ALLTEL Org.; added Assumptions |
| 0.7 | 4/12/02 | Marshall Dempsey | Added sec 1.1.2 |
| 0.8 | 4/12 | Danette Weatherholt | Added sections 4.7, 4.8 & 4.10.1 for D. Switzer |
| 0.9 | 4/15/02 | Janet Bricker | |
| 0.10 | 4/17/02 | Danette Weatherholt | Updated Org Chart, added BJ's and Janet's Deliverable section |
| 0.11 | 4/17/02 | Billie Jo Johnson | Updated Deliverable Summary section and Dependent Project #12 |
| 0.12 | 4/18/02 | Danette Weatherholt | Updated ALLTEL Org Chart. Updated styles to Toyota deliverables and text 4.7, 4.8 & 4.10.1. Added 4.9 Quality Mgmt section  Updated signature page. |
| 0.13 | 4/18/02 | Diane Switzer | Clean up |
| 0.14 | 4/18/02 | Danette Weatherholt | Clean up |
| 0.15 | 4/19/02 | Diane Switzer | Clean up |
| 0.16 | 5/13/02 | Danette Weatherholt | Added BillieJo's and Janet's section on vendor |
| 1.0 | 5/20/02 | Diane Switzer | Release to Steering Committee |

Toyota Financial Services Confidential                                    OSCAR Relaunch Project Charter

| 1.1 | 6/14/02 | Diane Switzer | Incorporated Steering Committee feedback |

**F 01414**

# *Table of Contents*

| Section # | Title | Page |
|---|---|---|
| | Document Information | ii |
| **1** | **Executive Summary** | **1** |
| 1.1 | Executive Overview | 1 |
| 1.1.1 | Business Situation | 1 |
| 1.1.2 | Project Criticality | 2 |
| **2** | **Strategic Business Alignment** | **3** |
| **3** | **Project Definition** | **5** |
| 3.1 | OSCAR Project Mission | 5 |
| 3.2 | Project Objectives | 5 |
| 3.3 | In Project Scope | 6 |
| 3.4 | Out-Of-Project Scope | 7 |
| 3.5 | External Project Dependencies | 8 |
| 3.6 | Business Measures of Success | 10 |
| 3.7 | Project Management Measures of Success | 10 |
| 3.8 | Project Priorities | 11 |
| 3.9 | Major Deliverables and Milestones | 11 |
| 3.9.1 | Deliverables | 11 |
| 3.9.2 | Milestones and High-Level Timeline | 13 |
| 3.10 | Assumptions | 15 |
| 3.11 | Constraints | 16 |
| 3.12 | Project Organization Chart | 17 |
| 3.13 | Supplier Procurement | 20 |
| 3.14 | Budget | 20 |
| 3.14.1 | Cost Estimates | 20 |
| 3.14.2 | Budget Assumptions | 21 |
| 3.14.3 | Approved Budget | 21 |
| **4** | **Project Controls** | **22** |
| 4.1 | Communication Management | 22 |

| Section # | | Title | Page |
|---|---|---|---|
| 4.2 | | Scope Management | 24 |
| 4.3 | | Change Management | 24 |
| 4.4 | | Issue Management and Escalation | 25 |
| 4.5 | | Risk Management | 25 |
| 4.6 | | Procurement Management | 25 |
| 4.7 | | Resource Management | 28 |
| 4.8 | | Budget Management | 29 |
| 4.9 | | Quality Management | 30 |
| 4.10 | | Time Management | 32 |
| | 4.10.1 | Plan Development | 32 |
| | 4.10.2 | Time Tracking | 32 |
| **5** | **Glossary** | | **34** |
| **6** | **Approvals** | | **36** |
| **Appendix A** | **OSCAR Relaunch Deliverables** | | **37** |

**F 01416**

# *1 Executive Summary*

## 1.1   EXECUTIVE OVERVIEW

The On-line System for Contract Acquisition and Reporting (OSCAR) project was initiated in June 2000.  By early 2001, it was recognized that progress was not meeting expectations.  TFS and the software vendor (ALLTEL) undertook project audits.  In late May 2001, an OSCAR Strategy meeting was conducted where representatives of both TFS and ALLTEL worked jointly to develop a strategy to move forward.  The "Go Forward" strategy was structured in three phases:

> Phase I: Strategy session and architectural review

> Phase II: Requirements Definition Assessment[1]

> Phase III: Formal OSCAR project re-launch

This document lays the foundation for the third phase of the go-forward strategy.

### 1.1.1   Business Situation

**Toyota Specific Strategic Initiatives**

TFS is reinventing itself to better address the needs of its dealers and customers through the Renaissance project. To achieve this goal, TFS must move to the next generation of application systems that are more flexible and able to handle increased volumes.  The OSCAR project is a key element to the success of TFS reinvention for the following reasons:

- The replacement of the contract acquisition system is determined to be the number one priority for legacy system replacement because the current system is limiting growth and business opportunities.

- A key TFS goal is to book 1 million contracts by 2005.  In 2002, we were at 835,000.

- We must be able to address emerging markets.

- We must have the ability and flexibility to change as the marketplace changes.

The new contract acquisition system will need to:

- Provide a common repository for flexible data access.

- Have the ability to use new technology in Toyota's business environment.

- Allow the ease of service configuration changes.

- Support roll out of new TFS products and services.

- Be scalable to Toyota's business goals.

---

[1] The Phase II Project Charter is titled OSCAR RDA Project Charter v1.3a.doc.                    **F 01417**

Toyota Financial Services Confidential

## ALLTEL Specific Strategic Initiatives

ALLTEL key strategies include:

- Automotive Captive Finance is a mission critical line of business for ALLTEL; therefore, ALLTEL must succeed in its partnership with Toyota.
- The end product needs to serve the larger marketplace as well as meet TFS needs.

### 1.1.2 Project Criticality

The TFS Application Processing System (APS) is a proprietary in-house custom application (RPG AS400, COBOL MF) that was installed in January 1991. This is a mission critical system that is custom designed and supported by BTS. It is a "green-screen" application that does not provide the user interface features or the core business functionality to meet the changing needs of either the user or the business. Many manual processes are in place to work around system limitations, resulting in inefficient workflow and a high risk of error. In addition, user interface technology has changed dramatically in recent years and a change to quicker, more intuitive ways of work would enable associates to perform job tasks with far greater efficiency.

Discounting processes will also benefit greatly from a new system. Marketing programs will be selected through system logic rather than manual analysis, eliminating the need for discounters to search through external program documentation to identify the appropriate program. DSSO personnel will no longer have to ask corporate to "open a window" to allow a deal to book. Held offerings will be more easily tracked through the use of checklists for required documents and processing steps. ALS COM will be able to automatically generate and send reports informing dealers of held offerings. The system contains integrated checklists for required documents or tasks that can be customized for each branch, eliminating manual checklists and ensuring that deals are not booked until all requirements are met.

The existing APS system does not meet the competitive challenges that exist in the current marketplace. Additionally, supporting the system has become increasingly costly due to its age and the proprietary nature of the programming.

The Contract Acquisition Replacement project was initiated based on the recommendation of the team that was chartered with developing a strategy for replacement of the TFS/LFS legacy applications. Key to developing the replacement strategy was confirming the assumption that it was necessary to commence planning for and implementing replacement systems. Based on the team's analysis of TFS business strategies, research into industry trends, and a competitive review, it was clearly apparent that the need was real.

**F 01418**

Toyota Financial Services Confidential

# 2 Strategic Business Alignment

This section details the initiative's alignment with Toyota Financial Services Business Strategy. It includes a description of how the particular initiative relates to the strategy, as provided within the following table.

**Table: Strategic Alignment**

| Business Strategy | Description of initiative's alignment with a strategy |
|---|---|
| **Financial** <br><br> • Grow revenues by strengthening and increasing contract volume <br> • Improve cost structure | **Achieve Balanced Financial Growth** <br><br> • Improved operational efficiency <br>  o Manual and error prone processes will be eliminated <br> • Risk-based pricing <br>  o System determines customer tier based on business rules <br> • Increased flexibility in defining Marketing programs <br> • Auto decisions, including auto declines <br>  o Business rules define the parameters for auto approvals & declines <br> • Non-Toyota/Lexus lending <br>  o Supports all makes/models |
| **Customer Relationship** <br><br> • Develop stronger customer relationships (consumer, dealer and TFS) <br> • Become a full service financial provider | **Develop Stronger Customer Relationships** <br><br> • Responsiveness to market conditions <br>  o More flexibility in developing and implementing Marketing programs <br> • Quicker response through auto decisions <br>  o Auto-approval and auto-decline criteria is more flexible <br> • Mega dealers <br>  o Supports marketing programs targeted to mega dealers <br> • Customer segmentation / Lifetime Value Analysis <br>  o Data sent to the Credit Scoring system or the Data Warehouse where it will be available for analysis <br> • Consistency <br>  o Credit policies are checked systematically <br>  o Overrides are allowed according to authority levels and are tracked for analysis |

**F 01419**

Toyota Financial Services Confidential

OSCAR Relaunch Project Charter

---

**Table: Strategic Alignment**

| *Business Strategy* | *Description of initiative's alignment with a strategy* |
|---|---|
| *Internal Process* | *Achieve operational excellence* |
| <ul><li>Achieve operational excellence through process focus and ownership</li><li>Improve customer relationship processes to create value for customers (consumer, dealer and TMS)</li></ul> | <ul><li>Replace outdated legacy systems that tie us to ineffective and inefficient ways of doing things</li><li>Automate manual processes<ul><li>Validation of contract terms and calculations</li><li>Vin verification</li><li>Used car valuation</li><li>Verification of prior TFS customer history</li><li>Increased automation related to business deals</li><li>Automated wholesale interface to determine wholesale status</li></ul></li><li>Enhance functionality<ul><li>"What if" capacity for rehashing deals</li><li>Compliance validation</li></ul></li></ul> |
| *Support for Future initiatives* | <ul><li>Dealer funding via ACH<ul><li>Electronic payments module will allow funding replacement of our current draft mechanism</li></ul></li><li>Netting<ul><li>Supports netting the wholesale balance due against proceeds</li></ul></li><li>Business expansion<ul><li>Sub prime lending interface</li><li>Direct lending</li><li>Lending for non-automotive products</li></ul></li></ul> |

**F 01420**

# 3  *Project Definition*

## 3.1  OSCAR PROJECT MISSION

This is a collaborative software implementation effort designed to deliver a commercially marketable Automotive Captive Finance software product with the goal to minimize TFS customization.

**TFS**

Implement a flexible contracts acquisition system to enable TFS to achieve the strategic goals described in Section 2.

**ALLTEL**

- Make sure Toyota's mission is achieved
- Enable ALLTEL to meet the needs of other customers.

## 3.2  PROJECT OBJECTIVES

The following are the OSCAR Relaunch objectives:

- Complete detailed requirements for remaining gap items and for approved change requests.
- Develop functional specifications for ALS COM and TFS interfaces to meet detailed requirements.
- Develop technical specifications, construction, and unit test for ALS COM and TFS interfaces.
- Conduct integration, function/system, performance, fail-over, configuration, and user acceptance tests.
- Define, develop, and test ACRM definitions and rules to support workflow, credit scoring, and marketing programs.
- Facilitate the revision process for policy and procedures impacted by OSCAR.
- Plan for and conduct train-the-trainer sessions.  Train CSC, DSSO, and corporate staff.
- Prepare for and conduct a Pilot for each production release.
- Plan and support deployment of OSCAR to Corporate and the CSCs and DSSOs.
- Working with Production Services, procure, install, and configure the necessary hardware and software to support OSCAR in development, test, and production environments.
- Facilitate the smooth transition of OSCAR to production, for production services, application support, and customer (help desk) support.

**F 01421**

## 3.3   IN PROJECT SCOPE

The following is within scope of the OSCAR project:

- Enhancements or changes to ALS COM to support OSCAR requirements, as defined in the OSCAR Master Gap Matrix. Refer to Table 1 for a summary of the status of OSCAR gaps. Refer to Figure 1 for a summary of the requirements that are in scope for OSCAR. Post implementation or removed gaps that have been identified to date are not in scope at this time.

- Development of interfaces to/from ALS COM and TFS legacy systems, as defined in the OSCAR Master Gap Matrix. Interfaces include Data Warehouse, Pars/DRS, OCA, Dealer Daily, Customer Information (CIF), Credit Scoring[2], Wholesale, Lease, Retail, rebooking and Residual Value.

- Enhancements or changes to certain TFS legacy systems to support OSCAR requirements (Lease, Retail, FOCUS ). This work is to be performed by the impacted legacy systems groups and Keane.

- Changes to OCA to support the new interface to/from OCA and ALS COM. This work is to be performed by the OCA team.

- Pilot and deployment of OSCAR to the field. Training of impacted CSC, DSSO, and corporate personnel.

| Requirement / Gap Status | Count |
|---|---|
| Requirement Not Started | 0 |
| Requirement in Progress | 76 |
| Delivered in 2.4 | 23 |
| Post Implementation | 33 |
| Removed | 23 |
| Merged | 48 |
| Functional Spec Signed Off | 8 |
| Requirement Signed Off | 8 |
| Planned Enhancement | 1 |
| R2.21 OK as is | 47 |
| **Total** | **267** |

**Table 1: OSCAR Gap Summary**

---

[2] Added to OSCAR project scope via PCR DET74.

**F 01422**



**Figure 1: Gap Status for OSCAR Relaunch**

## 3.4   OUT-OF-PROJECT SCOPE

The following is not within scope of the OSCAR project:

- Enhancements or changes to the Dealer Daily system to support OSCAR requirements. Changes to Dealer Daily that may impact OSCAR that are not specified in the approved requirement are not in scope for OSCAR. The effort for the OSCAR team to extract the interface data is in scope. This interface supports new features for Dealer Daily as well as existing features. The effort needed to accept this interface and make revisions to the Dealer Daily Credit Application is not within scope for the OSCAR team and is the responsibility of the Dealer Daily Credit Application team.

- Enhancements or changes to the OCA front-end system to support OSCAR requirements. Changes to OCA that may impact OSCAR that are not specified in the approved requirement are not in scope for OSCAR. (The OSCAR effort to build an interface to OCA is in scope. The OCA effort to handle this new interface is also in scope.)

- Enhancements or changes to a Data Warehouse or Data Mart to support OSCAR requirements. The OSCAR effort to build a DW extract is in scope. The effort to accept this extract and load it into a data warehouse or data mart is not in scope for the OSCAR team and is expected to be the responsibility of the Data Warehouse team. As of June 2002, accepting the OSCAR extract is not in scope for the Data Warehouse team. The Data Warehouse team will ensure that the existing Operations data mart continues to operate correctly when OSCAR goes into production; however, new functionality for the existing data mart or a new credit scoring data warehouse is not yet planned or approved.

- Inventorying of or upgrades to facilities or hardware at DSSOs and CSCs to support OSCAR.

- Enhancement of the current Toyota e-mail infrastructure to support secure e-mail transmissions.

- An interface to the Toyota Dealer Network (TDN) system for Toyota or Lexus dealers.

## 3.5   EXTERNAL PROJECT DEPENDENCIES

If the project is dependent upon another group within or outside of the enterprise, or must integrate with other applications, those integration deliverables are documented here.   In addition, this section identifies the owner within the project team who will coordinate with the deliverable owner to ensure timeliness of completion.

*Table: Integration Management*

| | Dependent Project | Impact | Project Manager/Owner | OSCAR Team Owner |
|---|---|---|---|---|
| 1 | Renaissance | Impact to OSCAR – Organizational Structure changes may impact OSCAR requirements. | Renaissance / Margaret Meloni | Billie Jo Johnson |
| 2. | ECOA Letter Modifications | Impact to OSCAR – ECOA compliance matters are currently being addressed.  Modifications will provide OSCAR requirements. | Legal / Elise Ross | Billie Jo Johnson |
| 3. | APS Lease Scorecards | 1) Impact to OSCAR – new scorecards will provide OSCAR requirements<br><br>2) OSCAR impact to Scorecards/APS – Delay of OSCAR implementation will dictate a need to modify Lease Scorecards  This would require APS changes. | Risk Management / Reddy Pakanati<br>APS / Maggie Bazua | Billie Jo Johnson |
| 4 | Dealer Daily | OSCAR impact to DD – Replacing APS will dictate a need to interface from the extranet to OSCAR, and OSCAR to DD.  This interface is planned.<br><br>DD impact to OSCAR - Ongoing changes to DD may impact OSCAR scope and timelines. | APS / Maggie Bazua<br>DD Credit App / Maggie Bazua | Billie Jo Johnson |
| 5 | On-Line Credit Apps | OSCAR impact to OCA – Replacing APS will dictate a need to interface from the internet to OSCAR.  This interface is planned.<br><br>OCA impact to OSCAR - Ongoing changes to OCA may impact OSCAR scope and timelines. | APS / Maggie Bazua<br>OCA / Maggie Bazua | Billie Jo Johnson |
| 6. | Consumer Lending | OSCAR impact to CLP – OSCAR requirements may impact CLP.  OSCAR data will be uploaded to CLP.<br><br>CLP impact to OSCAR – once CLP replaces the legacy servicing systems, OSCAR must interface to CLP. | CLP / Doriene Viera | Billie Jo Johnson |
| 7. | Data Warehouse | OSCAR impact to Data Warehouse – OSCAR requirements will impact the Data Warehouse.  OSCAR will interface to the Data Warehouse. | Management Reporting / Luna Wong<br>Risk Management / Reddy Pakanati | Billie Jo Johnson |

Toyota Financial Services Confidential                                        OSCAR Relaunch Project Charter

*Table: Integration Management*

| Dependent Project | Impact | Project Manager/Owner | OSCAR Team Owner |
|---|---|---|---|
| 8. Experian Attribute Comparison | **Impact to OSCAR** - Modifications to existing bureau definitions/attributes will provide OSCAR requirements | Risk Management / Reddy Pakanati | Billie Jo Johnson |
| 9. Magnum Upgrade (project not yet defined) | **OSCAR impact to Magnum** – Delay of OSCAR implementation will dictate a need to upgrade. | APS / Maggie Bazua | Billie Jo Johnson |
| 10. Windows 2000 | **Impact to OSCAR** – The WIN 2000 project is inventorying and upgrading, as necessary, all CSC and DSSO desktops to Windows 2000. Desktops for OSCAR users are assumed to be updated prior to OSCAR pilot or roll-out to any single site. | WIN 2000 project team / Connie Rayna & Chris Bunts | Janet Bricker |
| 11. Dealer Daily replacement of TDN interface | **Impact to OSCAR** - Dealer Daily has replaced the TDN interface for Toyota dealers. The interface still exists for Lexus dealers. Dealer Daily plans to replace the Lexus dealer TDN piece. It was assumed Dealer Daily would replace the TDN interface for Lexus dealers prior to the OSCAR production implementation. These plans have changed and this assumption is no longer valid for Lexus dealers. Lexus dealers will not be able to use this interface after OSCAR is deployed. | Dealer Daily project team, Sue Janielson | Janet Bricker |

**F 01425**

Toyota Financial Services Confidential                                OSCAR Relaunch Project Charter

## 3.6  BUSINESS MEASURES OF SUCCESS

---

*Table: Measures of Business Success*

---

| Business Drivers | Metric |
|---|---|
| 1.  A positive Cost Benefit result | Refer to the OSCAR Cost Benefit for details.  In summary, key metrics for success are: |

- An overall return on investment (ROI) of 8.7% by FY 2009.

- Improved operational efficiencies by the end of FY2004 for Credit Analyst functions and by the end of FY2005 for Discounter functions.  The efficiencies translate to FTE savings through either a reduction in headcount or a reduction in new hires.

- A credit loss reduction by the end of FY 2004

- A fraud loss reduction by the end of FY 2004.

- Better margin control by the end of FY 2005.

## 3.7  PROJECT MANAGEMENT MEASURES OF SUCCESS

---

*Table: Project Management Measures of Success*

| Measures of Success | Metric |
|---|---|
| On Time | Release 1 Deployment completed by 6/30/2004.<br>Release 2 Deployment completed by 9/30/2004*.<br>(*or a new date if there is an approved change in scope that impacts the milestone date) |
| Quality specifications / scope | Scope delivered as defined in the OSCAR Master Gap Matrix and approved Project Change Requests |
| On Budget | Scope delivered for a total cost not to exceed $26,516,859, excluding associate costs.  Refer to Section 3.14 for specific budget details. |

**F 01426**

---

Toyota Financial Services Confidential                                      OSCAR Relaunch Project Charter

## 3.8    PROJECT PRIORITIES

The following are the key project drivers as identified and approved by the Project Sponsor.

**Table: Project Priorities**

| Priority | Scope/Quality | Time | Cost |
|---|---|---|---|
| 1st Priority | | X | |
| 2nd Priority | X | | |
| 3rd Priority | | | X |

The business will prioritize *Time* first as long as the project offers operational advantages. OSCAR's value depends on the relationship of the scope to the business need. Should the scope not meet the need or enhance the current standards of operation, the priorities would be realigned such that *Scope* would have the greatest influence.

## 3.9    MAJOR DELIVERABLES AND MILESTONES

This section lists the project's major deliverables, milestones and their associated timeframe, duration and critical dependencies.

### 3.9.1    Deliverables

The following tables describe the major deliverables and ownership for the OSCAR relaunch project. Refer to Appendix A for a complete list and description of each deliverable.

