UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IRON MOUNTAIN INTELLECTUAL
PROPERTY MANAGEMENT, INC.,

        Interpleader-Plaintiff,

v.

FIDELITY INFORMATION SERVICES, INC.,
f/k/a ALLTEL INFORMATION SERVICES,
INC., and TOYOTA MOTOR CREDIT
CORPORATION,

        Interpleader-Defendants.

C.A. No. 05 CV 10018-RGS

## DECLARATION OF JOHN VAUGHAN

I, John Vaughan, hereby depose and state as follows:

1.     I have been involved with the Toyota Motor Credit Corporation ("Toyota") ALS-Comprehensive Origination Management ("ALS-COM") project since May 2001. From May 2001 through January 2003, I was the general manager for the ALS-COM product, which is the core Fidelity software used in the OSCAR project. From January 2003 through May 2003, I performed product strategy duties for consumer lending. From June 2003 through October 2004, I was the Toyota Account Manager at Fidelity. My duties as Toyota Account Manager included oversight of all Fidelity activities related to the Toyota account and the ALS-COM project.

2.     I base this declaration upon personal knowledge and a review of business records.

### "Architecture" and "Crashes"

3.     I have reviewed the Declaration of Christine Gallucci. That declaration at least implies that there is a relationship between (a) earlier purported system "crashes" (more

# 2523565_v10

technically stated, "system-wide outages") and (b) the claimed inadequacy of the ALS-COM system architecture. Ms. Gallucci also claims that the ALS-COM product and its architecture are "inadequate." Both claims are incorrect.

4.  The ALS-COM product delivered by Fidelity meets or exceeds all performance standards specified in the parties' agreements. Further, the system architecture fully supports the functionality of the product and is precisely the same architecture the parties agreed upon in writing.

### ALS-COM Architecture

5.  The term "architecture" has different meanings, depending on context. "Network architecture" refers to the underlying structure of a computer network, including hardware, functional layers, interfaces, and protocols, used to establish communication and provide the reliable transfer of information. "Architecture" also refers to the physical construction or design of a computer system and its components. "Architecture" also can refer to the design of application software, incorporating protocols and the means for expansion and interfacing with other programs.

6.  The fundamental architecture of the ALS-COM software can be described as follows. The software application is based on a traditional architecture, common on local area networks (LANs), whereby the application processing takes place physically at the client, such as a desktop PC, and not at the server. This architecture is sometimes referred to as a "thick client" architecture because the software processing takes place at the client.

7.  A contrasting architecture is a so-called "thin client" architecture. This architecture is used in web-based applications, and here the application processing takes place physically at the server, and not on the client.

8. Software that is based on a "thick client" architecture can achieve a "thin client" implementation through the use of so-called "terminal servers." These servers sit between the client and the server and host the application processing that would otherwise take place on the client. After completing the processing, the terminal server forwards the results to the client. The application processing does not take place at the client, and the client is now, in effect, a "thin client."

9. The ALS-COM software employs terminal servers in this manner, and its architecture for deployment in the OSCAR system relies on terminal servers to provide a thin client to end-users' desktops.

**The Parties Discuss, And Toyota Agrees To, The Architecture Contained in ALS-COM**

10. In 2002, after the parties determined to recommence the OSCAR project, they structured a "go forward" strategy. Part of this strategy included a joint review of the architecture of the ALS-COM system. *See* Exhibit 7, Project Charter, §1.1 at 1

11. As part of this architecture review, Randy Gillis and I, among others, attended a meeting in Jacksonville, Florida on February 28, 2002 before the current operative agreements were signed. At that meeting, Shaun Coyne from Toyota raised the possibility of changing the ALS-COM architecture by migrating it to a web-based application without a terminal server structure.

12. We discussed the positive and negatives associated with that approach. We also offered to accelerate our evaluations of a web-based architecture and come up with a Toyota-specific plan for migration if Toyota was willing to participate in funding the effort. We also stated that the effort would extend the timeframe for delivery of business functionality to Toyota.

13. At that time, Mr. Coyne stated that the priority needed to be placed on delivering functionality to the business and not replacing the architecture. Consequently, the agreements

were drawn up for the project to deliver the functionality on the existing software architecture, which employed the use of terminal servers.

