UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC., <br><br> Interpleader-Plaintiff, <br><br> v. <br><br> FIDELITY INFORMATION SERVICES, INC., f/k/a ALLTEL INFORMATION SERVICES, INC., and TOYOTA MOTOR CREDIT CORPORATION, <br><br> Interpleader-Defendants. | C.A. No. 05 CV 10018-RGS |

## DECLARATION OF DAVID SLIDER

I, David Slider, hereby depose and state as follows:

1. I am Senior Vice President and Managing Director of the Automotive Finance Division of Fidelity Information Services, Inc. ("Fidelity"). I have held the position of Senior Vice President and Managing Director since February, 2003. In the summer of 2003, my Automotive Finance Division assumed responsibility for Fidelity's relationship with Toyota in connection with the OSCAR project. The OSCAR project is a Toyota project that Fidelity participates in through delivery of its ALS-COM software asset and related services. The ALS-COM software and Fidelity's role are only a part of the overall Toyota OSCAR project.

2. My responsibilities in relation to the OSCAR project include managing Fidelity's overall performance of its contractual responsibilities, providing executive level contact with appropriate Toyota management personnel, providing general direction of Fidelity personnel engaged with Toyota on the OSCAR project, and growing Fidelity's relationship with Toyota.

# 2530224_v5

3.      I base this declaration upon personal knowledge and a review of the business records of Fidelity.

## Fidelity Information Services

4.      As a subsidiary of Fidelity National Financial, Fidelity has clients in more than 50 countries and territories. Fidelity provides application software, information processing management, outsourcing services and professional Information Technology ("IT") consulting to the financial services and mortgage industries, including core banking applications, retail and consumer lending and servicing solutions, automotive finance solutions, commercial lending, and mortgage lending and servicing solutions.

5.      Fidelity has 40 years experience in IT for the banking, financial services and outsourcing industries.

6.      Fidelity has over 7,000 employees.

7.      Fidelity IT systems and supporting business processes are at the foundation of some of the world's most successful financial services organizations. Forty-six of the top 50 U.S. and 24 of the top 50 global financial services organizations rely on Fidelity software products and services. Fidelity services seven of the top 10 consumer lending and nine of the top 10 mortgage lending organizations in the United States. Fidelity provides loan servicing automation and account processing for more than 24 million mortgage loans a year, representing 40% of all residential mortgage loans nationwide, with balances exceeding $3 trillion. More than 114 million deposit accounts are processed on Fidelity's deposit systems. Fidelity's Advanced Commercial Banking System's commercial lending clients arrange nearly half of the world's syndicated loans. Fidelity's software processes over twenty million automotive loans and leases.

8.  Fidelity has completed more than 16,000 successful software and systems conversions for clients since 1968.

## ALS-COM Performance

9.  Fidelity licenses a suite of software products directed to the loan process and workflow used by these organizations. One product within that suite is Fidelity's ALS Comprehensive Origination Management ("ALS-COM"). ALS-COM is used by clients in the origination of loans. The stages of loan process workflow encompass origination, servicing and collections. The ALS-COM product must be integrated with a client's other loan processes and systems to facilitate and work within the client's workflow. The ALS-COM software supplies the strategic integration of a retail loan origination system with multiple servicing and information systems.

10. The ALS-COM project is divided into three phases, with the majority of originally agreed-upon functionality in Phase 1. Toyota gave final acceptance to Phase 1 of the system in 2003. Fidelity completed its Phase 2 development work and performance validation testing, and made final delivery of this Phase 2 software in November, 2003. Toyota moved the Phase 2 software into production in May, 2004. Toyota elected to implement the Phase 2 software using part of the original Phase 2 functionality, and using new "Route One" functionality that Toyota had requested as a change order.

11. Toyota is successfully using the ALS-COM software.

12. Toyota's largest Dealer Sales and Service Office ("DSSO" or "branch") is located in Los Angeles, California and is known as "LA South." The OSCAR software was implemented in the LA South branch in mid-November, 2004 (just before Toyota claimed to terminate the agreements in its letter dated December 1, 2004). LA South was the last Toyota DSSO to implement the OSCAR software, and all Toyota branches are now using the OSCAR

software. Approximately ten percent of Toyota's origination volume comes from LA South. Fidelity is not aware of any issues or problems arising out of the launch of the OSCAR software at the LA South branch.

13. Fidelity's ALS-COM product is meeting or exceeding the performance standards and technical requirements as set forth in the Agreements, and Toyota has not communicated empirical performance data to Fidelity that demonstrates that the software does not currently, or will not in the future, meet the performance standards as described in the Agreements.

### Communications Leading to Purported Termination

14. Beginning in August, 2004, Toyota began sending letters to Fidelity purporting to raise complaints concerning the OSCAR system. As outlined below, when Fidelity responded by pointing out the stage of Toyota's acceptance and the performance of the OSCAR system, and by referencing the parties' contractual obligations, Toyota changed the nature of its stated complaints.

