UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC.<br><br>       Interpleader-Plaintiff,<br><br>v.<br><br>FIDELITY INFORMATION SERVICES, INC., f/k/a ALLTEL INFORMATION SERVICES, INC., and TOYOTA MOTOR CREDIT CORPORATION,<br><br>       Interpleader-Defendants. | Civil Action<br>No. 05-10018-RGS<br><br>**Request for ex parte consideration** |

## REPLY TO INTERPLEADER-DEFENDANT FIDELITY INFORMATION SERVICES' RESPONSE TO TOYOTA FINANCIAL SERVICES' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Fidelity's opposition to TFS' Application for a Temporary Restraining Order fails to articulate any legitimate basis for denying TFS access to the OSCAR software. When the dust settles on Fidelity's obvious attempt at obfuscation, the following two dispositive facts remain:

- TFS, with the help of Microsoft, identified a legitimate problem with the ALS-COM architecture.

- Fidelity refused to fix this problem (although Fidelity has offered to fix the problem for its other customers).

Under the contracts, these facts create an Impact Event which entitles Toyota to access the OSCAR software.

I.  **TOYOTA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM**

As TFS detailed in its application, the Agreements give TFS the right to recover the OSCAR software from escrow if TFS identifies a material defect with OSCAR that Fidelity refuses to remedy. The parties drafted the Agreements this way so that TFS could support OSCAR while the parties resolved their disputes in a subsequent arbitration proceeding. Since TFS has identified a material defect and Fidelity has refused to remedy that defect, TFS will likely succeed on the merits of its claim for the release of software from escrow.

The Agreements also give TFS the right to recover the OSCAR software from escrow if Fidelity discontinues support for OSCAR. Although Fidelity has been a bit unclear on this issue, Fidelity's latest position is that it no longer has the obligation to support OSCAR. *See, e.g.*, Fidelity Opp. at 14 ("Mr. Keil never made the statement . . . that statement hardly constitutes a statement of intent . . . Mr. Keil's statement happens to be correct.").[1] Since Fidelity has terminated its support, TFS will, again, likely succeed on the merits of its claim for the release of the software from escrow.

A.  **The Architecture Problem is a Real Problem and Fidelity Has Refused to Fix It**

As detailed in the declarations of Christine Gallucci, and as Fidelity admits in its opposition, Fidelity encountered numerous problems during the deployment of Release 1 of the OSCAR software. Gallucci Decl. at ¶¶ 7-14; Second Gallucci Decl. at ¶3; Fidelity Opp. at pgs 8-9; *see also* Shold Decl. at ¶ 4. With no more that 50% of the functionality deployed, performance was sluggish and the system was prone to crashing. *Id.*; Second Gallucci Decl. at ¶

---

[1] Fidelity has also claimed that it has not reassigned its Toyota team. *See* Fidelity Opp. at pg. 11. This is simply not true. On December 14, 2005, shortly after TFS terminated the agreements and made an initial demand for release of the software from escrow, Fidelity pulled its resources from TFS with an e-mail labeled "**No more on-site activities at Toyota.**" Second Gallucci Decl at ¶ 9.

2

8. TFS brought in Microsoft Consulting to analyze the system and identify the root causes of the problems. Gallucci Decl. at ¶ 13.[2] Microsoft accessed OSCAR and found both fundamental software coding errors and basic architectural flaws. With respect to the architecture, Microsoft:

- Recommended that Fidelity make "*significant architectural changes* that [would] provide a foundation for a more flexible and scalable application." Microsoft Report at 13, Fidelity Exhibit 13. (emphasis added)

- Found that "[t]he client heavy nature of [Fidelity's] application requires large amounts of data to be sent to the application resulting in a significant dependency on network efficiency. *Deploying this application over a wide area network (WAN) would effectively render the application unusable* due to its excessive network utilization and the latency of a WAN." *Id.* (emphasis added)

- Found that "*[s]olving the inefficiencies in [Fidelity's] application requires an improved application architecture.*" *Id.* (emphasis added)

Microsoft also proposed a solution for the ALS-COM problems, namely rearchitecting the system so that it rested on a web-based architecture. *Id.* at pgs. 13 – 15.

Fidelity read the Microsoft Report and agreed that the current ALS-COM architecture would not support the full OSCAR functionality.[3] Gallucci Decl. at ¶ 14; Second Gallucci Decl.

---

[2] Fidelity now disputes that it was unwilling to bring in Microsoft. Several TFS individuals, however, heard Fidelity refuse to undertake this effort. Gallucci Decl. at ¶12; Viera Decl. at ¶ 5.
[3] Fidelity claims in its opposition that TFS expressly agreed to the ALS-COM architecture through the OSCAR Re-launch Plan. Fidelity, however, fails to mention the intent of the parties which is clearly expressed in this document. On page 1, the document indicates that Fidelity was to provide a system that:
- Provided for flexible data access.
- Had the ability to use new technology
- Allowed ease of service configuration changes

3

at ¶ 4; Viera Decl. at ¶ 4; Shold Decl. at ¶ 5. In fact, Fidelity planned to implement the findings of the Microsoft Report by moving all of its ALS-COM projects to a thin-client web-based architecture referred to as Falcon. Second Gallucci Decl. at ¶ 4; Shold Decl. at ¶ 6. After further analysis, however, Fidelity decided that although it would move its main line of products to Falcon, it could not afford to also move the OSCAR project.[4]

### B. The Parties Drafted the Escrow Provisions to Avoid the Type of Gamesmanship Fidelity is Attempting to Employ in this Case

In 2002 the parties amended the Master Software License Agreement to clearly state their intent with respect to the release of software from escrow. Specifically, the parties decided that:

> In the event of [Fidelity's] material breach of this Agreement, [TFS] may terminate this Agreement and, without limiting [TFS'] other rights or remedies, such termination shall be considered an Impact Event as defined in the Source Code Escrow Agreement.