**Table: ALLTEL Deliverables**

| ALLTEL Project Deliverables | Description/scope | |
|---|---|---|
| Project Management Deliverables (Developed by the ALLTEL project management team) | • Project Plan | • Quality Management Plan |
| Project Management Deliverables (Jointly developed by the OSCAR project management team (TFS & ALLTEL)) | • Communications Plan<br>• Change Control Process<br>• Risk Management Process | • Escalation Process<br>• Configuration Management Process<br>• Time Reporting Process<br>• Incident Tracking Process |
| Training | • System Admin Training<br>• ACRM Definitions, Training and Validation<br>• ACRM Support | • Tester Training<br>• Train the Trainer<br>• Post-Training Support |
| Installation | • Site Prep Checklist<br>• Base ALS COM Installation and Patch Upgrades<br>• Installation Support Testing | • Install Sign-off<br>• System Support Package<br>• Pilot Strategy Planning & Rollout Support |

**F 01427**

Toyota Financial Services Confidential

*Table: ALLTEL Deliverables*

| ALLTEL Project Deliverables | Description/scope | |
|---|---|---|
| Performance Testing | • Performance Test Plan (includes ACRM)<br>• Performance Test (includes ACRM) | • Performance Test Results (includes ACRM) |
| ALLTEL Product | • Tested ALS COM System | • Phase-End Test Report |
| | • Test Support (ALLTEL) | |
| ALS COM Base Product Custom and Design Deliverables | • ALS COM Auto Indirect Module<br>• ALS COM Leasing Auto Indirect Module<br>• ALS COM Retail Balloon Indirect Module | • Customization to ALS COM as specified in Business Requirements (See Master Gap Matrix)<br>• Functional Specifications |
| Documentation Deliverables | • ALS COM Documentation<br>• Release Notes | • Data Dictionary |

*Table: TFS Deliverables*

| TFS Project Deliverables | Description/scope | |
|---|---|---|
| Requirements & Specifications | • Business Requirements<br>• Requirements Traceability | • Functional Specification & ALS COM Functional Spec Edits |
| Architecture | • Overall System Architecture<br>• Communications Design | • Technical Infrastructure Design |
| Design & Construction | • Interface Specification<br>• Application Interfaces Design | • Standards and Procedures<br>• ACRM Plan and Design |
| Test | • Established Test Environment<br>• Test Tool Implementation Plan<br>• Interface Functional Test Plan & Design<br>• System Test Plan & Test Cases<br>• Stress and Performance Test Plan & Design and Report<br>• Network Application Readiness (NAR) Report | • Fail over Test Plan & Design & Report<br>• Configuration Test Plan & Design and Report<br>• Overall Test Strategy<br>• Test Entrance and Exit Criteria<br>• Phase-End Test Report |
| System Management | • Systems Management Design<br>• Fault Management Procedure<br>• Configuration Management Procedure<br>• Performance Management Procedure | • Security Management Procedure<br>• Data Management Procedure<br>• OSCAR System Monitoring Tool(s)<br>• Disaster Recovery Strategy |

**F 01428**

Toyota Financial Services Confidential                                    OSCAR Relaunch Project Charter

*Table: TFS Deliverables*

| TFS Project Deliverables | Description/scope | |
|---|---|---|
| Pilot & Deployment | • Pilot Test Plan<br>• Pilot Test Results Report<br>• Deployment Plan<br>• Hardware & Software installation Plan<br>• Staged and Installed Hardware & Software | • Business Process Change Document<br>• Training Plan & Materials<br>• Quick Reference Guide<br>• System support plan |
| Post Deployment | • Customer Support Transition Plan<br>• Production Transition Strategy | • Application Support Transition Plan |
| Other | • Product Support Contingency Plan | • Experian Data Files |

## 3.9.2  Milestones and High-Level Timeline

*Table: Milestones*

| Project Milestones | Timeframe | Responsible Project Team |
|---|---|---|
| **Data Entry & Decisioning Release** | | |
| Detailed Requirements | 04/10/02 | TFS |
| Functional Specification | 06/03/02 | TFS & ALLTEL |
| Design, Code, Unit Test | 11/27/02 | TFS & ALLTEL |
| ALLTEL Performance Test Plan | 10/11/02 | ALLTEL |
| ALLTEL Performance Test | 12/20/02 | ALLTEL |
| ALLTEL Performance Test Results | 01/06/03 | ALLTEL |
| ALS COM Documentation | 11/27/02 | ALLTEL |
| System Testing / UAT | 02/28/03 | TFS |
| Data Entry & Decisioning Pilot | 05/02/03 | TFS |
| Data Entry & Decisioning Deployment | 10/31/03 | TFS |
| | | |
| **Discounting Release** | | |
| Detailed Requirements | 02/07/03 | TFS |
| Functional Specification | 03/19/03 | TFS & ALLTEL |
| Design, Code, Unit Test | 09/29/03 | TFS & ALLTEL |
| ALLTEL Performance Test Plan | 08/29/03 | ALLTEL |
| ALLTEL Performance Test | 10/31/03 | ALLTEL |
| ALLTEL Performance Test Results | 11/14/03 | ALLTEL |
| ALS COM Documentation | 09/29/03 | ALLTEL |
| System Testing / UAT | 01/16/04 | TFS |
| Discounting Pilot | 03/19/04 | TFS |
| Discounting Deployment | 09/30/04 | TFS |

**F 01429**

Toyota Financial Services Confidential                    OSCAR Relaunch Project Charter

| Table: Milestones | | |
| --- | --- | --- |
| *Project Milestones* | *Timeframe* | *Responsible Project Team* |
| **Final Release** | | |
| Detailed Requirements | 06/11/03 | TFS |
| Functional Specification | 07/09/03 | TFS & ALLTEL |
| Design, Code, Unit Test* | 03/14/04 | TFS & ALLTEL |
| ALLTEL Performance Test Plan* | 01/23/04 | ALLTEL |
| ALLTEL Performance Test* | 03/26/04 | ALLTEL |
| ALLTEL Performance Test Results* | 04/16/04 | ALLTEL |
| ALS COM Documentation* | 03/14/04 | ALLTEL |
| System Testing / UAT* | 06/12/04 | TFS |
| Final Pilot* | 07/16/04 | TFS |
| Final Deployment* | 11/30/04 | TFS |

\* Includes two months schedule contingency



F 01430

Toyota Financial Services Confidential    OSCAR Relaunch Project Charter

## 3.10 ASSUMPTIONS

The following are project assumptions:

1. Existing Project Management tools will be used where appropriate and feasible.

2. All Project Management and Product Development processes that have common touchpoints between the two organizations (ALLTEL and Toyota) will be identified, defined, detailed and agreed to by the Program Team.

3. Enterprise-wide project dependencies will be reviewed with each applicable decision made by the Program Team.

4. Modifications required to TFS' existing legacy systems or new applications will be completed by TFS in time to test with the ALLTEL application.

5. Initial quality assurance testing for each release will be performed by Alltel at the ALLTEL Site. Final quality assurance testing for each release will be performed by Alltel at the TFS Site after installation and prior to TFS' User Acceptance Testing. During TFS' User Acceptance Testing, ALLTEL will provide support to TFS' testing resources.

6. The deployment of ALS COM software and initial databases to production will be accomplished by the TFS Team with assistance from the ALLTEL Team.

7. Implementation and monitoring of the pilots will be performed by the TFS Project Team with assistance from the ALLTEL Project Team.

8. The deployment of any third party or operating system upgrades to support ALS COM, including but not limited to SQL Server, Microsoft NT™, Rightfax™, Microsoft Terminal Server™, Metaframe™, and Crystal Reports™ product upgrades will be performed by the TFS Team. ALLTEL will specify the required version and/or release numbers of these packages.

9. The Detailed requirement phase executed by Toyota will not result in an increase in effort estimates. In other words, additional content added by Toyota will not cause significant deviations from the original mid level requirement to the effect that an increase in effort results. Deviations (increases or decreases in effort estimate) will necessitate change control.

10. The work effort for certain gaps was distributed across the other gap groups (Data Entry & Decisioning, Discounting). The specific gap components to be delivered in each release have been agreed to by Toyota and ALLTEL.

11. Toyota signoff tasks/milestones for functional design documents are included in the project plan. Review and approval will be timely (2-3 days) in order to prevent delays to the timeline.

12. The OSCAR Project Team in California will be located in the same facility.

**F 01431**

Toyota Financial Services Confidential

## 3.11 CONSTRAINTS

| Table: Constraints | |
|---|---|
| **Constraint:** | **Imposed by:** |
| 1. The team exists in distributed environments both internally to Toyota and ALLTEL. In addition, Toyota is headquartered in Los Angeles and ALLTEL in Alpharetta. | General business practices by Toyota and ALLTEL |
| 2. The team will need to work within the architectural boundaries of ALS COM system. | ALS COM System |
| 3. The ability of interfacing systems within Toyota to accept the changes of ALS COM system may be limited. | TFS Legacy Systems |
| 4. Third party software programs supported by Toyota impose limitations. E.g., Vertex | Software support systems |

**F 01432**

Toyota Financial Services Confidential                    OSCAR Relaunch Project Charter

## 3.12 PROJECT ORGANIZATION CHART

Below are the organizational charts for the OSCAR project.

### OSCAR Program



**F 01433**

Toyota Financial Services Confidential    OSCAR Relaunch Project Charter

# BTS OSCAR Project Team



**F 01434**

Toyota Financial Services Confidential

OSCAR Relaunch Project Charter

# ALLTEL Project Team



F 01435

## 3.13 SUPPLIER PROCUREMENT

The project is dependent upon outside suppliers to provide identified materials, equipment and/or services necessary for program success.  Following is a list of materials, equipment and/or services.

### *Material/Equipment/Services*

1. ALLTEL – To provide the ALS COM product including TFS enhancements and related services (such as project management, requirements definition support, functional specifications for TFS gap items  train-the-trainers, installation support, pilot support, product documentation, product performance testing, product validation testing, and ACRM rules definition support).

2. Dell, EMC, IBM and other hardware providers to provide development, test, and production environments.

3. UOT Training Vendor – To train CSC and DSSO staff

4. ILAB – To provide ALS COM performance testing and documented results

5. Experian – To provide scoring attribute comparisons (old Magnum scoring results versus current Experian scoring results), bureau based alert (flag) variables[3] and non-scoring attributes[4].

## 3.14 BUDGET

### 3.14.1 Cost Estimates

Costs are divided into three types:

- <u>Capital Items:</u>  Expenses associated with the procurement of assets that are capitalized such as hardware and software.

- <u>Expense Items:</u>  Expenses associated with operating expenses, such as travel, materials, training, supplies, books, periodicals, copying, graphic arts, printing, etc.

- <u>Labor:</u>  Cost associated with the total time team members work on a project based on a standard hourly rate for each skill set.

---

[3] It is a Risk Management responsibility to acquire this information from Experian.
[4] It is a Risk Management responsibility to acquire this information from Experian.

**F 01436**

### 3.14.2 Budget Assumptions

Assumptions are factors that, for planning purposes, are considered to be true, real, or certain. Assumptions generally involve a degree of risk. Any known (major) assumptions that have been made regarding the project that may influence this agreement are noted in the list.

The following are project budget assumptions:

1. Groups outside of the OSCAR management team's direct control will meet [illegible] the [illegible] to [illegible] Requirements Definition Assessment phase. These groups include Kevin, Production Services, Lease, Retail, and other legacy system groups.
2. The [illegible] 35% 65% associate / contractor split is maintained
3. The estimated rates are achieved.
4. Production support once OSCAR is in production (after a one month transition period) is budgeted elsewhere.
5. Facilities and team member provisions (such as desktop computers) are budgeted elsewhere.
6. The scope of the OSCAR project is as defined in the Master Gap Matrix
7. New technology products or standards as required by new (unknown as of December 2001) enterprise technology directions

### 3.14.3 Approved Budget



F 01437

Toyota Financial Services Confidential     OSCAR Relaunch Project Charter

# 4  Project Controls

## 4.1  COMMUNICATION MANAGEMENT

The OSCAR Communication Plan defines the process for delivering project-related information to the stakeholders in a timely and consistent manner.  The specific objectives of the communication plan are to:

- Facilitate optimal stakeholder involvement.
- Develop and maintain awareness of OSCAR project progress.
- Assure that all stakeholders are provided with useable and accurate information through reliable communication channels.

To meet these objectives, the OSCAR Communication Plan summarizes the frequency, subject, delivery format, and audience for communications.  The communication vehicles for OSCAR are summarized in the table below.  This table is maintained separately and will not be updated in this charter.  Refer to the OSCAR Communication Plan v2.x doc and OSCAR Relaunch Communication Plan Matrix.xls.

**Table: Communication Management**

| Frequency | Communication Vehicle | Responsible | Method | Format |
|---|---|---|---|---|
| Daily | Meeting Schedules | Program Manager All Project Managers | Email | Lotus Notes |
| Weekly | Project Plan Reports | PMO | Email | Niku |
| | Project Status Report | All Project Managers | Email | Document |
| | Program Status Report | Program Manager | Email | Document |
| | Change Control Review Meeting | ALLTEL Change Manager | In-Person | |
| | Program Status Meeting | Program Manager | In-Person | |
| | Business Project Status Meeting | OSCAR (Bus) & ALLTEL Project Managers | In-Person | |
| | Technical Project Status Meeting | OSCAR Project Mgr (Tech) | In-Person | |
| | ALLTEL TFS Management | ALLTEL Project Mgr | In-Person | |
| | ALLTEL Management Status Meeting | ALLTEL Project Mgr - Torrance | In-Person | |
| | One-on-one ETC Meeting | Project Managers | In-Person | |
| | Timesheet / Status Report | Team | Email | Niku |
| Bi-Weekly | Prod Services Status Meeting | Prod Services Logistics Mgr. | In-Person | |
| Monthly | Steering Committee Meeting | Program Manager | In-Person | |
| | Steering Committee Presentation | Program Manager | In-Person | Presentation |
| | | Program Manager | Email | Email |

### Table: Communication Management

| Frequency | Communication Vehicle | Responsible | Method | Format |
|-----------|----------------------|-------------|--------|--------|
| | Executive Committee Meeting | Enterprise Lending Gen. Mgr. | In-Person | |
| | Prod Services Infra Meeting | Program Manager | In-Person | Presentation |
| As needed | Scope Meetings | OSCAR Project Manager (Bus) | In-Person | |
| | Deliverable Outlines | Refer to OSCAR RAM | Email | Document |
| | Deliverable Drafts | Refer to OSCAR RAM | Email / | Misc. |
| | Deliverable Approvals/Signoffs | Refer to OSCAR RAM | Email | Email |
| | Requirement Workshops | Toyota Business Analysts | In-Person | |
| | Change Requests | OSCAR Project Manager (Bus) | Email / Hardcopy | Document |
| | Change Control Meeting | OSCAR Project Manager (Bus) | In-Person | |
| | Ad hoc Status Update | Program Manager | In-Person | |

**F 01439**

## 4.2  SCOPE MANAGEMENT

Scope Management is the process of ensuring that the project contains all of the work required to produce the end product. Scope Management is primarily concerned with defining and controlling what is or is not included in the project.

The scope for the OSCAR project is maintained in the OSCAR Master Gap Matrix.

In addition, the Scope Management approach for OSCAR uses the project change request process for managing project scope. Any potential change that impacts the project scope must be formally requested via a *Project Change Request (PCR) Form.* These project change requests are then analyzed to determine the impact to the project. PCR's must be approved by the appropriate approval authority before the change is incorporated into the project. Once a scope change is approved, project documents are updated as appropriate, and the project may be re-baselined.

## 4.3  CHANGE MANAGEMENT

Any potential change that impacts the project scope must be formally requested via a *Project Change Request (PCR) Form.* The objectives of the OSCAR Change Control Process are to:

- Provide a mechanism to allow controlled change to occur with regard to scope, time, and budget.
- Assure change issues are resolved as quickly as possible.
- Involve all parties necessary to evaluate the change and determine if the risk is acceptable and the change is warranted.

The OSCAR Change Control Process identifies the steps to be performed when a change to project schedule, budget, and/or scope is identified. Decision-making authority levels are defined for each type of change.

The following authority levels apply to the OSCAR Change Control Process.

### Table 2: OSCAR Authority Levels

| Authority Levels For: | Time Changes | Scope Changes | Budget Changes |
|---|---|---|---|
| Program Team | Within phase end date | None | Within budgeted variance |
| Steering Committee | <= 4 Weeks | Within Time & Budget Authority Levels | <= 10% of budget |
| Governance Committee | > 4 Weeks | In excess of Steering Committee authority levels | > 10% of budget |

The OSCAR change control process is documented separately. Refer to *OSCAR Change Control Process v1.x.doc.*

F 01440

Toyota Financial Services Confidential                                    OSCAR Relaunch Project Charter

## 4.4   ISSUE MANAGEMENT AND ESCALATION

The Issue Management approach is to identify, document, and track all significant project issues through to resolution as designated by the project team. The responsible project manager logs all issues and works with the project team to resolve them. When appropriate, issues that cannot be resolved are escalated as per the OSCAR Escalation process.

Escalation should occur when two affected parties are unable to agree on the resolution of an issue, and a sincere attempt to negotiate a resolution has occurred. In this situation, higher levels of the project's leadership must be called upon to help resolve the issue.

The objectives of the OSCAR Escalation Process are to:

- Provide a mechanism to communicate unresolved issues that arise within the project.
- Assure that issues are resolved as quickly as possible.
- Involve all parties necessary to develop and implement solutions to unresolved issues.

The Escalation Process is documented under separate cover. Refer to the document titled *OSCAR Escalation Process*, stored in the phase directory on the O: drive.

## 4.5   RISK MANAGEMENT

. Risk Management includes the following steps:

- Identify risks that may occur
- Analyze the probability of the risks occurring and the impact to schedule, cost and scope/quality if the risk occurs
- Develop risk mitigation plans for high priority risks, (e.g., define strategies to eliminate or reduce impacts of risks that have a high probability of occurring).

An ongoing risk assessment is part of the OSCAR Project project. As new risks are identified, they are to be added to the *Project Risk List* and managed.

Refer to the OSCAR Risk Management Plan.

## 4.6   PROCUREMENT MANAGEMENT

Procurement Management includes the processes required to acquire goods and services from outside Toyota Financial Services.

The overall objective of the Requirements Definition Assessment (RDA) phase of the OSCAR project was to clearly define the scope, re-estimate the effort, and re-establish the timeline for OSCAR. With the completion of this phase and management review and approval of the plans for moving forward, the OSCAR project was relaunched. Vendor Management practices established during the RDA phase have been carried forward for the relaunch and in many cases incorporated into the vendor agreements. The vendor management practices are summarized below:

**F 01441**

Toyota Financial Services Confidential                                    OSCAR Relaunch Project Charter

**Project Schedule**: A redefinition and quality review of the vendor's (ALLTEL's) effort and timeframes required to complete TFS enhancements for OSCAR was completed as part of the Requirements Definition Assessment (RDA) phase of the OSCAR project.

**Statement of Work**: A renegotiation of the Statement of Work, Master Services License Agreement, Product Schedule, and Master Services Agreement was completed as part of the Requirements Definition Assessment (RDA) phase of the OSCAR project.

**Gap Matrix:** The project scope is identified and documented in the formal *gap matrix* document. The document contains high-level business requirements and the scheduled product release for each requirement. The gap matrix is contractual as it is included in the Statement of Work between TFS and ALLTEL.

   [O:\BPT\OSCAR Project\OSCAR Relaunch\11 Requirements\Master GAP Matrix] and
   [O:\BPT\OSCAR Project\OSCAR Relaunch\04 ALLTEL\Contracts Appendix E]

**List of Deliverables:** A formal list that identifies major deliverables, the scope of each deliverable, and ownership of each deliverable. ALLTEL and TFS have formally agreed to the content of the deliverable list. A complete list of deliverables is documented in the OSCAR Relaunch Project Charter.

   [O:\BPT\OSCAR Project\OSCAR Relaunch\02 Project Plan\OSCAR Relaunch Project Charter]

**Deliverable Outline:** States the deliverable purpose and identifies key components to be addressed in the document. A deliverable outline is documented and approved prior to the creation of the deliverable. ALLTEL and TFS agree to each deliverable outline. A Deliverable Sign Off Procedure provides a formal sign off form for project deliverables. A sample deliverable outline, the Deliverable Sign Off Procedure, and a sample deliverable sign off form are included in the Statement of Work between TFS and ALLTEL.

   [O:\BPT\OSCAR Project\OSCAR Relaunch\04 ALLTEL\Contracts Appendix H]

**Project Plan:** All project work is accounted for in the project plan, with detail required for approximately a six-month period. Milestone dates agreed to in the Statement of Work must be completed on time. A common project planning tool is used for each sub-project: NIKU. Each project plan is rolled up to one master plan.

**Risk Management:** A formal plan to identify and analyze risks and establish mitigation approaches for high priority risks. The probability of the risks occurring and the impact to the schedule, cost and scope/quality if the risk occurs is analyzed. ALLTEL and TFS jointly define and approve the risk management plan. The requirement for risk management planning is included in the Statement of Work between TFS and ALLTEL.

   [O:\BPT\OSCAR Project\OSCAR Relaunch\04 ALLTEL\Contracts Appendix 3]

**F 01442**

Toyota Financial Services Confidential

**Project Issue Avoidance:** Issues Management and Escalation procedures provide guidance to the project team to ensure effective and appropriate communication occurs at all project levels in an effort to resolve issues. Issues are escalated appropriately; escalation occurs when two affected parties are unable to agree on the resolution of an issue and a sincere attempt to negotiate a resolution has occurred. The Escalation Process is included in the Statement of Work between TFS and ALLTEL.

[O:\BPT\OSCAR Project\OSCAR Relaunch\04 ALLTEL\Contracts Appendix 5]

**Time Reporting Process:** Team resources update spreadsheets with actual hours spent on deliverables. Prior to logging actual hours into the project-planning tool, team resources review their spreadsheets with their project manager to obtain approval. Time tracking is performed to meet the following objectives:

- Map invoices to tracked hours. (Invoices must reconcile to tracked hours).
- Validate project estimated hours to actual hours spent.
- Monitor project progress.

The Time Reporting Process is included in the Statement of Work between TFS and ALLTEL.

[O:\BPT\OSCAR Project\OSCAR Relaunch\04 ALLTEL\Contracts Appendix I]

**Change Control Process:** There is a formal Change Control Process that Toyota and ALLTEL follow for all changes to the project (schedule, budget and/or scope). Any change to the scope baseline, as defined in the Master Gap Matrix, or to the schedule or budget, is handled though this Change Control Process. Both ALLTEL and Toyota had input into defining this process.

[O:\BPT\OSCAR Project\OSCAR Relaunch\21 Relaunch Deliverables\Project Management Process]

**Deliverable Sign Off Procedure:** All formal deliverables go through a formal sign-off that has been agreed to by ALLTEL and Toyota. The resources required for sign-off for each deliverable are identified in the Responsibility Assignment Matrix. All sign-offs are stored with their respective deliverable in the project repository.

[O:\BPT\OSCAR Project\OSCAR Relaunch\18 Methodology & Standards\Project Management Processes\Deliverable_Signoff_Procedure.doc]

**Responsibility Assignment Matrix (RAM):** Identifies in a central location all formal deliverables, project roles (who does what) and responsibilities (who decides what).

[O:\BPT\OSCAR Project\OSCAR Relaunch\02 Project Plan\Relaunch RAM Vx.xls]

**Status Reporting:** ALLTEL is required to complete a weekly status report using the TFS standard status report template. In addition, the onsite ALLTEL Project Manager attends a weekly status meeting.

[O:\BPT\OSCAR Project\OSCAR Relaunch\06 Status Reports\Project\ALLTEL]

**F 01443**

Toyota Financial Services Confidential

**Escalation:** There is a formal escalation procedure that both ALLTEL and Toyota follow to resolve issues. Escalation should occur when two affected parties are unable to agree on the resolution of an issue, and sincere attempt to negotiate a resolution has occurred.

> [O:\BPT\OSCAR Project\OSCARRelaunch\18 Methodology & Standards\Project Management Processes\EscalationProcedures.doc]

**Scope Assumptions:** There are mutually agreed upon scope assumptions as stated in attachment twelve of the Statement of Work. In the event that either party becomes aware that an assumption is not valid, both parties agree to use the Escalation Process. If either party becomes aware of an assumption that is not met and fails to follow the Escalation Process, the assumption not met may not be relied upon as a reason for non-performance.

**Acceptance Criteria:** Clear Acceptance Criteria for the ALS COM product must be defined and mutually agreed upon by ALLTEL and Toyota before the product is delivered. There will be specific criteria for accepting the product into test and specific exist criteria. The acceptance criteria will cover:

- a) OSCAR business functionality
- b) Production Hardware Configuration
- c) Base ALS COM
- d) Technical requirements
- e) An acceptable number of defects: the ALS COM Software will contain zero (0) Severity One Defects, zero (0) Severity Two Defects, no more than twenty (20) Severity Three Defects, and no more than forty (40) Severity Four Defects as defined in Attachment 2 to the Product Schedule
- f) Satisfactory performance on mutually agreeable test cases to be executed that represent the validation steps required for achieving the Business Requirements
- g) Product functional specifications

## 4.7   RESOURCE MANAGEMENT

The overall effort by activity by release is maintained in a master spreadsheet, tilted OSCAR RelaunchResourceLoadCombined Vx.xls. This spreadsheet indicates the person months required for each activity and the approximate timeframe for the work.

This person month information is translated to an overall staffing plan (maintained in Relaunch Staffing.xls). The staffing plan identifies resource types. Each resource type is based on a primary skill set (e.g., training, analysis, performance testing). The person month data from the activity breakdown is mapped by calendar month against the appropriate resource type. This mapping provides the basic information required for resource assignments: skills required, number of resources by skill, and approximate start and end month for each resource.  .

**F 01444**

Toyota Financial Services Confidential

## 4.8   BUDGET MANAGEMENT

The OSCAR Project Budget Management is subject to the TFS Policies and Procedures in place for project Budget Management.

The budget for the OSCAR relaunch project was developed as follows

**Labor**

- Detailed estimates were prepared for all ALS COM and Interface development work by gap/requirement.  (Refer to the OSCAR project directory for ALS COM and Interface estimates).
- A master WBS was created that identified all required project work/deliverables, in addition to the development effort.  Estimates were developed for each deliverable.  Each estimate was divided by major resource skill area (e.g., project management, tester, analyst, Keane, production services).  (Refer to OSCAR Relaunch Estimates v1.x.xls).
- Blended rates were developed for contingent workers and associates, based on historical project rates.  Rates were also identified for other resource categories, such as Keane.
- Team composition was assumed to remain at the historical percentage spilt.  The blended rate was applied accordingly.

**Expenses**

- Other costs in addition to labor were identified for applicable deliverables, using the master WBS as a reference baseline.  These other costs were estimated and then augmented by a contingency amount.
- Travel and Living was estimated as a percentage of labor costs.

**Capital**

- Hardware and software costs were estimated based on the planned configuration for OSCAR.

The project budget is documented in detail in the OSCAR CBA Dec 2001.xls.