14. The Second Amendment to Implementation Statement of Work ("Statement of Work") controls the scope of work for the OSCAR project. The Statement of Work provides that "[t]he architectural design of ALS-COM including Gap Requirement customizations will comply with the Production Hardware Configuration Guide attached hereto as Appendix L." *See* Exhibit 4, Second Amendment to Implementation Statement of Work, §3.2 at 3.

15. The architecture, and the terminal servers, are illustrated graphically in Appendix L to the Statement of Work. This graphic is entitled "Network Diagram." *See* Exhibit 4, Appendix L,, at 7.

16. Appendix L also describes the precise architecture involved. It states that the Terminal Server "runs the ALS-COM Client," and that the end-user's workstation "runs the Microsoft Terminal Server client software" and does not run the ALS-COM application. *See* Exhibit 4, Appendix L, at 1, 4.

17. In addition, after the Statement of Work was executed, the parties spent additional resources discussing and evaluating the ALS-COM architecture to prepare the project's formal Project Charter. The Statement of Work requires that "[a]t the commencement of each subsequent Phase of the Project, new documents will be prepared, including a ... Project Charter." *See* Exhibit 4, §3.1 at 2-3.

18. As required by the Statement of Work, the parties completed a detailed Project Charter. A true and accurate copy of this charter is included as Exhibit 7. Among other components, the Project Charter lists "project constraints," with the term "constraint" defined to

mean "[a]pplicable restrictions that will impact the performance of the project. Any factor that determines the schedule of an activity." *See id.,* §5, at 34.

19. Listed as one of the Project Constraints is the agreed fact that "[t]he team will need to work within the architectural boundaries of ALS-COM system." *See id.,* §3.11 at 16.

20. Finally, the Project Charter gives Toyota the responsibility for preparing a description of the overall system architecture, placing Fidelity's ALS-COM software and its architecture within Toyota's full framework. *See id.,* §3.9.1 at 12, and Appendix A at 45.

21. Toyota itself prepared, and circulated to Fidelity, a network diagram showing the full system architecture. *See* Exhibit 11. This network diagram shows the ALS-COM terminal servers (in the bottom, middle).

22. Toyota well-understood the ALS-COM system architecture from the time it first entered into the operative agreements, and understood that the architecture employed terminal servers.

### Development, Testing, Acceptance and Deployment Process

23. The parties' agreements are structured with a typical development, testing, acceptance, and deployment process. *See* Exhibit 5, First Amendment to Master Software License Agreement, §6.2 at 3-4; Exhibit 6, First Amendment to Product Schedule No. 1, §5 at 3-5.

24. The agreements also provide for detailed error correction procedures both before and after Toyota has accepted or provisionally accepted a deliverable. *See* Exhibit 5, §7.1 at 5-6; Exhibit 6, §7.0 at 6-9.

25. Finally, the agreements provide performance standards against which to judge the ALS-COM software, as delivered to and installed by Toyota. Specifically, the agreements provide (a) that the software shall be available 98% of Toyota's normal business hours, and

(b) that the system shall process 600 credit applications per hour, from initiation through final decision, for a standard volume. *See* Exhibit 6, §§7.3 and 7.4 at 8; *see also* Exhibit 6, Attachment 2, §5 at 15.

26. The ALS-COM Software Availability requires that the system be available 98% of Scheduled Uptime per month. The term "Scheduled Uptime" is defined to mean "that period of time during which the ALS-COM software is made available ... for normal business use." *See* Exhibit 6, Attachment 2, §§1 and 4. This standard translates to excusable unscheduled downtime of approximately 12.6 hours per month, based on a 21 hour "normal business use" day.

## History of Project

27. The ALS-COM project was divided into three phases. Phase 1 included data entry and decisioning functionality, enhancements (called "gaps" for the project), and change requests (PCRs). Phase 1 was designed to allow dealers to send loan applications into the system and receive automated decisions within 2 minutes.

28. Phase 2 included so-called "discounting" functionality, gaps, and change requests. "Discounting" refers to the steps Toyota finance personnel complete when they provide terms on a loan. Phase 2 was designed, in part, to automate those steps. Phase 3 was a catch-all for lower priority enhancement gaps and remaining change requests.