15. Toyota first claimed that purported defects in Phase 1 provided it grounds to change the parties' existing contractual obligations. In a letter from Shaun Coyne to Frank Sanchez dated August 10, 2004, Toyota asserted that Phase 1 of the project had not been completed, and claimed a right to reject Phase 1 in its entirety. A true and accurate copy of this letter is included as Exhibit 14.

16. To "remedy" the situation, Toyota requested that Fidelity focus its efforts on Phase 1. Fidelity explained that Toyota had provided final acceptance of Phase 1 in 2003, and that remedying the minor defects at issue was governed by the parties' existing Agreements.

17. Toyota followed its August 10, 2004 letter with further letters where Toyota repeatedly incorrectly described the OSCAR project as still being in Phase 1. True and accurate copies of those letters are included as Exhibits 16 and 17. Fidelity continued to explain that,

under the terms of the agreements, acceptance of Phase 1 (which was placed into production at Toyota in March, 2003) placed the OSCAR project into Phase 2. Finally, in a letter from Mr. Coyne to Mr. Sanchez dated November 3, 2004, Toyota acknowledged that Toyota had accepted Phase 1. A true and accurate copy of this letter is included as Exhibit 20.

18. In the summer of 2004, Toyota requested that Fidelity re-architect the system. On August 20, 2004, Mr. Sanchez and Mr. Coyne met together in Torrance, CA. Also present were John Fitzpatrick and myself from Fidelity, and Doriene Viera and Christine Galluci from Toyota. John Vaughan (Fidelity) was on the phone, and Dean Shold (Toyota) was on the phone. The subject of the meeting was how Toyota and Fidelity could move forward together and complete the Fidelity deliverables associated with the OSCAR project. During the meeting, Toyota indicated that it wanted Fidelity to implement significant strategic architectural changes to the OSCAR system to convert the software to a new architecture .

19. Fidelity stated, as we had in the past, that implementing this change would require an extensive re-write of the OSCAR code base, that this work was outside the parties' present agreements, and that Toyota would therefore need to financially participate in these architecture changes. Mr. Coyne responded by stating that Toyota would not pay Fidelity any more money.

20. After this meeting, in late September, Mr. Coyne requested twice in writing that Fidelity move its development work on site at Toyota's facility, provide training to a third party Indian programming firm named Wipro, and focus all programming resources on claimed "Phase 1 defects." *See* Exhibits 16 and 17.

21. In response to Mr. Coyne's request, a series of meetings were held in October of 2004. Those meetings included Michael Harris and myself from Fidelity and Dean Shold, Doriene Viera, Christine Galluci and others from Toyota. In each Fidelity response, both written

and verbal, Fidelity told Toyota that Fidelity would be willing to consider making the program changes to accomplish Toyota's objectives, but stated that the requested changes were not within the scope of the agreements, and therefore the agreements would need to be modified to reflect those changes. Toyota never agreed to modify the agreements and commercial arrangements to accomplish Toyota's desired program changes.

22. In a letter dated November 3, 2004 from Mr. Coyne to Mr. Sanchez, Toyota withdrew its request to move programming onsite and made a number of factually incorrect statements regarding the status of the project. I corrected those statements in a letter to Mr. Coyne dated November 11, 2004. True and accurate copies of this correspondence are included as Exhibits 20 and 21. I explained that Phase 1 was complete and accepted by Toyota, and that Phase 2 and Phase 3 would be complete by an estimated date of mid-year 2005. At that time, Fidelity would have completed its contractual obligations, and any further project work requested by Toyota would constitute change controls outside the scope of the current agreements.

23. In a letter from Mr. Coyne to Mr. Sanchez dated December 1, 2004, Toyota first formally asserted that Fidelity was in breach of its obligations under the agreements. A true and accurate copy of this letter is included as Exhibit 22. In this letter, Toyota provided no specific facts to support its assertion that the ALS-COM software failed to meet Fidelity's contractual obligations. The agreements contain performance standards for the ALS-COM software that are specific, and that allow performance measurements based on objective, reproducible data. Toyota chose not to provide any such performance data.

24. In correspondence between Toyota, Fidelity and Iron Mountain dated December 13, 2004, whereby Toyota requested the release of Fidelity's source code from escrow, Toyota

stated that its claim of breach was based on claimed, so-called Phase 1 defects. A true and accurate copy of this letter is included as Exhibit 23.

25. In contrast, however, a December 20, 2004 letter from Mr. Coyne to Mr. Sanchez, Mr. Coyne cites "architecture" as the reason for Toyota's breach claim. There is no mention of Phase 1 defects. A true and accurate copy of this letter is included as Exhibit 24.

26. In the Declaration of Christine Galluci, dated January 6, 2005, there is no mention of Phase 1 defects as the basis for Toyota's claim of non-performance by Fidelity. Instead, Toyota asserts that "system architecture" is the basis for its claim of breach.

27. In the time between December 1, 2004 and January 6, 2005, Toyota's stated basis for claiming that Fidelity is not performing has progressed from claims of delay, to claims that Phase 1 contains defects, and finally to claims that the system must be re-architected.