The obvious purpose of this change was to allow Toyota access to the software so that it could support a partially deployed system while the parties resolved a breach of contract claim in arbitration. Without this protection, TFS would never be able to fully and fairly prosecute a claim against Fidelity because it would be beholden to Fidelity to continue to support an on-going system.

---

- Supported roll-out of new products
- Was scalable to meet Toyota's business needs

Fidelity Exhibit 7 at 1. Fidelity, as the expert, assured Toyota that its ALS-COM architecture would provide for these requirements. Now that Fidelity has realized that its own proposed architecture is inadequate, it seeks to reverse the blame onto TFS.

[4] Although the OSCAR project was initially built from Fidelity's ALS-COM code base, in early 2004, Fidelity split off the TFS code into a separate code line. Thereafter, Fidelity maintained two separate code bases: its main code-line (which served its banking customers) and the TFS line. See Viera Decl. at ¶3 ; Shold Decl. at ¶ 3.

4

## II.     TOYOTA WILL BE IRREPARABLY HARMED

Tellingly, Fidelity does not dispute that TFS would suffer incalculable harm in the event OSCAR crashes while TFS does not have access to the OSCAR code.[5]  Instead, Fidelity argues that the Court should not consider TFS' irreparable harm because it is speculative and self-inflicted.  Neither of these claims apply.

Fidelity cites two cases in support of its argument that TFS' irreparable harm is too speculative: *Matos ex rel. Matos v. Clinton School District*, 367 F.3d 68 (1st Cir. 2004) and *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896 (1st Cir. 1988).  These cases, however do not support Fidelity's position since in both cases the courts expressly based their findings on the fact that the harm had not occurred in the past.  *See Matos* at 73; *Rare Coins* at 902.  OSCAR, on the other hand, has a clear track record of crashing.

Fidelity also argues that TFS' irreparable injury is self-inflicted and therefore not cognizable.  Again, Fidelity is simply wrong.  "Equity does not require a plaintiff to acquiesce in the violation of his rights in order to avoid a claim that the injury is self-inflicted."  *A.W. Chesterton Co. v. Chesterton*, 907 F.Supp. 19, 24 (D.Mass. 1995) (emphasis added) (citing *Stewart B. McKinney Found. Stewart B. McKinney Foundation v. Town Plan & Zoning Comm.*, 790 F.Supp. 1197, 1209 (D.Conn. 1992).  *See, also, Murphy v. Zoning Comm. of New Milford*, 148 F.Supp.2d 173, 185 (D.Conn. 2001) (failure to appeal local commissioner's cease and desist order did not bar finding of irreparable harm).

---

[5] Indeed, Massachusetts courts have expressly recognized the type of irreparable harm TFS would suffer. *See, e.g., Computer Associates Int'l, Inc. v. State Street Bank and Trust Co.*, 789 F.Supp 470, 471-472 (D. Mass. 1992) ("I find that State Street is likely to suffer irreparable injury if the injunction is not allowed.  I make that finding on the basis of the following underlying findings.  First, in the absence of maintenance support, the functionality of the Datacom program (and others) is likely to erode .  Second, even if the Datacom program were to remain functional, the Bank and its customers could not continue to rely on the availability of that program.  As a result, the Bank's business and business reputation would be substantially harmed.").

Since TFS will suffer irreparable harm without access to the OSCAR software, the Court should enter a temporary restraining order releasing the software to TFS.

**III.   FIDELITY WILL FACE NO HARM FROM THE ISSUANCE OF THE INJUNCTION**

Fidelity perhaps steps furthest over the line when it argues that it would be harmed by a release of the OSCAR software due to trade secret concerns. As Fidelity well knows, the parties always intended for TFS eventually to have access to the OSCAR code so that TFS could hire a third party to maintain the code. *See* First Amendment to Product Schedule No. 1, Scarsi Decl., Ex. 6. Specifically the parties agreed that:

> "[TFS] may outsource the application maintenance processing . . . of the [OSCAR] Software to a third party Operator. . . . [Fidelity] and [TFS] agree that [TFS'] outsourcing to an Operator of the application maintenance processing . . . of the source code version of the ALS-COM Software, following a release to [TFS] of source code under the Source Code Escrow Agreement . . . shall not be a breach of [TFS'] duties under Section 4 of the Escrow Agreement and shall be permitted by the license provided for under Section 8 of the Escrow Agreement."

*Id.* at pages 1-2.

Fidelity's only other alleged harm is a potential that TFS would unfairly receive an economic windfall. Leaving aside for the moment the legitimacy of this proposition, there is no question that this alleged harm could be completely ameliorated through the posting of a bond.

6

Since Fidelity has failed to show any real harm, the Court should enter a temporary restraining order releasing the software to TFS. *See also*, *Chesterfield*, 907 F.Supp at 22 ("The movant's burden regarding probability of success varies depending on the corresponding harm to the opposing party of issuing the injunction"), citing *A-Copy, Inc. v. Michaelson*, 599 F.2d 450, 451 (1st Cir. 1978).

## IV.   PUBLIC INTEREST UNDISPUTED

Fidelity does not dispute that the public interest favors issuance of the temporary restraining order.

## V.   CONCLUSION

For the foregoing reasons and authorities, TFS' respectfully asks the Court to issue a Temporary restraining Order releasing the OSCAR software from escrow.

Dated: January 18, 2005                    TOYOTA FINANCIAL SERVICES, INC.,

By its Attorneys,

s/David B. Chaffin
BBO# 549245
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
(617) 330-5000

Of Counsel:
Mark C. Scarsi
Timothy M. Martin
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, California 90071-2899
(213) 430-7800