**Tracking of Actual Versus Budgeted Expenses**

- Expense and Capital items are tracked via the TFS monthly budget report.
- In addition to TFS reporting, labor is also tracked at the program level.  Weekly actuals are tracked for each TFS contingent and associate resource.  The actual hours for each resource are multiplied by the applicable rate to calculate a monthly total for labor.  This monthly total is compared to the original budgeted amount by month.
- ALLTEL actuals are also tracked on a weekly basis.  These actuals are mapped back to budgeted deliverables as appropriate.  ALLTEL costs are based on a fixed price amount for the relaunch project work.  Deliverables are invoiced in one of three ways: 1) on a percent complete basis to a maximum for development work; 2) using a set fee to be paid upon approval of a specific deliverable; and 3) on a monthly, set fee basis for ongoing costs, such as project management.

**F 01445**

Toyota Financial Services Confidential

- All project activities, as created in NIKU, are tracked back to the original budgeted WBS for both ALLTEL and TFS.

**Budget Management Progress Reporting**

- A comparison analysis (planned versus actuals) is reported to the Steering Committee during regularly scheduled meetings.
- A NIKU report is produced on a weekly basis to summarize effort progress against the original budgeted hours documented in the master WBS.

**Budget Management Issue Management Process**

The OSCAR Escalation Process and Change Control Process are used to manage budget issues, as applicable.

## 4.9   QUALITY MANAGEMENT

All individuals on the OSCAR team are responsible to perform their tasks and complete quality project work products.  The OSCAR Project Managers are responsible for implementing quality standards and through their leadership and example making certain overall quality is sustained for the life of the project.

OSCAR Quality Management will focus on implementation of quality procedures and processes for each critical stage of the project.  Relevant procedures implemented during the RDA Phase will be reviewed and updated as needed for this phase.  New procedures will be added for detail analysis, development, testing, and implementation of OSCAR.  In addition to formally documented procedures, quality processes and tools will be used to incorporate consistent quality for all major deliverable work products.

Toyota and ALS COM PMO standards and tools will be utilized, with Toyota standards taking precedence for any conflicting tools and templates.

The following table represents specific Quality standards for the OSCAR project:

*Project*

| | |
|---|---|
| Formal Project Reviews | ▪ ALS COM will schedule periodic external (ALLTEL Corporate PMO) project audits for the life of the OSCAR project. |
| | ▪ Toyota will also schedule periodic project audits. |
| Project Plan | ▪ Niku Tool required for all plans and rolled up to one master plan. |
| | ▪ All work done is accounted for in the plan, with detail required for at least 6 months |
| | ▪ Milestone dates agreed to in the SOW must be completed on time. |
| | ▪ Actuals are posted weekly to the current week. |
| Reporting / Meetings | ▪ Standardized report templates provided, with team reports used as input to executive reporting. |

**F 01446**

Toyota Financial Services Confidential

| | |
|---|---|
| Scope Management / Change Control | ▪ ALLTEL change control board (for those OSCAR requests that require a change or impact ALS COM software). Proposed changes and associated hour estimates are reviewed and approved before forwarding requests to Toyota. |
| | ▪ Toyota change control board determines disposition of the request. Business needs and budget/timeline impacts are reviewed. ALLTEL has input representation on the Toyota change control board. |
| Procedures | ▪ Procedures for critical project processes are documented. Existing procedures for Detail Business Requirements and Functional Specifications include quality gates for review and input by appropriate team and SME resources before final documents are submitted for approval. |
| Deliverables | ▪ Formal project deliverables are identified early in the project and included in the project charter. |
| | ▪ Deliverable Outlines or documented deliverable descriptions are required to be completed for all major deliverables and require PM approval before work begins. |
| | ▪ Formal sign-off is required for all major deliverables. Approvers are identified and documented in the project Responsibility Assignment Matrix (RAM). |
| Charter Document | ▪ The Project Charter documents the scope, objectives, team organization, deliverables list, and critical project processes. |

## Quality Assurance

| | |
|---|---|
| Software Development Life Cycle | ▪ During the construction phase of the product, ALS COM and Toyota Technical will utilize a standard software development life cycle process that provides for technical solution reviews (including architecture impact), system specification/flow documentation, unit testing, and implementation checklists, to help ensure sound code development practices. |
| Testing Strategy/Plan | ▪ A testing strategy defines the testing scope, objectives, and roles and responsibilities. It will be documented and shared by the ALS COM and Toyota testing groups. The test plan(s) include entrance and exit criteria, test practices and identification of test procedures that will be utilized to manage and report on testing activities. |
| Traceability Matrix | ▪ A traceability matrix (using RequisitePro) tracks the coverage of all approved requirements, from creation to final testing. |
| ClearQuest | ▪ This tool and supporting procedures are used to document and track all test faults for the life of the project. |
| Service Level Agreements (SLAs) | ▪ SLAs are used to measure system acceptance standards for performance and application functionality. |

**F 01447**

Toyota Financial Services Confidential

## 4.10  TIME MANAGEMENT

### 4.10.1 Plan Development

The OSCAR project uses a rolling wave approach for building the NIKU project plan. The OSCAR project is to be delivered in three production releases. Key milestones have been established and baselined for each release. Detailed activities, tasks, and resources are created for project work, within a two to six month window, by release. The objective is to ensure that sufficient detail is included in the plan at any one time to ensure that any risk to a baselined, key milestone will be recognized in time to mitigate the risk.

The OSCAR procedures for NIKU plan development also support budget management. Every NIKU task is assigned to a WBS element from the original budget (as described in the section for Budget Management). NIKU reports are then produced on a weekly basis to show overall progress against the original plan

### 4.10.2 Time Tracking

The project team manages the project schedule on a weekly basis at project team meetings attended by all project team members, as described in the following time management processes.

The objectives of the Time Tracking Process are to:

- Log actual hours spent on deliverables by team resources.
- Map invoices to tracked hours.
- Validate project estimated hours to actual hours spent.
- Monitor project progress.

The diagram indicates the steps for updating the project plan with actual hours.

**F 01448**



**Step 1** – On Monday, Niku posting starts at 11:00 a.m. PST and completes by 1 to 2 p.m. PST.

**Step 2** – The PMO Analyst exports Timesheet spreadsheets to Project Managers and Team members.

**Step 3** – Tuesday through Friday, the Team members update timesheets with hours worked on project deliverables.

**Step 4** – On Friday the Team members meet with their Project Manager and review the time logged on the spreadsheet. All ETCs (Estimated Time to Complete) are approved. ETCs must be completed for each task for which time is recorded in a week.

**Step 5** – Team members input time into Niku Time by EOD Friday. The ALLTEL PM remotely updates time in NIKU by EOD Friday. Approved time spreadsheets are forwarded to Toyota's PMO Analyst for filing, in monthly batches.

**Step 6** – Any approved new or changed ETCs are sent to the Toyota or ALLTEL PMO Analyst, as appropriate, by the Project Manager. The PMO Analyst updates the NIKU plan.

**F 01449**

# *5 Glossary*

The following glossary defines terms used within the Project Charter and are based on the *Project Management Institute's Guide to Project Management Body of Knowledge (PMBOK)*.

| TERM | DEFINITION |
|------|------------|
| Assumptions | Assumptions are factors that, for planning purposes, are considered to be true, real, or certain. Assumptions impact all aspects of project planning, and are part of the progressive elaboration of the project. Assumptions generally involve a degree of risk. |
| Baseline | The original approved plan, plus or minus approved scope changes |
| Communication Planning | Determining the information and communication needs of the project stakeholders; who need what information, when they need it, and how it will be given to them |
| Constraint | Applicable restrictions that will impact the performance of the project. Any factor that determines the schedule of an activity |
| Contingency | An action to be taken should an identified risk occur |
| Deliverable | Any measurable, tangible, verifiable outcome, result, or item that must be produced to complete a project or part of a project |
| Estimate | An assessment of the likely quantitative result |
| Issue | Issues are unresolved questions, problems, or conditions that require a decision and concurrence to prevent it from impacting forward progress on the project |
| Milestone | A significant event in the project, usually completion of a major deliverable |
| Objective | Objectives are statements that support the project's mission. Objectives should be specific, measurable, attainable, relevant, and time-framed. |
| Program | A group of related projects managed in a coordinated way. |
| Project | A temporary endeavor undertaken to create a unique product, service, or result |
| Project Charter | A document that formally authorizes the existence of a project |
| Project Communications Management | A subset of project management that includes the processes Required to ensure timely and appropriate generation, collection and dissemination, storage and ultimate disposition of project information |
| Project Budget Management | A subset of project management that includes the processes required to ensure that the project is completed within the approved budget |
| Project Human Resource Management | A subset of project management that includes the processes required to make the most effective use of the people involved in the project |
| Project Integration Management | A subset of project management that includes the processes required to ensure that the various elements of the project are properly coordinated |
| Project Life Cycle | A collection of generally sequential project phases whose name and number are determined by the control needs of the organization or organizations involved in the project |

**F 01450**

Toyota Financial Services Confidential

| TERM | DEFINITION |
|------|-----------|
| Project Management | The application of knowledge, skills, tools, and techniques to project activities to meet the project requirements |
| Project Manager | The individual responsible for managing a project |
| Project Mission | The project mission provides a focus on the desired project outcomes. The mission answers the questions about what should be done, for whom, and how the project team will go about doing it. |
| Project Phase | A collection of logically related project activities, usually culminating in the completion of a major deliverable |
| Project Plan | A formal, approved document used to guide both project execution and control |
| Project Procurement Management | A subset of project management that includes the processes required to acquire goods and services to attain project scope from outside the performing organization |
| Project Quality Management | A subset of project management that includes the processes required to ensure that the project will satisfy the need for which it was undertaken |
| Project Risk Management | Risk Management is the systematic process of identifying, analyzing, and responding to project risk. It includes maximizing the probability and consequences of positive events, and minimizing the probability and consequences of events adverse to project objectives. |
| Project Scope | The work that must be done to deliver a product with the specified features and functions |
| Project Scope Management | A subset of project management that includes the processes required to ensure that the project includes all of the work required, and only the work required, to complete the project successfully |
| Project Schedule Management | A subset of project management that includes the processes required to ensure timely completion of the project |
| Responsibility Assignment Matrix | A structure that relates the project organization structure to the work breakdown structure to help ensure that each element of the project's scope of work is assigned to a responsible individual |
| Risk | An uncertain event or condition that, if it occurs, has a positive or negative affect on a project's objectives. |
| Risk Mitigation | Risk mitigation seeks to reduce the probability and/or impact of a risk below an acceptable threshold |
| Scope | The sum of the products and services to be provided as a project |
| Scope Change | Any change to the project scope. A scope change almost always requires an adjustment o the project budget or schedule. |
| Stakeholder | Individuals and organizations that are actively involved in the project or whose interests may be positively or negatively impacted as a result of project execution or project completion. Stakeholders may also exert influence over the project and its results. |
| Work Breakdown Structure | A deliverable-oriented grouping of project elements that organizes and defines the total work scope of the project |

**F 01451**

# *6 Approvals*

| | | |
|---|---|---|
| Janet Bricker | Signature | Date |
| Project Manager | Email | 6/14/02 |
| Chris Bunts | Signature | Date |
| National Manager | Email | 6/14/02 |
| Mike Cottrell | Signature | Date |
| ALLTEL Project Manager | Email | 6/14/02 |
| Marshall Dempsey | Signature | Date |
| PS Liaison | Email | 6/14/02 |
| Anne Fallace | Signature | Date |
| National Manager | Meeting | 6/14/02 |
| Arlene Feliz | Signature | Date |
| ALLTEL Project Manager | Email | 6/14/02 |
| Randy Gillis | Signature | Date |
| ALLTEL Technical Consultant | Email | 6/14/02 |
| Steve Foy | Signature | Date |
| National Manager | Email | 6/14/02 |
| | Signature | |
| Product Manager | Email | 6/14/02 |
| Brenda Johnson | Signature | Date |
| Project Manager | Email | 6/14/02 |
| Dan Langlois | Signature | Date |
| Project Sponsor | Email | 6/14/02 |
| Marty Lazniarz | Signature | Date |
| Technology Manager | Hardcopy / Email | 6/14/02 |
| Reddy Pakanati | Signature | Date |
| National Manager | Email | 6/14/02 |
| Diane Switzer | Signature | Date |
| Program Manager | Email | 6/14/02 |
| John Vaughan | Signature | Date |
| ALLTEL GM | Email | 6/14/02 |
| Steve Braun | Signature | Date |
| Production Services ITC | Email | 6/14/02 |
| David Palica / Michael McKinney | Signature | Date |
| | | |
| | Signature | |
| | Signature | |

F 01452

Toyota Financial Services Confidential                                   OSCAR Relaunch Project Charter

## APPENDIX A          OSCAR RELAUNCH DELIVERABLES

*Table: ALLTEL Deliverables*

| ALLTEL Project Deliverables | Description/scope |
|---|---|

### Project Management Deliverables

Deliverables included in this section will be developed or updated by the ALLTEL project management team.

| | |
|---|---|
| Project Plan | A detailed project work breakdown structure and schedule outlining project deliverables, activities, and tasks with related work effort, duration, and assigned resources. |
| Quality Management Plan | Provides quality controls for the project team and identifies those quality review checkpoints and guiding principals for the completion of project deliverables necessary to ensure delivery of a quality product. |

Deliverables included in this section will be jointly developed or updated by the OSCAR project management team (Toyota and ALLTEL).

| | |
|---|---|
| Communications Plan | A matrix and distribution process that identifies who, what, and when project team members and project stakeholders will receive project information. |
| Change Control Process | Definition of change control requirements, the approval process, the appropriate authorization of changes, and the related escalation process. |
| Risk Management Process | Defines the methods to be used to identify, prioritize, mitigate, and track project risks and issues. |
| Escalation Process | Provides the guiding principals for escalation, which will promote issue resolution at the team level. Defines a hierarchy to be used in those instances when an issue requires escalation. |
| Configuration Management Process | Outlines a plan for managing the project repository. Includes documentation naming standards, directory clean-up standards, and the use of one repository as the repository of record. |
| Time Reporting Process | Defines methods to be used for time reporting by project team members. Includes timesheets and schedules for reporting and entering actual time worked in the project plan. |
| Incident Tracking Process | Defines the incident tracking flow and use of the ALLTEL Clientele system and Toyota's ClearQuest system. Provides for efficiency of reporting and resolving incidents. |

**F 01453**

*Table: ALLTEL Deliverables*

| ALLTEL Project Deliverables | Description/scope |
|---|---|
| | **Training Deliverables** |
| System Admin Training | Includes setup of user-configurable tables in ALS COM that control the application's workflows, audit checks, credit policies, and validation parameters. Provides Toyota's ALS COM System Administrator(s) with the knowledge necessary to configure the base table maintenance module and the ACRM module. |

The following requirements apply to this deliverable:

* Toyota will complete the Table Maintenance Configuration Guide and ALLTEL will review it for completeness and accuracy prior to the training session.
* Toyota will designate an ALS COM System Administrator(s) whose responsibility will be to control and maintain ALS COM Tables for Toyota.
    * Standard training materials will be used for the System Admin training session.
    * Toyota will provide up to ten System Administration resources that are, preferably, knowledgeable in their business processes and procedures and have prior experience with ALS COM and Table Maintenance.
    * Toyota class participants will be dedicated to each session that they attend and will be held accountable for not missing any part of the session due to phone calls, conference calls, meetings or other activities.

Any third-party training for related ALS COM software (such as Seagate Crystal Reports, Microsoft NT, Microsoft Terminal Server, etc.) will not be the responsibility of ALLTEL.

| ACRM Definitions Training and Validation | Provides Toyota's ALS COM System Administrator(s) with the knowledge necessary to configure and maintain the ACRM module to fit their specific business practices. |
|---|---|

It is recommended that this class be limited to no more than four participants. The list of attendees should include at least one decision-maker who can address ALS COM workflows, user profiles, credit policies or any Toyota-specific business need.

Upon completion of training ACRM will be validated at the Toyota site by designated ALLTEL team members.

The following requirements apply to this deliverable:

* Standard Table Maintenance Configuration materials will be used for this training session. This will include the completed ACRM section of the Table Maintenance Configuration Guide.
* All Toyota attendees will have had prior exposure to ALS COM Table Maintenance. Preferably, participants have attended prior training sessions and have participated in prior ALS COM testing phases.
* Toyota will provide resources that are knowledgeable in Risk Management and Credit Policy to attend training session.

*Table: ALLTEL Deliverables*

| ALLTEL Project Deliverables | Description/scope |
|---|---|
| | • Toyota class participants will be dedicated to each session that they attend and will be held accountable for not missing any part of the session due to phone calls, conference calls, meetings or other activities. |
| ACRM Support | Will focus on specific ACRM rules built by Toyota and will begin following initial delivery of ACRM (in ALS COM 3.0).  ALLTEL will provide remote support for the life of the implementation project. |
| | The following requirements apply to this deliverable: |
| | • ALLTEL will deliver the Base Rule Library for loan types |
| | • Toyota will develop additional rules for ACRM |
| | • This support activity will not involve VB script consulting for Toyota |
| Tester Training | Provides training for Toyota's users who have been identified as participants in the System Test/UAT phase.  Trains the Tester group on how to properly use ALS COM so the Test phase can begin. |
| | ALLTEL will design and plan these sessions to meet Toyota needs. System Aids will also be provided and will cover the enhancement of ALS COM for Toyota per Business Requirements. |
| | This maximum class size is limited to ten participants and should include at least one decision-maker who can address ALS COM workflows, user profiles, credit policies or any Toyota-specific business need. |
| Train the Trainer | It is recommended that this training be limited to the Test team. Provides training for Toyota's designated "Trainers" on how to effectively convey ALS COM knowledge transfer based on how the product is configured to work in Toyota's environment.  Focuses on critical areas a trainer will need to know for training others.  This session is not intended to provide training on Toyota business processes, but instead will focus on recommended class format and content and use of step-by-step training guides and practice training sessions. |
| | This class is limited to no more than ten participants and should include at least one decision-maker who can address ALS COM workflows, user profiles, credit policies or any Toyota-specific business needs. It is recommended that this training be limited to Toyota ALS COM Trainers and their back ups. |
| | As a pre-requisite to this class, all Toyota Trainers should participate in the testing of their training area of responsibility. |
| | The materials used for this training session include: |
| | • An instructor guide to be used by the ALS COM Trainer. |
| | • End-user Instructor Guides for Toyota Trainers. |
| | • Any Toyota-specific materials created by Toyota for the effective |

Toyota Financial Services Confidential

**Table: ALLTEL Deliverables**

| ALLTEL Project Deliverables | Description/scope |
|---|---|
| | deployment of the end-user training. |
| | • Custom ALS COM User Manuals addressing the customization of ALS COM per Business Requirements provided by Toyota. |
| | The following requirements apply to this deliverable: |
| | ▪ Toyota will assign ALS COM Trainers and define their roles and responsibilities. |
| | ▪ All Toyota attendees will have had prior exposure to ALS COM. Preferably, participants have attended prior training sessions and have participated in prior ALS COM testing phases. |
| | ▪ Toyota class participants will be dedicated to each session that they attend and will be held accountable for not missing any part of the session due to phone calls, conference calls, meetings or other activities. |
| | Any third-party training for related ALS COM software (such as Seagate Crystal Reports, Microsoft NT, Microsoft Terminal Server, etc.) will not be the responsibility of ALLTEL. |
| Post-Training Support | Support available to Toyota in response to any training related questions or issues, via on-site visits, phone, or e-mail. |
| | The ALLTEL trainer will also provide consulting to Toyota by assisting in development of any custom User Aids for end-user training and by assisting in the initial pilot rollout training session. |
| | This deliverable will apply to each phase of the project. |

## Installation Deliverables

| | |
|---|---|
| Site Prep Checklist | A list outlining hardware, software, networking, and configuration required to install ALS COM. This checklist is used to ensure that all ALS COM-related components have been installed, configured, and tested by Toyota prior to ALLTEL arriving on-site. The checklist will be delivered to Toyota for completion, and Toyota will complete the checklist and sign off that the site is prepared for ALS COM installation. |
| | This deliverable will apply to each phase of the project. |
| Base ALS COM Installation and Patch Upgrades | Installation and configuration by an ALLTEL Installation Engineer of all components of the base ALS COM system at the Toyota site. The Installation Engineer will also install any patch upgrades required. Third-party software, although not installed by ALLTEL, will be configured by ALLTEL as needed to work with the ALS COM system. |
| | This deliverable will apply to each phase of the project. |
| Installation Support Testing | A high-level test of the system by ALLTEL Business Analysts to verify that it was installed correctly. Tests executed are for high-level functionality of the system and are not designed to test custom interfaces. Test plans and scripts will be created and used in this testing. Copies of these plans and scripts will be provided to Toyota. |
| | This deliverable will apply to each phase of the project. |

**F 01456**

### Table: ALLTEL Deliverables

| ALLTEL Project Deliverables | Description/scope |
|---|---|
| Install Sign-off | Upon completion of testing, the ALLTEL Business Analyst will sign off that the system is ready to go to the next level of testing. |
| | This deliverable will apply to each phase of the project. |
| System Support Package | Three documents, the ALS COM System Monitoring Guide, the ALS COM Performance Management Guide, and the ALS COM Troubleshooting Guide will be customized for Toyota by ALLTEL using outlines previously approved by Toyota. This package will be delivered to Toyota during a turnover session onsite at Toyota. Delivery will be accompanied by a brief presentation. |
| Pilot Strategic Planning Support | Assistance provided by ALLTEL project management and business analyst resources to Toyota project team members in creating a strategy and documenting a plan to roll out ALS COM in a pilot phase prior to full production. |
| Pilot Rollout Support | Support provided by ALLTEL Business Analysts and Developers following installation of ALS COM to a production environment for Toyota's pilot rollout. Two ALLTEL Business Analysts will provide support onsite at Toyota for a period of twenty days following the move to pilot production. Two Development resources will also provide remote support from Atlanta during this time. |
| | This deliverable will apply to each phase of the project. |

### Testing Deliverables

| Performance Testing | |
|---|---|
| Performance Test Plan (includes ACRM) | Outlines the scope of testing and the steps involved in ALS COM performance test execution conducted at ILab. Toyota will provide any test plans for testing efforts performed at the Toyota site. |
| | This test plan will include: <br> • Test Requirements and Assumptions <br> • Test Case Scenarios (preliminary) <br> • Project Plan for Testing Activities / Tasks <br> Identification of Region Specific LAN, WAN, WS, and Server Info |
| | This deliverable will apply to each phase of the project. |
| Performance Test (includes ACRM) | End-to-end testing of all ALS COM components as specified herein conducted according to the Performance Test Plan will be performed at Ilab with ALLTEL and Toyota participating. This testing will address the characteristics of the system necessary to meet the required level of performance in the areas of Response Time, Volume/Throughput, Usage, Peak Hours of Operation, and Degradation as defined in the Oscar Non-Functional Requirements document. This testing will also consider environmental factors, such as expected network configuration. |
| | Components of the performance test will include: |
| | The Client will perform transactions driven by the test tool interfacing with the bureau process which will emulate bureau pulls, accessing the image server to pull tif files across the network, processing the applications through the workflow server and the ACRM module. Every |

Toyota Financial Services Confidential

*Table: ALLTEL Deliverables*

| ALLTEL Project Deliverables | Description/scope |
|---|---|
| | application will run through the data entry module, either keyed in or imported from another source and will be decisioned through ACRM, some manually decisioned through the test tool and the remainder auto decisioned by the ACRM module. |
| | Utilizing the same processes performed on the client, ALLTEL will script and execute the transactions through Terminal Services. ALLTEL will test the effect of client failure and the effect of a server failure in the terminal services environment to validate data integrity and evaluate the latency of other clients, performing other processes, during the recovery process. A small group (e.g., three) of Terminal Servers will be used to test failover and recovery. The test will also compare the throughput of the terminal server client to the workstation client. At least one Terminal Server will be tested for degradation with increasing sessions. |
| | Additionally, ALLTEL will utilize a mechanism to emulate multiple user connectivity and activity against the ALS COM database. The activity will be constructed of appropriate user functionality and user mix, and processed against configured ACRM rules. |
| | The second delivery (Discounting Release) will include all activities from the first test with the addition of completing the discounting workflow. |
| | The third delivery (Final Release) will include all activities from the previous test plus the remaining functionality. |
| | Performance testing will not include interfaces to Toyota legacy systems. |
| | Performance testing will include:<br>■ Development and Approval of Test Case Scenarios<br>■ ILAB Hardware Acquisition / Configuration<br>■ Environment Configuration<br>■ Dry Run Setup and Execution<br>■ Test Execution<br>■ Final Report Generation |
| | ALLTEL will also supply up to ten days of support for any stress testing efforts performed at the Toyota site. |
| | This deliverable will apply to each phase of the project. |
| Performance Test Results (includes ACRM) | A Test Summary document provided by ALLTEL to Toyota that outlines specifically how Toyota requirements were met in testing conducted at ILab. Results of testing conducted onsite at Toyota by Toyota staff will be provided to ALLTEL.<br><br>This deliverable will apply to each phase of the project. |

**F 01458**

Toyota Financial Services Confidential                OSCAR Relaunch Project Charter

### Table: ALLTEL Deliverables

| ALLTEL Project Deliverables | Description/scope |
| --- | --- |

**ALLTEL Product Validation Testing**

| Tested ALS COM System | Will be provided to Toyota upon completion of ALLTEL product validation testing, satisfaction of testing exit criteria, and confirmation of site readiness for install. |
| --- | --- |
| | In addition to ALS COM product validation testing, custom-developed code for letters, faxes, calculations, and scorecards will be tested by Business Analysts and Developers prior to installing the code at Toyota. |
| | This deliverable will apply to each phase of the project. |
| Phase End Test Report | A summary report, which ALLTEL will provide to Toyota once product validation testing has been successfully completed. This report provides an overall assessment of product validation test execution results. |
| | This deliverable will apply to each phase of the project. |

**Toyota System Testing**

| Test Plans and Test Scripts (Toyota) | Toyota will be responsible for the test plans and scripts to be used in System Testing. Test plans created by Toyota will be reviewed by an ALLTEL Business Analyst prior to test execution. |
| --- | --- |
| | Test scripts for ALS COM Indirect Auto Loan, Leasing, and Retail Balloon Indirect modules and scripts for testing Toyota gap items will be provided by ALLTEL to Toyota. |
| | This deliverable will apply to each phase of the project. |
| Test Entrance and Exit Criteria (Toyota) | Specific criteria that must be met for System Test to commence and to declare completion of testing. These entrance and exit criteria will be documented by Toyota and agreed upon by Toyota and ALLTEL prior to code delivery for testing. Entrance criteria must be met in order to commence the System Test, and exit criteria must be satisfied in order to officially complete the System Test. |
| | As a part of meeting ALLTEL entrance criteria, Toyota will need to allocate the appropriate resources to ensure that thorough testing, problem resolution, and regression testing can be accomplished in the time allotted. Test participants should be very familiar with the client's loan products and lending policies and procedures. |
| | This deliverable will apply to each phase of the project. |
| Test Support (ALLTEL) | Support provided by ALLTEL (Developer, BA, and Product Validation resources) during each phase of Toyota's System Test. Support will be provided for testing of the ALS COM system and custom interfaces. Knowledge transfer between ALLTEL and Toyota personnel on the use of these interfaces will be included, and ALLTEL will work with Toyota to create interface testing plans and scripts. |
| | ALLTEL technical resources onsite at Toyota will provide configuration testing expertise, to ensure the adequate functioning of all ALS COM components for the production environment, and testing of the ALS COM environment's ability to withstand failure resulting in a "failover." |
| | This deliverable will apply to each phase of the project. |

**F 01459**

Toyota Financial Services Confidential                                    OSCAR Relaunch Project Charter

*Table: ALLTEL Deliverables*

| ALLTEL Project Deliverables | Description/scope |
|---|---|

Once testing has been successfully completed, Toyota will deliver a final Phase-End Test Report to provide an overall assessment of testing. This will include sign-off signifying that Toyota Exit Criteria have been met and the delivered system is ready to move into production.