## Phase 1

29. Toyota accepted Phase 1 of the software provisionally in March, 2003. A true and accurate copy of this acceptance is included as Exhibit 8. Toyota provided final acceptance of Phase 1 in August 2003 after the referenced issues had been resolved under the contracts' procedures, and paid the final holdback invoice as of October 31, 2003. True and accurate

copies of Toyota's email acceptance and evidence of its final payment on Phase 1 are included as Exhibits 9 and 10.

### Phase 2

30. During Toyota's acceptance testing of Phase 1, Fidelity continued with the development of Phase 2. During development, the scope of Phase 2 changed materially due to Toyota's request that Fidelity include functionality in Phase 2 for Toyota's so-called "Route One" project. Route One was designed to facilitate further electronic communications in the auto finance industry. Fidelity included this change request for Route One in Phase 2.

31. After completing its internal performance validation testing, Fidelity delivered Phase 2 code in September, 2003 and November, 2003. After the November 2003 delivery, Toyota began its acceptance testing.

32. In May, 2004, Toyota put the Phase 2 code base into production in order to utilize Route One functionality. Toyota chose not to activate the remaining Phase 2 discounting functionality at that time.

33. Ms. Gallucci identifies a series of outages during the period of March through May, 2004. At this point, only the Phase 1 code base was in production. Presented with the number of potential root causes, the parties discussed obtaining outside independent consultants. As a result, among other consultants, Microsoft was engaged by Toyota in 2004 to evaluate the OSCAR system as a whole and make recommendations.

34. I have reviewed Ms. Gallucci's claims that I said that Fidelity "would not voluntarily hire Microsoft to assess the problems." This statement is inaccurate. We welcomed Microsoft's involvement, although it was only a part of a bigger system review, which at various times included personnel from Toyota, Fidelity, Microsoft, Compuware and EMC.

35.     After completing their evaluations in late May, 2004, the consultants identified a number of contributing root causes. These included: (i) the Toyota database server did not meet specifications provided by Fidelity in the hardware configuration guide; (ii) the server configuration tuning for failover was improperly set; (iii) Toyota needed to install Microsoft software service packs; (iv) the drives used within the SAN for the database were substandard; and (v) the ALS-COM software should be performance tuned.

36.     In May 2004, Fidelity implemented a plan that was based on the consultant's findings and recommendations, including those set out in the Microsoft report.

37.     The plan involved a series of service packs to improve performance and address other identified issues. Each service pack resulted in improved system performance. Fidelity has implemented all ALS-COM performance enhancements recommended by the consultants, including by Microsoft in its report (*see* Exhibit 13), with the exception of the "longer term" architectural changes identified in the Microsoft report, which fall outside the parties' Agreements.

### Performance

38.     The ALS-COM system, as installed and running in Toyota's production environment, meets or exceeds all contractual performance standards, and Toyota has provided no data to suggest otherwise.

39.     Although the system is meeting all contractual performance standards, Toyota recently began to request that the ALS-COM system meet additional requirements, which can be grouped under the heading of the "5-second performance requirements." These are a series of eight metrics that do not appear in the parties' agreements, but that Toyota has sought to impose on Fidelity. Toyota has taken the position that these additional performance measures can be

met if Fidelity were to undertake a re-architecture of the ALS-COM system to convert it to a web-based architecture without terminal servers.

40. On August 4, 2004, Sheila McCartney, Randy Gillis and I spoke with Dean Shold, Doriene Viera and Christine Gallucci from Toyota via conference call to discuss the fact that our development plans did not include a re-architecture of the system. Fidelity stated that the intent was to address any performance issues on the current technology stack, which had an estimated longevity of 2010. We informed Toyota that we would address any contract-based performance issues, but any other changes would need to be approved through a funded change request.

### Alleged Statement Concerning Architecture

41. I have reviewed Ms. Gallucci's declaration, in which she claims that I stated that the "current architecture would not support the Release 2." Although Ms. Gallucci tried to get me to make that statement, I never did. Such a statement would be incorrect. Further, no one from Toyota "presented" me with Microsoft's findings, as Ms. Gallucci also suggests.

Signed under the penalties of perjury this __14__ day of January, 2005.

_____
John Vaughan