28. Through communications between August and the end of December, 2004, it became apparent either (i) that Toyota management did not understand the correct status of the project, what software Toyota had accepted, the number of hours that Fidelity had remaining to perform on the project, the process for prioritizing enhancements and defect corrections, and the estimated date that Fidelity would conclude its obligations under the agreements; or (ii) that Toyota sought to obtain more than the parties had agreed upon under the Agreements.

## Continued Service and Support

29. Fidelity has consistently articulated, in writing and verbally, its willingness and intention to perform its service obligations under the agreements. True and accurate copies of one of these letters expressing this willingness is included as Exhibit 25.

30. Fidelity has continued to provide support services and software development services, to the extent possible, as agreed by Toyota and Fidelity. For example, Fidelity

delivered to Toyota, on January 6, 2005 as scheduled, "Service Pack E" containing certain performance enhancements, support bug-fixes, and other agreed-upon content.

31.  Fidelity has not disbanded and reassigned its Toyota team to other projects, nor has it reallocated any assets dedicated to the Toyota project.

32.  Toyota has unilaterally discontinued project communication with Fidelity.

## Toyota Management

33.  The OSCAR project has been beset by significant Toyota mismanagement of its obligations under the Agreements. As discovered during the performance improvement effort, the Toyota controlled operation of the OSCAR system was fraught with serious shortcomings that contributed to the performance issues that occurred in 2004. Significant turnover in Toyota project leadership that occurred in late 2003 lead to a loss in project execution discipline. For example, beginning in 2004 Toyota stopped holding project steering committee meetings, which are contractually specified and important to the proper running of a large scale project like OSCAR. Management of project scope has utterly failed, and change requests have gone out of control. Having apparently forgotten the terms to which they previously had agreed, Toyota management began demanding changes and enhanced performance criteria, including faster response times, that well exceeded any contract requirements. When Fidelity refused to provide these upgrades for free, Toyota started to claim a breach.

## Project Costs; Outstanding Invoices

34.  Under the terms of the agreements, the OSCAR project is under the control and direction of Toyota. For example, Toyota sets the priority for when new releases are implemented, manages the operation of the software in Toyota's data center, decides which issues and defects it wants Fidelity to prioritize, determines functional enhancements to the software, and provides project management oversight.

35. Toyota is one of the largest industrial concerns in the world. They are a large and sophisticated buyer of IT software and services, as indicated by the complex and heavily negotiated agreements between the parties. Prior to entering into the agreements, Toyota performed extensive due diligence on the architecture of the system.

36. The architecture of the system as delivered, accepted and in production is in compliance with the architecture of the system as described in the agreements and agreed to by Toyota.

37. Fidelity has delivered the ALS-COM software to the OSCAR project in accordance with the terms of the agreement and at the direction of Toyota, and the software meets or exceeds all technical requirements and contract terms in the agreements.

38. Toyota is obligated to pay to FIS an estimated additional $3.2 million through the end of the project. This $3.2 million figure includes currently past due amounts Toyota owes Fidelity that have been invoiced to it. I understand that Toyota has approved at least four invoices but nevertheless has not paid them.

### Source Code

39. The basis for Fidelity's business is its unique and proprietary intellectual property, principally in the form of its software assets. Fidelity's core software asset is its source code and related documentation.

40. In the agreements, Toyota acknowledges the value and trade secret nature of Fidelity's software. For example, in the Master Software License Agreement, Toyota "acknowledges that the Software and Documentation constitute valuable assets and trade secrets of [Fidelity]." Exhibit 3, §5 at 2.

41. In the Services Agreement, Toyota similarly "acknowledges and agrees that any and all specifications, applications, routines, subroutines, systems, programs, formulae, software

and discoveries, which are provided, developed or created in whole or in part by [Fidelity] in the performance of [Fidelity's] duties under this Agreement ... are and will be the sole and exclusive property of [Fidelity], and will constitute valuable trade secrets of [Fidelity]." Exhibit 1, §10.1 at 6.

42.    Fidelity National Financial, Inc. ("FNF") acquired ALS-COM through its acquisition of Alltel Information Services, Inc. ("AIS"), which was later renamed 'Fidelity Information Services, Inc." Fidelity has invested millions of dollars in the development of the ALS-COM product, including approximately $18 million in enhancements to the product for the Toyota engagement alone.

43.    Due to the sensitive and extremely valuable nature of the source code for the project, the agreements between Toyota and Fidelity provide for Toyota to receive the object code for the ALS-COM software. Object code licenses are the customary method by which Fidelity licenses the ALS-COM and similar software. The only exception is the case of one international customer for whom Fidelity granted a source code license. The object code for the ALS-COM software is the code in production at Toyota today. While Toyota potentially could have licensed the source code, the fees would have been substantially more than an object code license.

Signed under the penalties of perjury this 14th day of January, 2005.

_____
David Slider

# 2530224_v4                                  10