This deliverable will apply to each phase of the project.

## ALS COM Base Product, Custom, and Design Deliverables

ALS COM Auto Indirect Module

ALS COM Leasing Auto Indirect Module

ALS COM Retail Balloon Indirect Module

... pointed in Business Requirements (See Master Gap Matrix)

Business Requirements

Detailed documents outlining system functionality required in order to satisfy Toyota's business needs.  Documents are completed by Toyota Business Analysts and provided to ALLTEL.  Toyota will review Mid-Level Requirements produced, validate assumptions included, and deliver the final Detailed Business Requirements to ALLTEL.  ALLTEL Business Analysts will allocate up to 25 percent of the estimated hours to complete a requirement to providing support to the Toyota Business Analyst who is responsible for completion of that requirement.

Functional Specification

Detailed documents addressing business requirements provided by Toyota that will specify the required changes to be made to ALS COM functionality and will describe existing functionality where no change is required. Using the final Detailed Business Requirement approved, the ALLTEL BA will draft a Functional Specification for each Toyota requirement identified as in scope in the Statement of Work or as approved through change control. In instances where interfaces are required, ALLTEL and Toyota developers will work together to define these.  Completed documents will be reviewed and approved by both ALLTEL and Toyota. The following resource documents are used in developing Functional Specifications documents:

- Development Estimate
- Business Requirement
- Pre-estimate Requirement Assessment

ALLTEL Business Analysts will allocate up to 25 percent of the estimated hours to complete functional specifications onsite at Toyota.

Upon final approval of a Functional Specification, both ALLTEL and Toyota agree that any assumptions contained in the business requirements and functional specifications have been validated and accepted as statements of fact.  If the business conditions change, ALLTEL or Toyota will submit a change control request to amend the assumption.

**F 01460**

### Table: ALLTEL Deliverables

| ALLTEL Project Deliverables | Description/scope |
| --- | --- |
| | **Documentation Deliverables** |
| ALS COM User Manual as modified | • ALS COM User Manual as modified to include Toyota Gap Matrix items |
| | • ALS COM Table Maintenance Manual as modified to include Toyota Gap Matrix items |
| | • ALS COM Help as modified to include Gap Matrix items |
| Release Notes | Release Notes will outline any major new feature, added functionality, and/or new Loan Type included in the release delivered. Release Notes will also include a list of outstanding incidents pertaining to Toyota functionality at the time of code delivery. |
| | The Data Dictionary contains descriptive information for each table and the columns contained therein. This includes the name, brief description of functionality, data type, column width and valid values. The Data Dictionary will be customized to include Toyota Gap Matrix items. |

### Table: TFS Deliverables

| TFS Project Deliverables | Description/scope |
| --- | --- |
| | **Requirements & Specifications** |
| Requirement Traceability 4.1 | A document describing the process for establishing traceability from the requirement, to the functional specification, design, program unit and test case. Also, a repository for capturing requirements. |
| Functional Specification 5.1 | A document that defines the general approach to the solution for the requirement (Gap) and will contain enough information that test cases can be written from it. |
| Edits 5.4 | A document defining the edits for each functional spec. Examples of edits include: field length, type of field, min/max/invalid values, special edits and required fields. |
| | **Architecture** |
| Overall System Architecture | A document describing and graphically representing the entire Oscar system. It will include the hardware, software, storage, network and the inter-relationships between the Oscar system and external systems. The document will include the points of access to the system including desktop, intranet and internet. It will provide a context for the development of requirements for each infrastructure component. |
| Design Communications Design 6.3 | A document that defines the network communications infrastructure to support the local and distributed components of the system. This includes the network bandwidth requirements and the necessary, hardware to support the requirements. Also included is the impact on the configuration due to growth projections in regards to volume of applications and number of users and the potential rearranging of the company's business infrastructure. |

**F 01461**

Toyota Financial Services Confidential

### Table: TFS Deliverables

| TFS Project Deliverables | Description/scope |
|---|---|
| Technical Infrastructure Design 5.4 | A document that defines the design for the development, test and production environments. |

## Design & Construction

| | |
|---|---|
| Interface Specification 5.2 | A document that defines the detail computer system interface design for a particular requirement (Gap). Toyota and Alltel's computer systems personnel to gain concurrence on the interface design use this document. |
| Application Interfaces Design 6.2 | A document that defines the detailed design of each interface. The design will cover the elements of the corresponding functional specification and detail how the specifications are being met in the design. |
| Design and Development Standards and Procedures 5.1 27.2 27.3 27 4 | A document describing the design standards for OSCAR including architectural and design standards, interface development standards, configuration management and the working relationship procedures between IS and PS.  Development standards and procedures govern actual coding practices. Configuration management procedures include source-code control procedures and documentation templates. Configuration management documents the management of project data and environments from documentation to the build process and promotion. |
| ACRM Plan and Design | A document that describes what must be defined in ACRM prior to production, the relationships between the items that will be defined, standards and procedures for defining, and roles and responsibilities for the business in the development of the ACRM rules. |

## Test

| | |
|---|---|
| Established Test Environment 14.1 | The test environment is configured, validated and ready for the testing team to use.  Appropriate monitoring, recovery and support processes are ready to support each phase of testing from unit to acceptance. |
| Test Tool Implementation Plan 14.2 | A document that defines the process, roles and responsibilities, effort and schedule to implement selected test tools. (The test strategy will define the recommended testing tools. A test tool implementation plan is developed for each tool.) |
| | A smoke test has been completed on ALS COM and all the interfaces ensuring that all components have been setup correctly. Once this test has been completed successfully the rest of system testing can commence. |
| Interface Functional Test Plan & Design 14.4 | A completed test plan to address all functionality of Toyota built interfaces of the OSCAR application. This includes completion of all the test cases that trace to the business requirements and functional specifications for these interfaces. |

**F 01462**

Toyota Financial Services Confidential

### Table: TFS Deliverables

| TFS Project Deliverables | Description/scope |
| --- | --- |
| System Test Plan | A document that defines the scope of System Testing for the OSCAR project. The document will identify preparation steps necessary to begin 'system testing', including number of resources, roles and responsibilities of testing resources, and schedule of system test. The document will also identify areas/functionality to be tested, testing tools that will be used, the approach that will be taken to execute the testing efforts, incident tracking and resolution guidelines. |
| System Test Cases | A set of standardized documents that identify test steps to perform quality system testing of specific functionality. Each test case will include business scenarios that can be applied to simulate realistic user functions when executing the test. Each test case will include expected results. |
| System Tested System | All components of OSCAR have been functionally tested and have met the acceptance criteria for production implementation. The testing effort includes application test execution using 'system test' test cases, evaluation of test results, tracking and reporting of test incidents, and resolution of test incidents. Participants include representatives of the end user community. |
| Function Tested System 14.4 2 | Each Toyota built interface has been successfully functionally tested using the comprehensive test cases that trace to the business requirements and functional specifications. This is a point-to-point test from the point that ALS COM calls Toyota Interfaces through the wholes cycle of the interface back to the ALS COM call. This does not include testing functional changes that are made to the back end systems or to ALS COM. |
| Function Tested System (Other Systems) | All components of Toyota's legacy systems modified as a result of ALS COM required interfaces have been tested by the legacy system group. |
| Stress and Performance Test Plan & Design 14.7.1 | A document defining the stress and performance test strategy and the test cases to execute the strategy. Includes test cases to measure the application limits on various parameters. All performance criteria to be measured are identified in this plan. |
| Stress and Performance Test Report 14.7.2 | A report that documents the results of the stress and performance test. The OSCAR application (ALS COM and the Toyota built interfaces) have been performance tested using the test cases that trace back to the non-functional requirements. |
| Network Application Readiness (NAR) Report 14.8 | A NAR report that documents the results of monitoring the network load conducted during the stress and performance tests. |
| Fail over Test Plan & Design 14.9 | A document defining the fail over test strategy and the test cases to execute this strategy. The test cases will exercise the clustering, replication and load balancing features of the system. |
| Fail over Test Report 14 9 | A report that documents the results of the fail over test. |
| Configuration Test Plan & Design 14.10.1 | A document that defines the test strategy for testing the various configurations of the desktop that are out in the field to validate that ALS COM can coexist with the other applications on the desktops. This document also includes the detail test cases. |

F 01463

Toyota Financial Services Confidential

*Table: TFS Deliverables*

| TFS Project Deliverables | Description/scope |
|---|---|
| Configuration Test Report 14.10.2 | A report that documents the results of the configuration test. |
| Test Strategy 14.12 | A document that defines the overall test definitions, objectives, roles, responsibilities, and timeframes. |

### System Management

| | |
|---|---|
| Systems Management Design 3.3 | A document that describes the design of the ALS COM monitoring tool and the utilities and practices to manage and report on the performance and health of the system. |
| Fault Management Procedure | A document defining the production fault handling requirements. These requirements will include possible faults, handling options, escalation for issues, tolerance and reporting. The requirements will consider the impact of external interfaces and the process for changing the fault management process to meet those interface changes. |
| Configuration Procedure 15.2 | A document defining a complete set of production configuration management requirements. These requirements will include capacity planning, measurement and reporting. The requirements will consider the impact of external interfaces and the process for changing the configuration to meet those interface changes. This document will also define the system management process to support configuration management in the development, test and production environment. |
| Performance Management Procedure 15.4 | A document defining production requirements for performance monitoring, and reporting. The performance management plan must provide adequate proactive notification and provide input to the capacity planning process. It is closely tied to the SLA criteria and supports measurement and reporting of performance against service levels. |
| Security Management Procedure 15.5 | A document defining the production security requirements and the design of the security policy necessary to protect confidential data and enforce Toyota policy. The process will begin with a review of the application provided security and will recommend necessary remediation. It will also consider the passing of data through external interfaces and the necessary protection issues. The WAN/Internet/Intranet issues will be addressed. This deliverable will include the implementation of the security policy as stated in the design document. |
| Data Management Procedure 15.6 | A document defining the data capacity, access, and retention requirements. These must reflect company policy for retention and availability. The data warehouse strategy must also be considered. The data management process will support capacity planning |
| Production System Monitoring Tools 15.7 | A custom monitor(s) that will monitor the Interfaces and ALS COM and notify resources e.g. production application support or network operations in a proactive manner. |
| Disaster Recovery Strategy 16 | A document describing a disaster recovery strategy that complies with Toyota standards and business continuation requirements. This will include evaluating options for providing the determined levels of availability in various diminished capacity scenarios. |

**F 01464**

Toyota Financial Services Confidential    OSCAR Relaunch Project Charter

**Table: TFS Deliverables**

| TFS Project Deliverables | Description/scope |
|---|---|
| | **Pilot & Deployment** |
| Pilot Test Plan 17 | A document that defines the strategy, approach, schedule and resources for the Pilot. The plan includes a fall back strategy in the event that the pilot locations are required to revert back to the legacy systems. |
| Pilot Test | A document that describes the results and action items from the Pilot Test. |
| Deployment Plan | Define the strategy, approach, schedule and resources required to deploy the application to the field. |
| Hardware & Software Installation Plan 18.2 | A document that defines the processes to install and configure the hardware and software for OSCAR. |
| Staged and Installed Hardware & Software | Hardware and software is installed and configured. Procure and stage equipment, install hardware and software. |
| Business Process Change Document | A document that identifies the changes in processes (policies/procedures) that will occur as a result of the OSCAR implementation. This information is provided to Best Practices and Policies and Procedures as a starting point for updating operational procedures |
| Training Plan | A document that describes the objectives of the OSCAR training approach. This document identifies individual groups that are to be trained, roles and responsibilities of training participants, location of training classes, procedures for developing a training class, quality measures, medium of delivery, and the schedule of training. The document identifies the type of training materials that are created by ALLTEL and Toyota, the training material format, the training material quantity, the training material reproduction requirements, and the delivery method for the training materials. |
| Training Material | Toyota specific training materials for the instructor and/or the user to augment the ALS COM training materials with Toyota specific information. |
| Quick Reference Guide | Quick reference tips to augment the standard ALS COM user aids. |
| Table Population Plan 18.3 | A document identifying non-obvious table data requirements. |
| | **Post Deployment** |
| Customer Support Transition Plan | A document describing the customer support transition strategy and plan. This document describes work during the pre rollout and post rollout period to transition customer support from the OSCAR project team to the production customer support team. |
| Transitioned Customer Support 19.2 | Customer support transitioned from project team to help desk |
| Production Transition Strategy | Design the schedule and plans for final data moves and support transition. |

**F 01465**

Toyota Financial Services Confidential                                      OSCAR Relaunch Project Charter

*Table: TFS Deliverables*

| TFS Project Deliverables | Description/scope |
|---|---|
| Transitioned Production System 19 4 | System in production and supported by the production team. This will include testing the migration strategy and making the final move of configuration and other static data to production. It will involve the immediate timeframe after transition with heightened monitoring and the postproduction move to monitoring and maintaining the established service levels. |
| Application support Transition | A document describing the application support transition strategy and plan. This document will describe work during the pre rollout and post rollout period to transition application support from the OSCAR project team to the production application support team. |
| Transitioned Application support | The application support of OSCAR has been transitioned to the production application support team. Each production release has been transitioned. |

### Other

| | |
|---|---|
| Product Support Contingency Plan | Define a high level strategy to address how to take over support of ALS COM in the event that Toyota acquires the source code (e.g., in the event of a bankruptcy) |
| Experian data | Deliver Credit Bureau files (for Experian) with all privacy information removed. |

**F 01466**

`

EXHIBIT 8

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

DISASTER RECOVERY
FILE ROOM PROJECT
DATE COPIED 9/24/03

ORIGINAL

March 10, 2003

*VIA FACSIMILE AND ORIGINAL BY OVERNIGHT COURIER*

ALLTEL Information Services, Inc.
Attention:    Mr. Rob Lee
              601 Riverside Avenue
              Mail Stop 1199 B1F01
              Jacksonville, FL  32204
            Mr. Tim Keil, Legal Department
              4001 Rodney Parham Road
              Mail Stop 1170 1364A
              Little Rock, AR 72212
Copy to:    Mr. John Vaughan
              13560 Morris Road
              Mail Stop 2130 1.3.4
              Alpharetta, GA  30004

Gentlemen:

Reference is made to that certain Master Software License Agreement No. 2000AIS002, executed on August 25, 2000, as amended, and the related Product Schedule thereto, as amended (collectively, as so amended, the "Agreement"), between Toyota Motor Credit Corporation ("TMCC") hereby notifies Alltel Information Services, Inc. ("Alltel"). Capitalized terms used herein have the meanings ascribed to such terms in the Agreement.

Pursuant to Section 6.2 of the Agreement, TMCC hereby notifies Alltel as follows:

TMCC has completed its Acceptance Test for the first Phased Delivery Software (in advance of the expiration date of the Acceptance Test Period therefor).  As of March 6, 2003, TMCC has identified the following Defects in the first Phased Delivery Software:

2 Severity Two
25 Severity Three
15 Severity Four

Despite these remaining Defects, in order to meet its business objectives, TMCC intends to commence use of the first Phased Delivery Software in its Production Environment on Tuesday, March 11, 2003.

In that regard, in accordance with Section 6.2 of the Agreement (referencing the fifth paragraph, subclause (iii) of the text of such Section set forth in the First Amendment to the Agreement), notwithstanding the foregoing remaining Defects, and without prejudice to TMCC's rights under the Agreement for correction of such Defects by Alltel and to utlimately reject the Software as provided in the last paragraph of Section 6.2, TMCC hereby proposes to ACCEPT the first Phased Software. :

**F 00002**

1

ALLTEL and TMCC further agree as follows:

1)  Alltel shall correct a subset of the above-listed remaining Defects, detailed on Attachment A hereto ("Pre-Deployment Patch"), within a mutually agreeable time period, to be agreed upon promptly following execution of this letter agreement, but no later than the initiation of Full Deployment for the first Phased Delivery Software, scheduled to begin on May 13, 2003.

2)  TMCC will pay ninety percent (90%) of the first Phased Delivery Software Holdback amount within thirty (30) days of receipt of Alltel's invoice, to be issued upon execution by Alltel of this letter agreement in recognition of TMCC's  Acceptance of the first Phased Delivery Software.

3)  The remaining ten percent (10%) of the first Phased Delivery Holdback amount will be paid within thirty (30) days of TMCC's receipt of Alltel's invoice therefor, to be issued upon TMCC's Acceptance of the Pre-Deployment Patch.

4)  It is expressly agreed that, to the extent of any conflict between the terms of this Letter Agreement, and the terms and conditions of the Agreement referenced herein, the terms of this Letter Agreement shall prevail.

By 2:00 P.M., PST, on Monday, 10, 2003, please indicate your acknowledgement and agreement to the foregoing Letter Agreement by signing a copy of this letter in the space indicated below and returning the same to the undersigned via facsimile at (310) 381-6270.

Sincerely,

ACKNOWLEDGED AND AGREED:

TOYOTA MOTOR CREDIT CORPORATION


By: _Anne Fallace_____
Anne Fallace
National Manager, Business Technology and Solutions

Attachment A:  "Pre-Deployment Patch Defects"


ACKNOWLEDGED AND AGREED:

**F 00003**

ALLTEL INFORMATION SYSTEMS, INC.

By: _____
Name: _CLIFF THOMPSON_____
Title: _ALLTEL  MANAGING  Director  Auto Finance_



RECEIVED
MAR 1 8 2003
LEGAL DEPARTMENT

**Attachment A – Pre-Deployment Patch Defects**

| | Defect Description | Severity | ALLTEL id | TFS id | Count by Severity |
|---|---|---|---|---|---|
| 1 | Concurring officer does not get checked against CAA rulesets | 2 - Serious | 16158 | 434 | 1 |
| 2 | User Unable to Logon after PC Client or TS Failure without Concurrent Sessions allowed | 2 - Serious | 16932 | 746 | 2 |
| 3 | Audit reports not generated correctly. | 3 - Moderate | 16042 | 352 | 1 |
| 4 | User receives Unexpected condition message if no application is opened in ALS COM | 3 - Moderate | 16439 | 562 | 2 |
| 5 | OFSC db/CIF Unavailable, CIF Grid freezes, disables all functions, session must terminate in order to proceed processing app | 3 - Moderate | 16640 | 611 | 3 |
| 6 | No dec reasons are selected in ALS COM and not displayed on ECOA letters or decision fax for auto declines | 3 - Moderate | 16844 | 667 | 4 |
| 7 | VDW: Port Accessory Codes do not show up in the VIN Validation window | 3 - Moderate | 16821 | 686 | 5 |
| 8 | Response time for the rescore process slow when demonstrated in the Train the Trainer class | 3 - Moderate | 16837 | 692 | 6 |
| 9 | Concurrence: Decisioned application changes back to undecided. | 3 - Moderate | 16839 | 694 | 7 |
| 10 | Concurrence: Supervisor forced into Concurrence without any rules set | 3 - Moderate | 16841 | 698 | 8 |
| 11 | Booked Applications not consistently reflected in ALS COM | 3 - Moderate | 16850 | 699 | 9 |
| 12 | MOM/Workflow: Unresolved error message within ALS COM Workflow log. | 3 - Moderate | 16852 | 704 | 10 |
| 13 | Encore Message not Automatically Sent | 3 - Moderate | 16851 | 709 | 11 |
| 14 | App Call Back report has incorrect data | 3 - Moderate | 16868 | 711 | 12 |
| 15 | Need Edit For Business Only if no Bureau rating, Internal Score or Internal Grade is entered | 3 - Moderate | 16862 | 712 | 13 |
| 16 | Application Activity Detail  (1 ) by Loan Type with Delivery channel does not indicate sub totals by loan type, (2) by program with Del channel does not have the correct sub totals,  (3) information on the screen is cluttered, by loan type, and (4) by program -- Need Page Break for subtotal after branch for region (5) by Dealer, the second title line is not displayed | 4 - Moderate | 16946 | 713 | 14 |
| 17 | Application Activity Detail by Dealer - incorrect data | 3 - Moderate | 16887 | 717 | 15 |
| 18 | Received Run Time error while Deleting a User in the User Table in TM | 3 - Moderate | 16874 | 726 | 16 |
| 19 | User Table in TM Delete process functioning improperly | 3 - Moderate | 16873 | 727 | 17 |
| 20 | LEASE: Can not add year, make & model for Lease Apps | 3 - Moderate | 16903 | 728 | 18 |
| 21 | Reports: Can not select printer when printing reports | 3 - Moderate | 16890 | 729 | 19 |
| 22 | ALS COM Discounting Workflow does not recover from path errors. | 3 - Moderate | 16902 | 733 | 20 |
| 23 | Dealer Application Status Summary has incorrect data | 3 - Moderate | 16919 | 735 | 21 |
| 24 | Clicking on NextApp by Two Users at 'same' time returns the same app | 3 - Moderate | 16904 | 736 | 22 |
| 25 | Dealer Productivity Report has incorrect data | 3 - Moderate | tbd | 743 | 23 |

3

| | Defect Description | Severity | ALLTE L id | TFS id | Count by Severity |
|---|---|---|---|---|---|
| 26 | Reporting Database not being Loaded | 3 - Moderate | 16945 | 747 | 24 |
| 27 | Dealer Application FAX is missing users name from originating fax | 4 - Minor | 16313 | 535 | 1 |
| 28 | Dealer Application fax is missing the applicants Middle initial | 4 - Minor | 16314 | 536 | 2 |
| 29 | CIF: Error message after CIF database fails and then comes back online | 4 - Minor | 16654 | 621 | 3 |
| 30 | CIF: The CIF form occasionally shows 2 CIF records even though only 1 exists | 4 - Minor | 16743 | 650 | 4 |
| 31 | Applicant Bureau Score appears under Co-Applicant Information | 2 - Minor | 16819 | 680 | 5 |
| 32 | ALS COM displays an error message and hangs indefinitely when a 'Search' is made with an apostrophe in it | 4 - Minor | 16893 | 687 | 6 |
| 33 | Email Notifications are malformed/different from Fax | 4 - Minor | 16835 | 693 | 7 |
| 34 | Carleton Error upon second Data Entry Complete | 4 - Minor | 16840 | 695 | 8 |
| 35 | Trade Rev: Buttons are grayed out when exiting Trade Rev Screen | 4 - Minor | 16842 | 700 | 9 |
| 36 | Booked Apps | 4 - Minor | 16871 | 719 | 10 |
| 37 | Booked App Failure | 4 - Minor | 16872 | 720 | 11 |

F 00005

Honda will receive a 10-year term license. The initial PCS term will be five years at $2.1M per year. All other terms outlined in the fact pattern above remain in effect, including the 25% service allocation, except as follows:

At the end of the five years, Honda will have three options:

- Renew the existing PCS agreement ($2.1M per year) for an additional five years.
- Choose to pay an upfront fee of $5.7M in year six, then $1M per year for each of years 6-10, and receive "reduced PCS".
- Not renew PCS, and not receive any PCS services for year 6-10. But, Honda will owe ALLTEL a royalty to cover ALLTEL's royalty obligation on certain intellectual properties related to the software (which is $.30/acct/yr, or at Honda's current volume of 1.8M accounts, an annual payment of $540,000).

Answer:
*This alternative would not allow AIS to establish VSOE of FV for PCS as the "royalty" from Honda is still contingent upon Honda renewing maintenance or not. Therefore, it could be assimilated to a fee to be paid by Honda to waive the PCS renewal and should be considered in the determination of the PCS renewal rate. As this royalty is clearly variable, the renewal rate of PCS would not be determinable and therefore would not meet the definition of a substantive renewal rate under TPA 5100.54.*

**Alternative 2:**

Honda will receive a 10-year term license. The initial PCS term will be five years at $2.1M per year. All other terms outlined in the fact pattern above remain in effect, including the 25% service allocation, except as follows:

- Honda will owe ALLTEL a royalty to cover ALLTEL's royalty obligation on certain intellectual properties related to the software (which is $.30/acct/yr, or at Honda's current volume of 1.8M accounts, an annual payment of $540,000).

   *Note: The royalty payments could start at any point in time during the term of the agreement.*

At the end of the five years, Honda will have three options:

- Renew the existing PCS agreement ($2.1M per year) for an additional five years.
- Choose to pay an upfront fee of $5.7M in year six, then $1M per year for each of years 6-10, and receive "reduced PCS".
- Not renew PCS, and not receive any PCS services for year 6-10.

Answer:
*This alternative would allow AIS to establish VSOE of FV for PCS, in accordance with TPA 5100.54.*

**F 00006**

EXHIBIT 9

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

**Fitzpatrick, John R**

| | |
|---|---|
| ᴼm: | Vaughan, John |
| Ᏻent: | Tuesday, September 23, 2003 12:46 |
| To: | Slider, David; Fitzpatrick, John R |
| Subject: | FW: Invoice Questions Holdback for Release 1 Patch (10%) |

```
-----Original Message-----
From: Vaughan, John
Sent: Tuesday, September 23, 2003 11:25 AM
To: Thompson, Cliff; Keil, Tim
Subject: FW: Invoice Questions Holdback for Release 1 Patch (10%)
```

```
-----Original Message-----
From: Diane_Switzer@Toyota.com [mailto:Diane_Switzer@Toyota.com]
Sent: Wednesday, August 20, 2003 8:48 PM
To: Martin, Darrell
Cc: Martin, Darrell; Vaughan, John
Subject: Re: Invoice Questions Holdback for Release 1 Patch (10%)
```

 yes and yes


|  | "Martin, Darrell" | | |
|---|---|---|---|
|  | <Darrell.Martin@f | To: | "Diane Switzer (E-mail)" |
| <Diane_Switzer@Toyota.com> | | | |
|  | nf.com> | cc: | "Vaughan, John" |
| <John.Vaughan@fnf.com>, "Martin, Darrell" | | | |
|  |  |  | <Darrell.Martin@fnf.com> |
|  | 08/20/2003 02:34 | Subject: | Invoice Questions Holdback for |
| Release 1 Patch (10%) | | | |
|  | PM | | |


```
Diane,
I had two questions concerning invoices that I was wondering if you could
answer:
          10% Acceptance Invoice - There was a 10% holdback (90%
          submitted) for the acceptance of the release 1 code. Since the
          Patch 7 has been UAT tested and promoted to production, I
          believe that we should be able to submit an invoice for payment
          of the remaining 10%. Can you confirm this?

          Release 1 Delivery - At this time, I believe all release 1
          deliverables and delivery tasks/activities are completed
          relating to implementation. As such, I believe we should be
          able to submit an invoice for the payment of the tasks
          associated with the Release delivery milestone. Can you confirm
          this?
```

F 00638

Darrell Martin
Sr. Project Manager, ALSCOM Toyota Project
Fidelity Information Services, Inc.
 division of Fidelity National Financial darrell.martin@fnf.com
(678) 351-6449 (Work)


DISCLAIMER:
This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information.  Any unauthorized review, use, disclosure or
distribution is prohibited.  If you are not the intended recipient, please contact the
sender by reply email and destroy all copies of the original message and attachments.

2

F 00639

EXHIBIT 10

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

# FIDELITY
**INFORMATION SERVICES™**
A DIVISION OF FIDELITY NATIONAL FINANCIAL

**Fidelity Information Services, Inc.**
13560 Morris Road
Alpharetta, GA 30004
(678) 351-2000

| | |
|---|---|
| INVOICE DATE: | September 2, 2003 |
| INVOICE NUMBER: | 1689 |
| BUSINESS UNIT NUMBER: | 8-11243-011 |

**TO:**     TFS PMO, OSCAR Project, ALS-COM

Attention: Diane Switzer
19001 South Western Avenue
Torrance, CA  90509-2991

| DESCRIPTION | | | TOTAL EXTENDED AMOUNT |
|---|---|---|---|
| **Phase I Holdback** | | | |
| **HOLDBACK RECAP (CUMULATIVE):** | | | |
| | | | |
| February Invoice | | $ | 10,930.00 |
| January Invoice | | $ | 13,374.12 |
| December Invoice | | $ | 26,257.23 |
| November Invoice | | $ | 26,455.82 |
| October Invoice | | $ | 34,518.07 |
| September Invoice | | $ | 80,885.28 |
| August Invoice | | $ | 99,751.09 |
| July Invoice | | $ | 123,767.37 |
| June Invoice | | $ | 60,456.39 |
| May Invoice | | $ | 30,189.39 |
| April Invoice | | $ | 27,134.55 |
| March Invoice | | $ | 11,743.25 |
| February Invoice | | $ | 9,816.88 |
| | | | |
| Total Phase I Holdback | | $ | 555,279.44 |
| 90 % of Holdback as Acceptance of Phase I (Approved Invoice 1680 in June 2003) | | $ | 499,751.50 |
| | | | |
| **Remaining Holdback due on Acceptance of Pre-Deployment Patch** | | $ | 55,527.94 |

| **INVOICE TOTAL** | **$** | **55,527.94** |
|---|---|---|
| | Please pay this amount | |

| Make all checks payable to : | Wire Transfers to: |
|---|---|
| Fidelity Information Services, Inc. | JP Morgan Chase |
| P.O. Box 911653 | Credit:  Fidelity Information Services, Inc. |
| Dallas, TX 75391-1653 | ABA Routing #: 021000021, Account #: 323906702 |
| | Swift Code: CHASUS33 |

**THANK YOU FOR YOUR BUSINESS!**

| Doc Type | Address # | Doc Type | Doc Type Description | Doc # | Pay Item | Pay Stat Description | Gross Amount | Open Amount | Total Billed Invoices | Date of Activity | Invoice Date | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80048 | 3642640 | RI | Invoice | 842 | 001 | Paid in Full | 6,488.20 | - | 6,488.20 | 12/15/1999 | 12/7/1999 | |
| 80048 | 3642640 | RI | Invoice | 843 | 001 | Paid in Full | 14,907.61 | - | 14,907.61 | 12/15/1999 | 12/7/1999 | |
| 80048 | 3642640 | RI | Invoice | 858 | 001 | Paid in Full | 12,138.92 | - | 12,138.92 | 1/24/2000 | 1/12/2000 | |
| 80048 | 3642640 | RI | Invoice | 874 | 001 | Paid in Full | 16,096.84 | - | 16,096.84 | 1/31/2000 | 1/21/2000 | |
| 80048 | 3642640 | RI | Invoice | 875 | 001 | Paid in Full | 9,093.00 | - | 9,093.00 | 1/31/2000 | 1/21/2000 | |
| 80048 | 3642640 | RI | Invoice | 897 | 001 | Paid in Full | 5,342.89 | - | 5,342.89 | 3/22/2000 | 3/9/2000 | |
| 80048 | 3642640 | RI | Invoice | 925 | 001 | Paid in Full | 4,725.00 | - | 4,725.00 | 2/28/2000 | 2/17/2000 | |
| 80048 | 3642640 | RI | Invoice | 930 | 001 | Paid in Full | 7,000.00 | - | 7,000.00 | 2/28/2000 | 2/17/2000 | |
| 80048 | 3642640 | RI | Invoice | 935 | 001 | Paid in Full | 4,375.00 | - | 4,375.00 | 2/28/2000 | 2/18/2000 | |
| 80048 | 3642640 | RI | Invoice | 939 | 001 | Paid in Full | (924.00) | - | (924.00) | 3/7/2000 | 3/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 940 | 001 | Paid in Full | 2,212.50 | - | 2,212.50 | 3/22/2000 | 3/9/2000 | |
| 80048 | 3642640 | RI | Invoice | 941 | 001 | Paid in Full | 2,975.00 | - | 2,975.00 | 3/22/2000 | 3/9/2000 | |
| 80048 | 3642640 | RI | Invoice | 942 | 001 | Paid in Full | (693.00) | - | (693.00) | 3/7/2000 | 3/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 952 | 001 | Paid in Full | 4,941.50 | - | 4,941.50 | 3/28/2000 | 3/15/2000 | |
| 80048 | 3642640 | RI | Invoice | 953 | 001 | Paid in Full | 1,050.00 | - | 1,050.00 | 3/28/2000 | 3/16/2000 | |
| 80048 | 3642640 | RI | Invoice | 954 | 001 | Paid in Full | 5,687.50 | - | 5,687.50 | 3/28/2000 | 3/16/2000 | |
| 80048 | 3642640 | RI | Invoice | 976 | 001 | Paid in Full | 1,400.00 | - | 1,400.00 | 4/7/2000 | 4/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 977 | 001 | Paid in Full | 700.00 | - | 700.00 | 4/7/2000 | 4/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 978 | 001 | Paid in Full | 2,625.00 | - | 2,625.00 | 4/7/2000 | 4/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 979 | 001 | Paid in Full | 6,650.00 | - | 6,650.00 | 4/7/2000 | 4/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 980 | 001 | Paid in Full | 1,225.00 | - | 1,225.00 | 4/7/2000 | 4/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 987 | 001 | Paid in Full | 600.00 | - | 600.00 | 4/25/2000 | 4/16/2000 | |
| 80048 | 3642640 | RI | Invoice | 993 | 001 | Paid in Full | 854.43 | - | 854.43 | 5/5/2000 | 5/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 998 | 001 | Paid in Full | 4,647.71 | - | 4,647.71 | 5/5/2000 | 5/1/2000 | |
| 80048 | 3642640 | RI | Invoice | 1072 | 001 | Paid in Full | 281,530.00 | - | 281,530.00 | 9/26/2000 | 8/31/2000 | |
| 80048 | 3642640 | RI | Invoice | 1089 | 001 | Paid in Full | 575,000.00 | - | 575,000.00 | 9/26/2000 | 9/26/2000 | |
| 80048 | 3642640 | RI | Invoice | 1136 | 001 | Paid in Full | 198,816.20 | - | 198,816.20 | 12/21/2000 | 1/24/2000 | |
| 80048 | 3642640 | RI | Invoice | 1137 | 001 | Paid in Full | 361,417.93 | - | 361,417.93 | 12/21/2000 | 1/26/2000 | |
| 80048 | 3642640 | RI | Invoice | 1138 | 001 | Paid in Full | 594,307.60 | - | 594,307.60 | 12/21/2000 | 1/28/2000 | |
| 80048 | 3642640 | RI | Invoice | 1166 | 001 | Paid in Full | 478,310.38 | - | 478,310.38 | 1/9/2001 | 1/5/2001 | |
| 80048 | 3642640 | RI | Invoice | 1188 | 001 | Paid in Full | 448,956.33 | - | 448,956.33 | 2/8/2001 | 2/7/2001 | |
| 80048 | 3642640 | RI | Invoice | 1220 | 001 | Paid in Full | 381,653.99 | - | 381,653.99 | 3/31/2001 | 3/16/2001 | |
| 80048 | 3642640 | RM | Credit Memo | 1220 | 001 | Paid in Full | (381,653.99) | - | (381,653.99) | 7/31/2001 | 7/31/2001 | Applied to Invoice #1258 & 1265 |
| 80048 | 3642640 | RU | | 1220 | 001 | | (381,654.00) | - | | 10/9/2001 | 10/9/2001 | |
| 80048 | 3642640 | RI | Invoice | 1221 | 001 | Paid in Full | 337,010.15 | - | 337,010.15 | 4/10/2001 | 4/6/2001 | Actual payment of invoice 1221 |
| 80048 | 3642640 | RM | Credit Memo | 1221 | 001 | Paid in Full | (318,346.01) | - | (318,346.01) | 7/31/2001 | 7/31/2001 | - $18,664.14 net-adjusted amount |
| 80048 | 3642640 | RI | Invoice | 1229 | 001 | Paid in Full | 264,273.16 | - | 264,273.16 | 6/8/2001 | 6/1/2001 | |
| 80048 | 3642640 | RI | Invoice | 1258 | 001 | Paid in Full | 377,850.44 | - | 377,850.44 | 6/8/2001 | 6/1/2001 | |
| 80048 | 3642640 | RI | Invoice | 1265 | 001 | Paid in Full | 162,306.42 | - | 162,306.42 | 6/21/2001 | 6/18/2001 | |
| 80048 | 3642640 | RI | Invoice | 1288 | 001 | Paid in Full | 139,362.01 | - | 139,362.01 | 9/30/2001 | 7/20/2001 | |
| 80048 | 3642640 | RI | Invoice | 1332 | 001 | Paid in Full | 6,303.15 | - | 6,303.15 | 10/31/2001 | 9/20/2001 | |
| 80048 | 3642640 | RI | Invoice | 1333 | 001 | Paid in Full | 25,532.81 | - | 25,532.81 | 10/31/2001 | 9/20/2001 | |
| 80048 | 3642640 | RI | Invoice | 1334 | 001 | Paid in Full | 19,100.33 | - | 19,100.33 | 10/31/2001 | 10/10/2001 | |
| 80048 | 3642640 | RI | Invoice | 1506 | 001 | Paid in Full | 3,875.01 | - | 3,875.01 | 10/31/2001 | 10/31/2001 | |
| 80048 | 3642640 | RI | Invoice | 1538 | 001 | Paid in Full | 19,875.33 | - | 19,875.33 | 1/31/2002 | 12/10/2001 | |
| 80048 | 3642640 | RU | Unapplied Cash | 1538 | 001 | | (19,875.33) | - | | 1/17/2002 | 1/17/2002 | Apply to invoice: paid on 1/17/02 |
| 80048 | 3642640 | RI | Invoice | 1539 | 001 | Paid in Full | 10,875.27 | - | 10,875.27 | 1/31/2002 | 12/10/2001 | |
| 80048 | 3642640 | RU | Unapplied Cash | 1539 | 001 | Paid in Full | (10,875.27) | - | | 1/17/2002 | 1/17/2002 | Apply to invoice: paid on 1/17/02 |
| 80048 | 3642640 | RI | Invoice | 1572 | 001 | Paid in Full | 5,893.03 | - | 5,893.03 | 7/29/2002 | 7/29/2002 | |
| 80048 | 3642640 | RU | Unapplied Cash | 1599 | 001 | Paid in Full | (5,893.03) | - | | 4/30/2002 | 4/30/2002 | Apply to invoice: paid on 04/30/02 |
| 80048 | 3642640 | RI | Invoice | 1622 | 001 | Paid in Full | 1,302.95 | - | 1,302.95 | 8/31/2002 | 8/15/2002 | |
| 80048 | 3642640 | RI | Invoice | 1623 | 001 | Paid in Full | 1,657.87 | - | 1,657.87 | 8/31/2002 | 8/15/2002 | |
| 80048 | 3642640 | RI | Invoice | 1624 | 001 | Paid in Full | 53,027.45 | - | 53,027.45 | 8/31/2002 | 8/19/2002 | |
| 80048 | 3642640 | RI | Invoice | 1625 | 001 | Paid in Full | 141,064.90 | - | 141,064.90 | 8/31/2002 | 8/19/2002 | |
| 80048 | 3642640 | RI | Invoice | 1650 | 001 | Paid in Full | 306,998.05 | - | 306,998.05 | 11/30/2002 | 10/29/2002 | |
| 80048 | 3642640 | RI | Invoice | 1651 | 001 | Paid in Full | 233,369.83 | - | 233,369.83 | 11/30/2002 | 10/29/2002 | |
| 80048 | 3642640 | RI | Invoice | 1664 | 001 | Paid in Full | 81,273.68 | - | 81,273.68 | 12/31/2002 | 11/21/2002 | |
| 80048 | 3642640 | RI | Invoice | 1676 | 001 | Paid in Full | 63,581.78 | - | 63,581.78 | 12/31/2002 | 12/9/2002 | |
| 80048 | 3642640 | RI | Invoice | 1678 | 001 | Paid in Full | 82,548.96 | - | 82,548.96 | 3/27/2003 | 3/25/2003 | |
| 80048 | 3642640 | RI | Invoice | 1679 | 001 | Paid in Full | 125,088.60 | - | 125,088.60 | 4/7/2003 | 4/4/2003 | |
| 80048 | 3642640 | RI | Invoice | 1681 | 001 | Paid in Full | 156,786.15 | - | 156,786.15 | 6/1/2003 | 5/1/2003 | |
| 80048 | 3642640 | RI | Invoice | 1687 | 001 | Paid in Full | 242,112.34 | - | 242,112.34 | 12/31/2003 | 12/31/2003 | |
| 80058 | 3642640 | RI | Invoice | 1688 | 001 | Paid in Full | 217,939.66 | - | 217,939.66 | 11/30/2003 | 11/24/2003 | |
| 80058 | 3642640 | RI | Invoice | 1689 | 001 | Paid in Full | 55,527.94 | - | 55,527.94 | 10/31/2003 | 10/31/2003 | |

| Doc Type | Address # | Doc Type | Doc Type Description | Doc # | Pay Item | Pay Stat Description | Gross Amount | Open Amount | Total Billed Invoices | Date of Activity | Invoice Date | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80048 | 3642640 | RI | Invoice | 1693 | 001 | Paid in Full | 46,673.70 | - | 46,673.70 | 5/31/2004 | 5/31/2004 | |
| 80048 | 3642640 | RI | Invoice | 1694 | 001 | Paid in Full | 3,026.11 | - | 3,026.11 | 3/31/2004 | 3/5/2004 | |
| 80048 | 3642640 | RI | Invoice | 1696 | 001 | Paid in Full | 60,155.58 | - | 60,155.58 | 5/31/2004 | 5/31/2004 | |
| 80048 | 3642640 | RI | Invoice | 1700 | 001 | Approved for Payment | 86,250.00 | 86,250.00 | 86,250.00 | 9/30/2004 | 9/1/2004 | |
| 80048 | 3642640 | RI | Invoice | 1703 | 001 | Approved for Payment | 4,380.09 | 4,380.09 | 4,380.09 | 9/30/2004 | 9/17/2004 | |
| 80048 | 3642640 | RU | Unapplied Cash | 14461 | 001 | Paid in Full | (156,786.16) | - | - | 6/17/2003 | 6/17/2003 | Applied to Invoice# 1681 |
| 80048 | 3642640 | RI | Invoice | 16520 | 001 | Paid in Full | 189,037.32 | - | 189,037.32 | 11/30/2002 | 10/29/2002 | |
| 80048 | 3642640 | RI | Invoice | 16777 | 001 | Paid in Full | 65,812.02 | - | 65,812.02 | 3/27/2003 | 3/24/2003 | |
| 80048 | 3642640 | RI | Invoice | 16800 | 001 | Paid in Full | 499,751.50 | - | 499,751.50 | 4/21/2003 | 4/10/2003 | |
| 80048 | 3642640 | RI | Invoice | 16820 | 001 | Paid in Full | 336,334.59 | - | 336,334.59 | 8/25/2003 | 8/18/2003 | |
| 80048 | 3642640 | RI | Invoice | 16830 | 001 | Paid in Full | 86,250.00 | - | 86,250.00 | 7/1/2003 | 7/1/2003 | |
| 80048 | 3642640 | RI | Invoice | 16882 | 001 | Paid in Full | - | - | - | 12/31/2003 | 12/31/2003 | |
| 80048 | 3642640 | RI | Invoice | 16892 | 001 | Paid in Full | 213,221.26 | - | 213,221.26 | 12/31/2003 | 12/31/2003 | |
| 80048 | 3642640 | RI | Invoice | 16902 | 001 | Paid in Full | 427,538.99 | - | 427,538.99 | 12/31/2003 | 12/31/2003 | |
| 80048 | 3642640 | RI | Invoice | 16911 | 001 | Paid in Full | 182,450.78 | - | 182,450.78 | 12/31/2003 | 12/31/2003 | |
| 80048 | 3642640 | RI | Invoice | 16921 | 001 | Paid in Full | 112,534.91 | - | 112,534.91 | 3/31/2004 | 3/5/2004 | |
| 80048 | 3642640 | RI | Invoice | 16951 | 001 | Paid in Full | 66,701.41 | - | 66,701.41 | 3/31/2004 | 3/5/2004 | |
| 80048 | 3642640 | RI | Invoice | 16971 | 001 | Approved for Payment | 69,449.78 | 69,449.78 | 69,449.78 | 9/30/2004 | 9/1/2004 | |
| 80048 | 3642640 | RI | Invoice | 16981 | 001 | Paid in Full | 19,411.00 | - | 19,411.00 | 5/31/2004 | 5/31/2004 | |
| 80048 | 3642640 | RI | Invoice | 16991 | 001 | Approved for Payment | 6,137.42 | 6,137.42 | 6,137.42 | 9/30/2004 | 9/1/2004 | |
| 80048 | 3642640 | RI | Invoice | 91681 | 001 | Paid in Full | 0.01 | - | 0.01 | 7/1/2003 | 7/1/2003 | |
| 80048 | 3642640 | RM | Credit Memo | 162400 | 001 | Paid in Full | (2.00) | - | (2.00) | 3/27/2003 | 3/25/2003 | |
| | | | | | | | 7,768,679.48 | 166,217.29 | 8,343,763.27 | | | |

| | | |
|---|---|---|
| JD Edwards | 7,768,679.28 | 166,217.29 |
| Diff | (0.20) | - |

EXHIBIT 11

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



Oscar Production Environment
Doc Version: 3.1
Updated: 03/31/2004
Created by: Mike Beels
147.146.59.201
Port 700 - Consumer
Router
Router
Router
PDN
10.48.X.X, 10.49.X.X traffic allowed out to credit bureaus
Firewall
OFSC
OCA
Dealer Daily
CAMPUS
Lexus (DB2)
IBM Mainframe
Wholesale System
Retail Discounting
Lease Discounting
Retail Servicing System
Lease Servicing System
Dealer Draft System
PARS and DRS
Credit Scoring
Token Ring
Workstation
Workstation
Users connect via Terminal Services Client through Port 3389
DATAPSNA01
SNA Gateway Server
SNA Server 4.0
VDW
TFS Data Warehouse
DATAPFAX03
RightFax Server
Router
EMC
MS Cluster Active-Passive
OSCRPASV10
BridgeWare Server
Windows 2000 Adv Server
MS BizTalk Server 2002
OSCRPASV11
BridgeWare Server
Windows 2000 Adv Server
MS BizTalk Server 2002
OSCRPWEB03
Oscar OIS/SQL Server
Windows 2000 Adv Server
Local Director
OSCRPASV03
Bureau Server
Windows 2000 Server
OSCRPASV04
Bureau Server
Windows 2000 Server
Load Balanced by CISCO Local Director
OSCRPTSV01
OSCRPTSV02
OSCRPTSV03
OSCRPTSV04
OSCRPTSV05
OSCRPTSV06
OSCRPTSV07
OSCRPTSV08
OSCRPTSV09
OSCRPTSV10
OSCRPTSV15
OSCRPTSV16
OSCRPTSV17
OSCRPTSV18
OSCRPTSV19
OSCRPTSV20
OSCRPTSV21
OSCRPTSV22
OSCRPTSV23
OSCRPTSV24
OSCRPTSV25
OSCRPTSV26
X 24
OSCRPTSV77
Terminal Server
Windows 2000 Server
OSCRPSQL01
SQL Server 2000 SP3
Windows 2000 Adv Server
SQL 2000 Server
OSCRPSQL02
SQL Server 2000 SP3
Windows 2000 Adv Server
SQL 2000 Server
MS Cluster Active-Active
EMC
OSCRPASV01
Bureau Server
Windows 2000 Adv Server
OSCRPASV02
Bureau Server
Windows 2000 Adv Server
OSCRPASV08
Image Server
Windows 2000 Adv Server
OSCRPASV09
Image Server
Windows 2000 Adv Server
MS Cluster Active-Passive
EMC
OSCRPASV05
Workflow Server
Windows 2000 Server
OSCRPASV06
Workflow Server
Windows 2000 Server
OSCRPASV07
Workflow Server
Windows 2000 Server
OSCRPASV18
Workflow Server
Windows 2000 Server
OSCRPWEB01
Oscar COM+ Server
Windows 2000 Adv Server
OSCRPWEB02
Oscar COM+ Server
Windows 2000 Adv Server
Load balanced by CISCO Local Director

F 01411

EXHIBIT 12

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



# PURCHASE ORDER

Technology Products Group
4001 Rodney Parham Road
Little Rock, AR 72212-2496
Phone: (501) 220-4700
Fax:  (501) 220-5529

| **VENDOR:** | EMC Corporation<br>Attn: John Quinsey<br>2201 Dupont Drive<br>Suite 500<br>Irvine, CA 92612 |
|---|---|

| **Inside Delivery Requested On All Orders** | Toyota Motor Sales, USA<br>ATTN: Mark Budka<br>19001 S. Western<br>AvenueTorrance,CA 90501<br>Contact: Randy Gillis<br>904-891-4407 | **INVOICE TO:** | Fidelity Information Services<br>Technology Products Group<br>Attn:  Tricia Valentine<br>4001 Rodney Parham Road<br>Mail Zone LRW1207<br>Little Rock,  AR  72212-2496 |
|---|---|---|---|

| Purchase Order # | Order Date | Vendor's Quote # | Quote Date | Delivery Date | Business Unit # |
|---|---|---|---|---|---|
| L151LD | 5/11/2004 | 8310 73 GB Upgrade | 5/10/1940 | 5/13/2004 | 11243011 |

| Qty. | Mfg | Type/ Model | Description | Unit Price | Extended Price |
|---|---|---|---|---|---|
| 1 | EMC | 8830 Upgrade | Upgrade Toyota EMC 8830 with (48) 144.6GB Drives sn HK185704985 | 193,839.00 | 193,839.00 |
| 24 | EMC | 8031-146M1UPG | SYM 8031 144.6GB MIRR UPG | | |
| 2 | EMC | MEM3-8192UPG | 8192MB M3E CACHE UPGRADE | | |
| 2 | EMC | MEM3-4096UPG | (RETURN) 4096MB M3E CACHE UPGRADE | | |
| 3 | EMC | PKG-SY-T5-30U | CC5.1 PKG SY T5-30UPG | | |
| 3 | EMC | SM-SYM-T5-30U | CC5.1 SM SYM T5-30 UPG | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | TOTAL: | $193,839.00 |

## NOTES/SPECIAL INFORMATION/INSTRUCTIONS:

This purchase is to be governed by the by the terms and conditions of the contract between Alltel and EMC dated April, 1995.

*Please include inside delivery service on all freight orders unless otherwise specified*

THIS IS FOR EXPIDITED OVERNITE DELIVERY.

**Technology Products Authorized Signature:**

Larry Diaz Equipment Analyst          CAR/car

cc:    John Vaughan
       Randy Gillis
       Mark Budka
       John Vaughan

       Tricia Valentine

F 01385

TECHNOLOGY PRODUCTS GROUP
CC#: 810734001
4001 Rodney Parham Rd
Little Rock, AR 72212
Ph#: (501) 220-4700
Fx#: (501) 220-5529
Email: technology.products@alltel.com

**REQUISITION FORM**
**HARDWARE / SOFTWARE / PERSONAL COMPUTERS**



*L151LD*

| Business Unit # Charged | |
|---|---|
| 112430-11 | |
| Business Unit Name | |
| Toyota Account | |
| Requesting Person | |
| John Fitzpatrick | |
| Phone Number | |
| 501-220-6721 | |
| Business Unit Manager | |
| Jim Wilson | |

| Company Name | | |
|---|---|---|
| Toyota Motor Sales, USA | | |
| Address Line 1 | | |
| ATTN: Mark Budka | | |
| Address Line 2 | | |
| 19001 S. Western Avenue | | |
| City | State | Zip Code + Four |
| Torrance | CA | 90501 |
| Contact Name | | Phone # |
| Randy Gillis | | 904-891-4407 |

**ADDITIONAL PAGE**

Requisition Date
**OVERNIGHT EXPEDITED**
Requested Delivery Date
**Wednesday, May 12, 2004**
Customer Ref #
**Page __1__ of _1__**

| QTY | MFG | TYPE MODEL or PART | FULL DESCRIPTION | UNIT COST Approved | UNIT AMT. Approved | DEPR TERM |
|---|---|---|---|---|---|---|
| 1 | EMC | 8031 Upgrade | Upgrade Toyota EMC 8830 with (48) 144.6GB Drives sn HK185704985 | $193,839.00 | 193,839.00 | 18 |
| 24 | EMC | 8031-146M1UPG | SYM 8031 144.6GB MIRR UPG | | 0.00 | |
| 2 | EMC | MEM3-8192UPG | 8192MB M3E CACHE UPGRADE | | 0.00 | |
| 2 | EMC | MEM3-4096UPG | (RETURN) 4096MB M3E CACHE UPGRADE | | 0.00 | |
| 3 | EMC | PKG-SY-T5-30U | CC5.1 PKG SY T5-30UPG | | 0.00 | |
| 3 | EMC | SM-SYM-T5-30U | CC5.1 SM SYM T5-30 UPG | | 0.00 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | TOTAL | $ 193,839.00 | |

| 1) Level 2 (< $50,000) | 2) Level 4 (> $100,000) | 3) Level 4 Controller (>$100,000) |
|---|---|---|
| Level 3 (> $50,000) | or Level 5 (> $500,000) | or Level 5 C.F.O. (> $500,000) |

| Signature | | Signature | | Signature |
|---|---|---|---|---|
| ☐ L2    Printed Name    ☑ L3 | | ☐ L4    Printed Name    ☐ L5 | | ☐ CTLR    Printed Name    ☐ CFO |
| DATE: _____ | | DATE: _____ | | DATE: _____ |

EMC Toyota 05-10-04 (2)1.XLS 8/22/98

**F 01386**

DATE: 5/10/2004

CONTENT: FIS Upgrade Order for Toyota

# EMC²
### where information lives

PREPARED FOR: Larry Diaz
COMPANY: FIS
ADDRESS: 4001 Rodney Parham Road
Little Rock, AR 72212
PHONE: (501) 220-5426

PREPARED BY: John Quinsey
COMPANY: EMC CORPORATION
ADDRESS: 2201 DUPONT DRIVE #500
IRVINE, CA 92692
PHONE: 949-797-2193
FAX 949-833-0690

| Hardware | | | | |
|---|---|---|---|---|
| Item | Quantity | Model | Description | List Price |
| 1 | 24 | 8031-146M1UPG | SYM 8031 144.6GB MIRR UPG | $221,760.00 |
| 2 | 2 | MEM3-8192UPG | 8192MB M3E CACHE UPGRADE | $65,184.00 |
| 3 | 2 (R) | MEM3-4096UPG | (RETURN) 4096MB M3E CACHE UPGRADE | $0.00 |
| | | | Subtotal: | $286,944.00 |
| Software | | | | |
| Item | Quantity | Model | Description | List Price |
| 1 | 3 | PKG-SY-T5-30U | CC5.1 PKG SY T5-30UPG | $47,670.00 |
| 2 | 3 | SM-SYM-T5-30U | CC5.1 SM SYM T5-30 UPG | $17,820.00 |
| | | | Subtotal: | $65,490.00 |

TOTAL LIST PRICE: $352,434.00
FIS Total Purchase Price: $193,839.00
FIS Revised Purchase Price: $193,839.00

NOTES:
Hardware Warranty:     coterminous     Monthly cost after warranty expires =     $2,528.00
Software Warranty:     3 months     Annual cost after warranty expires =     $9,828.00

CONDITIONS:
Trade-in credit for returning cache has been factored into the discount.
This transaction is subject to the terms and conditions specified in the applicable signed agreement between EMC and Customer.

F 01387

EXHIBIT 13

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

# Fidelity ALS COM Application
# Application Architecture and Design Recommendations

**Abstract:**

This document discusses the architectural and design change recommendations for the ALS Com application with the intent of improving application performance and scalability.

Prepared by Microsoft Consulting Services

F 00602

## Version History

| Date | Version | Description |
|------|---------|-------------|
| 5/13/04 | 1.0 | Initial Version |
| 5/14/04 | 1.1 | Added Connection Reuse and Stored Procedure Performance List |
| 5/19/04 | 1.2 | Added MS Access and Collection/Dictionary findings |
| 5/26/04 | 1.3 | Added longer term architectural recommendations |
| 5/27/04 | 1.4 | Updated architectural recommendations and migration path |

F 00603

# Table of Contents

**INTRODUCTION** ........................................................................................... 4

**SUMMARY** ..................................................................................................... 4

**DESIGN REVIEW** ......................................................................................... 6

RECORDSET COPYING ....................................................................................... 6
LOADING PROGRAM RULES ............................................................................... 6
CONSOLIDATING DATABASE CALLS .................................................................. 7
DATABASE CONNECTION REUSE ....................................................................... 9
STORED PROCEDURE PERFORMANCE IMPROVEMENTS ....................................... 10
MICROSOFT ACCESS DATABASE IN AISVALUATION ........................................ 11
COLLECTIONS VS. DICTIONARIES ..................................................................... 11

**ARCHITECTURAL REVIEW** ..................................................................... 13

CURRENT ARCHITECTURE .................................................................................. 13
RECOMMENDED ARCHITECTURE ........................................................................ 13
BUSINESS LOGIC CHANGES ............................................................................... 14
RULES SCRIPTING ENGINE ................................................................................ 15
UPGRADING TO VISUAL BASIC.NET .................................................................. 16

F 00604

## Introduction

Review of the ALS application has identified several areas of improvement both in the application and in the SQL Server database. This document will focus more on the application changes.

This document provides two types of recommendations. The design recommendations focus on providing an improved design within the current architectural layout of the application. These changes are considered near term and will provide a significant boost in performance. The architectural recommendations provide a roadmap for how the architecture of the application should evolve. This evolution will correct underlying issues in the application and provide increased deployment flexibility, scalability, and maintainability. The architectural recommendations are considered longer term.

Analysis was completed for recalling and rescoring an application as well as navigating to various screens. These processes form the foundation of the recommendations presented in this document.

The ALS application uses a highly object oriented approach to loading and rescoring an application. In addition, the application is heavily data driven from data stored in the database. The object and data model is a clear and consistent model that provides significant flexibility within the ALS application.

Heavily data driven applications must effectively blend the data and object model to avoid performance penalties. It is this integration that has shown to be a contributing factor in the overall performance of the ALS application.

## Summary

The application follows the traditional 2-tier client/server architecture. Moving to an n-tier architecture and updating the underlying technologies will make this application more scalable and easier to maintain and deploy.

The ALS application issues a very high number of database queries when recalling or rescoring an application. Any inefficiency in the database implementation compounds the performance issues in the application due to the large number of database queries.

The current design of data retrieval in the application places the utmost importance of efficiency on the database. Improving the performance of a database query by only 10ms when it is called 200 times will have a net performance improvement of around 2 second. The design of the application should not place such a high percentage of its performance on one subsystem.

By reducing the number of database queries issued, execution times of stored procedures become less critical to the overall performance of the application. Shaving 10ms off the execution time of a database query becomes less important when it is only called one or two times in a transaction.

In addition to the volume of database queries, a few other items have been identified for performance improvements.

File access to the Vapp.ini consumed 4.5 seconds of a 28 second rescore process. Improving access to the file is mandatory in order to achieve the 3-5 second transaction times requested by TFS.

The rescore process also logged 83 login attempts to the database. Proper connection reuse or ADO Connection pooling should be implemented.

Recordsets are copied from one instance to another and stored in a disconnected manner to act as a local cache. The copy mechanism is manually coded. Consider using the built-in Clone method of the ADO recordset object.

File and database access consumed 19 seconds of the 28 second rescore process. The remaining 9 seconds is mostly client processing time indicating the need to improve the internal processing logic of the application in addition to file and database access.

The ALS application centrally manages the process of loading data elements onto the fields of the various forms. This mechanism traverses a Collection object and proves to be an inefficient object for this purpose. In-order traversal of Collection objects slows exponentially as the size of the collection grows. By changing the existing implementation to a Dictionary object, the penalty of in-order traversal seen by the Collection object can be avoided. A prototype of the VistaApp was created using a Dictionary object to store the field tags used by the application with a 70% improvement in performance as compared to the Collection object. Since the loading of field data onto a form is not the only process involved with loading forms, the end user will see less than a 70% improvement. Another factor contributing to the slow load times of the forms is the retrieval of the field tag information from the database. The procedures involved are already listed in this document as needing to be improved (AIS_INIForms_SELECT_By_formname, AIS_ScreenParams_SELECT_By_formname).

The ALS application references a remote Microsoft Access database when loading the Vehicle Information screen. Access to this remote database file appears to cause a 1 second delay in both loading and unloading this screen. For best performance and reliability, this data should be loaded into a SQL Server database.

**F 00606**

## Design Review
The following sections cover changes that should be made to the ALS Com application. These changes focus on providing near term benefits to the overall performance of the application and does not address longer term underlying architectural issues.


## Recordset Copying
Each of the recordsets returned by the stored procedure *ACRM_GetProgramsByLoanType* (up to 10) are copied to global variables to be used as a local cache later in the application. The copy mechanism iterates over each row and copies each field into the new disconnected recordset. Iterating to the next recordset as well as copying each recordset consumed up to 9 seconds (instrumented) in a Rescore.
>  ~4 seconds to copy recordsets
>  ~3 seconds to issue the recordset.movenext command
>  ~2 seconds to execute stored procedure

Recommendations:
- Improve stored procedure execution time
- Test use of recordset.clone instead of manually copying each recordset.

Questions:
- The cached recordset variables populated by modDBGet::ListPrograms are global in scope, but are repopulated whenever an application is loaded or rescored. Is this truly volatile data or can this data be cached across applications or at least during the life of an application (i.e. not reloaded or only partially reloaded in a rescore)?


## Loading Program Rules
There are numerous program rules (vba like script) that apply to credit applications and other "programs" as supported by ALS. These program rules are loaded whenever a program (i.e. ScoreCard) is loaded. When loading and rescoring an application, all scorecards relevant to the application are loaded and then a process is run to determine which scorecard will be loaded. The rules in a scorecard are a VBA like script that must be parsed to identify the tokens and allow for compilation. The entire script is loaded into a series of classes and arrays of classes that represent each line and each token (key word) in the script. Since there are several scorecards and several rules for each scorecard, loading time becomes significant.

The core procedure that loads the scorecard information is modBuildRule::BuildScript() in AcrmExec.dll. For the sample rescore, this method was called 456 times. As mentioned above, the utility rules for programs were loaded from the database 1 at a time for a total of 52 round trips and approximately 24secs.

In the rescore example, parsing the scripts to identify each token resulted in the following access pattern on the class that represents each token. Note that the instrumented code to collect these metrics increases the time for these methods to execute:

**F 00607**

6

| Property/Method | # Calls | Instrumented time (seconds) | Comments |
|---|---|---|---|
| Name | 260,544 | 8.3 | Uses a Left(str, len) to return string. Could be removed for incremental performance gain. |
| TokenType | 326,747 | 2.6 | |
| SetReference | 26,828 | 3.3 | Uses external C++ code. Not sure what this does. |

Parsing the rules to identify the tokens makes 34,397 calls to a TrimToNull function for a total instrumented time of 5 seconds. It may be possible to speed up the string manipulation performed in this function to locate the null character, but its average instrumented execution time is only 0.15ms showing that frequency of the call is the primary issue.

Recommendations:
Since it appears rules can span programs, it is recommended that as rules are loaded they are added to a global cache that spans programs to avoid loading the same rules more than once. Similar logic already exists, but is on a per Program basis.

In addition, all rules for a program should be retrieved in one db call and all rule parameters for all rules in the program in another db call (totaling only 2 db calls as opposed to 104 in the rescore example).

The best approach from a performance standpoint would be to compile the rules in advance when they are entered/modified in the system with the table maintenance application. This in combination with a caching mechanism would eliminate nearly all overhead of loading, parsing, and compiling rules. It would need to be determined how/if parameters could be passed to a precompiled script at run time.

**Consolidating Database Calls**
The ALS application performs many database queries when loading various objects. A Scorecard appears to load several Program objects that load several Procedure objects that then load several Interval objects. Each of these objects, along with the Rule objects mentioned earlier make multiple database calls. Consolidating many of the database calls would make the application less susceptible to performance irregularities if there are inefficiencies in the implementation of the database.

Profiling a rescore process with Compuware's AppVantage tool, we can see the calls made to the database. Note that this was with an un-instrumented instance of the ALS application:

| SQL_CMD | Frequency | Duration | Call% | Time% |
|---|---|---|---|---|
| ACRM_GetProgramsByLoanType | 1 | 0.596 | 0% | 4% |
| ACRM_GetUtilityRule | 52 | 4.147 | 11% | 30% |
| ACRM_ListRuleParameters | 52 | 1.169 | 11% | 9% |

| | | | | |
|---|---|---|---|---|
| ACRM_ListScoreIntervals | 169 | 1.196 | 36% | 9% |
| Ais_acrmprogramversions_j_Program_Source_FIXED_SELECT_By_LoanType_Sour ceId | 2 | 0.007 | 0% | 0% |
| Ais_acrmprogramversions_j_Program_Source_FIXED_SELECT_By_LoanType_State Abbr | 1 | 0.003 | 0% | 0% |
| AIS_Applicants_Update_By_Id | 1 | 0.010 | 0% | 0% |
| AIS_Application_Update_By_Id | 1 | 3.033 | 0% | 22% |
| AIS_AppQueue_UPDATE_SetQueueFlags_BY_AppNumber_Analyst | 1 | 0.039 | 0% | 0% |
| AIS_AppQueue_UPDATE_SetQueueFlags_BY_AppNumber_AnalystNext | 1 | 0.183 | 0% | 1% |
| AIS_AppQueue_UPDATE_SetQueueFlags_BY_AppNumber_Complete | 1 | 0.004 | 0% | 0% |
| AIS_AppQueue_UPDATE_SetQueueFlags_BY_AppNumber_Problem | 1 | 0.001 | 0% | 0% |
| AIS_BureauSummary_SELECT_BY_appnumber_applicantid_type | 18 | 0.209 | 4% | 2% |
| AIS_BureauSummary_Update_By_Id | 1 | 0.026 | 0% | 0% |
| AIS_BureauTTY_SELECT_BY_appnumber_applicantid | 2 | 0.021 | 0% | 0% |
| AIS_BusinessUnits_SELECT | 1 | 0.009 | 0% | 0% |
| AIS_Contract_Update_By_Id | 1 | 0.026 | 0% | 0% |
| AIS_DEDupFields_SELECT_BY_type | 2 | 0.013 | 0% | 0% |
| AIS_j_app_maintasks_SELECT_BY_appnumber | 1 | 0.033 | 0% | 0% |
| AIS_j_app_SubTasks_SELECT_BY_appnumber | 2 | 0.031 | 0% | 0% |
| AIS_Loan_Update_By_Id | 1 | 0.038 | 0% | 0% |
| AIS_LookUpCriteria_SELECT_By_ID | 33 | 0.222 | 7% | 2% |
| AIS_LookUpHierarchies_SELECT_By_CriteriaId | 40 | 0.846 | 9% | 6% |
| AIS_LookUpHierarchies_SELECT_By_ID | 19 | 0.079 | 4% | 1% |
| AIS_LookUpTables_SELECT_By_ParentHierarchyID | 7 | 0.029 | 2% | 0% |
| AIS_LookUpValues_SELECT_By_ParentTableID_HorizontalID_VerticalID | 7 | 0.088 | 2% | 1% |
| Ais_ProgramSettings_SELECT_By_ProgramId | 7 | 0.361 | 2% | 3% |
| Ais_SELECT_By_appnumber | 7 | 0.210 | 2% | 2% |
| dbo.AIS_Audit_EventLog_INSERT_Event | 4 | 0.192 | 1% | 1% |
| dbo.AIS_j_app_maintasks_UPDATE_By_AppNumber_MainTaskID | 1 | 0.003 | 0% | 0% |
| dbo.AIS_j_app_SubTasks_UPDATE_By_AppNumber_SubTaskID | 25 | 0.869 | 5% | 6% |
| dbo.AIS_ScoreCardTypes_SELECT_By_InitialType | 1 | 0.001 | 0% | 0% |
| dbo.AIS_ScoreCardTypes_SELECT_By_ScoringType | 2 | 0.014 | 0% | 0% |
| Total | 465 | 13.706 | | |

Across 33 procedures there are 465 round trips to the database for only a single rescore. In addition, there were 83 database login requests (consuming .85 seconds).

Recommendations:
Consolidating the repetitive calls to *ACRM_GetUtilityRule*, *ACRM_ListRuleParameters*, and *ACRM_ListScoreIntervals* into one call each could eliminate up to 270 round trips to the database and shave up to 6 seconds from the processing time without making any performance improvements to the database procedures themselves.

The procedure *AIS_Application_Update_By_Id* is only called once and consumes 22% of the process time. This procedure is already on David Fyffe's plate of poor performing queries. And is listed in the next section covering the top procedures affecting application performance.

F 00609

The 83 login requests indicate the need to either manually reuse database connections more effectively in the application or leverage ADO connection pooling.

Further review of the ALS application should be performed to identify additional opportunities to consolidate repetitive database calls.

### Database Connection Reuse

As mentioned above, the application does not appear to effectively manage connections to the database. The AppVantage tool, which only sniffs data sent across the wire, identified 83 login attempts to the database. Initial review of the ALS application appeared to indicate the program would create and reuse approximately 3 connections when running the program.   Upon further investigation, the 83 login attempts are in fact occurring within the ALS application.

The cause for the extra logins is two-fold:
      1) Use of Server Side Cursors
      2) Attempting to share a connection when outstanding result sets still exist

With Server Side Cursors, all results sets must be traversed in order to free the connection for use with another command. If there are still results from a command that have not been retrieved (i.e. recordset.EOF is false), the connection assosicated with the recordset cannot be reused. All rows must either be retrieved from the server or the recordset must be closed.

Setting the ActiveConnection property of a recordset to a connection that is not "free" will result in the recordset using the connection information to establish a new connection when the Open method is executed on the recordset.

I would imagine this situation occurs frequently in the application, but for the rescore I identified one location that exhibited this problem (there may be others):

In CSILookUp, the clsLookup.HierarchyItemIDThatFits method makes 2 database calls to fill 2 recordsets that will be looped over further down in the method. The 2nd database call is on a new connection since the first call still has a hold on the connection. HierarchyItemIDThatFits is called in a loop inside of clsLookup.Lookup and as such, causes several connections to be created when making the 2nd database call. When tracing the SQL activity, we can see each of the first calls to ListLookUpCriteriaByID uses the same connection stored in AisDBRead, but each of the 2nd calls to ListLookUpHierarchiesByCriteriaId is on a new connection.

Recommendations:
It is strongly recommended that the ALS application use client side cursors by default. Use of client side cursors and disconnecting each recordset would free the connection stored in AisDBRead and allow subsequent calls to share the same connection.

In lieu of moving to client side cursors, a further review of the application should be conducted to identify where else this issue surfaces and force Recordset.MoveNext calls (or be sure to close recordsets) before attempting to issue a new command to the database.

**F 00610**

Effective Connection reuse (manual or ADO connection pooling) is a critical factor in maintaining high performance in the application.


**Stored Procedure Performance Improvements**

Although this document focuses on the client application architecture, this analysis did find a handful of procedures that should be reviewed to improve performance. Frequency and execution times may not match procedures listed above due to reviewing multiple traces of application execution.

Each procedure is listed in the context in which it had the most impact.  Most procedures impact more than one business function.  TotalExec Time represents the cumulative time spent executing the procedure for the specified business function.  (i.e. frequency * avg exec time).

| Procedure | Context | Frequency | TotalExec Time(msec) |
|---|---|---|---|
| AIS_Applicants_SELECT_By_appnumber_applicantid | Navigate | 6 | 5028 |
| AIS_Applicants_Update_By_Id | Rescore | 1 | 4332 |
| AIS_j_app_SubTasks_UPDATE_By_AppNumber_SubTaskID | Rescore | 48 | 4176 |
| ACRM_GetUtilityRule | Rescore | 52 | 4147 |
| AIS_Application_Update_By_Id | Rescore | 1 | 3033 |
| AIS_FIXED_SELECT_MultiBuyerCheck | Decision | 1 | 2647 |
| AIS_BureauSummary_SELECT_by_appnumber | Rescore | 18 | 2232 |
| sp_delete_app | Decision | 1 | 1730 |
| AIS_LookUpHierarchies_SELECT_By_CriteriaId | Rescore | 29 | 1624 |
| Ais_ProgramSettings_SELECT_By_ProgramId | Navigate | 30 | 1320 |
| ACRM_ListScoreIntervals | Rescore | 169 | 1196 |
| ACRM_ListRuleParameters | Rescore | 52 | 1169 |
| AIS_Loan_Update_By_Id | Rescore | 1 | 1113 |
| AIS_LookUpCriteria_SELECT_By_ID | Rescore | 23 | 989 |
| sp_app_phase | Decision | 1 | 987 |
| AIS_Application_SELECT_By_Id | Decision | 2 | 916 |
| AIS_SELECT_By_appnumber | Navigate | 16 | 720 |
| AIS_LookUpHierarchies_By_ID | Rescore | 14 | 616 |
| AIS_BureauSummary_Update_By_Id | Rescore | 1 | 470 |
| AIS_Folder_Update_By_Id | Decision | 1 | 422 |
| AIS_INIForms_SELECT_BY_formname | Navigate | 7 | 329 |
| AIS_Program_Settings_SELECT_By_ProgramId | Rescore | 7 | 329 |
| AIS_Emp_Income_Update_By_Id | Rescore | 1 | 325 |
| AIS_Contract_Update_By_Id | Rescore | 1 | 306 |
| AIS_j_product_iniForms_SELECT_BY_formname_loantype | Navigate | 6 | 288 |
| AIS_AppQueue_UPDATE_SeQueueFlags_By_AppNumber_Analyst | Rescore | 1 | 277 |
| AIS_PurchaseVehicle_Update_By_Id | Rescore | 1 | 253 |
| Ais_j_Program_Source_FIXED_SELECT_By_LoanType_SourceId | Rescore | 2 | 236 |
| Ais_j_App_ProgramResults_DELETE_By_appnumber | Decision | 1 | 229 |
| AIS_ZipCodeMatrix_SELECT_By_fromzip_tozip | Navigate | 4 | 228 |

| | | | |
|---|---|---|---|
| AIS_BureauTTY_SELECT_BY_appnumber_applicantid | Navigate | 5 | 210 |
| AIS_Source_Update_By_Id | Decision | 1 | 193 |
| AIS_TermTable_FIXED_SELECT_Active_NoStartdate_BY_source_programname | Navigate | 4 | 164 |
| AIS_j_app_SubTasks_SELECT_BY_appnumber | Navigate | 3 | 147 |
| AIS_ScreenParams_SELECT_By_formname | Decision | 1 | 133 |
| AIS_DlrAddOn_SELECT_By_loantypecode_ORDER_BY_allowedvehtype | Navigate | 1 | 131 |
| Ais_j_app_dec_codes_DELETE_By_appnumber | Decision | 1 | 127 |
| AIS_SELECT_BY_ORDER_BY | Navigate | 2 | 122 |
| AIS_AppQueue_UPDATE_SetQueueFlags_By_AppNumber_AnalystNext | Rescore | 1 | 118 |
| Ais_j_app_ProgramResults_Insert | Decision | 1 | 113 |
| AIS_BureauCustom_Insert | Navigate | 1 | 101 |
| AIS_Loan2_Insert | Rescore | 1 | 101 |
| AIS_LockFiles_DELETE_By_reference_appnumber | Navigate | 1 | 100 |

Recommendations:
Review the implementation of each procedure, table access patterns, and table indexing to determine the best approach to optimize performance.


**Microsoft Access Database in AISValuation**
The Microsoft Access database referenced by the AISValuation component appears to cause a 1 second performance penalty when initializing as well as terminating the NADANewVehicleInfo class in this component. The database file is located on a remote share and is accessed when navigating to the Vehicle Information Screen (frmVehInfo).

Recommendations:
Since multiple instances of the ALS application will be accessing this database file simultaneously and across the network, it is suggested this information be stored in a SQL Server database for optimal performance and reliability.


**Collections vs. Dictionaries**
The ALS application uses numerous Collection objects to store caches of data. Ordinal-based access to a collection is much slower than key-based access. As the collection grows in size, ordinal-based access slows exponentially. Using a test application, traversing a collection of 5,000 strings took 360ms while traversing 10,000 strings took just over 3 seconds.

If access to cached data is ordinal, the Dictionary object in the Microsoft Scripting Runtime library provides a mechanism to achieve far superior performance. Using a test application, traversing a dictionary of the same 5,000 strings took only 80ms and traversing 10,000 strings only took 180ms.

**F 00612**

The following code shows the best approach to traverse elements in a Dictionary using an ordinal value:

```
Dim dic As Dictionary
Dim ary() As Variant
Dim sVal As String
Dim n As Long

Set dic = New Dictionary
ary = dic.Keys
For n = LBound(ary) To UBound(ary)
    sVal = dic(ary(n))
Next
```

This code retrieves an array containing all the keys in the Dictionary. It then traverses the array in an ordinal manner providing the appropriate key to the Dictionary. Key based access should always be used when working with Collection and Dictionary objects. Only the Dictionary class provides this optimized approach to achieving the effect of ordinal access.

The ALS application performs ordinal-based traversal of a collection representing all form fields whenever loading a screen. Using the above approach will significantly reduce the time to traverse the data representing each of the form fields. I observed up to 15,400 items in the collection that stores field information (gTagFieldReference).

The TagArray::GetNextIndex method uses this ordinal traversal and consumed a total of 3.5 seconds of processing time (instrumented) when accessing the first 4 tabs on the Entry Applicant screen. It also consumed 3 seconds when navigating to the Application Summary and Collateral screens under the Approval menu.

I compiled a version of VistaApp.exe that used a Dictionary object as opposed to a Collection object and observed a 70% performance improvement in calls to TagArray::GetNextIndex for instrumented code.

Recommendations:
Dictionary objects provide far superior performance over Collection objects when ordinal-based traversal is needed. The Dictionary class should be the preferred means to store collections of information since it provides similar functionality to the Collection class and exhibits superior performance.

The ALS Application makes extensive use of Collection objects. A review of the application is needed to identify where collections are being accessed in an ordinal manner. Dictionary objects should be considered for any collection that is accessed this way.

## Architectural Review

The preceding analysis of the ALS Com application identified several concerns in the design of the application but doesn't speak to the longer term architectural changes that would provide greater benefits. The following sections discuss a roadmap for making significant architectural changes that will provide a foundation for a more flexible and scalable application.

## Current Architecture

The ALS Com application is architected around a traditional 2-tier client/server model. The business logic and user interface are combined into a thick client application that communicates back to a series of databases and remote files. Changes to business processes require re-deployment of the entire thick client application. The client heavy nature of the application requires large amounts of data to be sent to the application resulting in a significant dependency on network efficiency. Deploying this application over a wide area network (WAN) would effectively render the application unusable due to its excessive network utilization and the latency of a WAN.



The application accesses 3rd party provided data sources in MS Access databases as well as INI configuration files over the network. Connecting, reading, and closing these data sources remotely is not a desirable solution and becomes impractical in a WAN scenario.

Solving the inefficiencies in the application requires an improved application architecture. The new architecture would leverage the benefits of current technology to provide more deployment and integration opportunities along with a much more scalable and maintainable system.

## Recommended Architecture

The application architecture recommended allows the ALS Com application to maintain its rich user interface requirements while minimizing the amount of data and network traffic sent to and from the client. This architecture provides greater deployment flexibility and increased scalability.

Business processes and workflow logic should be extracted out of the client application and moved to a separate business layer exposed through Web Services. This separation will isolate the client from the data and network traffic required by business and workflow processing enabling the client application to be distributed more freely. Only the results of business

processing would be sent down to the client for display. Centralizing the business processing onto servers increases the opportunity to share cached information across client instances resulting in fewer round trips to backend data sources and more efficient utilization of server resources.



The 3rd party data sources and INI configuration information would also be made available through Web Services. Direct file access to both of these data sources by the ALS Com application would be eliminated. Through the use of Web Services, the configuration information would be stored in the IIS web server cache and shared across any instance of the client application. Consideration should also be given to loading the 3rd party MS Access databases into SQL Server to improve performance and reliability.

To load a loan application, ALS Com would request the application from a web service. The web service would work with the business processes to retrieve the loan and perform the workflow and route group selection processes on the server. Only the application and supporting metadata would be returned to the client. ALS Com would then display the application with the relevant visual elements enabled.

The Web Services and Business Processes layers should reside on a web farm to provide a scalable and highly available solution. By separating the user interface from business processing, the ALS Com application could effectively be deployed to client computers rather than hosted in Terminal Server. In addition, this separation provides more flexibility in how the user interface of the ALS Com application evolves. It may be appropriate to offer parts of the application functionality through a web application eliminating the need to distribute the windows client application to users that do not need rich user interface features. Deployment of updated business rules could also be performed without having to deploy a new version of the ALS Com application.

**Business Logic changes**
Migrating the existing business logic to a middle tier away from the client application does not fully address scalability concerns. The existing business logic has inherent inefficiencies that would still need to be addressed. The loading, parsing, and compiling of program rules (VBA-like script) used for scorecards, workflow, and route groups uses considerable resources when performed for multiple users on a single machine. These rules should be parsed and compiled by

the Table Maintenance application with the compiled form of the rule stored in the database for use by the ALS application. Pulling these steps out of the run-time processing of the ALS application will significantly reduce the amount of work performed during the load, rescore, decision, and completion tasks of loans.

If pre-compiling the program rules is too large of an effort, pre-parsing the scripts will still provide a significant boost in performance by eliminating the repetitive line-by-line, word-by-word parsing and translation currently performed by the application. The pre-parsed scripts can then be loaded and compiled at run-time resulting in much less load on the server. Streamlining this process will help control the number of application servers needed in the middle tier to support the client application.

In addition, it is reasonable to assume users have an expectation that saving and application may take a few seconds, while retrieving an application should be nearly instantaneous. The application logic should be reevaluated to determine how better to meet these expectations. As an example, workflow and routing group rules are executed every time an application is loaded. Workflow rules help identify what tasks the application will flow to and routing groups identify which users are eligible to work on an application. It would seem these rules could be run and the results stored with the application when it is saved (or task completed). When the application is retrieved, the workflow and route group results would be retrieved along with the application, eliminating the need to run the rules each time the application is loaded. Requirements of the ALS Com application may not support this change, but every effort should be made to consider how this approach could work.

**Rules Scripting Engine**
The existing scripting engine within ALS Com appears to have a complex integration scenario. Integration of the Cypress Enable scripting engine requires external DLLs written in C. These dlls help bind the scripting engine to the ALS Com object model. In addition, the complex parsing and translation tasks outlined above exist solely to help provide a user-friendly VBA style language syntax for developing the custom rules used by the application. This language syntax must be translated into the scripting syntax supported by the Enable engine to facilitate compiling and running the rules. In addition to the performance issues already discussed, supporting changes to these process and C libraries poses a significant maintenance challenge.

The Microsoft Visual Basic for Applications scripting engine is designed to be easily integrated into Visual Basic applications and is a widely supported scripting engine with a large developer community. Exposing the application's object model to the scripting engine requires very little code all written in Visual Basic. The Integrated Development Environment included with Microsoft VBA enhances productivity with color-coded syntax, drag-and-drop editing and IntelliSense technology. An Object Browser enables browsing and searching for methods, properties, and events.

For long-term support and maintainability of the custom scripting rules within ALS Com, it is highly recommended that the scripting engine be migrated to Microsoft VBA.

**F 00616**

**Upgrading to Visual Basic.Net**

The business logic components and the ALS Com client application would benefit significantly from upgrading the underlying technology from Visual Basic 6 to Visual Basic.Net. The .Net Framework provides a set of base class libraries that greatly enhance the productivity of developing in Visual Basic as well as significantly expanding the capabilities of the language. Server components and applications developed in .Net can leverage seamless integration with Web Services, built in support for data caching, and superior performance. Developing in Visual Basic.Net gives you access to a more powerful forms designer, deeper XML integration, more flexible and simplified data access and data binding, and full access to the .Net Framework platform.

Making the migration to Visual Basic.Net can be achieved one step at a time and does not require a wholesale rewrite of the application. The Visual Basic upgrade wizard can convert nearly all Visual Basic 6 code to Visual Basic.Net. In addition, the Visual Basic 6 Code Advisor scans VB6 code and provides recommended changes prior to any upgrade to help make the upgrade successful.

Upgrading to Visual Basic.Net will allow the ALS Com system to take full advantage of the recommended business logic and architectural changes outlined in this document.

F 00617

**Migration Path**

Outlined below is a suggested migration path to the recommended architecture. This approach controls the code changes within each milestone for reduced risk and provides a consistent foundation across the entire system from which to extend with new features in the future.

- **Milestone 1**
    - o Modify Table Maintenance to pre-parse/compile program rules
    - o Modify ALS Com to load and execute compiled scripts
- **Milestone 2**
    - o Modify ALS Com to act as a "presentation-layer" only. Extract business processes out of the application and into separate components (Route Groups, Workflows, etc.)
        - Loading an application by ID should just be a call to a separate business component requesting the application and displaying it on the screen appropriately
        - The business component will return the appropriate information to allow the caller to enable/disable relevant visual elements based on the workflow, route group, etc.
- **Milestone 3**
    - o Create Web Service layer in front of business components created in M2 and deploy Web Services to a web farm (possibly on the existing Terminal Servers)
    - o Upgrade business components created in M2 to Visual Basic.Net leveraging Web Services integration, performance, and data access and caching features of the .Net Framework
    - o Modify ALS Com to communicate with the Web Services to initiate each business process
- **Milestone 4**
    - o Upgrade ALS Com to Visual Basic.Net leveraging Click-Once deployment, improved Web Services integration, and enhanced Windows Forms features for an improved user experience
    - o Develop ASP.Net applications to complement the ALS Com application for users that only utilize functionality without the need for a rich Windows Forms user interface.
- **Milestone 5**
    - o Migrate custom scripting rules to Microsoft Visual Basic for Applications

F 00618

EXHIBIT 14

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

 **TOYOTA**
FINANCIAL SERVICES

 **Lexus**
**Financial Services**

Shaun J. Coyne
Vice President and
Chief Information Officer

19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-4393
Fax (310) 381-5484

August 10, 2004

Frank R. Sanchez
President, Strategy & Product Development Division
Fidelity Information Services
601 Riverside Avenue
Jacksonville, FL 32204

Re:   **_Revised Oscar Schedule_**

Dear Frank:

In anticipation of our meeting next Friday, I have reviewed Fidelity's revised OSCAR (ALS-COM) schedule for Releases 1 and 2. Although I welcome Fidelity's attempts to develop a realistic schedule, I remain troubled by the considerable delay on the project. As you know, Toyota Financial Services (TFS) conditionally accepted Release 1 in March 2003. At the time we envisioned that ALLTEL would fix the software within a matter of months. Your current schedule calls for completion in March 2005 – two years after TFS's conditional acceptance. Clearly, this delay alone provides a sufficient basis for TFS to exercise its contractual rights to reject Release 1 in its entirety under Section 6.2 of the Master Software License Agreement, as amended (Agreement).

In an effort to avoid any further schedule slippage, I ask that Fidelity focus all of its OSCAR resources on Release 1. By focusing all resources on Release 1, Fidelity should be able to complete Release 1 by November 2004, instead of March 2005 as set forth in the revised schedule. Per Section 22 of the Agreement, we should discuss the Release 1 schedule as well as the ultimate future of the project at our meeting next Friday.

Sincerely,

Shaun Coyne

cc:    Ernest Smith, President Fidelity Information Services

F 00640

EXHIBIT 15

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

**David Slider**
Senior Vice President
4001 Rodney Parham Road
Little Rock, AR 72212
501-220-4122
david.slider@fnf.com



August 18, 2004

Shaun J. Coyne
Vice President and Chief Information Officer
Toyota Financial Services
19001 South Western Avenue
P.O. Box 2958
Torrance, California 90509-2958

Re:     August 10, 2004 Letter

Dear Shaun,

I am in receipt of your letter to Frank Sanchez dated August 10, 2004 ("Letter") regarding the Master Software License Agreement between Fidelity Information Services, Inc. ("Fidelity") and Toyota Motor Credit Corporation ("TMCC") ("Agreement"). In accordance with Section 22 of the Agreement, Fidelity is responding within ten days of receipt of your Letter. Unfortunately, the Letter makes broad and erroneous factual and legal claims. Without the detail required by Section 22, Fidelity is unable to suggest a resolution or respond in detail in this response.

However, Frank and I are ready to discuss with you on August 20, 2004 the current status of the work under the Agreement and address some of the misunderstandings that are reflected in your Letter.

Sincerely,

David Slider

cc:     Ernest D. Smith, Fidelity Information Services
        Frank R. Sanchez, Fidelity Information Services

**F 00641**

EXHIBIT 16

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

INTENTIONALLY
OMITTED

EXHIBIT 17

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



**received**
10-19-04


**Financial Services**

.aun J. Coyne
Vice President and
Chief Information Officer

19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-4393
Fax (310) 381-5484

October 18, 2004

Frank R. Sanchez
President, Strategy & Product Development Division
Fidelity Information Services
601 Riverside Avenue
Jacksonville, FL  32204

<div align="center">

Re:  ***OSCAR Project***

</div>

Dear Frank:

I understand from Doriene Viera, and Dean Shold that they spoke with David Slider and Michael Harris yesterday regarding next steps for the Oscar project.  The plan now appears to be to have David and Michael meet with the Oscar team here at TFS on October 25, 2004 and discuss the various options that have been proposed.  As I stated in my letter of September 20, 2004, TFS is willing to consider certain options to fix the current situation, but those options must be viable and result in the delivery of the ALS-com product on a time schedule that meets our business needs.  As I stated on the phone when we spoke on October 5, 2004, TFS views the following steps as the best course of action for the project:

    1) Fidelity will continue to create patches to the Release 1 software to address outstanding issues and add the remainder of the Release 1 functionality.

    2) Fidelity will build each new revision of the Release 1 software on site at TFS to allow TFS more visibility into the content of each revision with the hopes of eliminating the miscommunication issues we have had in the past.

    3) Fidelity will allow TFS to bring in WiPro to audit Fidelity's effort and offer additional support as appropriate at no additional cost to TFS.

    4) Finally, we want Fidelity to continue looking at the current schedule to identify ways to expedite final delivery of the Release 1 software.

F 00644

I came away from our conversation on the 5th with the understanding that you had agreed to these steps. According to David Slider you agreed to "consider" them. We apparently had a misunderstanding of our conversation. It is these types of misunderstandings that underscore why I think we need an independent team working on site at TFS auditing the completion of the next builds. I also want to make it clear that TFS views these steps as measures of quality assurance—and since a quality product is required by our agreements, the on site work should be at no additional cost to TFS.

Also, as you may be aware, another issue came up this week regarding the work being performed by Fidelity. Our project team was informed Fidelity views some of the current change requests as relating to Release 3, which is not a credible position. I want to reiterate it is TFS' position that the work presently being performed by Fidelity relates to Release 1 and that is it. TFS has conditionally accepted Release 1, and has not accepted Release 2 at all; therefore it is not reasonable for Fidelity to claim it is doing any work on Release 3. As I wrote in my letter of August 10, 2004, "*In an effort to avoid any further schedule slippage, I ask that Fidelity focus all of its OSCAR resources on Release 1. When, and if, we are comfortable that Release 1 can be completed by March, we will consider an appropriate schedule for the remainder of the project. In the interim, per Section 22 of the Agreement*. . . ." After you received my letter, you agreed to focus all of your resources on Release 1; therefore, there has been some miscommunication within Fidelity.

I trust that we will have a productive meeting on the 25th.

Sincerely,

Shaun Coyne
Vice President & Chief Information Officer
Toyota Financial Services

F 00645

.

# EXHIBIT 18

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

**Frank R. Sanchez**
President, Strategy & Product Development Division
Fidelity Information Services
601 Riverside Avenue
Jacksonville, Florida 32204



October 22, 2004

Shaun J. Coyne
Vice President and Chief Information Officer
Toyota Financial Services
19001 South Western Avenue
P.O. Box 2958
Torrance, California 90509-2958

Re:    October 18, 2004 Letter

Dear Shaun,

I am in receipt of your letter to me dated October 18, 2004 ("Letter") regarding the
Toyota Financial Services ("TFS") OSCAR Project. With regard to Toyota's positions
regarding project and contractual matters, we respectfully disagree with each of the
Toyota positions described in your letter.

I want to confirm that David Slider and Michael Harris of Fidelity Information Services,
Inc. ("Fidelity") will be at your offices at Torrance, CA on October 25, 2004. The purpose
of their visit is to discuss options for advancing the OSCAR Project that will meet the
needs of both TFS and Fidelity. Fidelity believes the best approach to resolving the
current challenges with the OSCAR Project is to consider all available options to moving
forward in order to arrive at the best solution to both parties.

We are all motivated to find a way to move forward together. The discussions that
began last week and continuing on Monday give us the best opportunity to find an
alternative that works for both Toyota and Fidelity. Our belief is that direct
communication gives us the best chance for success, and we would like to avoid trying
to find a solution via correspondence. After our upcoming meeting, or subsequent to
that, we will respond in more detail to your October 18 letter if necessary.

Sincerely,

Frank Sanchez

cc:    David Slider, Fidelity Information Services
       Michael Harris, Fidelity Information Services

**F 00646**

Client Confidential

EXHIBIT 19

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



**IPO Central**     **Hoover's Books**



Find out trends, markets, forecasts and much more...



Tuesday, January 11, 2005

**Home**     **About Hoover's**     **Subscription Options**     **Help**     **My Hoo**

---

Company Name

[Search]

Browse Directories »

**Subscribe Now**
Call 866-619-3096

**Browse Company Record**

▌**Fact Sheet**

People 🔒

Products/Operations 🔒

Competitors 🔒

News

Financials

SEC Filings

Profile View 🔒

**Pro Premium Tools**

🗂 Family Tree Viewer

📊 Build Company List
(D&B In-Depth)

**Pro Plus Tools**

📊 Build Company List
(D&B Basic)

🌐 Build Company List
(D&B International)

**Pro Tools**

🖧 Find Similar Companies

📊 Build Company List
(Hoover's In-Depth)

👤 Build Executive List

📰 Custom News Search

◎ Target IPO Companies

📈 StockScreener

**Tools**

📄 Search For Reports

📥 Download to PDA

# Toyota Motor Credit Corporation

19001 S. Western Ave.
Torrance, CA 90509 (Map)

Phone: 310-468-1310
Fax: 310-468-7800

http://www.toyotafinancial.com ☞

advertisement

*Covered by Kathi Whitley*

Toyota Motor Credit Corp. is the US financing arm of Toyota Financial Services, a subsidiary of Toyota Motor. It provides retail leasing, retail and wholesale financing, and other financial services to Toyota and Lexus dealers, as well as Toyota industrial equipment dealers and their customers. The company operates three regional customer service centers, three management offices, and some 30 branches across the US, as well as Puerto Rico, Mexico, and Venezuela. Toyota Motor Credit also holds minority stakes in Toyota financing operations in Brazil and Argentina. The company's subsidiaries sell insurance, acquire and securitize lease receivables, and provide retail and wholesale lease financing.

## Key Numbers

| | |
|---|---|
| **Company Type** | Subsidiary of Toyota |
| **D&B D-U-N-S Number** | Subscribers Only 🔒 |
| **Fiscal Year-End** | March |
| **2003 Sales (mil.)** | $3,830.0 |
| **1-Year Sales Growth** | 6.9% |
| **2003 Net Income (mil.)** | $110.0 |
| **1-Year Net Income Growth** | (54.7%) |
| **2003 Employees** | 2,700 |
| **1-Year Employee Growth** | 3.8% |

More Financials

## Key People

| | |
|---|---|
| **President, CEO, and Director** | George E. Borst 🔒 |

Scottrade: Low
Online Trading!

Mobile Access

| | |
|---|---|
| **Group VP, Sales, Marketing and Operations, Secretary, and Director** | David Pelliccioni |
| **VP and CFO** | John F. Stillo |
| **VP and CIO** | Subscribers Only |
| **VP, Human Resources** | Subscribers Only |

**More People**

Job Ope

## Industry Information

- Financial Services
  - Lending
    - **Auto Lending** (primary)
    - Receivables Lending, Forfaiting & Factoring
- Insurance

FedEx. Ground

## Top Competitors

- DaimlerChrysler
- Ford Motor Credit
- GMAC

**9 Competitors Listed For Toyota Motor Credit**

## Trading Toolbox



Trade Here

30 FREE TRADES

Trade Here

The **Ladders**

Click here for $100k+ this industry. Openin VPs, Senior VPs, Dire and more.

## Related Products From Our Trusted Partners

**D&B** Buy A D&B Report For Toyota Motor Credit

**Buy Reports and Books**

- Auto Lending: Financial Analysis Profiles
  (BizMiner, May 24, 2004, Business Reports)
- UK Motor Finance 2003
  (Datamonitor, Sep 24, 2003, Business Reports)
- ValuEngine Quantitative Industry Report for FINANCE & LOAN
  (ValuEngine, Inc., Nov 1, 2002, Business Reports)
- Auto Lending: Marketing Research Profiles
  (BizMiner, May 24, 2004, Business Reports)
- ValuEngine Quantitative Industry Report for INSURANCE

  (ValuEngine, Inc., Nov 1, 2002, Business Reports)
- Credit Insurance: Financial Analysis Profiles
  (BizMiner, May 24, 2004, Business Reports)

**The Rich Register**

Featuring information on 4,700 individuals with a net worth greater than $25 million, The Rich Regist available in both hardc and CD-ROM format.

Learn More

**Build Lead Lists**

Use Hoover's Lead Finder to create prospect and contact lists.



(BizMiner, May 24, 2004, Business Reports)

**Report Search**

Search

**Additional 3rd Party Libraries**

🔒 Indicates subscriber-only content.

↪ Indicates external site content that will open in a new browser window.

**Hoover's Online US** | **Hoover's Online UK** | **Choose Your Edition**
IPO Central | Hoover's Books | Subscription Options | Newsletters
Hoover's Mobile | Help | Feedback

Copyright © 2005, Hoover's, Inc., ALL RIGHTS RESERVED
About Hoover's | Job Opportunities | Privacy Policy | Advertising Info

EXHIBIT 20

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



**TOYOTA**
FINANCIAL SERVICES



**LEXUS**
Financial Services

~~aun J. Coyne
Vice President and
Chief Information Officer

*To: David Slider*

19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-4393
Fax (310) 381-5484

received
11-5-04

November 3, 2004

Mr. Frank Sanchez
President, Strategy &
Product Development Division
Fidelity Information Services
601 Riverside Avenue
Jacksonville, FL  32204

        **Re:   *ALS-COM/OSCAR Project***

Dear Frank:

I understand that our teams have met and developed a plan for
proceeding forward on the ALS-COM/OSCAR project.  I also understand
that Fidelity Information Services (FIS) has asked for written clarification
of Toyota Financial Service's ("TFS") position on a number of points.  The
purpose of this letter is to provide that clarification.

Phase 1 (also referred to as Release 1 or Data Entry and Decisioning
Phase)

Although TFS has accepted Phase 1 of the ALS-COM software, there are
still a number of outstanding issues that FIS has yet to resolve.  These
include both defects (bugs) and Program Change Requests ("PCRs") that
are essential for TFS's ability to use and continue to use the first Phased
Delivery Software.  TFS specifically asks that FIS focus its near term
efforts exclusively on correcting Phase 1 bugs and implementing Phase 1
PCRs.

Building the ALS-COM/ OSCAR software onsite at TFS

I understand that FIS is taking the position that building the software
onsite at TFS would delay Phase 1 bug fixes and implementation of Phase
1 PCRs.  While, I disagree with your position, I do not want this issue to
delay progress.  Therefore, I will not presently insist that FIS build the
software onsite at TFS.

Phase 2 and beyond

TFS asks FIS to descope any PCR not related to the Phase 1 software
from upcoming releases (e.g., "Patch 'F'").   We anticipate that this
descoping will help you expedite the process of fixing Phase 1 bug fixes
and implementation of Phase 1 PCRs.

                                                        F 00647

TFS acknowledges that the current releases of the ALS-COM software includes enhancements required to close the gaps identified as belonging to the 'discounting' functionality (Phase 2 or Release 2) in Appendix E of the Second Amendment to the Implementation SOW ("Gap Matrix").   TFS has not yet acceptance tested this functionality and we understand that FIS is continuing to resolve issues and correct defects in this functionality.

PCR hours

I understand that FIS is taking the position that it has fully expended the allotted 5899 hours for PCRs.  This comes as a surprise to us and, therefore, we are asking FIS to provide us with an accounting of the number of PCR hours expended.

Please let me know if you have any questions or concerns related to the issues addressed in this letter.

Sincerely,

Shaun Coyne
Vice President &
Chief Information Officer
Toyota Financial Services

F 00648

EXHIBIT 21

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

**David Slider**
Managing Director, Auto Finance Division
4001 Rodney Parham Road
Little Rock, AR  72212
501-220-4122
david.slider@fnf.com



November 11, 2004


Shaun J. Coyne
Vice President and Chief Information Officer
Toyota Financial Services
19001 South Western Avenue
P.O. Box 2958
Torrance, California  90509-2958

Re:    November 3, 2004 Letter

Dear Shaun:

I am in receipt of your letter to Frank Sanchez, dated November 3, 2004 ("Letter"), regarding the ALS-COM / OSCAR Project ("Project") and the related Master Software License Agreement between Fidelity Information Services, Inc. ("Fidelity") and Toyota Motor Credit Corporation ("TMCC") ("Agreement").  The purpose of this letter is to respond to the issues addressed in your Letter.


Phase 1 (also referred to as Release 1 or Data Entry and Decisioning Phase)

Thank you for your acknowledgement that Toyota Financial Services ("TFS") has accepted Phase 1 of the ALS-COM software.

In your Letter, you asked that Fidelity focus its near term efforts exclusively on correcting Phase 1 defects ("bugs") and implementing Phase 1 Program Change Requests ("PCRs").  As part of the agreed to process for implementing change to the ALS-COM software, TFS has control over the prioritization of PCRs including those associated with Data Entry and Decisioning functionality.

The approach that Fidelity will continue to adhere to is the following:

1.    To promote high quality results, TFS and Fidelity will follow a disciplined process for implementing change to the ALS-COM software.  This process includes TFS approved requirements definitions and functional specifications for each enhancement, methodical software development, change control and testing activities, and orderly promotion to production.

**F 00649**

2.    The next distribution of the ALS-COM software has been identified as "Service Pack E", and is scheduled to be delivered by Fidelity to TFS in January 2005. Change control for Service Pack E was frozen on October 29, 2004, and Fidelity development was completed on November 5, 2004. Service Pack E is now in Fidelity testing prior to delivery to TFS.

3.    "Service Pack F" is the next distribution of the ALS-COM software after Service Pack E. For PCRs to be included in Service Pack F (including Data Entry and Decisioning PCRs), TFS must provide Fidelity with approved requirements definitions and functional specifications by November 12, 2004. This date has been communicated to TFS since early October, 2004. The Service Pack F delivery date will be determined after the content of this distribution is finalized.

4.    The schedule for ALS-COM software distributions after Service Pack F will be mutually determined by TFS and Fidelity.


Phase 2 and beyond

"De-scoping" Service Pack F to include only Data Entry and Decisioning PCRs will delay Fidelity's ability to deliver the functionality described in the Agreement, and will delay Fidelity's correction of defects. Fidelity suggests the following approach:

1.    Service Pack E to contain PCRs and defect corrections as agreed by TFS and Fidelity.
2.    Service Pack F to contain the following:
    Phase 1 ("Data Entry and Decisioning") PCRs and defect corrections;
    Phase 2 ("Discounting") PCRs and defect corrections;
    Phase 3 ("Final Release") functionality ("gaps") described in the Agreement, and PCRs.
3.    Service Pack G to contain any remaining gaps and PCRs according to the terms of the Agreement, and defect corrections.
4.    ES Services to correct defects according to the terms of the Agreement.

This approach can provide TFS the ALS-COM functionality described in the Agreement by mid year 2005, and allow Fidelity to fulfill its obligations under the Agreement at the earliest possible date.


PCR hours

Fidelity has not taken the position that the 5,899 PCR hours described in the Agreement have been fully expended. Of the 5,899 PCR hours described in the Agreement, 3,343 PCR hours have been expended to date, and 2,556 PCR hours remain to be expended. Any PCR hours expended for Service Pack F will be deducted from the currently remaining 2,556 PCR hours.

Fidelity has provided TFS with an accounting of PCR hours on numerous occasions. In addition, Fidelity's invoices to TFS include an accounting of expended PCR hours according to the mutually agreed invoice process for the Project. Fidelity will continue to provide TFS with a periodic accounting of PCR hours as these hours are expended, and will continue to include PCR information on applicable invoices.

**F 00650**

Building the ALS-COM / OSCAR software onsite at TFS

Thank you for agreeing that Fidelity should not change the location of its development and testing activities.  Changing the current location of Fidelity ALS-COM development and testing activities is a significant change in the scope of the Project, and will delay Fidelity's delivery of ALS-COM software distributions to TFS.  Fidelity intends to provide TFS with the functionality and defect corrections described in the Agreement, and to do so at the earliest possible date under the terms of the Agreement.

I believe TFS and Fidelity have made good progress on the Project, and I am confident that we will sustain this progress and complete the Project at the earliest possible date. Please let me know if you have any questions or concerns.

Sincerely,


David Slider

cc:    Frank Sanchez, Fidelity Information Services
       Mike Harris, Fidelity Information Services
       John Fitzpatrick, Fidelity Information Services

F 00651

EXHIBIT 22

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

 

**Shaun J. Coyne**
Vice President and
Chief Information Officer

19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-4393
Fax (310) 381-5484

December 1, 2004
**"VIA OVERNIGHT MAIL"**


Frank Sanchez
President, Strategy &
Product Development Division
Fidelity Information Services
601 Riverside Avenue
Jacksonville, FL 32204

              Re:    ***OSCAR Project***

Dear Frank:

As you well know, performance of the software provided by Fidelity Information Services' (FIS) on the OSCAR project has been unsatisfactory for a number of years.  The project has moved in fits and starts since early 2000 and has consumed more TFS resources (financial and otherwise) than is commercially reasonable or acceptable.  Now, after four plus years of effort and with only one of the three phased deliveries of the functionality deployed, the system continues to show signs of failing.  In fact, TFS will need to replace the entire system.  As your own management has admitted the current system architecture will not support the deployment of the remaining software and certainly will not meet TFS' needs long term.  Your refusal to accept responsibility for this issue and fulfill your contractual obligations to provide a system that meets TFS' needs has left us with no choice but to terminate work on the project, transition support of the system to another vendor and end our relationship with FIS.  Accordingly, the purpose of this letter is to inform you that TFS deems FIS to be in material breach of its obligations and hereby demands that FIS provide the source code and transition assistance as set forth in the various Agreements between FIS and TFS.

More specifically, pursuant to the terms of the Agreements, TFS:

      (1)  rejects the Phase 2 discounting software, as well as any Phase 3 software, pursuant to Section 6.1 of the Master License Agreement, Section 2.1 of the Implementation Statement of Work as amended, and section 5.3 of Product Schedule No. 1 as amended;

      (2) demands release of the source code from escrow pursuant to Section 9.2 of the Master Software License Agreement as amended, Section 4.0 of Product Schedule No. 1 as amended, Section 7.1 of the Source Code Escrow Agreement, and Paragraph 1 of the First Amendment to the Source Code Escrow Agreement;

                                                                    F 00652

(3) <u>demands that FIS provide transition assistance of six people, including Brian McKnight, Brad Martin, Kevin Chin, Adrian Carr, for a period of 60 ("sixty") days to assist in transitioning its maintenance support to a third party vendor</u> pursuant to Section 4.0 of Product Schedule No. 1 as amended, this includes providing assistance with transitioning third party licenses such as Luxor and Blackbook to TFS;

(4) <u>terminates the implementation statement of work</u> pursuant to Section 2.2 of the Services Agreement as amended;

(5) <u>will temporarily continue using the deployed OSCAR software while retaining a third party vendor to maintain the software</u> pursuant to Sections 12.0 and 2.2 of the Services Agreement as amended, Sections 4.3.2 and 6.3 of the Master Software License Agreement as amended, and Sections 1.9 and 5.3.2 of Product Schedule No. 1 as amended;

(6) <u>demands that FIS agree to mediate any disagreement with the above</u> pursuant to Section 15.7 of the Services Agreement (TFS initially selects JAMS/Endispute as the mediation organization).

TFS demands immediate release of the source code. In addition, transition assistance must begin no later than December 6, 2004. TFS has a large potential damages claim as a result of FIS' failure to provide the software as required by the Agreements and reserves all rights to assert those claims in the appropriate forum.

Please respond to this letter as soon as you are able, and in any event, no later than December 6, 2004. If you would prefer, you may have your attorneys contact our attorneys directly. The contact information is as follows:

Katherine E. Adkins
Managing Counsel
Toyota Financial Services
19001 S. Western Ave., EF12
Torrance, CA  90509
310-468-3401

Sincerely,

Shaun Coyne
Vice President & Chief Information Officer
Toyota Financial Services

F 00653

EXHIBIT 23

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-1310

December 13, 2004

Christian Dooder
Fort Knox Escrow Services, Inc.
2100 Norcross Parkway, Suite 150
Norcross, Georgia 30071

Re:    ***Release of the ALSCOM Source Code***

Dear Mr. Dooder:

By this letter, Toyota Financial Services, Inc. ("TFS") requests release of Fidelity Information Systems, Inc.'s ("FIS") ALS-COM software per the attached Source Code Escrow Agreement (as amended) (exhibit A).  The basis for TFS' request is as follows:

a) FIS has been unable to resolve defects in the ALS-COM software in accordance with the procedures established in section 7.0 of Product Schedule No. 1 of its Master Software License Agreement with TFS.

b)As a result of FIS' failure, TFS has terminated FIS' provision of ES services pursuant to section 7.1.5 of Product Schedule No. 1 (as amended) (attached as Exhibit B)

c) Per section 7.1.5 of Product Schedule No. 1 (as amended) and paragraph 1 of the First Amendment to Source Code Escrow Agreement, TFS' termination entitles TFS to immediately receive the ALS-COM software from escrow.

Sincerely,

Katherine Adkins

cc:    Frank Sanchez
      ALLTEL Information Services, Inc.

LA2:744038.1

F 00498

EXHIBIT 24

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*





received
12/27/04



Financial Services

**Shaun J. Coyne**
Vice President and
Chief Information Officer

19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958
(310) 468-4393
Fax (310) 381-5484

December 20, 2004
**"VIA OVERNIGHT MAIL"**

Frank Sanchez
President, Strategy &
Product Development Division
Fidelity Information Services
601 Riverside Avenue
Jacksonville, FL 32204

     Re:   ***OSCAR Project***

Dear Frank:

This letter responds to your letters of December 15 and December 20, 2004. Your letters incorrectly characterize TFS' position and by this letter I will once again clearly state our basis for our actions.

1. The OSCAR architecture will not support deployment of the discounting functionality originally envisioned for the system. As I have explained, Fidelity's own engineers have admitted that this fault exists.

2. We made you aware of this issue at least as early as last July when Microsoft conducted its evaluation of the system.

3. Fidelity has refused to agree to rearchitect the system to cure this fault. You've told me this expressly.

4. Fidelity's refusal to remedy the architecture places Fidelity in material breach of the Master License Agreement which gives TFS the right to terminate the Master License Agreement, which we have done. Our termination for material breach gives us the right to demand software from escrow pursuant to section 9.2 of the Master License Agreement (as amended).

5. The problem with the system architecture also constitutes a "defect" which gives TFS the "Termination remedy" identified in section 7.1.5 of Product Schedule No. 1 (as amended).

6. As you admitted during our meeting last week, TFS and Fidelity have exhausted all of the escalation and cure procedures required to perfect a claim relating to the system architecture issue. You have categorically refused to rearchitect the system. In light of this, any discussion of escalation and cure is simply a red herring.

As to the specific allegations you make in your December 15, 2004, please be aware that TFS disputes each and every one of them. With respect to your specific issue on payments, we will be happy to address this in the context of the coming arbitration proceeding.

Finally, we remain willing to discuss settlement. Unfortunately, we are at an impasse. As I've told you, I will not be able to settle this dispute without a substantial payment from Fidelity. If you are serious about settling, you need to put some money on the table. If you are unwilling to do so, continued "settlement discussions" are pointless.

Sincerely,

Shaun J. Coyne
Vice President & Chief Information Officer
Toyota Financial Services

EXHIBIT 25

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*

Fidelity Information Services                                      Timothy P. Keil
4001 Rodney Parham Road, Little Rock, AR 72212 501.220-5458 fax 501 220-4034        Senior Vice President,
                                                                  Division Counsel



December 23, 2004

Mr. Shaun J. Coyne
Vice President and Chief Information Officer
Toyota Financial Services
19001 South Western Avenue
P.O. Box 2958
Torrance, CA 90509-2958

        Re:  OSCAR Project

Dear Shaun:

On the afternoon of December 20th , there occurred a conference call among the attorneys for
Toyota, Fidelity and the escrow agent in which Toyota requested the escrow agent to file a lawsuit
on or before December 30, 2004 to determine whether the escrow agent is required to release
Fidelity's software source code to Toyota.  In this call, Toyota indicated that it needed this
accelerated legal action because, as a result of Toyota's own termination assertion, it claimed to
feel vulnerable to Fidelity discontinuing providing support and maintenance services.

By this letter, I want to confirm that Fidelity will continue to provide Toyota with ongoing support
and maintenance services for the ALS-COM software pursuant to our agreements.  As previously
indicated to you, it is Fidelity's intention to continue to honor all of its contractual obligations.


 Sincerely,



Frank R. Sanchez
President Leveraged Product Development Division
Fidelity Information Services, Inc.

cc:  Katherine Adkins
      Toyota Financial Services

EXHIBIT 26

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



-----Original Message-----
**From:** Christine_Gallucci@toyota.com [mailto:Christine_Gallucci@toyota.com]
**Sent:** Thursday, January 06, 2005 7:01 PM
**To:** Gillis, Randy; Barker, Carlon A
**Cc:** Lynn_Cahill-Buss@toyota.com; Katherine_Adkins@toyota.com
**Subject:** FNF Communication re: Delivery of Patch E


Randy,  The involvement of Fidelity in the OSCAR project has been terminated pursuant to a letter from Shaun Coyne to Frank Sanchez on December 1, 2004.  Please direct any further correspondence to our inhouse counsel, Katherine E. Adkins at 19001 S. Western Ave., Torrance, California 90509; telephone number 310-468-3401.


----- Forwarded by Lynn Cahill-Buss/Vendors/Toyota on 01/06/2005 04:48 PM -----

| | | |
|---|---|---|
| **"Gillis, Randy" <Randy.Gillis@fnf.com>** | To: | <lynn_cahill-buss@toyota.com> |
| 01/06/2005 01:21 PM | cc: | <christine_galucci@toyota.com>, "Barker, Carlon A" <Carlon.A.Barker@fnf.com> |
| | Subject: | Service Pack E is available |


On September 30, 2004; Fidelity and Toyota Financial Services agreed to the timeline and content governing Service Pack 'E'. Per this agreement, Fidelity undertook and completed the following efforts:

11/05/2004      Completed R&D coding of enhancements and defect resolution
11/30/2004      Completed QA test cycle 1
12/16/2004      Completed QA test cycle 2
12/30/2004      Completed QA test cycle 3
01/05/2005      Completed Roll back testing cycle 3
These efforts include the mutually agreed upon qualitative and performance attributes for all service packs.

Fidelity has therefore provided all required documentation and code for this service pack according to commonly used practices for software delivery (i.e. we have posted it to the FTP site). We have Gary Lau on standby to assist in the implementation of this service pack pending your approval as usual.

This service pack contains all mutually agreed content including ACRM rule processing architecture changes. This was the final item remaining from the architectural changes specified by the Microsoft consultant in the 07/28/2004 document delivered to TFS by Microsoft and completes Fidelity's delivery of all Microsoft recommendations.

EXHIBIT 27

*(Opposition to Ex Parte Application for a Temporary Restraining Order)*



-----Original Message-----
**From:** Gillis, Randy
**Sent:** Monday, January 10, 2005 18:51
**To:** Fitzpatrick, John R
**Cc:** Martin, Brad
**Subject:** FW: OSCAR Maintenance Build -Tuesday-Thursday, January 11-13 @ 8:00 pm Pacific Time

FYI

    -----Original Message-----
    **From:** Jose_Dalton@Toyota.com on behalf of tfs_support_team@Toyota.com
    **Sent:** Mon 1/10/2005 4:52 PM
    **To:** TFS-OSCAR-Users@toyota.com; tfs-oscar-users1@Toyota.com; tfs-oscar-user2@Toyota.com
    **Cc:** TFS-OSCAR-DSOM@toyota.com; TFS-BTS-OSCAR-Team@toyota.com; TFS_CM@Toyota.com;
    TFS_Tech_Ops@Toyota.com; tfs_ess_team@Toyota.com; TFS_BTS_Support_Team@toyota.com;
    TFS_NOW1@Toyota.com
    **Subject:** OSCAR Maintenance Build -Tuesday-Thursday, January 11-13 @ 8:00 pm Pacific Time

    All:

    Please be advised that we are conducting an OSCAR maintenance build within
    the production environment spanning across 3 days, Tuesday to Thursday,
    January 11-13 at 8:00 pm Pacific Time. These builds are required to apply
    the most recent Microsoft security patches to all OSCAR production terminal

    servers. In support of this build to production, we request that all users
    be off of the system by 8:00 pm Pacific Time, tomorrow, Tuesday to
    Thursday, January 11-13.

    Thanks very much for your assistance.

    For any questions or concerns, please contact the TFS Help Desk at
    866-TFS-NOW1 (866-837-6691), Email address: TFS_NOW1@Toyota.com, HelpNow:
    https://tfsnow1 .